

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMIGRA GROUP, LLC,

                    Plaintiff,

     - v -

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP,
FRAGOMEN, DEL REY, BERNSEN & LOEWY II, LLP,
FRAGOMEN GLOBAL IMMIGRATION SERVICES,
LLC, FRAGOMEN GLOBAL LLP, AND
RYAN MATTHEW FREEL,

                    Defendants.

**COMPLAINT**

**JURY TRIAL
DEMANDED**

07-CV-10688 (LAK) (HP)
ECF CASE

---

Emigra Group, LLC ("Emigra" or "Plaintiff") by its attorneys, Pinnisi & Anderson, LLP, as and for its Complaint, alleges as follows:

**THE PARTIES**

1. Emigra is a Delaware limited liability corporation with its principal place of business in Vienna, Virginia.

2. Upon information and belief:

    a. Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen LLP" or "Defendant") is a Delaware limited liability partnership registered in New York as a foreign limited liability partnership with its principal place of business in New York, New York;

    b. Fragomen, Del Rey, Bernsen & Loewy II, LLP ("Fragomen LLP II" or "Defendant") is a Delaware limited liability partnership registered in New York

as a foreign limited liability partnership, with its principal place of business in
New York, New York;

c.  Fragomen Global LLP ("Fragomen Global" or "Defendant") is a Delaware
limited liability corporation with its principal place of business in New York,
New York; and

d.  Fragomen Global Immigration Services, LLC ("Fragomen Global Immigration"
or "Defendant") is a Delaware limited liability corporation with its principal place
of business in New York, New York;

e.  The above-named Defendants are referred to collectively herein as the "Fragomen
Defendants."

3.      Upon information and belief, Ryan Matthew Freel ("Freel" or "Defendant") is a
resident of the State of Illinois, an attorney admitted to the New York Bar, and an
employee of one or more of the other Defendants named herein.

## JURISDICTION AND VENUE

4.  This action is brought, *inter alia,* pursuant to 15 U.S.C. §§ 2, 15, and 26; and New
York common law.

5.  This Court has jurisdiction over the federal and pendent state law claims in this case
pursuant to 28 U.S.C. §§ 1332, 1337, and 1367.

6.  This Court has personal jurisdiction over Defendants pursuant to federal law and New
York CPLR §§ 301 and 302 because Defendants, personally and/or through their agent or agents,
transact business in the State of New York and in this judicial district; contract to supply services
in the State of New York and in this judicial district; committed tortious acts within the State of

2

New York and in this judicial district; or, own, use, or possess real property situated within the State of New York and in this judicial district.

7.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2), as the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; and pursuant to 15 U.S.C. §§ 15 and 22.

## FACTUAL BACKGROUND

### Fragomen Dominance of Relevant Market

8.  Emigra is a single-source provider of business-related immigration services, offering a wide range of consultation in immigration matters, document procurement, consular processing, and general immigration case management and monitoring, consulting and related services to assist corporations in movement of employees across national borders.

9.  Fragomen Global and Fragomen Global Immigration also are single-source providers of business-related immigration services that are the same and/or substantially the same as those offered by Emigra, and are affiliate companies of Fragomen LLP and Fragomen LLP II.

10. Fragomen LLP and Fragomen LLP II also provide business-related immigration services.  In addition, these Fragomen Defendants provide legal advice and representation in immigration law matters and in other international law matters such as transnational mergers and acquisitions, and import/export and other regulatory compliance.

11. Although separate legal entities, the Fragomen Defendants function as one.  As stated in the Fragomen LLP web site: "Fragomen Global is designed to function as a natural adjunct to Fragomen, Del Rey, Bernsen & Loewy to ensure a coordinated and effective overall representation of immigration matters, regardless of destination."

12. The relevant geographic market for business-related immigration services is global.

3

13.  The clientele for business-related immigration services is primarily large multinational corporations who are major employers of U.S. citizens and foreign nationals. These services are intended to speed and reduce the cost of international employee placements, and effective provision of such services has become an important part of conducting international commerce and domestic U.S. commerce that has an international component. Annual gross revenue in this substantial market for single-source business immigration services is estimated to exceed $100 million.  Business-related immigration services thus comprise and affect both U.S. domestic interstate commerce and international commerce.

14. Upon information and belief, the Fragomen Defendants are the world's largest provider of business-related immigration services.

a.  The Fragomen LLP web site boasts that this Defendant alone "is the leading provider of corporate immigration services and solutions," noting its continuous service in the industry for more than fifty years, and its employment of "over 130 attorneys and over 1000 professional immigration specialists and staff located in more than 30 offices in the Americas, Asia Pacific, and Europe."

b.  That same web site notes the integrated work of Fragomen LLP with other Fragomen Defendants to provide "guidance and assistance to clients on immigration matters for the international movement and relocation of employees and new hires and between countries worldwide."

c.  Upon information and belief, the Fragomen Defendants capture well over three quarters of the world market for single-source business immigration services.

4

15. Upon information and belief, Emigra is the world's second-largest provider of business-related immigration services, and is growing, but it was formed in 2000, it has only about half as many offices as the Fragomen Defendants, and an even smaller relative staff.

16. Upon information and belief, there exist worldwide only two or three other global providers of business-related immigration services, who in combination account for only a few percentage points of the total annual market for such services.

17. Until recent years, no provider was in a position to challenge the Fragomen Defendants' dominance of the world market for these services.

18. Emigra recently has become able to compete effectively with Fragomen on price and other terms, and has won some business that otherwise would have gone to Fragomen.

19. Upon information and belief, it is this recent ability of Emigra that has prompted the Fragomen Defendants, singly and in combination, to engage in unlawful practices that are intended to weaken Emigra before it becomes able to truly challenge Fragomen's global domination of the world market for business-related immigration services.

20. Upon information and belief, if Emigra and others are not protected against unlawful action by Fragomen to restrain trade in this market, the result will be diminished competition, reduction in quality of services, and increases in price for all consumers of immigration services, in the United States and abroad.

21. Emigra conducts substantial business with United States corporations, Defendants' actions complained of here have had a direct and substantial negative impact upon Emigra's ability to service those clients in their conduct of domestic and international trade, and such impact was a reasonably foreseeable effect of Defendants' actions.

## Prior Fragomen Market Dominance Actions

22. Approximately over the past two years, the Fragomen Defendants have engaged in an escalating pattern of activity against Emigra that seems intended to continue Fragomen market dominance by the employment of improper means.  Those actions have included, without limitation:

    a.   Interference with Emigra bidding for new work;

    b.   Interference with Emigra dealings with existing customers;

    c.   Solicitation of key Emigra employees.

23. Examples of each include the causing of a re-bid of a contract Emigra had won, causing a carve-out of a geographic region from a contract Emigra has with a major customer, and recruiting an Emigra director of an Asian office and receiving Emigra trade secrets from that former director and using them to Fragomen's competitive advantage.

24. Emigra believes that Fragomen's recent recruiting and communications with Defendant Freel and the use it has put to information received from Freel, are part of that same pattern of activity, and that those acts constitute an alarming escalation in the nature and consequences of Fragomen's prior anticompetitive activity.

25. This pattern of activity, especially the recent events complained of here, have had a substantial adverse impact upon Emigra's ability to win business, retain customers, retain employees, control costs, and otherwise prosper.  The result has been a slowing of Emigra growth that has directly benefited Fragomen, and that has deprived the general market of the benefits of full and fair competition in this market.

**Acquisition and Use of Emigra Trade Secrets by Freel and Fragomen Defendants**

26. For some time prior to August 2005, Freel was employed by one or more of the Fragomen Defendants.

27. On or about August 16, 2005, Freel commenced employment as Emigra's Vice President of Operations.

28. As Vice President of Operations, Freel was an officer of Emigra and a member of Emigra's highest management team, reporting directly to Emigra's CEO.

29. As Vice President for Operations and as an Officer of Emigra, Freel was in a position of responsibility, trust, and confidence with Emigra.

30. As Vice President for Operations and as an officer of Emigra and otherwise, Freel was granted access to and acquired knowledge of virtually all aspects of Emigra business, trade secrets, confidential information, and other proprietary information, including but not limited to the following: Emigra's strategies to maintain and expand its business, deal with competitors, and satisfy customers;  its methods of pricing and actual pricing, marketing, promotion, and client management;  receivables and collections;  sales figures;  profit and loss figures;  key suppliers;  the number, qualifications, attributes, and salaries of its employees;  the identities, addresses, contacts, plans, histories, and needs of Emigra's customers;  and other forms of confidential information.

31. Emigra has expended great expense and effort over several years to create, develop, compile and maintain its trade secrets, confidential information, and proprietary information and technologies.

32. This above-referenced confidential and proprietary information, developed and compiled through Emigra's efforts, is not publicly available, and is not readily available to its competitors.

33. The above-referenced confidential and proprietary information was and is highly confidential, and known to be so by Freel at the time he received it.

34. Emigra's confidential and proprietary information and its trade secrets had and have economic value in that their use is vital to Emigra's success and the continued viability of the business.

35. Emigra had and has taken reasonable steps to protect the confidentiality and secrecy of the information described above by means including but not limited to the following: restricting access to the information; informing and reminding employees that the information was confidential and was required to remain confidential; and requiring employees to sign agreements indicating that they would protect confidential information.

36. Those steps included, without limitation, specific measures taken to ensure that Freel would not disclose such information outside of Emigra, either during or after his employment by Emigra.

37. At the time Freel commenced employment by Emigra, he signed Emigra's "Client Confidentiality Statement."

38. By doing so, Freel agreed expressly that he would not disclose Emigra confidential information to anyone outside Emigra, that all such information was Emigra property and was not to be used by Freel for personal gain, and that these obligations would continue indefinitely after termination of his employment.

39. Also at the time Freel commenced employment by Emigra, he received Emigra's "Employee Handbook."

40. The Employee Handbook stated in part that "[p]rotecting our company's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed. Do not discuss the company's confidential business with anyone who does not work for us." It stated further: "employees must never use their positions within the company, or any of its clients, for private gain, to advance personal interests or to obtain favors or benefits for themselves, members of their families or any other individuals, corporations, or business entities .... Employees of the company shall conduct their personal affairs in such a fashion that their duties and responsibilities to the company are not jeopardized and/or legal questions do not arise with respect to their association or work with the company."

41. Freel provided signed acknowledgement of his receipt and understanding of these Employee Handbook terms to Emigra.

42. On or about September 19, 2007, Freel resigned from his employment with Emigra and undertook employment with one or more of the Fragomen Defendants.

43. Freel negotiated such employment while still an employee and officer of Emigra.

44. Freel did not disclose to Emigra the fact that he had been solicited by Fragomen or that he was negotiating with Fragomen for a high-level position there while Freel continued to participate in meetings with other members of the Emigra management team and while he continued to supervise and conduct other Emigra business.

45. Upon information and belief, in the course of those negotiations, Freel disclosed to one or more of the Fragomen Defendants that he possessed extensive trade secrets and other proprietary information about Emigra's business that could be used to take Emigra customers

and key employees, interfere with Emigra's business relationships, and otherwise damage and disrupt Emigra's business.

46. Upon information and belief, in the course of those negotiations, Freel disclosed Emigra trade secrets and other proprietary information about Emigra's business to one or more of the Fragomen Defendants.

47. Upon information and belief, shortly after he resigned from Emigra, Freel disclosed Emigra trade secrets and other proprietary information about Emigra's business to one or more of the Fragomen Defendants.

### Misuse of Emigra Trade Secrets - Customers

48. Within days after Freel became employed by the Fragomen Defendants, Freel contacted certain Emigra customers on behalf of the Fragomen Defendants.

49. Upon information and belief, Freel disclosed Emigra's customer list to one or more of the Fragomen Defendants.

50. Upon information and belief, Freel disclosed Emigra's confidential pricing information to one or more of the Fragomen Defendants.

51. Upon information and belief, Freel and the Fragomen Defendants have used Emigra's confidential customer information to advance their own business and business planning.

52. Upon information and belief, the Fragomen Defendants will continue to do so unless restrained by this Court.

## Misuse of Emigra Trade Secrets - Employees

53. Within days after Freel became employed by the Fragomen Defendants, Fragomen Defendants solicited certain key employees at Emigra's London and Madrid offices, and extended offers of employment to them.

54. The offers all were made to Emigra employees who formerly reported directly or indirectly to Freel and for whom Freel had participated in employment reviews and compensation decisions.

55. The offers all were for salaries that were significantly above the compensation those employees were receiving from Emigra.

56. Offers were not extended to all Emigra employees formerly under Freel's review, or to all similarly situated Emigra employees, but rather, only to those employees whom Freel had known and reviewed favorably.

57. All such employment offers were rejected by the Emigra employees.

58. If the offers had been accepted, the effect on Emigra's operations in Europe would have been disastrous, likely causing destabilization of Emigra's European business with consequent negative impact upon its worldwide operations.

59. Upon information and belief, Freel was fully aware that such consequences would have followed acceptance of those offers.

60. Upon information and belief, Freel communicated this likely effect to the Fragomen Defendants.

61. Upon information and belief, Freel disclosed Emigra's confidential information regarding employee identification, performance, and compensation to one or more of the Fragomen Defendants.

11

62. Upon information and belief, Freel and the Fragomen Defendants have used Emigra's confidential employee information to target Emigra employees for solicitation of Fragomen hiring.

63. Upon information and belief, the Fragomen Defendants attempted such hiring both to improve their employment roster and to injure Emigra.

64. Upon information and belief, the Fragomen Defendants will continue to do so unless restrained from doing so by this Court.

65. Upon information and belief, one or more of the Fragomen Defendants have offers of employment outstanding to Emigra employees even now.

66. By utilizing Freel's knowledge of Emigra's employees and employee compensation, and by extending offers to key employees identified by Freel, the Fragomen Defendants used trade secrets, confidential and proprietary information unlawfully obtained from Freel.

67. Emigra has been injured by this conduct by, without limitation, negative impact upon employee morale, increased compensation costs, investigation expense and distraction, and loss of productivity and business opportunity.

**Misuse of Emigra Trade Secrets - Contracts**

68. While Freel was an officer and employee of Emigra, he was involved in confidential plans to open an Emigra office in Japan.

69. The plan to open the office, and the specifics regarding such plans, all were trade secrets of Emigra.

70. One confidential aspect of the plan was to utilize a particular vendor for certain of the services to be provided through the office, a vendor who, upon information and belief, also

provided such services for other immigration service companies including but not limited to certain Fragomen Defendants.

71. Freel was aware of all such Emigra plans for a Japanese office, and was integrally involved in the planning and execution of the opening of that office.

72. Within days after Freel became employed by the Fragomen Defendants, the above-described vendor contacted Emigra and advised, in part and substance, that it had been contacted by a Fragomen representative and told that, if the vendor provided services for Emigra, that Fragomen would terminate that vendor from further Fragomen business.

73. The vendor advised further that, because of this threat from a Fragomen Defendant, it would no longer do business with Emigra.

74. Upon information and belief, Freel, who was heavily involved in creating and structuring this relationship while with Emigra, anticipated that the vendor would terminate services to Emigra as a result of this contact.

75. Loss of this vendor had a material negative impact upon Emigra's plans for an office in Japan for reasons including without limitation, increased expense and delay in entry to market, with some question now raised as to viability of the plans for the office.

76. Upon information and belief, Freel was fully aware that such consequences would follow from interference with Emigra's dealings with this vendor.

77. Upon information and belief, Freel communicated this likely effect to the Fragomen Defendants.

78. Upon information and belief, prior to being advised of the same by Freel, the Fragomen Defendants were not aware of Emigra's plans to open an office in Japan, or to use the above-referenced vendor in such business.

79. Upon information and belief, Freel disclosed Emigra's confidential information regarding plans for the Japan office to one or more of the Fragomen Defendants.

80. Upon information and belief, Freel and the Fragomen Defendants used Emigra's confidential information about plans for a Japan office in order to disrupt Emigra's plans for that office and thereby cause Emigra immediate and continuing injury.

81. Upon information and belief, the Fragomen Defendants will continue to attempt to disrupt Emigra business plans utilizing information provided by Freel unless restrained from doing so by this Court.

### Generally

82. Defendants' conduct in misappropriating Emigra's confidential and proprietary customer information, and wrongfully using it as set forth above, has caused and, unless and until restrained by Order of this Court, will continue to cause, great and irreparable harm to Emigra.

83. Such irreparable harm includes (a) disruption of business plans; (b) loss of revenue and profit that will cause irrecoverable loss of growth and market share; (c) diminished employee morale and loss of confidence and trust of clients, (d) loss of good will and loss of business reputation; (e) incalculable economic loss; and (f) threat to Emigra stability.

84. On information and belief, Defendants' wrongful conduct has unjustly enriched and will continue to unjustly enrich Defendants.

85. Emigra believes that the above-mentioned acts and omissions of Defendants were willful, malicious, oppressive, and done with an intent to injure Emigra, and with full knowledge of the adverse effects such acts would have on Emigra, or with a conscious disregard of Emigra's rights and willful and deliberate disregard for the substantial economic consequences to Emigra,

14

such as to constitute oppression, fraud, or malice, thus entitling Emigra to exemplary and punitive damages in an amount appropriate to punish or set an example of Defendants, and to deter such conduct in the future, the exact amount subject to proof at the time of trial.

## COUNT I

### (Unlawful Restraint of Trade)

86. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

87. The Fragomen Defendants possess monopoly power in the business-related immigration services market.

88. The Fragomen Defendants willfully and intentionally acquired and maintain that monopoly power in the relevant market.

89. The Fragomen Defendants have willfully and unlawfully used exclusionary and predatory conduct, including but limited to, bidding interference, contract interference, interference with employment relationships, misappropriation of trade secrets, and use of misappropriated trade secrets, to maintain and preserve its monopoly power in the market, and to attempt to maintain and preserve such power.

90. The Fragomen Defendants have engaged in such conduct for the specific anticompetitive purpose of foreclosing a substantial share of the relevant market from competitors including but not limited to Emigra.

91. The Fragomen Defendants have not maintained their monopoly power as a consequence of superior product offerings, good faith business acumen, or historical accident. Rather, they have employed a pattern of predatory and economically coercive practices to force customers to make purchasing decisions in a less-than-fully-competitive market.

92. In acting as set forth above, Defendants have monopolized, or attempted to monopolize, or combined and conspired with another person or persons to restrain competition in and to monopolize, part of the trade or commerce among the several states, and with foreign nations, specifically, the provision of global business immigration services within the relevant international market, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

93. The effect of the above-described acts and practices of Defendants is likely to be a substantial lessening of competition, or the creation of a monopoly, in the business of providing business-related immigration services.

94. By reason of the Fragomen Defendants' global dominance of the pertinent market, and by reason of their predatory practices as described above, Defendants' attempt to monopolize the provision of business-related immigration services has a dangerous probability of success.

95. Defendants' actions have harmed and threaten to harm the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

96. Defendants' acts and predatory practices, as set forth above, have caused Emigra injury and damage in an amount to be determined at trial.

97. Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

98. Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

99. As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such

services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

100.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT II

### (Unfair Competition – Misappropriation of Trade Secrets)

101.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

102.    Under New York law, a trade secret is defined as "any formula, pattern, compilation, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," or "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others."

103.    Emigra possessed trade secrets as defined under New York law.

104.    Emigra's trade secrets and other confidential and proprietary information were generally not known outside of Emigra.

105.    Emigra's trade secrets and other confidential and proprietary information could not be readily acquired or duplicated by others, and was not readily obtainable by persons, businesses, or entities outside Emigra unless illegally obtained.

106.    Emigra took substantial measures to guard the secrecy of its trade secrets and its confidential and proprietary information.

107.    Most of Emigra's trade secrets, confidential and proprietary information were not generally known within Emigra, as access to them was limited to officers, directors, and key employees of Emigra.

108.    The information was critically valuable both to Emigra and to its competitors.

109.    Emigra expended substantial resources of time and money to develop this information.

110.    Defendant Freel, as an Emigra Officer and as Vice President of Operations for Emigra, was privy to the highest level of confidential, proprietary information and trade secrets, as set forth above.

111.    Defendant Freel knew that that his knowledge of confidential, proprietary information and trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

112.    Defendant Freel provided other Defendants with confidential, proprietary information and trade secrets obtained from Emigra.

113.    Defendants knew that Defendant Freel owed a duty to Emigra to maintain the secrecy of the confidential, proprietary information and trade secrets Freel transmitted to Defendants.

114.    Defendants' conduct as set forth above constitutes actionable misappropriation of trade secrets and unfair competition under New York law.

115.    As a result of Defendants' actionable misappropriation, Emigra has been damaged in an amount to be determined at trial.

116.    Unless Defendants are restrained and enjoined from misappropriating Emigra's trade secrets, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT III

### (Breach of Fiduciary Duty)

117.     Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

118.     Freel, as Vice President of Operations and Officer of Emigra, owed Emigra a fiduciary duty and a duty of loyalty.

119.     Pursuant to this duty, Freel was prohibited from acting in any manner inconsistent with his agency and trust, and was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

120.     Freel violated his fiduciary duty to Emigra by acts that included but are not limited to the following: disclosing trade secrets and other proprietary and confidential information to Defendants, and using Emigra time, facilities, equipment, and trade secrets and confidential and proprietary information to prepare for and join Defendants.

121.     As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## COUNT IV

### (Tortious Interference with Contract)

122.     Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

123.     Emigra had contracts with certain customers and with a vendor in Japan.

124.     Defendants had knowledge of those contracts.

125.     Defendants intentionally interfered with those contracts, inducing or causing a amendment or breach or termination of those contracts.

126.     Defendants' actions were improper, unjustified and unprivileged.

127.     Defendants acted with malice and used wrongful means.

19

128. As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## COUNT V

### (Tortious Interference with Prospective Advantage)

129. Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

130. Freel knew of a business relationship and proposed contract between Emigra and its vendor in Japan with a probability of future economic benefit to Emigra.

131. Freel intentionally interfered with that business relationship and proposed contract.

132. Were it not for Freel's interference, the business relationship would have continued and the proposed contract would have been entered into.

133. Freel's interference was accomplished by wrongful means, specifically, through use of misappropriated trade secrets and proprietary information, and was aimed at injuring Emigra's business.

134. As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## COUNT VI

### (Breach of Contract)

135. Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

136. The "Client Confidentiality Statement" signed by Freel was a contract.

137. Emigra fully performed its obligations under the contract.

138. Freel failed to fully perform his obligations under the contract.

139. Freel breached his duty of good faith and fair dealing with respect to the contract.

140.   As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

141.   Freel will continue to breach the contract, causing irreparable harm to Emigra, unless restrained from doing so by this Court.

## COUNT VII

### (Unjust Enrichment)

142.   Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

143.   Emigra conferred a benefit upon Freel.

144.   Freel knew that Emigra was conferring a benefit upon him.

145.   Freel has accepted and retained that benefit under circumstances that render it inequitable for Freel to retain the benefit without paying for its value.

146.   As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Emigra respectfully requests that this Court enter judgment for the following relief:

(a) awarding compensatory damages in an amount to be determined at trial;

(b) awarding treble damages pursuant to 15 U.S.C. § 15;

(c) awarding pre-judgment and post-judgment interest on its damages;

(d) imposing a preliminary and a permanent injunction pursuant to 15 U.S.C. §26, restraining Defendants and all those acting in concert or participation with them, from, among other things:

21

(1) soliciting, or attempting to solicit, or initiating any contact with, directly or indirectly, any of Emigra's customers;

(2) acquiring, seeking to acquire, misappropriating, using and/or disclosing any trade secrets or proprietary or confidential business information of Emigra;

(3) soliciting, encouraging, or otherwise inducing current Emigra employees to leave employment by Emigra and/or to accept employment with Defendants or any Defendant-related or associated entity or individual;

(4) ordering Defendants, and all persons working in concert with Defendants, including, but not limited to, any officer, agent, representative, or employee of Defendants, to return to Emigra all trade secrets, proprietary and confidential information of Emigra in his/their possession, custody, or control;

(e)     granting Emigra's costs, including a reasonable attorney fee, as provided by law;

(f)     awarding punitive damages in an amount to be determined by this Court, including but not limited to trebling of compensatory damages pursuant to 15 USC § 15;

(g)     such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Dated: November 29, 2007

EMIGRA GROUP, LLC
By their attorneys,

PINNISI & ANDERSON, LLP

By:     _Michael Pinnisi_
Michael D. Pinnisi (MP-5075)
111 North Tioga Street, Suite 200
Ithaca, New York 14850
Telephone:  (607) 257-8000
Facsimile:  (607) 257-0990

22

## DEMAND FOR TRIAL BY JURY

The undersigned demands a trial by jury of all issues so triable.

PINNISI & ANDERSON, LLP

November 29, 2007

BY: *Michael Pinnisi*

Michael D. Pinnisi (MP-5075)
*Attorneys for Plaintiff*
111 North Tioga Street, Suite 200
Ithaca, New York 14850
Telephone: (607) 257-8000
Facsimile: (607) 257-0990