UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMIGRA GROUP, LLC,

Plaintiff,

- v -

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP,
FRAGOMEN, DEL REY, BERNSEN & LOEWY II, LLP,
FRAGOMEN GLOBAL IMMIGRATION SERVICES,
LLC, FRAGOMEN GLOBAL LLP, AND
RYAN MATTHEW FREEL,

Defendants.

**AMENDED COMPLAINT**

**07-cv-10688 (LAK)(HP)**

ECF CASE

FOR TRIAL BY JURY

---

Emigra Group, LLC ("Emigra" or "Plaintiff") by its attorneys, Pinnisi & Anderson, LLP, as and for its Complaint, alleges as follows:

<u>THE PARTIES</u>

1.    Emigra is a Delaware limited liability corporation with its principal place of business in Vienna, Virginia. Emigra is a provider of business-related immigration services, offering a wide range of consultation in immigration matters, document procurement, consular processing, general immigration case management and monitoring, and related services, to assist corporations in their movement of employees across national borders.

2.    Upon information and belief:

a.    Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen LLP" or "Defendant") is a Delaware limited liability partnership registered in New York as a foreign

limited liability partnership with its principal place of business in New York, New York;

b. Fragomen, Del Rey, Bernsen & Loewy II, LLP ("Fragomen LLP II" or "Defendant") is a Delaware limited liability partnership registered in New York as a foreign limited liability partnership with its principal place of business in New York, New York;

c. Fragomen Global LLP ("Fragomen Global" or "Defendant") is a Delaware limited liability corporation with its principal place of business in New York, New York;

d. Fragomen Global Immigration Services, LLC ("Fragomen Global Immigration" or "Defendant") is a Delaware limited liability corporation with its principal place of business in New York, New York;

e. The above-named Defendants are referred to collectively herein as the "Fragomen Defendants";

f. Fragomen Global and Fragomen Global Immigration are providers of business-related immigration services that are the same and/or substantially the same as those offered by Emigra, and both are affiliates of Fragomen LLP and Fragomen LLP II; and

g. Fragomen LLP and Fragomen LLP II also provide business-related immigration services. In addition, these Fragomen Defendants provide legal advice and representation in immigration law matters and in other international law matters such as transnational mergers and acquisitions, and import/export and other regulatory compliance.

3.      Upon information and belief, Ryan Matthew Freel ("Freel" or "Defendant") is a
resident of the State of Illinois, an attorney admitted to the New York Bar, and an
employee of one or more of the Fragomen Defendants.

## JURISDICTION AND VENUE

4.  This action is brought, *inter alia,* pursuant to 15 U.S.C. §§ 1, 2, 15, and 26 and New
York common law.

5.  This Court has jurisdiction over the federal and pendent state law claims in this case
pursuant to 28 U.S.C. §§ 1332, 1337, and 1367.

6.  This Court has personal jurisdiction over Defendants pursuant to federal law and New
York CPLR §§ 301 and 302 because Defendants, personally and/or through their agent or agents,
transact business in the State of New York and in this judicial district; contract to supply services
in the State of New York and in this judicial district; committed tortious acts within the State of
New York and in this judicial district; or, own, use, or possess real property situated within the
State of New York and in this judicial district.

7.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2), as the
judicial district in which a substantial part of the events or omissions giving rise to the claim
occurred; and pursuant to 15 U.S.C. §§ 15 and 22.

8.  Plaintiff and the Fragomen Defendants are engaged in interstate commerce and in
activities substantially affecting interstate commerce.  The Fragomen Defendants offer services
throughout the United States assisting moves of U.S. employees across international boundaries.
The business activities of the Fragomen Defendants represent a regular, continuous and
substantial flow of interstate commerce, and have had a substantial effect upon interstate
commerce as well as upon commerce within the State of New York.

3

## FACTUAL BACKGROUND

9.   In today's global economy, large multinational corporations move many employees around the world each year, at substantial expense.  Smaller corporations that move only a few employees internationally have very different immigration service needs than the corporations that frequently move many employees cross-border.  Those latter corporations need large immigration service vendors who have extensive international networks of supporting secondary vendors, knowledge of the differing immigration requirements of many jurisdictions, and purchasing power that permits competitive pricing.  Customers for such services currently have few choices of suitable immigration service providers.  At present, the companies which satisfy those requirements are limited to the Fragomen Defendants, Emigra, and a small handful of other companies, with all players dominated by the Fragomen Defendants.  At issue in this case are actions by the Fragomen Defendants to maintain and increase that market dominance by improper means.

### The Markets

10. There is a product/service market for immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals (the "Service Market").

11. There is a product/service submarket for business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals (the "Service Submarket").

12.  The services provided in the Service Market and the Service Submarket are intended to speed and reduce the cost of international employee placements, and effective provision of such services has become an important part of conducting international commerce and domestic U.S. commerce that has an international component.

13. The geographic market is global (the "Geographic Market").

14. There is a geographic submarket of the Geographic Market which encompasses (i) those countries where the Plaintiff and the Fragomen Defendants and other service providers in the Services Submarket have offices; and (ii) those countries where the Plaintiff and the Fragomen Defendants otherwise provide services (the "Geographic Submarket").

15. The Fragomen Defendants' website indicates it has offices within the United States in Massachusetts, Illinois, New York, Florida, Pennsylvania, Texas, California, New Jersey, Michigan and the District of Columbia; and offices abroad in Australia, Belgium, China, France, Germany, India, New Zealand, Singapore, and the United Kingdom. Emigra has offices within the United States in North Carolina, Texas, and Virginia; and offices abroad in Australia, Belgium, Canada, China, France, Germany, Japan, Singapore, Spain, Switzerland, and the United Kingdom. Both Emigra and the Fragomen Defendants conduct business in many countries outside of those where they maintain offices.

16. Annual gross revenue in the Service Submarket is estimated to exceed $100 million.

## Market Structure

17. The services provided in the Service Market require specialized skill on the part of the service providers. Service providers also need to develop relationships with secondary service providers and government agencies in the areas they serve.

18. The Service Submarket is highly concentrated. In addition to the need for specialized skill on the part of all service providers in the Service Submarket, there is the additional need to provide a broad range of services over a large geographic region at competitive pricing. The requisite relationships with secondary service providers and government agencies can be difficult to establish and enhance, and need to be made in many different regions with quality providers

who can handle the requisite volume rapidly and at competitive cost. Substantial expertise and capital and time are required to accumulate the facilities, staff, relationships, and other resources necessary to compete in this market, and multinational corporate clients prefer and can require service providers with large international networks. There are barriers to entering the Service Submarket that include and are not limited to these factors. To date, only the Fragomen Defendants and Emigra and a handful of others have entered this submarket successfully.

## Fragomen Dominance of Relevant Markets

19. Although separate legal entities, the Fragomen Defendants function effectively as one entity with consequent cumulative market power. There exist both commonality of ownership interests in the Fragomen Defendants and coordinated action among the Fragomen Defendants. As stated in the Fragomen LLP web site: "Fragomen Global is designed to function as a natural adjunct to Fragomen, Del Rey, Bernsen & Loewy to ensure a coordinated and effective overall representation of immigration matters, regardless of destination."

20. Upon information and belief, the Fragomen Defendants are by far the world's largest provider in both the Service Market and in the Service Submarket.

    a. As the Fragomen Defendants recently advertised in the December 5, 2007 issue of Globility, "Fragomen is the world's largest firm practicing exclusively in the area of global immigration law for the corporate sector."

    b. The Fragomen LLP web site similarly boasts that this Defendant alone "is the leading provider of corporate immigration services and solutions," noting its continuous service in the industry for more than fifty years, and its employment of "over 130 attorneys and over 1000 professional immigration specialists and staff located in more than 30 offices in the Americas, Asia Pacific, and Europe."

6

      c.   That same web site notes the integrated work of Fragomen LLP with other Fragomen Defendants to provide õguidance and assistance to clients on immigration matters for the international movement and relocation of employees and new hires and between countries worldwide.ö

21. The market share and resources and coordinated action of the Fragomen Defendants evidence market dominance in both the Service Market and the Service Submarket.

      a.   Upon information and belief, the Fragomen Defendants are the worldøs largest provider in the Service Market and the Service Submarket, capturing well over three quarters of the Service Submarket.

      b.   Upon information and belief, Emigra is the worldøs second-largest provider in the Service Market and in the Service Submarket. Even so, Emigra has a minor fraction of the staff and revenues of the Fragomen Defendants.

      c.   Emigraøs profitability and growth have been stunted by actions of the Fragomen Defendants complained of here.

      d.   Upon information and belief, there are only a few other providers in the Service Market and the Service Submarket that are able to provide the comprehensive services offered by the Fragomen Defendants and Emigra, and those other providers, in combination, account for only a few percentage points of the total worldwide annual gross revenue in the Service Submarket.

      e.   Until recent years, no provider has challenged the Fragomen Defendantsø lead position in the Service Market or powerful dominance in the Service Submarket.

22. Upon information and belief, it is the recently-developed ability of Emigra to compete effectively with Fragomen and win market share that has prompted the Fragomen

Defendants, singly and in combination, to engage in unlawful practices that are intended to weaken Emigra before it becomes able to truly challenge Fragomen's position.

23. The conduct of the Defendants is substantially restraining trade in those markets and unlawfully enhancing and maintaining Fragomen's monopoly position in those markets, and thus in interstate commerce.

24. Upon information and belief, if Emigra and others are not protected against the unlawful actions of the Defendants, the result will be further diminished competition, reduction in the quality of services, and increases in price for all consumers of the services in the Service Market and the Service Submarket, both in the United States and abroad.

25. Emigra conducts substantial business with United States corporations. Defendants' actions complained of here have had a direct and substantial negative impact upon Emigra's ability to service those clients in their conduct of domestic and international trade, and such impact was a reasonably foreseeable effect of Defendants' actions.

**Fragomen Market Dominance Actions**

26. Approximately over the past two years, the Fragomen Defendants have engaged in a targeted, escalating pattern of activity against Emigra that, when viewed as a whole and in conjunction with the tortious acts pled here, goes beyond lawful competition.  Those actions have included, without limitation:

   a.  Interference with Emigra bidding for new work;

   b.  Interference with Emigra dealings with existing customers (by means including, without limitation, predatory pricing and threatened interruption of Fragomen use or delivery of services to those of its vendors and customers using or planning to use the services of Emigra in other dealings);

    c.  Recruiting and hiring Freel, who is described in Fragomen's current website as previously being "the Vice President of global operations for a leading immigration provider where he was responsible for overall profitability and management of its worldwide operations," and then attempting to recruit and hire simultaneously several key Emigra employees in Europe for purposes of disrupting and/or damaging Emigra and its business;

    d.  Misuse of Emigra's trade secrets and other confidential information;

    e.  Inducing Emigra's customers to breach or otherwise modify their contracts with Emigra;

    f.  Exclusive dealing and entering into agreements in restraint of trade with Emigra's vendors; and

    g.  Conspiring or attempting to conspire to damage Emigra.

27. Examples of such conduct include causing and precipitating a re-bid of a contract Emigra had won; causing a carve-out of a geographic region from an existing contract Emigra has with a major customer; hiring Emigra's then-director of an Asian office and receiving Emigra trade secrets and confidential information from that former director; and using those misappropriated trade secrets to Fragomen's competitive advantage.

28. The Fragomen Defendants' recent recruiting of and communications with Defendant Freel and the use made of information received from him are part of that same pattern of activity, and constitute an alarming escalation in the nature and consequences of Fragomen's prior anticompetitive activity.

29. Viewed as a whole, this pattern of activity has had a substantial adverse impact upon Emigra's ability to win business, retain customers, retain employees, contain costs, and

otherwise prosper. The result has been a slowing of Emigra growth that has directly benefited Fragomen, and that has deprived (and has the potential to further deprive) the relevant markets of the benefits of full and fair competition.

**-- Acquisition of Emigra Trade Secrets by Freel and Fragomen Defendants**

30. On or about August 16, 2005, Freel commenced employment as Emigra's Vice President of Operations.

31. As Vice President of Operations, Freel was an officer of Emigra and a member of Emigra's highest management team, reporting directly to Emigra's CEO.

32. As Vice President for Operations and as an Officer of Emigra, Freel was in a position of responsibility, trust, and confidence with Emigra.

33. As Vice President for Operations and as an officer of Emigra and otherwise, Freel was granted access to and acquired knowledge of virtually all aspects of Emigra business, trade secrets, and other confidential information, including but not limited to the following: Emigra's strategies to maintain and expand its business, deal with competitors, and satisfy customers; its methods of pricing and actual pricing, marketing, promotion, and client management; receivables and collections; sales figures; profit and loss figures; key suppliers; the number, qualifications, attributes, value to Emgira, and salaries of its employees; the identities, addresses, contacts, plans, histories, and needs of Emigra's customers; and other confidential information.

34. Emigra has invested great expense and effort over several years to create, develop, compile and maintain its trade secrets and other confidential information.

35. This above-referenced trade secrets and other confidential information are not publicly available, and are not otherwise readily available to Emigra's competitors.

36. The above-referenced trade secrets and other confidential information were and are highly confidential, and known to be so by Freel at the time he received that information.

37. Emigra's trade secrets and other confidential information had and have economic value in that their use is vital to Emigra's success and the continued viability of its business.

38. Emigra had and has taken reasonable steps to protect the confidentiality of the information described above by means including but not limited to the following: restricting access to the information; informing and reminding employees including Freel that the information was confidential and was required to remain confidential; and requiring employees including Freel to sign agreements indicating that they would protect confidential information.

39. Those steps included, without limitation, specific measures taken to ensure that Freel would not disclose such information outside of Emigra, either during or after his employment by Emigra.

40. At the time Freel commenced employment by Emigra, he signed Emigra's "Client Confidentiality Statement."

41. By doing so, Freel agreed expressly that he would not disclose Emigra confidential information to anyone outside Emigra, that all such information was Emigra property and was not to be used by Freel for personal gain, and that these obligations would continue indefinitely after termination of his employment.

42. Also at the time Freel commenced employment by Emigra, he received Emigra's "Employee Handbook."

43. The Employee Handbook stated in part that "[p]rotecting our company's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed.  Do not discuss the company's confidential business

with anyone who does not work for us.ö  It stated further:  õemployees must never use their

positions within the company, or any of its clients, for private gain, to advance personal interests

or to obtain favors or benefits for themselves, members of their families or any other individuals,

corporations, or business entities í . Employees of the company shall conduct their personal

affairs in such a fashion that their duties and responsibilities to the company are not jeopardized

and/or legal questions do not arise with respect to their association or work with the company.ö

44. Freel provided signed acknowledgement of his receipt and understanding of these

Employee Handbook terms to Emigra.

45. On or about September 19, 2007, Freel resigned from his employment with Emigra

and undertook employment with one or more of the Fragomen Defendants.

46. Freel negotiated such employment while still an employee and officer of Emigra.

47. Freel did not disclose to Emigra the fact that he had been solicited by Fragomen or

that he was negotiating with Fragomen for a high-level position there while Freel continued to

participate in meetings with other members of the Emigra management team and while he

continued to supervise and conduct other Emigra business.

48. Upon information and belief, in the course of those negotiations, Freel disclosed to

one or more of the Fragomen Defendants that he possessed extensive trade secrets and other

confidential information about Emigraøs business that could be used to take Emigra customers

and key employees, interfere with Emigraøs business relationships, and otherwise damage and

disrupt Emigraøs business.

49. Upon information and belief, in the course of those negotiations, Freel disclosed

Emigra trade secrets and other confidential information about Emigraøs business to one or more

of the Fragomen Defendants.

50. Upon information and belief, shortly after he resigned from Emigra, Freel disclosed Emigra trade secrets and other proprietary information about Emigra's business to one or more of the Fragomen Defendants.

## -- Misuse of Emigra Trade Secrets - Customers

51. Within days after Freel became employed by the Fragomen Defendants, Freel contacted certain Emigra customers on behalf of the Fragomen Defendants.

52. Upon information and belief, Freel disclosed Emigra's customer list to one or more of the Fragomen Defendants.

53. Upon information and belief, Freel disclosed Emigra's confidential pricing information to one or more of the Fragomen Defendants.

54. Upon information and belief, Freel and the Fragomen Defendants used Emigra's confidential customer information obtained from Freel to target Emigra's customers, damage Emigra and its business, and advance their own business and business planning.

55. Upon information and belief, the Fragomen Defendants will continue to do so unless restrained by this Court.

## -- Misuse of Emigra Trade Secrets - Employees

56. Within days after Freel became employed by the Fragomen Defendants, Fragomen Defendants solicited certain key employees at Emigra's London and Madrid offices, and extended offers of employment to many of them.

57. The offers all were made to Emigra employees who formerly reported directly or indirectly to Freel and for whom Freel had participated in employment reviews and compensation decisions.

58. The offers all were for salaries that were significantly above the compensation those employees were receiving from Emigra.

59. Offers were not extended to all Emigra employees formerly under Freel's review, or to all similarly situated Emigra employees, but rather, only to those employees whom Freel had known and reviewed favorably while he was employed by Emigra.

60. The offers were rejected by the Emigra employees for reasons other than compensation.

61. If the offers had been accepted, the effect on Emigra's operations in Europe would have been disastrous, likely causing destabilization of Emigra's European business, and with consequent negative impact upon Emigra's worldwide operations.

62. Upon information and belief, Freel was fully aware that such consequences would have followed acceptance of the offers.

63. Upon information and belief, Freel communicated this likely effect to the Fragomen Defendants.

64. Upon information and belief, Freel disclosed Emigra's confidential information regarding employee identification, performance, and compensation to one or more of the Fragomen Defendants.

65. Upon information and belief, Freel and the Fragomen Defendants have used Emigra's confidential employee information to target Emigra employees for solicitation of Fragomen hiring.

66. Upon information and belief, the Fragomen Defendants attempted such hiring at least in part to injure Emigra.

67. Upon information and belief, the Fragomen Defendants will continue to do so unless restrained from doing so by this Court.

68. Upon information and belief, one or more of the Fragomen Defendants have offers of employment outstanding to Emigra employees even now.

69. By utilizing Freel's knowledge of Emigra's employees and employee compensation, and by extending offers to key employees identified by Freel, the Fragomen Defendants unlawfully used Emigra trade secrets and other confidential information they had obtained unlawfully from Freel.

70. Emigra has been injured by this conduct by, without limitation, negative impact upon employee morale, increased compensation costs, investigation expense and distraction, and loss of productivity and business opportunity.

71. Upon information and belief, the Fragomen defendants will continue to so injure Emigra unless restrained by this Court.

## -- Misuse of Emigra Trade Secrets - Contracts

72. While Freel was an officer and employee of Emigra, he was aware of and involved in confidential plans to open an Emigra office in Japan.

73. The plan to open the office, and the specifics regarding execution of the plan, all were trade secrets of Emigra.

74. One confidential aspect of the plan was to utilize a particular vendor for certain of the services to be provided through the office, a vendor who, upon information and belief, also provided such services for other immigration service companies including but not limited to certain Fragomen Defendants.

75. Freel was aware of all such Emigra plans for a Japanese office, and was integrally involved in the planning and execution of the opening of that office.

76. Within days after Freel became employed by the Fragomen Defendants, the above-described vendor contacted Emigra and advised, in part and substance, that it had been contacted by a Fragomen representative and told that, if the vendor provided services for Emigra, that Fragomen would terminate that vendor from further Fragomen business.

77. The vendor advised further that, because of this threat from a Fragomen Defendant, it would no longer do business with Emigra.

78. Upon information and belief, Freel, who was heavily involved in creating and structuring this relationship while with Emigra, anticipated that the vendor would terminate services to Emigra if Fragomen threatened to terminate its business.

79. Loss of this vendor had a material negative impact upon Emigra's plans for an office in Japan for reasons including without limitation, increased expense and delay in entry to market.

80. Upon information and belief, Freel was fully aware that such consequences would follow from interference with Emigra's dealings with this vendor.

81. Upon information and belief, Freel communicated this likely effect to the Fragomen Defendants.

82. Upon information and belief, prior to being advised of the same by Freel, the Fragomen Defendants were not aware of Emigra's plans to open an office in Japan, or to use the above-referenced vendor in such business.

83. Upon information and belief, Freel disclosed Emigra's confidential information regarding plans for the Japan office to one or more of the Fragomen Defendants.

84. Upon information and belief, Freel and the Fragomen Defendants used Emigra's confidential information about plans for a Japan office in order to disrupt Emigra's plans for that office and thereby cause Emigra immediate and continuing injury.

85. Upon information and belief, the Fragomen Defendants will continue to attempt to disrupt Emigra business plans utilizing information provided by Freel unless restrained from doing so by this Court.

**-- Misuse of Emigra's Trade Secrets – Exclusive Dealing in Restraint of Trade**

86. The fact that Fragomen reportedly threatened Emigra's Japanese vendor with termination of Fragomen business if that vendor continued dealings with Emigra, combined with the vendor's consequent refusal to do business with Emigra, is evidence that the Defendants entered into an agreement in restraint of trade.

87. In so doing, one or more of the Fragomen Defendants used Fragomen's monopoly power with the purpose of inducing the vendor to deal exclusively with Fragomen, to the exclusion of Emigra.

88. At least one of the Fragomen Defendants thereby entered into a vertical agreement, contract, or combination with the Japanese vendor (the "Vendor Agreement").

89. The essence of the Vendor Agreement was that vendor would not provide services to Emigra, in order to avoid Fragomen termination of doing business with the vendor.

90. The Vendor Agreement imposed by the Fragomen Defendants unreasonably restrains trade or commerce and unreasonably restricts competition in the relevant Markets.

**Generally**

91. Defendants' conduct in misappropriating Emigra's trade secrets and other confidential information, and wrongfully using that information, has caused and, unless and until restrained by Order of this Court, will continue to cause, great and irreparable harm to Emigra.

92. Such irreparable harm includes and will include (a) disruption of business plans; (b) slowed growth and reduced market share; (c) diminished employee morale and recruiting; (d) loss of confidence and trust of clients, with consequent loss of business reputation and good will generally; and (e) incalculable economic loss.

93. Upon information and belief, Defendants' wrongful conduct has unjustly enriched and will continue to unjustly enrich Defendants.

94. Emigra believes that the above-mentioned acts and omissions of Defendants were willful, malicious, oppressive, unconscionable, and done with an intent to injure Emigra, and with full knowledge of the adverse effects such acts would have on Emigra, or with a conscious disregard of Emigra's rights and willful and deliberate disregard for the substantial economic consequences to Emigra, such as to constitute oppression, fraud, or malice, thus entitling Emigra to exemplary and punitive damages.

95. The conduct of the Defendants has restrained and is restraining trade in the markets identified above with Defendants' full knowledge of the effects such conduct would have on those markets; and such conduct is unlawfully maintaining and enhancing the Fragomen Defendants' monopoly position in those markets, and is causing harms to consumers that follow from diminished competition in those markets.

## COUNT I

### (Acquiring, Enhancing and Maintaining Monopoly Power)

96. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

97. The Fragomen Defendants possess monopoly power in the Service Market and Service Submarket.

98. The Fragomen Defendants willfully and intentionally acquired, enhanced and maintain monopoly power in those markets.

99. The Fragomen Defendants have willfully and unlawfully engaged in a pattern and practice of exclusionary and predatory conduct including but not limited to bidding interference, contract interference, interference with employment relationships, interference with vendor and customer relationships, misappropriation of trade secrets, use of misappropriated trade secrets, and predatory pricing.

100.    The Fragomen Defendants so acted with the intention to maintain and preserve and enhance monopoly power in the Service Market and Service Submarket.

101.    The Fragomen Defendants so acted with the specific anticompetitive purpose of foreclosing a substantial share of the relevant market from competitors including, but not limited to, Emigra.

102.    The Fragomen Defendants have employed a pattern of anticompetitive, predatory, exclusionary, and economically coercive practices to damage Emigra and to force customers to make purchasing decisions in a less-than-fully-competitive market.

103.    The Fragomen Defendants have not acquired, enhanced or maintained their monopoly power as a consequence of superior product offerings, good faith business acumen, or historical accident.

104.    The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification relating to the enhancement of consumer welfare.  The anticompetitive harm outweighs the procompetitive benefit, if any (which benefit is not admitted), and hinders competition in an unnecessarily restrictive way.

105.    In acting as set forth above, the Fragomen Defendants have monopolized part of the trade or commerce among the several states, and with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

106.    The effect of the above-described acts and practices of Defendants, assessed in combination or in the aggregate, is likely to be anticompetitive and to lead to a substantial lessening of competition through the acquisition, enhancement and/or maintenance of a monopoly in the relevant markets.

107.    Defendantsø actions have caused Emigra injury and damage in an amount to be determined at trial.

108.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

109.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

110.    Defendantsø actions have causally harmed and threaten to harm competition and the general public by unreasonably reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

111.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services in some instances (and will pay higher prices if Emigra is further disrupted or eliminated), than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

112.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT II

### (Conspiracy to Monopolize)

113.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

114.    There is a combination or conspiracy between two or more of the Defendants to target and damage Emigra.

115.    There have been overt acts in furtherance of that conspiracy, including but not limited to the hiring of Freel, misappropriation and use of Emigra's trade secrets and other confidential information, inducing Emigra's customers to breach or modify their contracts with Emigra, engaging in exclusive dealing to induce Emigra's Japanese vendor not to do business with Emigra, and otherwise as set forth at ¶¶ 26-29 above.

116.    At least two of the Defendants have had the specific intent to monopolize the Service Market and Service Submarket.

117.    In acting as set forth above, Freel and the Fragomen Defendants (and, to the extent that the Fragomen Defendants do not have complete common ownership, the Fragomen Defendants themselves) have engaged in a conspiracy to monopolize part of the trade or commerce among the several states, and with foreign nations, to wit, the provision of services

within the Service Market and the Service Submarket, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

118.    Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

119.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

120.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

121.    Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

122.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

123.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT III

### (Attempt to Monopolize)

124.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

125.    To the extent Defendants do not already have a monopoly and monopoly power, which Plaintiff does not admit, the Fragomen Defendants have willfully and unlawfully used

exclusionary and predatory conduct to obtain such power by means including but not limited to bidding interference, contract interference, interference with employment relationships, interference with vendor relationships, misappropriation of trade secrets, use of misappropriated trade secrets, predatory pricing, and otherwise as set forth at ¶¶ 26-29 above.

126.    Defendants had a specific intent to destroy competition with respect to part of commerce or to build monopoly.  Defendants' intent can be proven either by direct evidence and/or by inference from evidence of Defendants' anticompetitive conduct.

127.    Defendants' anticompetitive conduct was directed to accomplishing their unlawful purpose.

128.    The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification, the anticompetitive harm outweighs the procompetitive benefit, if any (which benefit Plaintiff does not admit), and hinders competition in an unnecessarily restrictive way.

129.    To the extent that they have not already done so, which is not admitted, Defendants have the ability to lessen or destroy competition in the Service Market and Service Submarket.  Defendants' attempts to monopolize those markets have a dangerous probability of success.

130.    In acting as set forth above, Defendants have attempted to monopolize  part of the trade or commerce among the several states, and with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

131.    Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

132.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

133.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

134.    Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

135.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

136.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT IV

### (Unlawful Horizontal Agreement In Restraint of Trade)

137.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

138.    Two or more of the Defendants, not having complete common ownership (upon information and belief), entered into a contract, agreement, arrangement or combination whereby they formed a conspiracy or reciprocal relationship to target and damage Emigra using unlawful means.

139.    The Defendants' actions taken in furtherance of that conspiracy or reciprocal relationship unreasonably restrain trade or commerce and unreasonably restrict or affect competition in the Service Market and the Service Submarket.

140.    The purpose of the restraint is unlawful.

141.    In so acting, the Defendants have entered into an unlawful agreement in restraint of trade or commerce which affects interstate commerce, and commerce with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

142.    The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification relating to the enhancement of consumer welfare.  The anticompetitive harm outweighs the procompetitive benefit, if any (which benefit is not admitted), and hinders competition in an unnecessarily restrictive way.

143.    Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

144.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

145.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

146.    Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

147. As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

148. Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT V

### (Unlawful Vertical Agreement In Restraint of Trade)

149. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

150. At least one of the Defendants has entered into a vertical agreement, contract, or combination with Emigra's former vendor in Japan (*i.e.*, the Vendor Agreement).

151. The Vendor Agreement unreasonably restrains trade or commerce and unreasonably restricts competition in the Service Market and the Service Submarket.

152. The purpose of the restraint is unlawful.

153. In so acting, Defendants have entered into an unlawful agreement with another person or persons in restraint of trade or commerce which affects interstate commerce, and commerce with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

154. The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct. The conduct of the Fragomen Defendants lacks a procompetitive justification relating to the enhancement of consumer welfare. The anticompetitive harm outweighs the procompetitive benefit, if any (which benefit is not admitted), and hinders competition in an unnecessarily restrictive way.

155.    Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

156.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

157.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

158.    Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

159.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

160.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT VI

### (Unfair Competition – Misappropriation of Trade Secrets)

161.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

162.    Under New York law, a trade secret is defined as "any formula, pattern, compilation, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," or

"any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others."

163.    Emigra possessed trade secrets as defined under New York law.

164.    Emigra's trade secrets and other confidential information were critically valuable to Emigra, and potentially to its competitors if disclosed.

165.    Emigra expended substantial resources of time and money to develop its trade secrets and its other confidential information.

166.    Emigra took substantial measures to guard the secrecy of its trade secrets and its other confidential information.

167.    Emigra's trade secrets and other confidential information were generally not known outside of Emigra.

168.    Many of Emigra's trade secrets and other confidential information were not generally known even within Emigra, as access to them was limited to officers, directors, and key employees of Emigra.

169.    Emigra's trade secrets and other confidential information could not be readily acquired or duplicated by others, and were not readily obtainable by persons, businesses, or entities outside Emigra unless illegally obtained.

170.    Defendant Freel, as an Emigra Officer and as Vice President of Operations for Emigra, was privy to the highest level of Emigra trade secrets and other confidential information.

171.    Defendant Freel knew that that his knowledge of Emigra trade secrets and other confidential information was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

172.    Defendant Freel nonetheless provided one or more Fragomen Defendants with trade secrets and other confidential information obtained from Emigra.

173.    The Fragomen Defendants knew that Defendant Freel owed a duty to Emigra to maintain the secrecy of the Emigra trade secrets and other confidential information that Freel transmitted to Defendants.

174.    Defendants' conduct as set forth above constitutes actionable misappropriation of trade secrets and unfair competition under New York law.

175.    As a result of Defendants' actionable misappropriation and unfair competition, Emigra has been damaged in an amount to be determined at trial.

176.    Unless Defendants are restrained and enjoined from further misappropriation and use of Emigra's trade secrets and other confidential information, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

**COUNT VII**

**(Breach of Fiduciary Duty)**

177.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

178.    Defendant Freel, as Vice President of Operations and Officer of Emigra, owed Emigra a fiduciary duty and a duty of loyalty.

179.    Pursuant to those duties, Freel was prohibited from acting in any manner inconsistent with Emigra's best interests, and was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

180.    Freel violated his fiduciary duty and his duty of loyalty to Emigra by acts that included but are not limited to the following: disclosing trade secrets and other confidential information to one or more of the Fragomen Defendants; and using Emigra time, facilities,

equipment, and trade secrets and confidential information for personal gain, including but limited to obtaining employment by and currying favor with the Fragomen Defendants.

181.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

182.    Unless Defendants are restrained and enjoined from further misappropriation and use of Emigra's trade secrets and other confidential information, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT VIII

### (Tortious Interference with Contract)

183.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

184.    Emigra had contracts with certain customers.

185.    Defendants had knowledge of those contracts.

186.    Defendants intentionally interfered with those contracts, inducing or causing amendment or breach or termination of those contracts.

187.    Defendants' actions were unjustified and unprivileged.

188.    Defendants acted with malice and used wrongful means.

189.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## COUNT IX

### (Tortious Interference with Prospective Advantage)

190.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

191.    Freel knew of a business relationship and proposed contract between Emigra and its vendor in Japan with a probability of future economic benefit to Emigra.

192.    Defendants intentionally interfered with that business relationship and proposed contract.

193.    Were it not for Freel's disclosure and Defendants' interference, the business relationship would have continued and the proposed contract would have been entered into.

194.    Defendants' interference was accomplished by wrongful means, specifically, through use of misappropriated trade secrets and confidential information, and was aimed at injuring Emigra's business.

195.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

196.    Unless Defendants are restrained and enjoined from further interference with Emigra's business relationships, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## <u>COUNT X</u>

### (Breach of Contract)

197.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

198.    The "Client Confidentiality Statement" signed by Freel was a contract.

199.    Emigra fully performed its obligations under the contract.

200.    Freel failed to fully perform his obligations under the contract.

201.    Freel breached his duty of good faith and fair dealing with respect to the contract.

202.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## COUNT XI

### (Unjust Enrichment)

203.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

204.    Emigra conferred a benefit upon Freel.

205.    Freel knew that Emigra was conferring a benefit upon him.

206.    Freel has accepted and retained that benefit under circumstances that render it inequitable for Freel to retain the benefit without paying for its value.

207.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Emigra respectfully requests that this Court enter judgment for the following relief:

(a) awarding compensatory damages in an amount to be determined at trial;

(b) awarding treble damages pursuant to 15 U.S.C. § 15;

(c) awarding pre-judgment and post-judgment interest on its damages;

(d) imposing a preliminary and a permanent injunction pursuant to 15 U.S.C. §26, restraining Defendants and all those acting in concert or participation with them, from, among other things:

(1) soliciting, or attempting to solicit, any of Emigra's customers;

(2) acquiring, seeking to acquire, misappropriating, using and/or disclosing any trade secrets or other confidential business information of Emigra;

(3) soliciting, encouraging, or otherwise inducing current Emigra employees to leave employment by Emigra and/or to accept employment with any Fragomen Defendant or any Defendant-related or associated entity or individual;

(4) ordering Defendants, and all persons working in concert with Defendants, including, but not limited to, any officer, agent, representative, or employee of the Fragomen Defendants, to return to Emigra all trade secrets and other confidential information of Emigra in their possession, custody, or control;

(e)     granting Emigra's costs, including a reasonable attorney fee, as provided by law;

(f)     awarding punitive damages in an amount to be determined by this Court, including but not limited to trebling of compensatory damages pursuant to 15 USC § 15;

(g)     such other and further relief as this Court deems just and equitable.

                              Respectfully submitted,

Dated: December 21, 2007        EMIGRA GROUP, LLC
                                By its attorneys,

                                PINNISI & ANDERSON, LLP

                    By:     s/ Michael D. Pinnisi
                            Michael D. Pinnisi (MP-5075)
                            111 North Tioga Street, Suite 200
                            Ithaca, New York 14850
                            Telephone: (607) 257-8000
                            Facsimile: (607) 257-0990