UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                               :

EMIGRA GROUP, LLC,

                                               :

                         Plaintiff,

                                               :        No. 07-cv-10688 (LAK) (HP)

              --against--

                                               :        ECF CASE

FRAGOMEN, DEL REY, BERNSEN & LOEWY,
LLP; FRAGOMEN, DEL REY, BERNSEN &
LOEWY II, LLP; FRAGOMEN GLOBAL          :
IMMIGRATION SERVICES, LLC; FRAGOMEN
GLOBAL LLP; AND RYAN MATTHEW FREEL,     :

                                             :

                        Defendants.

                                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## PURSUANT TO LOCAL CIVIL RULE 56.1

COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000

*Counsel to Defendants Fragomen, Del Rey,
Bernsen & Loewy, LLP; Fragomen, Del Rey,
Bernsen & Loewy II, LLP; Fragomen Global
Immigration Services, LLC; and Fragomen
Global LLP*

GISKAN SOLOTAROFF & ANDERSON LLP
11 Broadway, Suite 2150
New York, New York 10004
Tel: (212) 500-5106

*Counsel to Defendant Ryan Freel*

**Table of Contents**

A.  Nature of Immigration Practice.................................................................................1

B.  The Parties...............................................................................................................2

C.  Fragomen's Corporate Structure .............................................................................3

D.  Global Business Immigration Practice.....................................................................6

E.  Competition Among U.S. Immigration Lawyers and Law Firms .............................7

F.  Competition in the Global Immigration Services Market ......................................11

G.  Competition from Big Four Accounting Firms.......................................................14

H.  Competition from Relocation Service Firms .........................................................16

I.  Competition from Immigration Consulting Firms and Facilitators.........................17

J.  Competition from In-House Capabilities of Large Companies................................18

K.  Local Providers of Immigration Services in Japan ................................................20

L.  Australia & the United Kingdom ...........................................................................22

M.  Competition and Pricing in the Market for Global Immigration Services.............23

The undersigned defendants, by their attorneys, allege the following statement of material facts as to which they contend there is no genuine issue to be tried:

A.    Nature of Immigration Practice

1.    In the United States, immigration services generally are considered the practice of law, and only licensed attorneys (or persons working under their supervision) may provide them.  (Buffenstein Decl. ¶¶ 8, 10.)

2.    In other countries, regulatory regimes permit non-lawyers to provide some categories of immigration services.  In these locations, it is common for law firms to provide immigration services to clients, but they may compete to some extent with non-lawyers, at least with respect to certain procedures or parts of the immigration process.  (Buffenstein Decl. ¶ 9.)

3.    For a firm based in the United States that focuses on the immigration needs of corporate clients, immigration work can be either "inbound" or "outbound."  Inbound work generally refers to work involved in relocating foreign employees to the U.S. on a temporary or permanent basis.  For most immigration practices based in the U.S., inbound matters constitute the majority of the work handled.  (Buffenstein Decl. ¶ 10.)

4.    Outbound work, sometimes referred to as the "global" side of the business, generally refers to work involved in relocating employees from the United States to foreign countries, or relocating employees between offices in different foreign countries.  These assignments require expertise in the immigration laws and rules of the destination country. Frequently, it is necessary to retain an attorney or other immigration service provider in the destination country to lodge the visa or work permit application.  For outbound matters, staff based in the U.S. or sending country most commonly coordinate cases in conjunction with in-country experts at the destination location.  (Sometimes foreign visa applications can be prepared

1

and processed through a foreign government's consular office in the U.S. or other third country, but this is less common.)  (Buffenstein Decl. ¶ 11.)

       5.     The United States accounts for the most significant portion of the world market for overall business-related immigration services.  Immigration services relating to the relocation of foreign nationals to the U.S. – "inbound" work, using the terminology described above – constitute the substantial majority of the market by dollar volume.  (Buffenstein Decl. ¶ 12.)

B.     <u>The Parties</u>

       6.     Defendant Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen LLP") is a U.S. law firm that provides legal advice and services concerning U.S. immigration laws and does inbound work.  The Fragomen organization's global business for outbound matters is conducted by and through defendants Fragomen Global LLP and Fragomen Global Immigration Services, LLC ("FGIS").  (Buffenstein Decl. ¶ 13.)

       7.     Inbound work accounts for 80 to 85 percent of the revenues of the Fragomen organization as a whole.  Outbound work, covering all foreign countries, produces only 15 to 20 percent of the revenues of the Fragomen organization.  (Kaplan Decl. ¶¶ 14-15.)

       8.     Plaintiff Emigra Group, LLC ("Emigra") is headquartered in the U.S. and provides immigration services as an immigration consulting firm.  Because Emigra is not a law firm, it cannot directly provide legal services relating to U.S. immigration needs (this would constitute the unauthorized practice of law).  Emigra's website indicates that if clients seek U.S. immigration services from Emigra, the services will be provided by the U.S. law firm Ogletree Deakins, which appears to have a joint venture with Emigra for this purpose.  (Buffenstein Decl. ¶ 14.)

2

9.    Emigra has sought to position itself as a lower cost alternative to a law firm.  Emigra's website includes the following explanation under "FAQ" (Frequently Asked Questions):

> **We use a law firm to obtain our work visas.  Why should we use Emigra instead?**
>
> There are many law firms with excellent immigration capabilities in a single jurisdiction.  But if you are looking for a multinational immigration solution, only Emigra has the necessary infrastructure including offices in thirteen countries on four continents and a global information technology platform.  Emigra also delivers a level of proven customer service that is rarely found in law firms. Most importantly, Emigra's specialization and lower cost structure than law firms enables us to deliver superior products while saving you money.

(Buffenstein Decl. ¶ 15.)

10. According to the parties' websites: Emigra has foreign offices located in Australia, Belgium, Canada, China, France, Germany, Hong Kong, Japan, Singapore, Spain (Barcelona and Madrid), Switzerland, and the United Kingdom; and Fragomen's global business has offices located in Australia (Brisbane, Canberra, Melbourne, Perth, and Sydney), Belgium, China, Costa Rica, France, Germany, Hong Kong, India (Bangalore, Hyderabad, and Kochi), New Zealand, Singapore, and the United Kingdom.  The overlap of foreign countries where both firms have offices thus appears to be Australia, Belgium, China, France, Germany, Hong Kong, Singapore, and the United Kingdom.  (Buffenstein Decl. ¶ 16.)

C.    Fragomen's Corporate Structure

11.    In this lawsuit, Emigra has sued four related entities that are under common ownership:

(a)    Fragomen LLP;

(b)        Fragomen, Del Rey, Bernsen & Loewy II LLP ("Fragomen II");

(c)        Fragomen Global LLP; and

(d)        FGIS.

(Kaplan Decl. ¶ 5.)

12.     Fragomen LLP is a law firm that was organized as a limited liability partnership under Delaware law and has its largest office in New York.  Fragomen LLP is owned by the firm's 21 Class A equity partners.  (Kaplan Decl. ¶ 6.)

13.     Fragomen LLP specializes in providing legal advice and services concerning U.S. immigration laws to domestic and foreign clients.  Typically, Fragomen LLP's clients are companies seeking to relocate foreign employees to the United States.  (Kaplan Decl. ¶ 7.)

14.     In or about 2003, Fragomen LLP created Fragomen II as a separate Delaware entity wholly owned by Fragomen LLP and a Fragomen LLP equity partner.  At that time, Fragomen LLP was in the process of merging with a law firm known as Hirson, Wexler & Perl.  Fragomen LLP established Fragomen II as a subsidiary for the purpose of holding certain continuing assets, obligations, and liabilities of the Hirson firm during a transitional period following the merger.  Eventually, those assets, obligations, and liabilities were resolved, and there was no further need for this entity.  Fragomen II was merged into Fragomen LLP effective December 31, 2007 and no longer exists.  (Kaplan Decl. ¶ 8.)

15.     Fragomen Global LLP is a Delaware entity that acts as an intermediate holding company.  Fragomen Global LLP is owned by the same Class A equity partners who own Fragomen LLP.  (Kaplan Decl. ¶ 9.)

16.    Fragomen Global LLP currently owns approximately 93 percent of FGIS, which is the Fragomen organization's principal vehicle for providing information, guidance, and assistance to clients concerning the immigration requirements and procedures of various foreign countries.  FGIS is a Delaware entity that is not a law firm.  Typically, FGIS's clients are companies seeking to relocate employees to countries outside the U.S., either from the U.S. to a foreign country or between foreign countries.  (Kaplan Decl. ¶ 10.)

17.    The remaining equity interests in FGIS – totaling approximately 7 percent – are owned by a non-lawyer who was a senior executive at FGIS until her retirement at the end of 2007.  (Kaplan Decl. ¶ 11.)

18.    The following graphic illustrates the ownership structure described above:



(Kaplan Decl. ¶ 12.)

19.    Ryan Freel has been an employee of Fragomen LLP since October 1, 2007.  Mr. Freel previously worked for Fragomen LLP from August 1999 (following his graduation from law school) until January 2005.  (Kaplan Decl. ¶ 13.)

D.    <u>Global Business Immigration Practice</u>

20.    Competition for business-related immigration services is highly country-specific, because immigration rules and requirements are country-specific.  There is no internationally uniform set of immigration laws and procedures.  Even in the circumstance where there are regional or supra-national immigration arrangements or protocols in place, local implementation can and does vary widely among member states.  (Buffenstein Decl. ¶ 17.)

21.    It is not necessary for a U.S.-based firm that wishes to service the outbound immigration needs of corporate clients to have an office in every country where its clients may need to send employees.  U.S. firms often form alliances or working relationships with local firms in relevant foreign countries.  These relationships enable the U.S. firms to provide services abroad without having a physical presence in every possible destination jurisdiction.  In most foreign countries, there are various locally licensed immigration service providers who are willing to provide such assistance.  This is essentially a form of subcontracting.  These local practices usually are eager to attract referrals, as this presents an opportunity for them to grow their own businesses.  (Buffenstein Decl. ¶¶ 18, 27.)

22.    While it is common for U.S. firms to form such relationships with local providers in different countries, these relationships typically are not exclusive for either party.  In other words, even in situations where a local firm in a foreign country becomes a preferred provider for a U.S. firm, the U.S. firm usually remains free to use other local providers, and the local provider usually remains free to work with other firms seeking similar assistance.  (Buffenstein Decl. ¶ 19.)

23.    Large corporate clients often seek to achieve efficiencies and economies of scale by steering their immigration matters to a limited number of firms.  Clients may seek out

a single provider to handle all of their global immigration if this helps them realize more economical pricing and efficiencies, or facilitate compliance.  However, even among large corporations, a significant number of clients do not use a "single-source" provider for all of their outbound immigration needs worldwide.  This point is supported by statistically significant data compiled by PricewaterhouseCoopers ("PwC").  As part of its 2005 Global Visa Services Survey, that firm surveyed 131 companies about their immigration policies and practices.  The companies surveyed included multinationals in diverse industries ranging from companies with fewer than 1,000 employees to companies with well over 10,000 employees. In response to the question "If you use external counsel / immigration provider, do you use the provider globally?," only 25 percent of respondents answered affirmatively.  69 percent said that they did not.  In addition, many consumers divide their immigration business among several service providers: some handle matters in-house; many use different providers for different countries, different regions, or even for different types of desired authorizations.  (Buffenstein Decl. ¶¶ 20, 61.)

24.     Even in situations where a client may seek a "single source" provider, it is rarely, if ever, the case that the "single source" provider is the only firm that actually delivers the service.  Most firms sub-contract the work in countries where they do not have a direct physical presence.  (Buffenstein Decl. ¶ 21.)

E.     Competition Among U.S. Immigration Lawyers and Law Firms

25.     Fragomen LLP currently has approximately 179 lawyers in its U.S. practice.  This is a very small fraction (1.8 percent) of the approximately 10,000 attorneys who, as of 2007, had identified themselves as American immigration practitioners by joining the American Immigration Lawyers' Association ("AILA").  While not all AILA attorneys identified

themselves as providers of business immigration services for purposes of the directory published by AILA at that time, a majority of them did.  (Buffenstein Decl. ¶ 22.)

26.    Numerous law firms in the U.S. have established immigration practices and compete for the business of corporate clients who need business-related immigration services.  According to data reported in September 2007 based on a survey by *IndUS Business Journal* of the "Top 25" largest U.S. law firms with immigration attorneys, while Fragomen LLP was the largest firm in the survey, the 24 other firms identified included approximately 370 immigration lawyers and almost twice as many immigration paralegals.  (Buffenstein Decl. ¶¶ 23, 25.)

27.    The "Top 25" listing understates the competition among U.S. law firms with immigration practices because the survey does not purport to be, and is clearly not, comprehensive or exhaustive, and a number of notable immigration service providers, including some of the largest U.S. immigration practices, did not participate.  Publicly available information shows that many other established U.S. law firms – including many firms with substantial attorney head-counts and financial resources, and offices in many U.S. and foreign locations – offer immigration services geared to the needs of corporate clients.  (Buffenstein Decl. ¶ 24.)

28.    The tables below summarize information about the immigration practice capabilities of the firms in the "Top 25" survey and various other firms.  The table indicates the name of each firm; the number of reported immigration attorneys; the number of reported U.S. and foreign offices the firm has; and whether the firm claims to offer (directly or through other providers) global immigration services in addition to the U.S. immigration services it provides. (Buffenstein Decl. ¶ 25.)

**"Top 25" per *IndUS Business Journal* Survey (2007)**

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|------|------|------|------|
| Fragomen Del Rey Bernsen & Loewy LLP | 179 | 31 offices in 11 countries | Yes |
| Berry Appleman & Leiden LLP | 35 | 4 U.S. offices | Yes |
| Tindall & Foster P.C. | 30 | 3 U.S. offices | Yes |
| AzulaySeiden Law Group | 27 | 6 offices in 3 countries | No |
| Quan Burdette & Perez, P.C. | 23 | 4 offices in 2 countries | No |
| Barst & Mukamal | 21 | 4 U.S. offices | No |
| Ogletree Deakins Nash Smoak & Stewart PC (global services provided through Emigra) | 20 | 33 U.S. offices | Yes |
| Wolfsdorf Immigration Law Group | 19 | 2 U.S. offices | No |
| Siskind Susser Bland P.C. | 18 | 6 offices in 2 countries | Yes |
| Duane Morris LLP | 16 | 22 offices in 4 countries | No |
| Reeves & Associates | 14 | 4 offices in 2 countries | No |
| Klasko Rulon Stock & Seltzer LLP | 14 | 2 U.S. offices | No |
| Chin & Curtis LLP | 13 | 1 U.S. office | No |
| Paparelli & Partners LLP | 13 | 2 U.S. offices | No |
| Gibney Anthony & Flaherty LLP (global services provided in part through Magrath & Co., Solicitors) | 12 | 5 offices in 3 countries | Yes |
| Murthy Law Firm | 12 | 1 U.S. office | No |
| Kuck Casablanca & Odom LLC | 12 | 5 U.S. offices | No |
| Baker & McKenzie LLP | 11 | 70 offices in 38 countries | Yes |
| Mintz Levin Cohn Ferris Glovsky & Popeo PC | 11 | 8 offices in 2 countries | No |
| Maggio & Kattar PC | 11 | 1 U.S. office | No |
| Kramer Levin Naftalis & Frankel LLP | 8 | 2 offices in 2 countries | No |
| Dinsmore & Shohl LLP | 8 | 9 U.S. offices | No |
| Larrabee Mehlman Albi Coker LLP | 8 | 1 U.S. office | No |
| Quarles & Brady LLP | 7 | 6 U.S. offices | No |
| Aronson & Associates PA | 7 | 1 U.S. office | No |
| | Total = 549 | | |

9

**Certain Other Firms**

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|---|---|---|---|
| Alston & Bird LLP | 3 | 6 U.S. offices | No |
| Armstrong Teasdale LLP (global services provided through *Lex Mundi* international network) | 5 | 13 offices in 2 countries | Yes |
| ASK Law Group | 5 | 5 U.S. offices | No |
| Butzel Long | 10 | 13 offices in 3 countries | Yes |
| Cohen & Grigsby PC | 6 | 3 U.S. offices | Yes |
| Dykema Gossett PLLC | 21 | 11 U.S. offices | No |
| Faegre & Benson LLP | 12 | 6 offices in 4 countries | Yes |
| Fisher & Phillips LLP | 4 | 19 U.S. offices | Yes |
| Fulbright & Jaworski LLP | 5 | 16 offices in 7 countries | Yes |
| Frost Brown Todd LLC | 8 | 9 U.S. offices | No |
| Greenberg Traurig LLP | 19 | 28 offices in 3 countries | Yes |
| Hammond Law Group LLC | 13 | 3 offices in 2 countries | Yes |
| Hogan & Hartson LLP | 11 | 22 offices in 12 countries | No |
| Holland & Knight LLP | 6 | 22 offices in 5 countries | No |
| Jackson Lewis LLP | 5 | 29 U.S. offices | Yes |
| McGuire Woods LLP | 3 | 15 offices in 3 countries | No |
| Minsky McCormick & Hallagan PC | 9 | 1 U.S. office | No |
| Morgan Lewis & Bockius LLP | 9 | 22 offices in 7 countries | Yes |
| Nachman & Associates, PC | 5 | 7 offices in 3 countries | Yes |
| Nixon Peabody LLP | 6 | 17 offices in 2 countries | No |
| Patton Boggs LLP | 4 | 8 offices in 2 countries; affiliates in 34 countries | No |
| Paul Hastings Janofsky & Walker LLP | 20 | 18 offices in 9 countries | Yes |
| Pearl Law Group | 6 | 4 offices in 2 countries | Yes |
| Perkins Coie LLP | 2 | 14 offices in 2 countries | No |
| Powell Goldstein LLP | 3 | 5 U.S. offices | No |
| Reed Smith LLP | 11 | 24 offices in 10 countries | Yes |
| Serotte Reich Wilson LLP | 4 | 1 U.S. office | Yes |
| Seyfarth Shaw LLP (global services provided in part through *Ius Laboris* international network) | 7 | 10 offices in 2 countries | Yes |
| Sidley Austin LLP | 4 | 16 offices in 10 countries | No |

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|---|---|---|---|
| Steptoe & Johnson LLP | 4 | 8 offices in 3 countries | No |
| Troutman Sanders LLP | 7 | 12 offices in 4 countries | No |
| Williams Mullen | 5 | 12 offices in 2 countries | No |
| Wilmer Cutler Pickering Hale & Dorr LLP | 3 | 11 offices in 5 countries | No |
| Zhang & Associates, PC | 10 | 4 U.S. offices | No |
| | Total = 255 | | |

29.     Fragomen's 179 lawyers represent approximately 22.2 percent of the 804 lawyers accounted for by the U.S. law firms on these two lists.  (Buffenstein Decl. ¶ 26.)

F.     Competition in the Global Immigration Services Market

30.     Not all of the U.S.-based firms identified above have large global practices.  However, if unusually high prices were to persist in the market for outbound business immigration services, many of these firms would potentially be well-positioned to make the incremental investments necessary to grow their immigration practice groups to take advantage of the opportunity.  This is a reasonable inference because many of these firms have (a) an established core of experienced immigration lawyers and support personnel, (b) substantial institutional financial resources, (c) large lawyer headcounts, and (d) offices (and/or relationships with local professional service providers) in many locations abroad.  For example, Baker & McKenzie LLP, which presently has 11 lawyers specializing in U.S. immigration law, has a total of more than 3,400 lawyers firm-wide – including a total of 70 global migration lawyers – in offices located in 38 countries.  Greenberg Traurig LLP, which currently has 19 immigration lawyers, has a total of 1,750 lawyers in 28 offices located in 3 countries (as well as affiliate offices in four additional countries).  Reed Smith LLP, which has 11 immigration lawyers at present, has more than 1,600 lawyers in 24 offices in 10 countries.  If pricing for global

immigration services were to become and remain artificially inflated, firms like these should be able to take advantage of profit opportunities relatively quickly and without prohibitive additional capital investments. (Buffenstein Decl. ¶ 28.)

31. U.S. firms are not foreclosed from competing in the global immigration services market just because they may not have offices in foreign countries. In addition to more informal subcontracting, it is not uncommon for U.S. firms handling outbound work to forge formal alliances with local providers who are licensed to practice in the foreign destination jurisdictions where the services may be needed. Many law firms have already formed or joined strategic alliances with firms abroad. One example is *Lex Mundi*, which is an international association of independent law firms that provide assistance to each other. Through *Lex Mundi*, a U.S. firm with modest resources can take advantage of the resources of a network including more than 20,000 lawyers in 160 member firms, with a collective footprint spanning more than 560 offices in 99 countries. Other examples are *Ius Laboris*, a global network of more than 2,500 labor and employment lawyers that includes immigration lawyers, and has member firms in over 45 countries; ALFA International, a global legal network with 125 member firms that covers immigration law as part of its International Law practice group; and VisaLaw International, a smaller network which bills itself as the "Global Immigration Lawyers Alliance". (Buffenstein Decl. ¶ 29.)

32. For firms that already have immigration alliances or offices in foreign countries, and that have significant investments in other practice areas, the cost of adding global immigration should not be prohibitive. Outbound immigration is different than inbound immigration, but many of the core issues and constructs are the same. A firm with experience in handling inbound business immigration will have at least one relevant foundation for adding

outbound expertise. Also, there are many resources that describe and explain, on a country-by-country basis, the general structure of immigration regulations; the types of visas, work permits, and other documents that are needed for employee relocations; and the procedures for completing and submitting the required application forms. Examples include: (a) "AILA's Global Immigration Guide: A Country-by-Country Survey," edited by Scott M. Borene (2005), which covers 44 countries; (b) the "Global Business Immigration Handbook," assembled by Fragomen Global and edited by Nancy H. Morowitz (Thomson West Publishing 2007), which covers 15 countries; and (c) the Baker & McKenzie Immigration Manual (2006), a 400-page volume which covers 22 countries and is available for free on that firm's internet site. (Buffenstein Decl. ¶ 30.)

33.    While skills and expertise are obviously required to manage global service delivery or to troubleshoot complex problems, there are significant aspects of the immigration services market which are relatively commoditized. When multinational corporations relocate employees to different countries, providers often find that the same types of visas and work permits are needed on a regular basis. This type of repetition makes it possible for immigration lawyers to delegate the administrative aspects of preparing documents for these applications to paraprofessionals. The commoditization of certain types of business immigration services has led to a highly leveraged service delivery model at many immigration firms. (Buffenstein Decl. ¶ 31.)

34.    While competition among U.S. law firms for global immigration business is vigorous, U.S. law firms represent only one of several categories of service providers that compete in this area. As described below, there is also significant competition for global immigration work from, among others: (a) "Big Four" accounting firms; (b) relocation service

firms; (c) immigration consulting firms; and (d) the in-house legal and human resources departments of large corporations. (Buffenstein Decl. ¶ 32.)

35.     There is no factual support for the assertion in paragraph 21(a) of the Amended Complaint that Fragomen "captur[es] well over three quarters" of an appropriately defined market for antitrust purposes. (Kosicki Decl. ¶ 7-8 & n.7.)

36.     The Fragomen organization's share of the market for business immigration services is, by any reasonable measure, below the 35 percent threshold typically used by the Department of Justice and the Federal Trade Commission in assessing the likelihood that a horizontal merger would result in unilateral price increases. (Kosicki Decl. ¶ 15.1.)

37.     The concentration factor in the market for business immigration services is, by any reasonable Herfindahl-Hirschman Index assessment, well below 1000 and thus within the range considered to be unconcentrated by the Department of Justice and the Federal Trade Commission. (Kosicki Decl. ¶ 15.2.)

G.     Competition from Big Four Accounting Firms

38.     Multinational corporations seeking to relocate employees across borders often find Big Four accounting firms to be attractive immigration service providers. Accounting firms cannot provide immigration services in the U.S., but they are not so restricted in foreign countries where non-lawyers can provide such services, or where more lenient rules on multi-disciplinary practice permit lawyers to be partners in accounting firms. (Buffenstein Decl. ¶ 33.)

39.     Accounting firms have certain strong advantages in competing to provide immigration services for international employee relocations. As an initial matter, Big Four accounting firms benefit from the broad geographical footprint these organizations enjoy, which facilitates the provision of inbound immigration services in a multitude of locations. In addition,

Big Four accounting firms often are the only firms that can provide complex cross-border tax services needed by relocated employees and their employers.  This creates cross-selling opportunities for the immigration practice groups of the accounting firms.  Clients may appreciate the economies of scale and efficiencies that may flow from using a single provider for tax and immigration services associated with employee relocations.  (Buffenstein Decl. ¶ 34.)

40.    For example, Ernst & Young has a Global Business Immigration Services ("GBIS") business unit within its Global Mobility Business.  Ernst & Young provides business immigration services in more than 80 countries, through a staff of more than 600 people including more than 250 licensed immigration professionals.  GBIS promises clients a "one-stop, coordinated approach" through service teams managed by regional coordinators and country managers with localized expertise.  (Buffenstein Decl. ¶ 35.)

41.    PwC competes for global business in part through its International Assignment Services divisions and its Global Visa Services Group, which bills itself as the largest provider of immigration services globally, with coverage in over 80 countries.   In addition, in the UK, PwC operates in part as an immigration law firm.  PwC recently hired one of the most prominent immigration practitioners in the United Kingdom (and 10 attorneys who support her) to lead its UK global immigration group and accelerate the growth of this business.  (Buffenstein Decl. ¶ 36.)

42.    Deloitte Touche Tohmatsu provides similar services through its Global Employer Services and Global Immigration Solutions practice groups, which have immigration specialists deployed in more than 52 countries.  (Buffenstein Decl. ¶ 37.)

43.    KPMG, through its Migration Services practice group, is a significant competitor for immigration work in Australia.  (Buffenstein Decl. ¶ 38.)

H.    Competition from Relocation Service Firms

44.    Corporations often hire relocation services firms to assist with the logistical aspects of moving employees out of their homes in one country and into new homes in a different country.  Internationally-focused relocation firms typically have offices and support networks in many different countries.  Many of these firms also provide immigration services, either directly or through alliances or working relationships with local providers.  (Buffenstein Decl. ¶ 39.)

45.    Like Big Four accounting firms, relocation firms may also have an advantage in competing for immigration business.  Their involvement in moving personal effects creates an opportunity to cross-sell their immigration services, which generally are needed by the same clients.  (Buffenstein Decl. ¶ 40.)

46.    Some of the significant relocation firms that offer global immigration services to corporate clients are:

● Sirva Relocation, which offers immigration services through "in-house immigration attorneys, specialists and migration agents, as well as a global network of Certified Immigration Providers in over 130 countries."

● Santa Fe Relocation, a leading relocation company in the Far East that handles more than 20,000 employee relocations annually and "can manage all aspects of a client's immigration, employment visa, and dependent visa needs."

● Pricoa, which is an affiliate of Prudential Financial, Inc. and was formerly known as Prudential Relocation.  Pricoa offers services through "[e]xperienced immigration consultants [who] help expedite the process of filing legal paperwork and applying for visas and work papers for almost any country in the world."  Pricoa has offices in Asia,

16

Europe, Latin America, and North America, and claims to service 39,000 relocating employees and their families each year. Pricoa has offered immigration services in part through a working relationship with Emigra.

● Primacy Relocation, which handles moves to many locations around the world, and offers to "coordinate and manage the transferee and family's necessary immigration processes, including proactive immigration management support for the entire work process to expedite the issuance of required documents."

● Weichert Relocation Resources, Inc., which has employees in 120 countries.

● Cartus Corporation (formerly known as Cendant Mobility), which offers immigration services in part through a working relationship with Fragomen.

● Expat International, an Australian firm that specializes in relocations to Australia, New Zealand, and the United Kingdom, but also offers services through other providers in the Americas, Continental Europe, Asia, the Middle East, and Africa.

(Buffenstein Decl. ¶ 41.)

I.    Competition from Immigration Consulting Firms and Facilitators

47.    Another source of competition is immigration consulting firms and other immigration service facilitators, which can provide services in countries where non-attorneys can do this work. (Buffenstein Decl. ¶ 42.)

48.    Plaintiff Emigra is a prominent example of an immigration consulting firm. Emigra claims to be the largest immigration consulting firm in the world, with global service centers on three continents covering more than 125 countries. Emigra advertises that it

17

has offices in 13 countries that, Emigra believes, represent 80 to 95 percent of most clients' immigration needs.  (Buffenstein Decl. ¶ 43.)

49.    The following are some other immigration consulting firms or service facilitators that advertise global services:

● CIBT, Inc. a firm which bills itself as the "Global Visa and Passport Professionals."

● Aries Immigration Consulting, LLC, which is based in São Paulo and advertises immigration and visa services, directly or through other providers, for moves to Brazil, the U.S., Canada, the United Kingdom, Australia, and New Zealand.

● Skillclear, a firm based in the United Kingdom which "assist[s] with all types of immigration inquiries to and from almost 80 countries around the World."

● Pro-Link Global, a firm specializing in global work permits, residence permits, entry visas, immigration documentation and global migration consulting services. (Buffenstein Decl. ¶ 44.)

J.    Competition from In-House Capabilities of Large Companies

50.    The in-house legal and human resources departments of large corporations should also be taken into account as part of any assessment of the landscape of global immigration service providers.  (Buffenstein Decl. ¶ 45.)

51.    Many of the multinational companies that frequently find themselves in need of immigration services for employee relocations also have significant in-house resources. Such companies may be able to provide some or all of the services needed themselves without having to use an outside vendor.  In-house personnel may also have well-established contacts

with providers in some regions and countries that permit them to obtain global services without an additional intermediary.  (Buffenstein Decl. ¶ 46.)

52.    In a survey of clients conducted by PwC, in response to the question, "Who is responsible for making the application for work authorization to the immigration authorities abroad?," only 36 percent of respondents indicated that external vendors were used. A total of 53 percent of the respondents indicated that in-house human resources or legal personnel handled these matters.  (Buffenstein Decl. ¶ 47.)

53.    Similar results on the prevalence of outsourcing have been reported in the annual Global Relocation Trends Survey cosponsored by GMAC Global Relocation Services, the National Foreign Trade Counsel, and the Society for Human Resources Management Global Forum.  For example, the survey conducted in November 2003 asked respondents whether they outsourced any aspect of their international assignment program.   Of the 134 respondent companies, 42 percent indicated that they did not outsource any components of their program. Among those respondents that did engage in outsourcing, 64 percent reported outsourcing visa/immigration services.  These results suggest that only 37 percent [(1 - 0.42)(0.64)] of the companies outsourced visa/immigration services, which is consistent with the outsourcing percentage found in the PwC survey discussed previously.  (Kosicki Decl. ¶ 19.2.)

54.    Informational material posted for clients by Emigra is to the same effect. On Emigra's website, the first item on a list of questions that are frequently asked by clients is: "My company handles all immigration in-house.   Why should we consider outsourcing?" Emigra also appears to acknowledge that in many cases visa applications are handled by in-house human resources departments.  ("My job is Human Resources.  How can I get out of the visa process?")  (Buffenstein Decl. ¶ 48.)

K.    Local Providers of Immigration Services in Japan

55.    Emigra alleges in its Amended Complaint that Fragomen has injured competition in Japan by allegedly agreeing with a Japanese immigration services vendor that the vendor would not work with Emigra.  (Amended Complaint ¶¶ 74, 76.)  The Japanese vendor at issue is a firm called ILS Shimoda.  (Kaplan Decl. ¶ 18.)

56.    Emigra maintains an office in Japan.  (Amended Complaint ¶15.)

57.    Neither FGIS nor any other Fragomen entity maintains an office in Japan. FGIS provides immigration services in Japan through local Japanese providers.  FGIS generally uses three local services providers in Japan.  (Kaplan Decl. ¶ 18.)

58.    FGIS uses a ILS Shimoda for approximately 20 percent of its global immigration work in Japan.  (Kaplan Decl. ¶ 17.)

59.    The relationship between FGIS and ILS Shimoda is not exclusive for either party.  ILS Shimoda provides services to other foreign firms, and FGIS currently uses two other local providers:  Tokyo General Agency (TGA), which handles approximately 70 percent of FGIS's work, and Planners Relocation, which handles approximately 10 percent of FGIS's work.   The relationships with TGA and Planners Relocation are non-exclusive for those providers as well.  (Kaplan Decl. ¶ 19.)

60.    ILS Shimoda offers assistance with obtaining visas and other required documents for foreign nationals who wish to work and stay in Japan.  ILS Shimoda "ha[s] contracted to a great variety of member companies from all over the [w]orld."  Fragomen is not the only foreign firm for which ILS Shimoda serves as a local provider.  For example, the U.S. immigration law firm Suskind Susser provides services in Japan through ILS Shimoda. (Buffenstein Decl. ¶ 50.)

20

61.     ILS Shimoda is not the only option available to foreign firms seeking a local immigration services provider in Japan (such providers are referred to in Japanese as "gyoseishoshi," or administrative lawyers).  The following firms are examples of alternative business immigration specialists (most of which, like ILS Shimoda, are based in Tokyo):

● TGA (Tokyo General Agency), which "can provide full management of immigration issues from consultation of requirements to submission of documents to maintenance of immigration-related records."

● Planners Relocation.

● The Japanese branch of PwC's International Assignment Services division.

● Nakai Immigration Services LPC, which has provided services to over 100 Japanese and non-Japanese firms.

● Sarkar Office, which serves "a large and diversified clientele including multinational companies, major Japanese companies, medium and small size companies, emerging growth companies, government agencies and individuals" and provides assistance with visas, work permits, and similar matters.

● ReloJapan, a relocation services firm with offices in Tokyo and Nagoya.

● Futaba Immigration Lawyer's Office, which assists companies that employ foreign nationals throughout Japan and internationally with work visas, permanent residence applications, and other immigration matters.

● The Yamamoto Immigration and Labor Consulting Office.

21

● Acroseed Immigration Lawyer's Office, which has serviced more than 8,000 corporate and individual clients and assists corporations wishing to employ foreign nationals in Japan.

● Hashimoto Legal Accounting Office.

● H&A Noto Legal Office.

● Morita Gyoseishoshi Lawyer's Office.

● Murata Lawyer Office.

● Asahi Tokyo Law Office.

● Office Cosmopolitan, Licensed Immigration Lawyer.

(Buffenstein Decl. ¶ 51.)

L.    <u>Australia & The United Kingdom</u>

62.    In the United Kingdom, a recent survey by the Chambers organization of the most prominent business immigration practices in London placed Fragomen as one of four firms in "Band 4," behind 11 firms in the first three bands.  (Buffenstein Decl. ¶ 54.)

63.    In the United Kingdom, the Immigration Law Practitioners' Association reports approximately 1,000 members as of February 2008.  (Kosicki Decl. ¶ 16.)

64.    In Australia, immigration providers generally must apply for certification to the Migration Agents Registration Authority ("MARA").  MARA's Register of Agents identifies 61 Registered Migration Agents ("RMAs") as being affiliated with Fragomen relative to a total of 3,584 RMAs located in Australia (1.7%).  The competitors in the Australian immigration services market include, among others, Fragomen, Emigra, KPMG (20 RMAs), Ernst & Young (15 RMAs), Deloitte (12 RMAs), Hitchcock & Associates (12 RMAs), Hamilton Watts (10 RMAs), and AMIS (9 RMAs).  (Buffenstein Decl. ¶ 55.)

M.    Competition and Pricing in the Market for Global Immigration Services

65.    One illustration of the robustness of competition is a recent experience where a Fortune 100 multinational pharmaceutical company was looking for a firm to provide global immigration services.  The company sent out requests for information to 48 different potential providers.  28 of them responded.  The company then invited six vendors to participate in a formal RFP (request for proposal) process.  Three of those vendors – including FGIS but not including Emigra – were designated as finalists and gave oral presentations in support of their bids.  FGIS ultimately was awarded the contract.  This experience demonstrates that even a multinational corporation seeking a "single source" provider for global immigration services is not limited to the Fragomen organization, Emigra, and a handful of other potential vendors.  (Kaplan Decl. ¶ 22.)

66.    There are numerous immigration services vendors that have one or more global accounts, including "Big Four" accounting firms, relocation companies, and other law firms.  (Kaplan Decl. ¶ 22.)

67.    Most of the contracts the Fragomen organization bids on and those it obtains are non-exclusive.  The contracts bind Fragomen to the prices quoted for services, but the contracts also permit the client to use its own services or the services of other vendors for some or all of its needs while the contract is in force if it so chooses.  The standard "Letter of Agreement" form FGIS has used for contracts with local providers in various parts of the world includes a clause stating that "Vendor shall be a non-exclusive provider of visa and immigration services to FGIS."  (Kaplan Decl. ¶ 23.)

68.    FGIS has encountered very aggressive competition from rival providers over the past few years.  Price competition in this market is enhanced by the commoditized

nature of the document procurement services multinational corporations typically need for employee relocations.  Competition to provide such services is done in almost all cases on the basis of flat fixed fees.  As a general matter, FGIS quotes fixed fees based on (a) government filing fees which are governed and dictated by the respective government departments and uniform for all applicants (and providers) utilizing the same visa categories; (b) amounts necessary to cover overhead expenses (this is not even acceptable to all clients), and (c) a reasonable profit margin.  Pricing to different customers for these types of services generally is similar, except that volume discounts often are provided to larger customers.  (Kaplan Decl. ¶ 24.)

69.    The commoditization of procurement services has reached such a degree that some clients ask multiple potential providers to provide bids for services needed in internet auctions.  These auctions work a little like e-Bay, except that the competition is for providers to offer the lowest bids.  Some of these auction sites enable bidders to see the bids that other competitors have provided; other sites inform bidders where their most recent bids rank among all the competitors that have submitted bids.  (Kaplan Decl. ¶ 25.)

70.    In the current environment, clients seeking global immigration services generally have been unwilling to accept price increases, and/or have insisted on price concessions from vendors.  There has been no recent trend of price increases for the most common services in this market.  The number of competitors in the marketplace, the ease of

entry into these types of services, and the lack of contractual impediments to client switching make such increases infrequent and uncommon.  (Kaplan Decl. ¶ 26.)


Dated:    New York, New York
              February 22, 2008

COVINGTON & BURLING LLP          GISKAN SOLOTAROFF & ANDERSON LLP


By: /s/ C. William Phillips                By: /s/ Darnley D. Stewart
       Charles E. Buffon                          Darnley D. Stewart
       C. William Phillips                      11 Broadway, Suite 2150
       Andrew A. Ruffino                      New York, New York 10004
       Anna E. Lumelsky                      Tel: (212) 500-5106
620 Eighth Avenue
New York, New York 10018                 *Counsel to Defendant Ryan Freel*
Tel: (212) 841-1000


*Counsel to Defendants Fragomen, Del Rey,
Bernsen & Loewy, LLP; Fragomen, Del
Rey, Bernsen & Loewy II, LLP; Fragomen
Global Immigration Services, LLC; and
Fragomen Global LLP*