UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EMIGRA GROUP, LLC,

         Plaintiff,

     --against--

FRAGOMEN, DEL REY, BERNSEN & LOEWY,
LLP; FRAGOMEN, DEL REY, BERNSEN &
LOEWY II, LLP; FRAGOMEN GLOBAL
IMMIGRATION SERVICES, LLC; FRAGOMEN
GLOBAL LLP; AND RYAN MATTHEW FREEL,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    No. 07-cv-10688 (LAK) (HP)

    ECF CASE

DARYL R. BUFFENSTEIN declares pursuant to 28 U.S.C. § 1746:

    1.   I have been retained as an expert by the defendants in this case to provide

information to the Court concerning the market for business-related immigration services.  It is

my understanding that facts about the nature and extent of competition in that market are

relevant to antitrust claims that have been asserted.

A.   <u>Background and Qualifications</u>

    2.   I am a partner in the law firm Paul, Hastings, Janofsky & Walker LLP and

I co-chair the firm's immigration practice.  My practice comprises advising U.S. and foreign

employers with respect to immigration issues and options, including compliance with

immigration laws.  I have been practicing immigration law for approximately 30 years, and my

clients include large multinational corporations.  My firm competes with the parties in this case in the market for business immigration services.

3.    I have educational degrees from the University of Cape Town (B.A. 1972), the University of Rhodesia (B.L. 1974; LL.B. 1975), and the University of Exeter School of Law (LL.M. 1977).

4.    I have testified on numerous occasions before Congress on business immigration issues and have written provisions in every major piece of business immigration legislation enacted by Congress in the past twenty years.  I am a founding member of, and I function as General Counsel for, the Global Personnel Alliance ("GPA"), a consortium of internationally active companies interested in global personnel mobility.

5.    I am a past national President of the American Immigration Lawyers Association ("AILA"), and I also served for four years as AILA's General Counsel.  As President of AILA, in response to efforts in Congress to radically restrict immigration, I led a successful national campaign to defend legal immigration.  I was the 1997 recipient of AILA's Founders Award, which honors the person or entity with the most significant impact on immigration in the preceding year.  I am one of the founders of the Business Immigration Coalition (subsequently renamed American Business for Legal Immigration, and now called Compete America), an alliance of major national business organizations such as the National Association of Manufacturers, the U.S. Chamber of Commerce, AILA, the American Council on International Personnel, and many others.  I am a frequent speaker and writer on business immigration issues.  I have also been listed in *The Best Lawyers in America*, *Who's Who in American Law*, and the *International Who's Who in Business Law*.

6.    I have authored or co-authored various papers and publications, including: "INS Issues Premium Processing Program" (client alert), June 2001; "Evading 'The Slings and Arrows of Outrageous Fortune,'" *Immigration Briefings* (Nov. 1993); "Managers and Executives Under the Immigration Act of 1990," *Immigration Briefings*, Jan. 1992; "Advanced Business Visa Strategy Roundtable," *Immigration Briefings*, Sept. 1989; "Intracompany Transfers:  A Basic Outline of Selected Criteria and Developments Affecting L-1 Visas," C394 ALI-ABA 295 (Apr. 6, 1989) &  C505 ALI-ABA 181 (March 8, 1990).  I have also co-edited certain practice and procedure manuals published by AILA.  I have chaired or co-chaired numerous business and professional conferences on business immigration issues.

7.    I have not testified as an expert at trial or by deposition in the past four years.  I am being compensated for my work on this matter at my usual billing rate of $675 per hour.  My compensation is not contingent on the substance of the opinions I am expressing or the outcome of this matter.

B.    Nature of Immigration Practice

8.    Immigration services are regulated in different ways in different countries. In the United States, immigration services generally are considered the practice of law, and only licensed attorneys may provide them.   There are several countries where registration, qualification, or certification of immigration service providers is required.

9.    In other countries, regulatory regimes permit non-lawyers to provide some categories of immigration services.  In these locations, it is common for law firms to provide immigration services to clients, but they may compete to some extent with non-lawyers, at least with respect to certain procedures or parts of the immigration process.

10.     For a firm based in the United States that focuses on the immigration needs of corporate clients, immigration work can be either "inbound" or "outbound." Inbound work generally refers to work involved in relocating foreign employees to the U.S. on a temporary or permanent basis. This requires U.S. immigration law expertise, and the work must be done by or under the supervision of a U.S. lawyer. For most immigration practices based in the U.S., inbound matters constitute the majority of the work handled.

11.     Outbound work, sometimes referred to as the "global" side of the business, generally refers to work involved in relocating employees from the United States to foreign countries, or relocating employees between offices in different foreign countries. These assignments require expertise in the immigration laws and rules of the destination country. Frequently, it is necessary to retain an attorney or other immigration service provider in the destination country to lodge the visa or work permit application. For outbound matters, staff based in the U.S. or sending country most commonly coordinate cases in conjunction with in-country experts at the destination location. (Sometimes foreign visa applications can be prepared and processed through a foreign government's consular office in the U.S. or other third country, but this is less common.)

12.     The United States accounts for the most significant portion of the world market for overall business-related immigration services. It is my perception that immigration services relating to the relocation of foreign nationals to the U.S. – "inbound" work, using the terminology described above – constitute the substantial majority of the market by dollar volume.

13.     Defendant Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen LLP") is, to my knowledge, a U.S. law firm that provides legal advice and services concerning

U.S. immigration laws and does inbound work.  It is my understanding that the Fragomen organization's global business for outbound matters is conducted by and through defendants Fragomen Global LLP and Fragomen Global Immigration Services, LLC ("FGIS").  In this declaration, unless otherwise noted, I use the term "Fragomen" to refer generally to the Fragomen organization, including the U.S. law firm and the global business that is conducted through other entities.

14.    It is my understanding that the plaintiff in this case, Emigra Group, LLC ("Emigra") is headquartered in the U.S. and provides immigration services as an immigration consulting firm.  Because Emigra is not a law firm, it cannot directly provide legal services relating to U.S. immigration needs (this would constitute the unauthorized practice of law).  Emigra's website indicates that if clients seek U.S. immigration services from Emigra, the services will be provided by the U.S. law firm Ogletree Deakins, which appears to have a joint venture with Emigra for this purpose.[1]

15.    I am familiar with Fragomen and Emigra as competitors on the global side of the market for business immigration services.  Fragomen markets itself as the largest U.S. law firm that focuses primarily or exclusively on immigration law.  Emigra, in contrast, has sought to position itself as a lower cost alternative to a law firm.  Emigra's website includes the following explanation under "FAQ" (Frequently Asked Questions):

> **We use a law firm to obtain our work visas.  Why should we use Emigra instead?**
>
> There are many law firms with excellent immigration capabilities in a single jurisdiction.  But if you are looking for a multinational immigration solution, only Emigra has the necessary infrastructure including offices in thirteen countries on four continents and a global information technology platform.  Emigra also delivers a level of proven customer service that is rarely found in law firms.

> Most importantly, Emigra's specialization and lower cost structure than law firms enables us to deliver superior products while saving you money.[2]

16.    According to the parties' websites: Emigra has foreign offices located in Australia, Belgium, Canada, China, France, Germany, Hong Kong, Japan, Singapore, Spain (Barcelona and Madrid), Switzerland, and the United Kingdom;[3] and Fragomen's global business has offices located in Australia (Brisbane, Canberra, Melbourne, Perth, and Sydney), Belgium, China, Costa Rica, France, Germany, Hong Kong, India (Bangalore, Hyderabad, and Kochi), New Zealand, Singapore, and the United Kingdom.[4]  The overlap of foreign countries where both firms have offices thus appears to be Australia, Belgium, China, France, Germany, Hong Kong, Singapore, and the United Kingdom.

## C.    Global Business Immigration Practice

17.    The market for business-related immigration services is highly country-specific, because immigration rules and requirements are country-specific.   There is no internationally uniform set of immigration laws and procedures.  Even in the circumstance where there are regional or supra-national immigration arrangements or protocols in place, local implementation can and does vary widely among member states. In short, there are significant differences in the immigration rules and requirements of different countries.

18.    It is not necessary for a U.S.-based firm that wishes to service the outbound immigration needs of corporate clients to have an office in every country where its clients may need to send employees.  U.S. firms often form alliances or working relationships with local firms in relevant foreign countries.  These relationships enable the U.S. firms to provide services abroad without having a physical presence in every possible destination jurisdiction.  In most foreign countries, there are various locally licensed immigration service

providers who are willing to provide such assistance. This is essentially a form of subcontracting. These local practices usually are eager to attract referrals, as this presents an opportunity for them to grow their own businesses.

19.     While it is common for U.S. firms to form such relationships with local providers in different countries, these relationships typically are not exclusive for either party. In other words, even in situations where a local firm in a foreign country becomes a preferred provider for a U.S. firm, the U.S. firm usually remains free to use other local providers, and the local provider usually remains free to work with other firms seeking similar assistance.

20.     Large corporate clients often seek to achieve efficiencies and economies of scale by steering their immigration matters to a limited number of firms. Clients may seek out a single provider to handle all of their global immigration if this helps them realize more economical pricing and efficiencies, or facilitate compliance. However, even among large corporations, a significant number of clients do not use a "single-source" provider for all of their outbound immigration needs worldwide. Instead, some large companies may engage regional preferred providers. For example, a U.S.-based Fortune 500 company might use one provider for outbound immigration work involving countries in Europe, the Middle East, and Africa; a different provider for work involving the Asia / Pacific region; and still another provider for matters involving Latin and South American countries.

21.     Even in situations where a client may seek a "single source" provider, it is rarely, if ever, the case that the "single source" provider is the only firm that actually delivers the service. I am not aware of any major immigration services firm that has its own offices in every jurisdiction in the world where service needs may arise. Most firms sub-contract the work in countries where they do not have a direct physical presence.

D.    Competition Among U.S. Immigration Lawyers and Law Firms

22.    As explained above, advice relating to U.S. immigration laws must be provided by or under the supervision of lawyers.  It is my understanding that Fragomen LLP currently has approximately 179 lawyers in its U.S. practice.[5]  This is a very small fraction (1.8 percent) of the approximately 10,000 attorneys who, as of 2007, had identified themselves as American immigration practitioners by joining AILA.[6]  While not all AILA attorneys identified themselves as providers of business immigration services for purposes of the directory published by AILA at that time, a majority of them did.[7]

23.    The attached Exhibit A is a non-exhaustive list of the 25 largest U.S. law firms with immigration attorneys, as reported in September 2007 by the *IndUS Business Journal* based on a survey conducted by that publication.[8]  While Fragomen is the largest immigration firm on this list, the survey shows that numerous law firms in this country have established immigration practices and compete for the business of corporate clients who need business-related immigration services.  According to the data reported in the survey, the 24 other firms identified here include approximately 370 immigration lawyers and almost twice as many immigration paralegals.

24.    This listing understates the competition among U.S. law firms with immigration practices because the survey does not purport to be, and is clearly not, comprehensive or exhaustive, and a number of notable immigration service providers, including some of the largest U.S. immigration practices, did not participate.  Publicly available information shows that many other established U.S. law firms – including many firms with substantial attorney head-counts and financial resources, and offices in many U.S. and foreign locations – offer immigration services geared to the needs of corporate clients.

25.    The tables below summarize information about the immigration practice capabilities of the firms in the "Top 25" survey and various other firms.  The table indicates the name of each firm; the number of reported immigration attorneys;[9] the number of reported U.S. and foreign offices the firm has;[10] and whether the firm claims to offer (directly or through other providers) global immigration services in addition to the U.S. immigration services it provides.[11]

### "Top 25" per *IndUS Business Journal* Survey (2007)

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|---|---|---|---|
| Fragomen Del Rey Bernsen & Loewy LLP[12] | 179[13] | 31 offices in 11 countries | Yes |
| Berry Appleman & Leiden LLP[14] | 35 | 4 U.S. offices | Yes |
| Tindall & Foster P.C.[15] | 30 | 3 U.S. offices | Yes |
| AzulaySeiden Law Group[16] | 27 | 6 offices in 3 countries | No |
| Quan Burdette & Perez, P.C.[17] | 23 | 4 offices in 2 countries | No |
| Barst & Mukamal[18] | 21 | 4 U.S. offices | No |
| Ogletree Deakins Nash Smoak & Stewart PC[19] (global services provided through Emigra)[20] | 20 | 33 U.S. offices | Yes |
| Wolfsdorf Immigration Law Group[21] | 19 | 2 U.S. offices | No |
| Siskind Susser Bland P.C.[22] | 18 | 6 offices in 2 countries | Yes |
| Duane Morris LLP[23] | 16 | 22 offices in 4 countries | No |
| Reeves & Associates[24] | 14 | 4 offices in 2 countries | No |
| Klasko Rulon Stock & Seltzer LLP[25] | 14 | 2 U.S. offices | No |
| Chin & Curtis LLP[26] | 13 | 1 U.S. office | No |
| Paparelli & Partners LLP[27] | 13 | 2 U.S. offices | No |
| Gibney Anthony & Flaherty LLP[28] (global services provided in part through Magrath & Co., Solicitors)[29] | 12 | 5 offices in 3 countries | Yes |
| Murthy Law Firm[30] | 12 | 1 U.S. office | No |
| Kuck Casablanca & Odom LLC[31] | 12 | 5  U.S. offices | No |
| Baker & McKenzie LLP[32] | 11 | 70 offices in 38 countries | Yes |
| Mintz Levin Cohn Ferris Glovsky & Popeo PC[33] | 11 | 8 offices in 2 countries | No |
| Maggio & Kattar PC[34] | 11 | 1 U.S. office | No |
| Kramer Levin Naftalis & Frankel LLP[35] | 8 | 2 offices in 2 countries | No |
| Dinsmore & Shohl LLP[36] | 8 | 9 U.S. offices | No |

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|---|---|---|---|
| Larrabee Mehlman Albi Coker LLP[37] | 8 | 1 U.S. office | No |
| Quarles & Brady LLP[38] | 7 | 6 U.S. offices | No |
| Aronson & Associates PA[39] | 7 | 1 U.S. office | No |
|  | Total = 549 |  |  |

**Certain Other Firms**

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|---|---|---|---|
| Alston & Bird LLP[40] | 3 | 6 U.S. offices | No |
| Armstrong Teasdale LLP[41] (global services provided through *Lex Mundi* international network)[42] | 5 | 13 offices in 2 countries | Yes |
| ASK Law Group[43] | 5 | 5 U.S. offices | No |
| Butzel Long[44] | 10 | 13 offices in 3 countries | Yes |
| Cohen & Grigsby PC[45] | 6 | 3 U.S. offices | Yes |
| Dykema Gossett PLLC[46] | 21 | 11 U.S. offices | No |
| Faegre & Benson LLP[47] | 12 | 6 offices in 4 countries | Yes |
| Fisher & Phillips LLP[48] | 4 | 19 U.S. offices | Yes |
| Fulbright & Jaworski LLP[49] | 5 | 16 offices in 7 countries | Yes |
| Frost Brown Todd LLC[50] | 8 | 9 U.S. offices | No |
| Greenberg Traurig LLP[51] | 19 | 28 offices in 3 countries | Yes |
| Hammond Law Group LLC[52] | 13 | 3 offices in 2 countries | Yes |
| Hogan & Hartson LLP[53] | 11 | 22 offices in 12 countries | No |
| Holland & Knight LLP[54] | 6 | 22 offices in 5 countries | No |
| Jackson Lewis LLP[55] | 5 | 29 U.S. offices | Yes |
| McGuire Woods LLP[56] | 3 | 15 offices in 3 countries | No |
| Minsky McCormick & Hallagan PC[57] | 9 | 1 U.S. office | No |
| Morgan Lewis & Bockius LLP[58] | 9 | 22 offices in 7 countries | Yes |
| Nachman & Associates, PC[59] | 5 | 7 offices in 3 countries | Yes |
| Nixon Peabody LLP[60] | 6 | 17 offices in 2 countries | No |
| Patton Boggs LLP[61] | 4 | 8 offices in 2 countries; affiliates in 34 countries | No |
| Paul Hastings Janofsky & Walker LLP | 20 | 18 offices in 9 countries | Yes |
| Pearl Law Group[62] | 6 | 4 offices in 2 countries | Yes |
| Perkins Coie LLP[63] | 2 | 14 offices in 2 countries | No |

| Firm | # Immigration Attorneys | Offices | Global Practice? |
|---|---|---|---|
| Powell Goldstein LLP[64] | 3 | 5 U.S. offices | No |
| Reed Smith LLP[65] | 11 | 24 offices in 10 countries | Yes |
| Serotte Reich Wilson LLP[66] | 4 | 1 U.S. office | Yes |
| Seyfarth Shaw LLP[67] (global services provided in part through *Ius Laboris* international network)[68] | 7 | 10 offices in 2 countries | Yes |
| Sidley Austin LLP[69] | 4 | 16 offices in 10 countries | No |
| Steptoe & Johnson LLP[70] | 4 | 8 offices in 3 countries | No |
| Troutman Sanders LLP[71] | 7 | 12 offices in 4 countries | No |
| Williams Mullen[72] | 5 | 12 offices in 2 countries | No |
| Wilmer Cutler Pickering Hale & Dorr LLP[73] | 3 | 11 offices in 5 countries | No |
| Zhang & Associates, PC[74] | 10 | 4 U.S. offices | No |
|  | Total = 255 |  |  |

26.     Fragomen's 179 lawyers represent approximately 22.2 percent of the 804 lawyers accounted for by the U.S. law firms on these two lists.  It is true that many of the lawyers on the lists, including the Fragomen lawyers, may focus on inbound work.  However, it is notable that many of the firms on both these lists offer global immigration services.  Moreover, as discussed below, these two lists show that there are numerous practices which have the basic resources and position to enter the global market if they choose to make the incremental investment necessary to do so.

E.     Competition in the Global Immigration Services Market

27.     As indicated above, many U.S. law firms have global immigration practices that handle outbound work for corporate clients seeking to send employees abroad.  In some cases U.S. firms handle outbound work through qualified personnel in their own foreign offices; in other cases, U.S. firms offer global immigration services through working relationships with firms elsewhere.  In addition, it is notable that there are also various service

models.  For example, providers inclined more to providing a single point of contact operate more closely to a "high-touch" immigration service model.  These providers may work with local service providers but rely to a greater degree on their own employees' expertise in issues relating to the destination jurisdiction, and the providers themselves (while working with or through local service providers) take primary responsibility for case strategy, troubleshooting, and customization to fit individualized client needs.  In contrast, providers employing a "low-touch" immigration service model rely primarily on independent immigration service providers who are generally located in the destination jurisdiction for expertise, case strategy, and troubleshooting.   In this respect, "low-touch" immigration firms facilitate communication between the client and the destination expert, and "high-touch" immigration firms provide a greater level of internal expertise and coordination in the United States.

28.    I understand that one relevant factor in antitrust analysis is the relative ease or difficulty of entry into the market by new competitors. Not all of the U.S.-based firms identified above have large global practices.  However, if unusually high prices were to persist in the market for outbound business immigration services, many of these firms would potentially be well-positioned to make the incremental investments necessary to grow their immigration practice groups to take advantage of the opportunity.  This is a reasonable inference because many of these firms have (a) an established core of experienced immigration lawyers and support personnel, (b) substantial institutional financial resources, (c) large lawyer headcounts, and (d) offices (and/or relationships with local professional service providers) in many locations abroad. For example, Baker & McKenzie LLP, which I understand presently has 11 lawyers specializing in U.S. immigration law, has a total of more than 3,400 lawyers firm-wide – including a total of 70 global migration lawyers – in offices located in 38 countries.[75]  Greenberg Traurig LLP,

which apparently currently has 19 immigration lawyers, has a total of 1,750 lawyers in 28 offices located in 3 countries (as well as affiliate offices in four additional countries).[76]  Reed Smith LLP, which I understand has 11 immigration lawyers at present, has more than 1,600 lawyers in 24 offices in 10 countries.[77]  If pricing for global immigration services were to become and remain artificially inflated, firms like these should be able to take advantage of profit opportunities relatively quickly and without prohibitive additional capital investments.

29.    In addition, as discussed above, U.S. firms are not foreclosed from competing in the global immigration services market just because they may not have offices in foreign countries.  In addition to more informal subcontracting, it is not uncommon for U.S. firms handling outbound work to forge formal alliances with local providers who are licensed to practice in the foreign destination jurisdictions where the services may be needed.  Many law firms have already formed or joined strategic alliances with firms abroad.  One example is *Lex Mundi*, which is an international association of independent law firms that provide assistance to each other.  Through *Lex Mundi*, a U.S. firm with modest resources can take advantage of the resources of a network including more than 20,000 lawyers in 160 member firms, with a collective footprint spanning more than 560 offices in 99 countries.[78]  Other examples are *Ius Laboris*, a global network of more than 2,500 labor and employment lawyers that includes immigration lawyers, and has member firms in over 45 countries;[79] ALFA International, a global legal network with 125 member firms that covers immigration law as part of its International Law practice group;[80] and VisaLaw International, a smaller network which bills itself as the "Global Immigration Lawyers Alliance".[81]

30.    For firms that already have immigration alliances or offices in foreign countries, and that have significant investments in other practice areas, the cost of adding global

immigration should not be prohibitive.  Outbound immigration is different than inbound immigration, but many of the core issues and constructs are the same.  A firm with experience in handling inbound business immigration will have at least one relevant foundation for adding outbound expertise.  Also, there are many resources that describe and explain, on a country-by-country basis, the general structure of immigration regulations; the types of visas, work permits, and other documents that are needed for employee relocations; and the procedures for completing and submitting the required application forms.  Examples include: (a) "AILA's Global Immigration Guide: A Country-by-Country Survey," edited by Scott M. Borene (2005), which covers 44 countries; (b) the "Global Business Immigration Handbook," assembled by Fragomen Global and edited by Nancy H. Morowitz (Thomson West Publishing 2007), which covers 15 countries; and (c) the Baker & McKenzie Immigration Manual (2006), a 400-page volume which covers 22 countries and is available for free on that firm's internet site.[82]  Of course, these resources do not magically enable any inexperienced user to competently provide sophisticated immigration services, or provide all of the logistical and strategic knowledge required to manage large global programs capably.  The point is that the knowledge is available and many firms have the ability to acquire it if they so choose, with an investment that is not prohibitive.

31. While skills and expertise are obviously required to manage global service delivery or to troubleshoot complex problems, it should be noted that there are significant aspects of the market, particularly in the low-touch context, which are relatively commoditized. When multinational corporations relocate employees to different countries, providers often find that the same types of visas and work permits are needed on a regular basis.  This type of repetition makes it possible for immigration lawyers to delegate the administrative aspects of

preparing documents for these applications to paraprofessionals. The commoditization of certain types of business immigration services has led to a highly leveraged service delivery model at many immigration firms.

32. Finally, while competition among U.S. law firms for global immigration business is vigorous, U.S. law firms represent only one of several categories of service providers that compete in this area. As described below, there is also significant competition for global immigration work from, among others: (a) "Big Four" accounting firms; (b) relocation service firms; (c) immigration consulting firms; and (d) the in-house legal and human resources departments of large corporations.

F.     Big Four Accounting Firms

33.     Multinational corporations seeking to relocate employees across borders often find Big Four accounting firms to be attractive immigration service providers. Accounting firms cannot provide immigration services in the U.S., but they are not so restricted in foreign countries where non-lawyers can provide such services, or where more lenient rules on multi-disciplinary practice permit lawyers to be partners in accounting firms.

34.     Accounting firms have certain strong advantages in competing to provide immigration services for international employee relocations. As an initial matter, Big Four accounting firms benefit from the broad geographical footprint these organizations enjoy, which facilitates the provision of inbound immigration services in a multitude of locations. In addition, Big Four accounting firms often are the only firms that can provide complex cross-border tax services needed by relocated employees and their employers. This creates cross-selling opportunities for the immigration practice groups of the accounting firms. Clients may

appreciate the economies of scale and efficiencies that may flow from using a single provider for tax and immigration services associated with employee relocations.

35.    For example, Ernst & Young has a Global Business Immigration Services ("GBIS") business unit within its Global Mobility Business.  Ernst & Young advertises to clients that it can provide business immigration services in more than 80 countries, through a staff of more than 600 people including more than 250 licensed immigration professionals.  GBIS promises clients a "one-stop, coordinated approach" through service teams managed by regional coordinators and country managers with localized expertise.[83]  When providing more complex global immigration services, however, accounting firms like Ernst & Young and KPMG frequently outsource their legal work to local vendors or to U.S. law firms, including Paul Hastings and Fragomen. In Canada, by way of example, Ernst & Young apparently provides business immigration services through a partner law firm, Egan LLP.[84]

36.    PricewaterhouseCoopers ("PwC") competes for global business in part through its International Assignment Services divisions and its Global Visa Services Group, which bills itself as the largest provider of immigration services globally, with coverage in over 80 countries.[85]  In addition, in the UK, PwC operates in part as an immigration law firm.  PwC recently hired one of the most prominent immigration practitioners in the United Kingdom (and 10 attorneys who support her) to lead its UK global immigration group and accelerate the growth of this business.[86]

37.    Deloitte Touche Tohmatsu apparently provides similar services through its Global Employer Services and Global Immigration Solutions practice groups, which have immigration specialists deployed in more than 52 countries.[87]

38.    KPMG, through its Migration Services practice group, appears to be a significant competitor for immigration work in Australia.[88]

G.    Relocation Service Firms

39.    Corporations often hire relocation services firms to assist with the logistical aspects of moving employees out of their homes in one country and into new homes in a different country.  Internationally-focused relocation firms typically have offices and support networks in many different countries.  Many of these firms also provide immigration services, either directly or through alliances or working relationships with local providers.  Some of these relocation firms also look to U.S. law firms for assistance on immigration matters.

40.    Like Big Four accounting firms, relocation firms may also have an advantage in competing for immigration business.  Their involvement in moving personal effects creates an opportunity to cross-sell their immigration services, which generally are needed by the same clients.

41.    Some of the significant relocation firms that offer global immigration services to corporate clients are:

● Sirva Relocation, which apparently offers immigration services through "in-house immigration attorneys, specialists and migration agents, as well as a global network of Certified Immigration Providers in over 130 countries."[89]

● Santa Fe Relocation, a leading relocation company in the Far East that purports to handle more than 20,000 employee relocations annually and boasts that it "can manage all aspects of a client's immigration, employment visa, and dependent visa needs."[90]

● Pricoa, which is an affiliate of Prudential Financial, Inc. and was formerly known as Prudential Relocation.    Pricoa apparently offers services through

"[e]xperienced immigration consultants [who] help expedite the process of filing legal paperwork and applying for visas and work papers for almost any country in the world." Pricoa has offices in Asia, Europe, Latin America, and North America, and claims to service 39,000 relocating employees and their families each year. Pricoa appears to have offered immigration services in part through a working relationship with Emigra.[91]

● Primacy Relocation, which handles moves to many locations around the world, and offers to "coordinate and manage the transferee and family's necessary immigration processes, including proactive immigration management support for the entire work process to expedite the issuance of required documents."[92]

● Weichert Relocation Resources, Inc., which purports to have employees in 120 countries.[93]

● Cartus Corporation (formerly known as Cendant Mobility), which apparently offers immigration services in part through a working relationship with Fragomen.[94]

● Expat International, an Australian firm that apparently specializes in relocations to Australia, New Zealand, and the United Kingdom, but also advertises that it offers services through other providers in the Americas, Continental Europe, Asia, the Middle East, and Africa.[95]

H.      Immigration Consulting Firms and Facilitators

42.     Another source of competition is immigration consulting firms and other immigration service facilitators, which can provide services in countries where non-attorneys can do this work. These service providers also often rely on outside vendors and U.S. law firms for some of their immigration work.

18

43.    The plaintiff in this case, Emigra, is a prominent example of an immigration consulting firm. Emigra claims to be the largest immigration consulting firm in the world, with global service centers on three continents covering more than 125 countries. Emigra advertises that it has offices in 13 countries that, Emigra believes, represent 80 to 95 percent of most clients' immigration needs.[96]

44.    The following are some other immigration consulting firms or service facilitators that advertise global services:

● CIBT, Inc. a firm which bills itself as the "Global Visa and Passport Professionals."[97]

● Aries Immigration Consulting, LLC, which is based in São Paulo and advertises immigration and visa services, directly or through other providers, for moves to Brazil, the U.S., Canada, the United Kingdom, Australia, and New Zealand.[98]

● Skillclear, a firm based in the United Kingdom which apparently "assist[s] with all types of immigration inquiries to and from almost 80 countries around the World."[99]

● Pro-Link Global, a firm apparently specializing in global work permits, residence permits, entry visas, immigration documentation and global migration consulting services.[100]

I.    In-House Capabilities of Large Companies

45.    The in-house legal and human resources departments of large corporations should also be taken into account as part of any assessment of the landscape of global immigration service providers.

46.    Many of the multinational companies that frequently find themselves in need of immigration services for employee relocations also have significant in-house resources. Such companies may be able to provide some or all of the services needed themselves without having to use an outside vendor.  In-house personnel may also have well-established contacts with providers in some regions and countries that permit them to obtain global services without an additional intermediary.

47.    This observation is supported by data compiled by PwC.  As part of its 2005 Global Visa Services Survey, that firm surveyed 131 companies about their immigration policies and practices, and obtained data that was reported to be statistically significant.  A copy of the survey is attached hereto as Exhibit B.  The companies surveyed included multinationals in diverse industries ranging from companies with fewer than 1,000 employees to companies with well over 10,000 employees.  In response to the question, "Who is responsible for making the application for work authorization to the immigration authorities abroad?," only 36 percent of respondents indicated that external vendors were used.  A total of 53 percent of the respondents indicated that in-house human resources or legal personnel handled these matters.[101]

48.    Informational material posted for clients by Emigra is to the same effect. On Emigra's website, the first item on a list of questions that are frequently asked by clients is: "My company handles all immigration in-house.  Why should we consider outsourcing?"[102] Emigra also appears to acknowledge that in many cases visa applications are handled by in-house human resources departments.  ("My job is Human Resources.  How can I get out of the visa process?")[103]

J.    Japan

49.    It is my understanding that Emigra has an office in Japan, while Fragomen does not.  I understand that nevertheless, Emigra has alleged that Fragomen has injured competition in Japan by allegedly agreeing with a Japanese immigration services vendor that the vendor would not work with Emigra.

50.    It is my further understanding that the vendor at issue is ILS Shimoda. That firm offers assistance with obtaining visas and other required documents for foreign nationals who wish to work and stay in Japan.[104]  ILS Shimoda's website indicates that it "ha[s] contracted to a great variety of member companies from all over the [w]orld."[105]  In addition, it does not appear that Fragomen is the only foreign firm for which ILS Shimoda serves as a local provider.  For example, the U.S. immigration law firm Suskind Susser has indicated publicly that it provides services in Japan through ILS Shimoda.[106]

51.    ILS Shimoda is not the only option available to foreign firms seeking a local immigration services provider in Japan (such providers are referred to in Japanese as "gyoseishoshi," or administrative lawyers).  The following firms are examples of alternative business immigration specialists (most of which, like ILS Shimoda, are based in Tokyo):

● TGA (Tokyo General Agency), which apparently "can provide full management of immigration issues from consultation of requirements to submission of documents to maintenance of immigration-related records."[107]

● Planners Relocation.[108]

● The Japanese branch of PwC's International Assignment Services division.[109]

● Nakai Immigration Services LPC, which has apparently provided services to over 100 Japanese and non-Japanese firms.[110]

● Sarkar Office, which advertises that it serves "a large and diversified clientele including multinational companies, major Japanese companies, medium and small size companies, emerging growth companies, government agencies and individuals" and provides assistance with visas, work permits, and similar matters.[111]

● ReloJapan, a relocation services firm with offices in Tokyo and Nagoya that my firm, Paul Hastings, uses for immigration services in Japan.[112]

● Futaba Immigration Lawyer's Office, which apparently assists companies that employ foreign nationals throughout Japan and internationally with work visas, permanent residence applications, and other immigration matters.[113]

● The Yamamoto Immigration and Labor Consulting Office.[114]

● Acroseed Immigration Lawyer's Office, which advertises that it has serviced more than 8,000 corporate and individual clients and assists corporations wishing to employ foreign nationals in Japan.[115]

● Hashimoto Legal Accounting Office.[116]

● H&A Noto Legal Office.[117]

● Morita Gyoseishoshi Lawyer's Office.[118]

● Murata Lawyer Office.[119]

● Asahi Tokyo Law Office.[120]

● Office Cosmopolitan, Licensed Immigration Lawyer.[121]

52.    In light of the above, I find it implausible that an alleged refusal of one local provider to do business with one foreign client could have a significant effect on overall

competition in Japan, or even on the ability of the affected client to find some local partner or partners willing to provide services.

K.  Australia & The United Kingdom

53.  I have also considered Fragomen's relative market presence in two significant jurisdictions for global immigration work where Fragomen and Emigra both have offices.

54.  In the United Kingdom, a recent survey by the Chambers organization of the most prominent business immigration practices in London placed Fragomen as one of four firms in "Band 4," behind 11 firms in the first three bands.[122]

55.  In Australia, immigration providers generally must apply for certification to the Migration Agents Registration Authority ("MARA").  MARA's Register of Agents[123] identifies 61 Registered Migration Agents ("RMAs") as being affiliated with Fragomen relative to a total of 3,584 RMAs located in Australia (1.7%).  The competitors in the Australian immigration services market appear to include, among others, Fragomen, Emigra, KPMG[124] (20 RMAs), Ernst & Young[125] (15 RMAs), Deloitte[126] (12 RMAs), Hitchcock & Associates[127] (12 RMAs), Hamilton Watts[128] (10 RMAs), and AMIS[129] (9 RMAs).  (The RMA figures listed here are based on searches of the MARA database.)

L.  The Plaintiff's Allegations About Immigration Service Markets

56.  I have reviewed the Amended Complaint filed by Emigra in this case.  I find Emigra's allegations about competition in the market for business immigration services, and alleged monopolization of that market by Fragomen entities, incomplete in several respects.

57.    Emigra alleges that there is a "Service Submarket" for "business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals." (Amended Complaint ¶ 11.) Emigra asserts that this Service Submarket is "highly concentrated." (*Id.* ¶ 18.) According to Emigra (*id.* ¶ 18):

> In addition to the need for specialized skill on the part of all service providers in the Service Submarket, there is the additional need to provide a broad range of services over a large geographic region at competitive pricing. The requisite relationships with secondary service providers and government agencies can be difficult to establish and enhance, and need to be made in many different regions with quality providers who can handle the requisite volume rapidly and at competitive cost. Substantial expertise and capital and time are required to accumulate the facilities, staff, relationships, and other resources necessary to compete in this market, and multinational corporate clients prefer and can require service providers with large international networks. There are barriers to entering the Service Submarket that include and are not limited to these factors. To date, only the Fragomen Defendants and Emigra and a handful of others have entered this submarket successfully.

58.    These assertions do not accord with market realities for several reasons. First, Emigra's conclusion that "only the Fragomen Defendants and Emigra and a handful of others" have entered the market of providing immigration services to multinational corporations fails to take into account the many varieties of service providers that compete in this market all over the world, including (for example) accounting firms which have offices in many countries.

59.    Second, the commentary quoted above does not acknowledge the degree to which the immigration services needed by corporate clients can be furnished by many different providers. The various categories of competitors described above are reasonable substitutes from the perspective of most clients because they can provide similar services in the

same places.  In addition, there is price competition in this market because the services offered –
assistance in obtaining the standard types of work permits and visas required for foreign
employees relocating to certain countries – are reasonably uniform.  Indeed, my experience has
been that over the past few years, prices for routine global immigration services, at least in the
low touch model, have remained stable or might have fallen, in some cases, as a result of
aggressive competition.

      60.    Third, Emigra's statements fail to take into account that, as explained
above, many large multinational corporations take care of some immigration needs in-house.

      61.    Fourth, my perceptions, as well as data collected by PwC in the survey
described earlier in this declaration, do not support Emigra's assumption that global single
source provider relationships are the norm in the industry.   The market is much more
complicated than that. Many – perhaps most – consumers divide their immigration business
among several service providers:  some handle matters in-house; many use different providers
for different countries, different regions, or even for different types of desired authorizations.  In
the PwC survey, in response to the question "If you use external counsel / immigration provider,
do you use the provider globally?," only 25 percent of respondents answered affirmatively.  69
percent said that they did not.[130]

      62.    Fifth, Emigra overstates the difficulties that would be faced by
competitors seeking to enter this market or expand their presence in it.  It is true that forging
vendor relationships with service providers, opening new offices, and particularly gaining the
level of expertise required to competently provide immigration services requires a substantial
investment of capital and time. However, these barriers are not by any means prohibitive. As
previously noted, lawyers or educated non-legal professionals generally are not required to hold

myriad credentials to be authorized to provide immigration services. Opening up business offices in key locations and hiring immigration paralegals generally does not require prohibitively expensive fixed capital investments, particularly for firms that already have many lawyers and a global involvement or footprint. As explained above, there are many established firms that already have some immigration capacity, and personnel in offices around the world in key business centers; firms in such a position could "ramp up" their immigration practices to take advantage of profit opportunities without the full extent of resource investments a new market entrant would need to make. Furthermore, even if a firm were unable to immediately establish physical offices in all other countries where services were likely to be needed, this would not be an insuperable obstacle to development of a global immigration practice. As explained above, in most countries there are many local firms that can provide services on a subcontracted basis. There are many ways, and many companies worldwide providing ways, to skin the proverbial cat of global immigration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of February, 2008.

Daryl R. Buffenstein

## Endnotes:

[1] http://www.emigra.com/main/index.php?id=93&op=1&rtid=37;
http://www.ogletreedeakins.com/areas/index.cfm?Fuseaction=Immigration

[2] http://www.emigra.com/main/index.php?id=80&op=1&rtid=37

[3] http://www.emigra.com/main/page6.php

[4] http://www.fragomen.com/offices/index.shtml

[5] http://pubweb.fdbl.com/peoplebriefs.nsf/($pub2004-people-briefs-region)?openform&region=us&america=us&cat=all (the cited statistic is based on a print-out of web-site material accessed on January 31, 2008)

[6] *2007-08 AILA Membership Directory & Resource Guide*, p. 5

[7] *2007-08 AILA Membership Directory & Resource Guide*, pp. 63-291

[8] http://www.immigrationtracker.com/Top%2025%20Immigration%20List.pdf

[9] The figures in the first table are the number of attorneys reported in the *IndUS Business Journal Survey* (which I understand was published in September 2007), except in the case of Fragomen, where the figure listed is based on the number of U.S. attorneys listed on the firm's website on January 31, 2008.  The figures in the second table are based on information printed out from the firms' websites on January 31, 2008.

[10] In both tables, the identification of offices is based on information printed out from the firms' websites on January 31, 2008.

[11] In both tables, this information is based on immigration practice descriptions printed out from the firms' websites on January 31, 2008.

[12] http://www.fragomen.com/

[13] As noted above, this figure is based on the number of U.S. attorneys listed on the firm's website on January 31, 2008.

[14] http://www.usabal.com/

[15] http://www.tindallfoster.com/

[16] http://www.azulayseiden.com/

[17] http://www.quanlaw.com/

[18] http://www.barstmukamal.com/

[19] http://www.ogletreedeakins.com/

[20] http://www.visatrax.com/uploads/Emigra%20Ogletree%20Brochure%202008.pdf

[21] http://www.wolfsdorf.com/

[22] http://www.visalaw.com/

[23] http://www.duanemorris.com/

[24] http://rreeves.com/

[25] http://www.klaskolaw.com/

[26] http://www.chincurtis.com/

[27] http://entertheusa.com/

[28] http://www.gibney.com/

[29] http://www.magrath.co.uk/home/home.asp

[30] http://www.murthy.com/

[31] http://www.immigration.net/law/index.asp

[32] http://www.bakernet.com/BakerNet/default.htm

[33] http://www.mintz.com/home.php

[34] http://www.maggio-kattar.com/

[35] http://www.kramerlevin.com/

[36] http://www.dinslaw.com/

[37] http://www.larrabee.com/

[38] http://www.quarles.com/

[39] http://www.aronsonimmigration.com/

[40] http://www.alston.com/

[41] http://www.armstrongteasdale.com/

[42] http://www.armstrongteasdale.com/PracticeAreas/BusinessServices/Immigration/index.php

[43] http://www.kaflaw.com/

[44] http://www.butzel.com/

[45] http://www.cohenlaw.com/

[46] http://www.dykema.com/

[47] http://www.faegre.com/

[48] http://www.laborlawyers.com/

[49] http://www.fulbright.com/

[50] http://www.frostbrowntodd.com/

[51] http://www.gtlaw.com/

[52] http://www.hammondlawfirm.com/

[53] http://www.hhlaw.com/home/

[54] http://www.hklaw.com/

[55] http://www.jacksonlewis.com/; http://www.jacksonlewis.com/pa/pdf/6.pdf

[56] http://www.mcguirewoods.com/

[57] http://www.mmhpc.com/

[58] http://www.morganlewis.com/

[59] http://www.visaserve.com/

[60] http://www.nixonpeabody.com/

[61] http://www.pattonboggs.com/

[62] http://www.immigrationlaw.com/

[63] http://www.perkinscoie.com/

[64] http://www.pogolaw.com/

[65] http://www.reedsmith.com/

[66] http://srwlawyers.com/

[67] http://www.seyfarth.com/; http://www.seyfarth.com/dir_docs/brochure/3e23f3d0-201c-423b-a174-ef48ea4959b0_brochure.pdf

[68] http://www.seyfarth.com/index.cfm?fuseaction/practice_area.area_of_concentration_detail/object_id/3e23f3d0-201c-423b-a174-ef48ea4959b0/BusinessImmigration.cfm

[69] http://www.sidley.com/

[70] http://www.steptoe.com/

[71] http://www.troutmansanders.com/Home.aspx

[72] http://www.williamsmullen.com/index.htm

[73] http://www.wilmerhale.com/

[74] http://www.hooyou.com/

[75] http://www.bakernet.com/BakerNet/Practice/Employment/Areas/GlobalMigration/Professionals/default.htm

[76] http://www.gtlaw.com/

[77] http://www.reedsmith.com/

[78] http://www.lexmundi.com/lexmundi/Immigration_Profile.asp?SnID=2; http://www.lexmundi.com/lexmundi/About_Lex_Mundi.asp?SnID=1213039188

[79] http://www.iuslaboris.com/Menu/International+Practice+Groups

[80] http://www.alfainternational.com/practices/groupdetail.aspx?pgid=43

[81] http://www.visalawint.com/

[82] http://www.bakernet.com/BakerNet/Resources/Publications/Recent+Publications/immigration_manual2006

[83] http://www.ey.com/global/assets.nsf/Canada/Global_Business_Immigration_Group/$file/GBIS_2005.pdf

[84] http://www.ey.com/global/content.nsf/Canada/Law_-_Egan_LLP

[85] http://www.pwcias.com/home/eng/ias_regional.html; http://www.pwc-ias.jp/en/hrvisa.html; http://www.pwc.com/extweb/service.nsf/docid/32814E4C76867BEE80256F3B00372CBE; "Empowering Global Business: 2005 Global Visa Services Survey" (PwC Human Resource Services, 2005), p. 27.

[86] http://www.pwclegal.co.uk/pdf/appointment_release_dec07.pdf

[87] http://www.deloitte.com/dtt/section_node/0,1042,sid%253D2946,00.html; http://www.deloitte.com/dtt/section_node/0,1042,sid%253D9695,00.html

[88] http://www.kpmg.com.au/default.aspx?tabid=1135

[89] http://www.sirva.com/CorpRelo_Relocation_Global_Immigration.aspx.

[90] http://www.santaferelo.com/ecs/index.jsp

[91] http://www.pricoarelocation.com/preassignment.htm; http://www.presentationselect.com/pricoa/doc/PricoaPRFactSheet.pdf; http://moving-forward-newsletter.com/0507/global.html

[92] www.primacy.com/primacy_europe.asp?Language=EN&ID1=Management+Services&ID2=Immigration+Process

[93] http://www.wrri.com/assignment_management/index.jsp

[94] https://homepage.cartus.com/AboutCM/PressRelease.aspx?regid=1&cid=886&mid=7&sid=62

[95] http://www.expat.com.au/immigration.html

[96] http://www.emigra.com/main/; http://www.emigra.com/main/index.php?id=118&op=1&rtid=37

[97] http://www.us.cibt.com/

[98] http://www.how2immigrate.net/

[99] http://www.skillclear.co.uk/services.asp

[100] http://www.pro-linkglobal.com/index.htm

[101] "Empowering Global Business: 2005 Global Visa Services Survey" (PwC Human Resource Services, 2005), pp. 3, 11, 30.

[102] http://www.emigra.com/main/index.php?id=79&op=1&rtid=37

[103] http://www.emigra.com/main/index.php?id=81&op=1&rtid=37

[104] http://www.ils-co.jp/

[105] http://www.ils-co.jp/Support_service.htm

[106] http://www.visalaw.com/contact2.html

[107] http://www.tga.co.jp/content/view/22/47/

[108] http://www.plannersrelocation.com/immigration-assistance

[109] http://www.pwc-ias.jp/en/hrvisa.html

[110] http://www.tokyovisa.co.jp/aboutus1.html

[111] http://www.sarkaroffice.com/japan_immigration.html

[112] http://www.relojapan.com/services/index.html#5

[113] http://www.futaba-immigration.jp/english/other/services.html

[114] http://www.yilco.jp/index-e.html

[115] http://www.visadaikou.jp/indexenglish.htm

[116] http://www.hashm.gr.jp/english/index.html

[117] http://www.noto-legal.com/english/index.html

[118] http://moritasachio.gyosei.or.jp/eng.html

[119] http://www2.odn.ne.jp/yamato-office/english.html

[120] http://www.atlo.jp/entop.html

[121] http://www2s.biglobe.ne.jp/~koh/ENGLISH/service2.html

[122] http://www.chambersandpartners.com/uk/resultseditorial.aspx?cid=6&pid=132&solbar=1

[123] http://www.themara.com.au/Online/Default.asp?DeptID=117.  The MARA website permits users to run searches to identify, for example, all Registered Migration Agents affiliated with a specified organization.  The figures cited in text are based on searches run on January 31, 2008.

[124] http://www.kpmg.com.au/default.aspx?tabid=1135

[125] http://www.ey.com/global/Content.nsf/Australia/Human_Capital_-_Global_Mobility

[126] http://www.deloitte.com/dtt/section_node/0,1042,sid%253D148292,00.html

[127] http://www.hitchcock.com.au/

[128] http://www.hwims.com.au/

[129] http://www.amis.com.au/

[130] "Empowering Global Business: 2005 Global Visa Services Survey" (PwC Human Resource Services, 2005), p. 18.

**Buffenstein Declaration**

**<u>Exhibit A</u>**

**IndUS Business Journal Survey of "Top 25" U.S. Law Firms With
Immigration Attorneys (September 2007)**

# Law Firms with Immigration Attorneys

## (Ranked by the number of immigration lawyers)*

| Rank | Company Name / Address / Phone / Web Address | Immigration Lawyers / Total No. of Attorneys | Immigration Paralegals / No. of U.S. offices | Services Provided** | Head of Immigration Group / Title / Year Founded |
|---|---|---|---|---|---|
| 1 | Fragomen, Del Rey, Bernsen & Loewy LLP<br>515 Madison Ave., New York NY 10022<br>(212) 688-8555 www.fragomen.com | 156<br>156 | 525<br>14 | Provides U.S. inbound visas, work permits, and residence permits, visas and work permits, compliance-related advisory and audit services for LCAs and PERM applications, I-9 compliance program management and advisory services. | Austin T. Fragomen, Jr.<br>Partner<br>1951 |
| 2 | Berry, Appleman & Leiden LLP<br>353 Sacramento Street, Suite 1300, San Francisco CA 94111<br>(415) 398-1800 www.usabal.com | 35<br>35 | 146<br>4 | Provides full-range of corporate immigration services including U.S. and global visa acquisitions, I-9 and LCA compliance, outsourcing of immigration programs and training. | Warren Leiden<br>Founding Partner<br>1980 |
| 3 | Tindall & Foster P.C.<br>600 Travis St., Suite 2800, Houston TX 77002<br>(713) 229-8733 www.tindallfoster.com | 30<br>32 | 53<br>3 | Employment-based immigration law, focused on labor certification, aliens of extraordinary ability, national interest waivers, nonimmigrant work visas, family petitions and immigration court proceedings. | Charles C. Foster<br>President and Founding Shareholder<br>1973 |
| 4 | Azulay, Horn & Selden LLC<br>205 N. Michigan Ave., 40th Floor, Chicago IL 60601<br>(312) 832-9200 www.ahslaw.com | 27<br>27 | 48<br>3 | Provides complete immigration legal services for businesses and individuals (petition, consular, hearing, appellate work), immigration consulting and immigration related law practices including family and criminal matters. | Y. Judd Azulay<br>Managing Member<br>2003 |
| 5 | Quan, Burdette & Perez P.C.<br>5177 Richmond Ave., Suite 800, Houston TX 77056<br>(713) 625-9200 www.quanlaw.com | 23<br>23 | 58<br>3 | A full-service immigration law firm handling corporate visa processing, deportation defense, complete federal litigation, relative petitions, naturalization, employer compliance and outbound immigration. | Gordon Quan<br>Managing Partner<br>1980 |
| 6 | Barst & Mukamal LLP<br>2 Park Ave., New York NY 10016<br>(212) 686-3838 www.barstmukamal.com | 21<br>21 | 75<br>4 | Provides corporate, individual, family immigration and naturalization services, consular practice, litigation, removal proceedings and enforcement issues. | Philip J. Kleiner<br>Senior Partner<br>1930 |
| 7 | Ogletree, Deakins, Nash, Smoak & Stewart P.C.<br>600 Peachtree St., Suite 2100, Atlanta GA 30308<br>(404) 881-1300 www.ogletreedeakins.com | 20<br>352 | 30<br>28 | Full-service inbound (United States) and outbound (other countries) business immigration services including a world-wide network benefiting large and small companies. | Gray Geddie<br>Co-Chair, Managing Shareholder<br>1977 |
| 8 | Wolfsdorf Immigration Law Group<br>1416 2nd St., Santa Monica CA 90401<br>(800) 847-2529 www.wolfsdorf.com | 19<br>19 | 37<br>2 | A full-service immigration law firm handling all aspects of immigration and nationality matters. | Bernard P. Wolsdorf<br>CEO<br>1986 |
| 9 | Siskind, Susser, Bland P.C.<br>1851 Oak Run Cove, Memphis TN 38119<br>(901) 682-6455 www.visalaw.com | 18<br>18 | 25<br>5 | Provides full-service immigration services with an emphasis on business, employment, healthcare, arts and sports immigration matters. | Lynn Susser<br>Managing Partner<br>1994 |
| 10 | Duane Morris LLP<br>30 S. 17th St., Philadelphia PA 19103<br>(215) 979-1000 www.duanemorris.com | 16<br>639 | 6<br>18 | Represents corporate clients, nonprofit entities and individuals with a full range of immigration and naturalization legal services, immigration-related litigation and government compliance matters. | Denyse Sabagh<br>Partner<br>1904 |
| 11 | Reeves & Associates P.C.<br>#2 North Lake Ave., Pasadena CA 91101<br>(626) 795-6777 www.reeves.com | 14<br>14 | 24<br>3 | A full-service immigration law firm devoted exclusively to the practice of immigration and nationality law. | Robert L. Reeves<br>Managing Attorney/CEO<br>1980 |
| 12 | Klasko, Rulon, Stock & Seltzer LLP<br>1800 JFK Blvd., Suite 1700, Philadelphia PA 19103<br>(215) 825-8600 www.klaskolaw.com | 14<br>14 | 16<br>2 | Handles all immigration matters, specifically emphasizing intracompany transfers, researchers in the pharmaceutical and biotech industries and physicians. | H. Ronald Klasko<br>Managing Partner<br>2004 |
| 13 | Chin & Cutis LLP<br>75 Federal St., Boston MA 02110<br>(617) 482-1775 www.chincurtis.com | 13<br>13 | 16<br>5 | Provides entire range of employment-based immigration services and primarily represents business entities including corporation, academic and research institutions, closely-held companies, medical institutions and non-profit entities. | Francis E. Chin<br>Managing Partner<br>1986 |
| 14 | Paparelli & Partners LLP<br>4 Park Plaza, Suite 200, Irvine CA 92614<br>(949) 955-5555 www.entertheusa.com | 13<br>13 | 7<br>3 | Nonimmigrant visas and waivers, employment-based petitions, RIR labor certifications, employment-based petitions, consular visa practice, permanent residence, waivers, family-based immigration and immigration compliance audits. | Angelo A. Paparelli<br>Managing Partner<br>1997 |
| 15 | Gibney, Anthony & Flaherty LLP<br>665 Fifth Ave., New York NY 10022<br>(212) 688-5151 www.gibney.com | 12<br>30 | 21<br>1 | Employment and family-based immigrant law for non-immigrant and immigrant petitions and applications including program management for inward and outward bound personnel. | Stephen J.O. Maltby<br>Head, Immigration Practice Group<br>1978 |
| 16 | Murthy Law Firm<br>10451 Mill Run Circle, Suite 100, Owings Mills MD 21117<br>(410) 356-5440 www.murthy.com | 12<br>12 | 21<br>1 | Full-service immigration law firm concentrating in business and family immigration law. | Sheela Murthy<br>President, Founder and Managing Attorney<br>1994 |
| 17 | Kuck Casablanca LLC<br>8010 Roswell Road, Suite 300, Atlanta GA 30350<br>(404) 816-8611 www.immigration.net | 12<br>12 | 13<br>4 | Full-service immigration practice, providing permanent and temporary work visas, consular processing and waiver issues, family immigration cases, and representation in immigration court in removal matters. | Charles H. Kuck<br>Managing Partner<br>1989 |
| 18 | Baker & McKenzie LLP<br>815 Connecticut Ave. NW, Washington DC 20006<br>202-452-7000 www.bakernet.com | 11<br>800 | 20<br>10 | Full-service, global migration services group, providing business immigration services in the tax, labor, and benefits arena to major multinational including nonimmigrant visas and permanent residency sponsorship services. | Elizabeth Espin Stern<br>Partner<br>1949 |
| 19 | Mintz, Levin, Cohn, Ferris, Glovsky & Popeo P.C.<br>One Financial Center, Boston MA 02111<br>(617) 542-6000 www.mintz.com | 11<br>473 | 15<br>7 | Provides business immigration law services including all nonimmigrant and immigrant visas; strategic planning regarding the immigration impact of mergers and acquisitions; I-9 and LCA audits and advice; and immigration policy planning. | Susan J. Cohen<br>Chair, Immigration Practice Group<br>1933 |
| 20 | Maggio & Kattar P.C.<br>Suite 775, 11 Dupont Circle NW, Washington D.C. 20036<br>(202) 483-0053 www.maggio-kattar.com | 11<br>11 | 19<br>1 | A full service immigration firm representing individuals, companies and other institutions in employment-based matters, J-1 and other waivers, deportation defense and federal court litigation; naturalization and family cases. | Michael Maggio<br>Chairman<br>1978 |
| 21 | Kramer, Levin, Naftalis & Frankel LLP<br>1177 Avenue of the Americas, New York NY 10036<br>(212) 715-9421 www.kramerlevin.com | 8<br>350 | 10<br>2 | Provides business immigration law services to companies both in the United States and abroad regarding the hiring and transfer of foreign national executives and represents individuals in investor or family-based immigration. | Ted Ruthizer<br>Head of the Business Immigration Group<br>1968 |
| 22 | Dinsmore & Shohl LLP<br>255 E. 5th Street, Ste. 1900, Cincinnati OH 45202<br>(513) 977-8200 www.dinslaw.com | 8<br>300 | 6<br>8 | Provides a full-range of primarily corporate and business immigration services. | Gregory P. Adams<br>Chair, Immigration Practice Group<br>1908 |
| 23 | Larrabee, Mehlman, Albi, Coker LLP<br>10145 Pacific Heights Blvd., San Diego CA 92121<br>(858) 642-0420 www.larrabee.com | 8<br>8 | 30<br>1 | Employment-based immigration law firm focused on corporate clients' immigration needs, including temporary visas, labor certifications, immigrant visas, I-9 auditing, and immigration implications of mergers and acquisitions. | Sharon Mehlman<br>Partner<br>1995 |
| 24 | Quarles & Brady LLP<br>411 East Wisconsin Ave., Milwaukee Wi 53202<br>(414) 277-5000 www.quarles.com | 7<br>442 | 7<br>6 | Provides full range of business and individual temporary and permanent visa services (concentrating in healthcare, science and technology), immigration policy and strategic planning advice, and I-9 audit and compliance services. | Grant S. Sovern<br>Chair, Immigration Practice Group<br>1892 |
| 25 | Aronson & Associates P.A.<br>1221 Nicollet Mall, Suite 506, Minneapolis MN 55403<br>(612) 339-0517 www.aronsonimmigration.com | 7<br>1 | 12<br>1 | Handles all aspects of U.S. immigration law with special emphasis on employment-based immigration legal services, particularly for physicians and allied healthcare professionals | Robert D. Aronson<br>Senior Partner<br>1996 |

Source: InduS Business Journal Survey, Compiled by Mark Connors.
*Only the 25 largest immigration law firms and law firms with immigration practice groups were included in this list. In case of a tie in the number of immigration attorneys, firms have been ranked by the total number of attorneys, followed by the number of paralegals working on immigration matters and number of offices. Total number of attorneys includes both immigration and nonimmigration attorneys in the firm.

**For a complete list of services, please visit each law firm's internet site.
July 1 List: Venture Capital Recipients
To participate, contact Mark Connors at (781) 487-0555 ext. 205 or MConnors@InduSBusinessJournal.com

**Buffenstein Declaration**

**<u>Exhibit B</u>**

**PricewaterhouseCoopers, "Empowering Global Business,"**

**2005 Global Visa Services Survey**

PRICEWATERHOUSE COOPERS

*connectedthinking

# Empowering
# Global
# Business*

2005 Global Visa Services Survey

Human Resource Services

# Welcome to the 2005 PricewaterhouseCoopers' Global Visa Services (GVS) Survey

We are glad to share with you the results of our latest research in the area of global immigration. During the fall of 2004, PricewaterhouseCoopers (PwC) invited over 130 multinational companies to participate in research around mobility management, with a specific focus on employee immigration. We asked companies a wide variety of questions, ranging from how they structure their immigration support function, to how they determine the type of visa an employee should hold while traveling.

PwC invested in this Survey not only as a thought leadership piece, but also because this data has been largely missing from the marketplace. We hope you will be able to use these results to gain an overview of global immigration, and see how other organizations are dealing with the challenges associated with managing a globally mobile workforce.

PwC's Global Visa Services group provides immigration advice and assistance to many international companies with mobile populations. The findings of our Survey complement our regulatory and business knowledge, so that we are able to recommend immigration solutions that are compliant but are also practical and representative of best practice. Visa and immigration services have been integral to our firm for many years, and form part of the suite of services provided to corporations who have an international focus and move people throughout the world.

**Julia Smye-Rumsby**
Managing Director,
Human Resource Services

*PricewaterhouseCoopers*

PricewaterhouseCoopers (www.pwc.com) provides industry-focused assurance, tax and advisory services for public and private clients. More than 120,000 people in 139 countries connect their thinking, experience and solutions to build public trust and enhance value for clients and their stakeholders.

*Human Resource Services*

PricewaterhouseCoopers' Human Resource Services (HRS) practice, with approximately 6,000 practitioners, works with companies in aligning a company's HR strategy with their overall business performance by managing the financial, tax, regulatory, operational, risk management and compliance challenges associated with human resources. We work closely with clients to offer multi-disciplinary solutions that strive to make their people a sustainable source of competitive advantage.

Our strategy is built on our belief in developing our own people to be creative and effective team players committed to outstanding quality service. We bring the ability to take fresh perspectives, to think differently, to develop and implement new and value adding solutions. One of the main challenges faced by companies today is to create environments in which their people can work most effectively. HRS brings together all of the professionals within PricewaterhouseCoopers working in the HR services area - tax, benefits, retirement, compensation, financial planning, international assignments, equity, and compliance - affording our clients an unmatched breadth and depth of expertise, both locally and globally.



Creating Value For Your Business Through People

Human Resource Services

# Table of Contents

Welcome to the 2005 Pricewaterhousecoopers'
Global Visa Services (GVS) Survey ———————————————————— 1

The Global Visa Services Survey ———————————————————— 3

Company and Participant Information ———————————————————— 4

Baseline Numbers – Quantifying Employee Mobility ———————————————————— 5

Baseline Numbers – Supporting Employee Mobility ———————————————————— 7

Responsibility for Mobility – Filling the Business Need ———————————————————— 8

Responsibility for Mobility – Processing Work Permits ———————————————————— 9

Responsibility for Mobility – Tracking ———————————————————— 12

Responsibility for Mobility – Tracking Third Country Moves ———————————————————— 14

Responsibility for Mobility – Immigration Guidelines ———————————————————— 16

Responsibility for Mobility – Service Provider Selection ———————————————————— 18

Responsibility for Mobility –  Relationships with Local Authorities ———————————————————— 19

A Challenge of Coordination – Timing ———————————————————— 22

PwC's Global Visa Services ———————————————————— 27



# 2005 Global Visa Services Survey

For many large multinational companies and an increasing number of mid- and small-sized multinationals, addressing employee mobility, and specifically, immigration, is a somewhat uncharted and multifaceted challenge. In order to help companies deal with this challenge, PricewaterhouseCoopers is pleased to announce the release of the 2005 Global Visa Services (GVS) Survey Report

PwC's GVS Survey is the first study of its kind and includes questions related to visa procurement, compliance, process administration and communications

One hundred thirty-one companies completed the GVS Survey online between September and November 2004  The Survey contains statistically significant data relating to immigration policies and practices of multinationals with fewer than 1,000 employees, to well over 10,000 employees   All industry clusters are well represented

# Company and Participant Information

*Participants by industry cluster*



*Participating companies by their full time employee size:*

FTE = "Full Time Employees"



4

# Baseline Numbers – Quantifying Employee Mobility

*Total number of employees currently located in a country where they were not originally hired.*



| | |
|---|---|
| 1 001+ | 9% |
| 501-1 000 | 6% |
| 101-500 | 22% |
| 26-100 | 31% |
| 0-25 | 31% |

Companies operating internationally have different types of mobile personnel. Typically, they will have long-term assignees covered under a well defined long-term international assignments policy, and there will also be employees who are mobile but who are not covered by any formal policy.



*The company's globally mobile employee population under an
immigration policy, as a percent of total mobile employees*



We asked companies to indicate the percentage of their total traveling population
that is officially covered by an immigration policy  Only 30% of companies believe
that almost all of their mobile employees (90%-100%) are covered by an immigration
policy

*What is the estimated number of extended business trippers at any
one time?*



All of the companies surveyed have employees who travel to another country for three
weeks or more ("extended business trippers").

2005 Global Visa Services Survey

# Baseline Numbers – Supporting Employee Mobility

*How many people within your organization are involved with work permit and visas matters*

*in the US?*



*globally?*



# Responsibility for Mobility – Filling the Business Need

*This may explain why so many companies struggle with immigration compliance. Immigration considerations and realistic timings could be built into planning pipelines if HR/Global Mobility had a greater involvement at the outset and worked together with the business managers in the host location.*

*Who is responsible for selecting an employee to undertake an assignment overseas?*



56% of managers in the home location are responsible for selecting an employee to undertake an assignment overseas  This figure is very high and raises important questions: how many of these managers a) understand the needs of the business in the host location; and b) understand immigration issues pertaining to the host location?

*The consequence of businesses not enlisting the help of customers/joint venture partners locally to "sponsor" work permit applications is a propensity to send employees into those host locations on extended "business trips" when the employees really require work permits. This is one of the most common examples of immigration non-compliance that we see in today's business world.*

*Do you ever ask your customers in the host location to assist with immigration issues?*



49% of businesses never ask customers in the host location to assist with immigration issues   This is a real surprise, particularly in the technology sector  since it may be rare for the business to have a trading entity in the host location. This makes immigration compliance more difficult   A simple fix would be to enlist the assistance of the customer or joint venture partner based in the host location.

# Responsibility for Mobility – Processing Work Permits

*What triggers your company applying for a foreign work authorization? (choose all that apply)*



| | |
|---|---|
| Condition - Duration of assignment | 66% |
| Condition - Nature of activity | 57% |
| Condition - Ad hoc/case by case | 9% |
| Decision - Immigration counsel | 40% |
| Decision - Manager - Host location | 5% |
| Not Sure/Does not apply | 3% |

66% of companies surveyed cited 'Duration of Assignment' as a factor likely to trigger an application for work authorization overseas. From an immigration compliance standpoint, the duration of the assignment should not be the primary trigger. Many HR/Global Mobility managers, line managers and employees labor under the misapprehension that employees can go and work overseas provided that they do not stay for more than 183 days. This 183 days test has no place in the world of immigration compliance, it is a tax compliance "rule of thumb." When considering immigration compliance, the number one trigger that should give rise to the seeking of work authorization in the host location is the nature of the activity to be undertaken overseas.



*Which department in your organization is responsible for overseeing work permit and visa matters on a day-to-day basis?*





| | |
|---|---|
| HR/Global Mobility - head office | 38% |
| HR/Global Mobility - host location | 33% |
| HR/Global Mobility - home location | 8% |
| External counsel/immigration provider | 17% |
| In-house legal/Corporate Compliance | 2% |
| Not Sure/Does not apply | 2% |

*It will be interesting to monitor these figures in the coming years to see whether there is an increase in the centrally coordinated approach to global immigration compliance.*

Only 38% of companies surveyed handle day to day immigration matters in a centralized way through head office. Since 9/11, and in the post Sarbanes-Oxley environment, there is a greater emphasis on corporate governance  It is necessary for the company to know exactly where each employee is on any given day, anywhere in the world

*Is that department responsible internationally or does responsibility vary by territory?*



Not sure/Does not apply 5%

Yes, true internationally 46%

No, varies around the world 49%

Half of the companies surveyed do not have one global immigration system in place  This is a lost opportunity on several counts; it makes the tracking of the entire traveling and assignee population virtually impossible, it makes it difficult to leverage technology to help with immigration case management and it makes it less cost effective in terms of the use of external experts

10



*Who is responsible for making the application for work authorization to the immigration authorities abroad?*



| | |
|---|---|
| External counsel/immigration provider/Relocation | 36% |
| HR - host location | 35% |
| HR - head office/Relocation | 8% |
| HR - home location | 5% |
| In-house legal - head office | 3% |
| In-house legal - home location | 2% |
| Employee | 6% |
| Not Sure/Does not apply | 5% |

6% of the companies surveyed leave it up to employees to organize their own overseas work permit   It is surprising that any companies at all owned up to this as it is not good practice   From a corporate governance standpoint, the company has a responsibility to its employees to ensure that  if staff are sent oversees on company business, they have the appropriate paperwork/permissions in place

*Who looks after work permit extensions/renewals?*



| | |
|---|---|
| HR - host location | 39% |
| HR - home location | 9% |
| External counsel/immigration provider | 34% |
| In-house legal - home location | 4% |
| In-house legal - host location | 1% |
| The employee | 8% |
| Line mgmt - host location | 3% |
| Not Sure/Does not apply | 2% |

# Responsibility for Mobility – Tracking

*What happens to all of the employees who are traveling and working for days/ weeks overseas who are not classified as "long term assignees?" Those are the people who are most likely to end up performing work activities overseas illegally. And they are also the employees who pose a real risk to the company in terms of unmanaged personal and corporate tax liabilities.*

*Do you keep track of the number of employees you have overseas at any one time and their geographic location?*



| | |
|---|---|
| Yes exactly | 17% |
| Yes reasonably well | 26% |
| We try but are not always notified | 30% |
| No, only track long term assignments | 23% |
| Not Sure/Does not apply | 5% |

Only 17% of the 131 companies surveyed know the whereabouts of the entire traveling and assignee population  This number is alarmingly small and reveals just how many companies are struggling with this issue.

23% track only what they define to be "long term assignments "  Ironically, it is the long term assignments which pose least risk in terms of immigration compliance because there tends to be clearly defined processes and controls in place to identify the employee and obtain work authorization in the host location before the employee embarks on the overseas tour of duty



*What methodology do you use to track?*



N=58. Does not include responses related to who
tracks and whether they use electronic or other media
to gather relevant information (n=25)

Is the tracking reactive, e g , the administrator discovers a new long term assignee then logs that person into the system? Or, are there watertight processes and controls in place so that data captured for other purposes (e g , travel, expense reporting) is fed into the immigration tracking database? In the case of the former, this system will not enable the company to track anyone other than designated "long term assignees " If the latter, such a system can enable the company to track the entire traveling/assignee population and is therefore the best practice approach

*Which department does the tracking?*



# Responsibility for Mobility – Tracking Third Country Moves

*Does your company send employees from the host location to another foreign location directly, without routing through the employee's home country?*



*Who is responsible for safeguarding immigration compliance as part of the 3rd country move?*



A high percentage (59%) of the companies surveyed confirmed that they send employees from the host location to another foreign location directly without routing them through the employee's home country  This makes a lot of business sense in terms of speed and cost efficiency, but it increases the already difficult process of tracking  Referring back to our findings, with 41% of companies surveyed handling immigration compliance in a de-centralized way, the ability to have global visibility of all moves including these "third country" movements, is extremely difficult



# Responsibility for Mobility -- Immigration Guidelines

*Does your company have written guidelines for immigration policies and procedures?*



A total of 45% of companies surveyed either have no written guidelines for immigration policies and procedures or they are not sure if they do  This is a worryingly high figure  Day to day immigration and tax considerations aside, from a Sarbanes 404 corporate governance standpoint, it is essential for companies to implement appropriate processes and controls

*Who within your organization compiled written immigration guidelines?*



16



*How are immigration guidelines communicated to employees?*



| | |
|---|---|
| Company s intranet | 47% |
| One-off E-mail advice | 41% |
| Face-to-face meeting | 38% |
| One-off telephone advice | 34% |
| Staff handbook | 17% |
| Not Sure/Does not apply | 2% |

*Do you provide immigration compliance assistance to your employees' families?*



| | |
|---|---|
| Yes in every case | 76% |
| Sometimes | 21% |
| Rarely | 2% |
| Not sure | 1% |
| No | 1% |

# Responsibility for Mobility – Service Provider Selection

*If you use external counsel/ immigration provider, do you use the same provider globally?*



*Who decides which immigration provider you will use in different locations around the world?*



More than 2/3rds of the companies surveyed do not use the same immigration provider globally. There are some significant drawbacks associated with obtaining immigration advice on an ad hoc country by country basis:

- umbrella view of the global immigration compliance picture is difficult;
- centrally coordinated tracking is difficult; and
- communication of company's immigration strategy and approved process is confusing for the employee

18

# Responsibility for Mobility – Relationships with Local Authorities

*Does your company have established relationships with foreign consulates in key locations around the world?*



It is very important to build a reputation that the company takes immigration compliance seriously. Credibility and trust are two of the most significant factors impacting the level of cooperation a company can expect to receive from consular officials.

62% of companies surveyed do not have any established relationships with foreign consulates in key locations around the world. This is a high percentage. Building relationships with foreign consulates in those locations where the company has a high concentration of employees who travel overseas is an essential piece of any company's global mobility strategy



*Who is responsible for building and maintaining relationships with foreign consulates?*



It is interesting to note that, of the minority of companies who have established relationships, it is HR and in-house legal who have those relationships   Any relationship building is better than none, and it is certainly very useful for HR to get to know the visa officers who handle day to day visa processing   However, the involvement of in-house legal can sometimes arouse the suspicions of consular officials   Best practice is for the company's corporate officers to lead relationship building initiatives at a senior level



*Does your company have established relationships with foreign government labor authorities in key locations around the world?*



*Who is responsible for building and maintaining relationships with government labor authorities?*



Only 22% of the 131 companies surveyed have established relationships with the labor authorities (responsible for granting permission to overseas nationals to work) in key business locations around the world. This too should be a key piece of any company's global mobility strategy The business should strive to establish its credibility and demonstrate that it acknowledges the immigration laws and practices of the host country Strong relationships may also facilitate sending a message to local authorities that the company wants to ensure that all foreign employees undertaking work in the host location do so in full compliance

# A Challenge of Coordination – Timing

Nearly half of Survey participants report that they learn from business of the need for travel too late to obtain work authorization by the date requested (43%). So, there is a practical dilemma – balancing immigration compliance against the business need to earn money from the timely performance of customer contracts

The majority of participants (62%) responded that the single most difficult aspect of processing work permits is the length of processing time.

The length of the visa application process adversely impacts companies' ability to meet their business needs. When there is a delay in obtaining the work authorization, 59% of respondents indicate that the employee travels anyway, but with instructions regarding what types of activities they can and cannot perform. Another 25% report putting the business need on hold until the work permit comes through. Neither option – letting the employee travel or putting the business need on hold – is the optimal solution

> *The company needs to work on devising creative solutions that are at the same time compliant solutions. Managing expectations is crucial. Opening lines of communication between line managers, resourcing departments and HR in both home and host locations is the starting point. It is also essential to connect with those people within the company who are responsible for the "Planning Pipeline."*

*How far in advance does your company initiate the work permit process?*



43% of companies surveyed honestly admitted to struggling with obtaining work permits sufficiently ahead of the business need. Resourcing departments who manage planning pipelines may hold key resourcing information stretching at least 3 months into the future. Improving communication between HR and resourcing teams may provide reliable advance warning to HR of the need to deploy staff overseas

*Which countries' immigration policies cause you the most problems?*



Does not include 'other' responses (n=30)

*Why? – all countries*





Why? – Companies who cite US as most difficult



Why? – Companies who cite China as most difficult



Why? – Companies who cite France as most difficult

2006 Global Visa Services Survey

*There is an urgent need to send the employee overseas but there is a delay in obtaining the work authorization in the host location. How does your company handle such a situation?*



An interesting statistic to emerge from this question is the very small number of companies (only 3%), who when facing a delay in obtaining work authorization, seek to identify a similarly skilled resource locally. There are a number of countries in the EU whose work permit regimes are extremely slow, e.g., average work permit processing time in Spain is 6 months. In those cases, the best practice approach is to seek a suitably skilled resource from elsewhere within the EU.





# PwC's Global Visa Services

Visa and immigration services have been integral to PwC's business for many years and form part of the suite of services provided to corporations who have an international focus and move people throughout the world

*Global Coverage*

Providing the best immigration solutions globally depends on having experienced professionals on the ground locally  We have the largest immigration network in the world covering over 80 countries   Coordination of our network is managed through a number of regional hubs   This operating structure enables us to provide 24 hour coverage around the world and to mobilize our local professionals quickly so that they can initiate contact with the appropriate local labor offices



*Immigration and Tax Compliance Combined*

It is becoming increasingly common for a country's immigration and tax authorities to communicate with each other and share information   It is essential to make sure that there is total consistency in the presentation of the employee's position from both an immigration and a tax compliance perspective

*Scope of Services*

We secure the right for your employees and their family members to live and work overseas in full compliance   Immigration rules and procedures vary significantly around the world   Obtaining permission for a foreign national to work abroad commonly entails the following:

1   Obtaining permission from the labor authorities in the host location;
2   Obtaining a visa from the host country's Consulate in the country where the worker is currently located; and
3   There may also be a third stage namely obtaining a residence permit post arrival in the host location or registration with the local police

We offer additional services as follows:

- Unmarried and same sex partner applications;
- Applications for permanent residency;
- Applications for naturalization; and
- Passport renewals

*Business Travelers*

Companies are increasingly struggling to achieve and maintain full compliance while balancing the needs of the business which demands the immediate deployment of critically skilled employees overseas   The problem is much greater in relation to employees who travel frequently abroad on business as few companies provide full compliance support to the business traveler population   At PwC, we help companies manage the immigration risks associated with business travel   We work closely with our clients to develop flexible business traveler strategies which focus on helping an organization identify its transient population and helping them track that population as it moves around the world to ensure that, as each move takes place, the employee remains immigration and tax compliant

*Technology*

At PwC, we have developed a proprietary immigration case management system which is integrated into the same technology platform that our international assignments colleagues use for expatriate tax compliance.  This means that data pertaining to your internationally mobile employees collected for tax purposes is accessible by the global GVS team, and similarly data that the global GVS team collects for immigration purposes is accessible to the international assignments team for tax return preparation purposes

The piece of the system used by our clients' HR personnel we call `VisaWatch`   The piece of the system used by our clients' assignees we call "*My Visa*"

VisaWatch is an interactive real-time system available to HR & Tax Program Managers to initiate and monitor the progress of visa and work permits applications anywhere in the world   It also tracks expiration dates so as to facilitate the timely processing of renewals

28



*VisaWatch*

My Visa gives employees real-time access to their case status information and enables them to interact with the PwC case coordinators through the online tool for document exchange, credit card billing, reminders, all in a secure, data-privacy compliant environment



*My Visa*

### Seamless Worldwide Coordination

Another factor that differentiates our offering is our ability to coordinate immigration services globally through one single point of contact  Because of the breadth of our geographic coverage, our clients can choose a single point of contact  - the "global coordinator" - in their choice of location  The global coordinator acts as the interface between the client and our GVS colleagues in the host locations around the world.

*Survey Participants**

170 Systems, Inc.
ABB Lummus Global, Inc
Abbott Laboratories, Inc
ABNAMRO NV
Accenture
Advanced Medical Optics, Inc
Air France
Air Products and Chemicals, Inc
Alcatel
ALSTOM Power Inc
Altera Corporation
Amazon com
American Express
Aramco Services Company
Archer Daniels Midland Company
ARINC Incorporated
AT&T
Atmel Corporation
Aventis
BAE SYSTEMS
Barclays PLC
BEA Systems
Berwanger, Inc
Boeing Company
Campbell Soup Company
CARE-USA
CGI-AMS, formerly AMS, Inc.
Ciba Specialty Chemicals Corporation
CNT (Computer Network Technology)
Computer Sciences Corporation
ConocoPhillips
Continental Teves, Inc
Convergys
Corn Products International
Covance, Inc.
Cypress Semiconductor
Cytec Inc
Delphi Corporation
Diamond Offshore Drilling Inc
Dorsey & Whitney
Duke Energy Corporation
E & J Gallo Winery

Eastman Chemical Company
Eaton Corporation
Ecolab
EDS
eLoyalty Corporation
Emerson
Exel inc
Fidelity Investments
FM Global
Ford Foundation
Genencor International, Inc
Genzyme Corporation
GIC
Givaudan
Global Crossing
GlobalSantaFe
GMAC
Guidant
Harvest Natural Resources, Inc.
Hella North America
Hercules Incorporated
IBM UK Ltd
IMI plc
InterGen Services
JELD-WEN inc
Johnson & Johnson
Johnson Matthey
Kellogg Company
Kendle International Inc
Krispy Kreme Doughnut Corporation
Kudelski Group (Switzerland)
Lam Research Corporation
Logitech, Inc
MBNA America
Mentor Graphics
Merrill Lynch
MMC Inc
Morgan Stanley
Morrison & Foerster LLP
Nalco Company
NCR Corporation
New York Life Insurance Company
Nike, Inc
Office Depot, Inc
Oracle Corporation

Oxbow Corporation
Pactiv Corporation
PeopleSoft, Inc
Perot Systems Corporation
Philip Morris Brazil
Philips Electronics
Plantronics Inc
Polimeri Europa Americas, Inc
PTC
Putnam Investments
Quintiles Transnational Corp
Reader's Digest
Rockwell Automation, Inc
Royal Dutch Philips
Russell Investment Group
Sanmina-SCI
SAP
SCA
Schering-Plough
Seagate Technology
Shell Oil Company
Siebel Systems, Inc
Siemens Corp
SITEL Corporation
Sony
Starbucks Coffee Company
Stryker Corporation
Sybase, Inc
The BOC Group
The Coca-Cola Company
ThoughtWorks, Inc
TI Automotive
Transocean
TSYS
UBS AG
Unilever
Unisys Corporation
UPS, Inc
Viacom
Weatherford International Ltd
Wellington Management Company, LLP
Western Asset Management Company
Westinghouse Electric Company
Zoran Corporation

*Three of the above 134 companies responses are not included in the survey results*

For more information about the Survey, PricewaterhouseCoopers' Global Visa Services, or if you would like to participate in the 2006 Survey, please contact:

**Julia Smye-Rumsby**
408-207-6311
julia.d.smye-rumsby@us.pwc.com

**Tudor Havriliuc**
415-498-5328
tudor.c.havriliuc@us.pwc.com

**Jeffrey Adams**
408-817-3976
jeffrey.a.adams@us.pwc.com



PricewaterhouseCoopers has exercised professional care and diligence in the collection, processing and reporting of the information in this report. However, the data used is from third party sources and PricewaterhouseCoopers has not independently verified, validated or audited the data. PricewaterhouseCoopers makes no representations or warranties with respect to the accuracy of the information contained in this report. PricewaterhouseCoopers shall not be liable to any user of this report or to any other person or entity for any inaccuracy of information contained in this report or any errors or omissions in its content, regardless of the cause of such inaccuracy, error or omission. Furthermore, in no event shall PricewaterhouseCoopers be liable for consequential, incidental or punitive damages to any person or entity for any matter relating to this report. Under no circumstances will PricewaterhouseCoopers disclose individual entity data. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise without the prior written consent of PricewaterhouseCoopers.

© 2005  PricewaterhouseCoopers. All rights reserved. "PricewaterhouseCoopers" refers to the network of member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity. *Connectedthinking is a trademark of PricewaterhouseCoopers LLP.

SF-SF-05-0677 A 03/05 MW

www.pwc.com/us/hrs