UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
EMIGRA GROUP, LLC,
                                                    :
                        Plaintiff,
                                                    :        No. 07-cv-10688 (LAK) (HP)
            --against--
                                                    :        ECF CASE
FRAGOMEN, DEL REY, BERNSEN & LOEWY,
LLP; FRAGOMEN, DEL REY, BERNSEN &                   :
LOEWY II, LLP; FRAGOMEN GLOBAL
IMMIGRATION SERVICES, LLC; FRAGOMEN                 :
GLOBAL LLP; AND RYAN MATTHEW FREEL,
                                                    :
                        Defendants.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        GEORGE KOSICKI declares pursuant to 28 U.S.C. § 1746:

1.      I am a Vice President at Analysis Group, Inc., an economics, finance, and strategy

        consulting firm.  I have a Ph.D. in Economics from Cornell University and over 20 years

        of experience in economic research and teaching.  Prior to joining Analysis Group, I was

        chair of the Economics Department at the College of the Holy Cross in Worcester, MA,

        where I spent 15 years on the faculty.  My areas of specialization are applied

        microeconomics, industrial organization, antitrust, and labor economics.  As an economic

        consultant, I have worked on a number of antitrust issues including market definition,

        monopolization, the competitive impact of mergers, price fixing damages in state indirect

        purchaser litigation, and the competitive impact of information exchange.  A more

        detailed description of my background and credentials, including my testimony in the past

        four years, is contained in the attached copy of my curriculum vitae.

2.      I have been asked by counsel for the Fragomen Defendants to give my expert opinion regarding the market definition, market power, and vertical restraint of trade claims of the Plaintiff.  In undertaking this assignment, I have reviewed publicly available data and documents regarding the services at issue in this matter and the current and potential suppliers of these services.  I have also reviewed the declarations of Mr. Daryl R. Buffenstein[1] and Mr. Lance Kaplan.[2]  My opinion is informed by the materials I have reviewed and my understanding of the professional economics literature in the areas of microeconomics, industrial organization, and antitrust.

3.      Analysis Group is being compensated for my work in this case at my usual billing rate of $475 per hour.  Analysis Group's fees are in no way contingent on the substance of my opinion or the outcome of this case.

4.      For reasons I will describe in detail below, I have concluded that the Plaintiff's antitrust claims have no merit from an economic perspective.  In bringing these antitrust claims, I believe the Plaintiff has confused vigorous competition on the merits with harm to competition or consumers.

**MARKET DEFINITION**

5.      **Product market.**  The Plaintiff maintains that "There is a product/service market for immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals (the 'Service Market')" and that "The Fragomen Defendants possess

---

[1] Declaration of Daryl R. Buffenstein, February 20, 2008 ("Buffenstein declaration").

[2] Declaration of Lance Kaplan, February 21, 2008 ("Kaplan declaration").

monopoly power in the Service Market."[3]  While the Plaintiff's assertion of monopoly

power is completely unfounded, I consider the proposed Service Market definition to be a

reasonable starting point.

6.    The only refinement to the Plaintiff's Service Market definition that I believe is warranted

in this context is to recognize that the Plaintiff provides only a subset of the immigration

services provided by the Fragomen Defendants.  As the declaration of Mr. Kaplan

indicates, the Fragomen Defendants assist employers with relocations of U.S. employees

to or between other countries (outbound or global services) as well as relocations of

foreign employees to the U.S. (inbound services).[4]  In contrast, Emigra is precluded under

U.S. law from providing inbound services directly because it is not a law firm.[5]  As Mr.

Buffenstein indicates in his declaration, Emigra appears to refer requests for inbound

services to the law firm Ogletree Deakins, which is not a party to this complaint.  Because

the Plaintiff does not directly compete for the inbound business of the Fragomen

Defendants, I focus on outbound immigration services for purposes of this declaration.

7.    Because the Plaintiff's Service Market definition is a reasonable starting point, it is

unfortunate that it plays so little role in the complaint.  Instead, the Plaintiff's claim rests

primarily on the assertion of a "Service Submarket."  Specifically, the Plaintiff alleges that

"There is a product/service submarket for business-related immigration services provided

by single-source providers to large multinational corporations who are major employers of

---

[3] Amended complaint, December 21, 2007 ("Complaint"), ¶ 10 and ¶ 97.

[4] Kaplan declaration, ¶¶ 14-15.

[5] See Buffenstein declaration, ¶ 14.

U.S. citizens and foreign nationals (the 'Service Submarket')."[6]  The Plaintiff asserts that

the Fragomen Defendants represent well over 75 percent of the submarket and that there

are barriers to entering the submarket.[7]  The Plaintiff makes no specific claims regarding

the Fragomen Defendants' share in the proposed Service Market.

8.    In my view the Plaintiff's assertions regarding the Service Submarket have no economic

foundation.  In particular, the Plaintiff's claims are not credible when evaluated using the

framework for market definition (often referred to as the "hypothetical monopolist" test)

specified in the horizontal merger guidelines of the U.S. Department of Justice and the

Federal Trade Commission (FTC).[8]  Using the market definition approach in the Merger

Guidelines it becomes readily apparent that the Plaintiff's depiction of the relevant

product market is much too narrow.[9]

9.    The Plaintiff asserts that the relevant market is limited to services sold by "single-source

providers."[10]  While the term single-source provider is not explicitly defined in the

complaint, it appears to refer to the ability of a firm to provide business immigration

---

[6] Complaint, ¶ 11.

[7] Complaint, ¶¶ 21a, 18.  The Plaintiff does not indicate the source for the 75 percent market share figure or even what the denominator of the share represents.

[8] See Section 1.1 of the 1992 U.S. Department of Justice/FTC Horizontal Merger Guidelines (with 1997 revisions) (hereafter "Merger Guidelines"):  "Specifically, the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and nontransitory' increase in price, but the terms of sale of all other products remained constant.  If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next-best substitute for the merging firm's product."

[9] Hereafter, I disregard the Plaintiff's use of the term submarket.  In economics, the term is not distinguishable from the term "market" and so I would conduct the same analysis regardless of the term that is used.  See also ABA Antitrust Law Section, *Antitrust Law Developments* (5th edition, 2002), p. 557.  ("As the Eighth Circuit observed, therefore, 'the same proof which establishes the existence of a relevant product market also shows (or…fails to show) the existence of a product submarket.'")

[10] Complaint, ¶ 11.

assistance in any country.[11]  While in some cases antitrust markets have been limited to specific channels of distribution, such limitations are unusual in product market definition and require evidence that customers do not view other methods of distribution as close substitutes.  In this case, however, customers consider local service providers to be viable alternatives to providers that operate in several countries.  Consequently, a hypothetical "single source" monopolist could not initiate a "small but significant and nontransitory" increase in price without facing pressure from service providers that have a specific country focus.

9.1.    Local immigration service providers in a specific country typically focus on relocations of employees from other countries to that country, similar to U.S. law firms that specialize in inbound immigration services. Customers who primarily require immigration assistance for a smaller set of countries may prefer to use a specialized local service provider in each country because of the provider's local knowledge, rather than a single-source provider.  Mr. Buffenstein's declaration indicates that "even among large corporations, a significant number of clients do not use a 'single-source' provider for all of their outbound immigration needs worldwide"[12] and that "many [customers] use different providers for different countries, different regions, or even for different types of desired authorizations."[13]

---

[11] Under the heading "Single Source," the Emigra web site states:  "Emigra can be your single global source for immigration management."  See http://www.emigra.com/main/page11.php.

[12] Buffenstein declaration, ¶ 20.

[13] Buffenstein declaration, ¶ 61.

Therefore, local providers represent an important constraint on the pricing behavior of single-source providers.

9.2.    Local service providers can also easily assist with their customers' immigration needs in other countries through participation in networks and alliances of immigration law firms.  As described by Mr. Buffenstein, membership in an international alliance of law firms, such as Lex Mundi or Ius Laboris,[14] allows a local service provider in a specific country to establish a relationship with a local service provider in another country to jointly assist customers who require immigration services in both countries.  Such networks frequently have practice groups for lawyers specializing in immigration matters.  For example, Ius Laboris, an alliance of human resources lawyers that reports having members in over 45 countries and coverage in over 100 countries, maintains an International Practice Group focusing on Immigration and Expatriation.[15]  Similarly, the Immigration Practice Group of Lex Mundi, an association of independent law firms, reported having members in over 60 different countries in 2005.[16]

10.    The Plaintiff's Service Submarket definition is also unusual because it limits the market to a specific group of corporate customers, specifically "large multinational corporations

---

[14] Buffenstein declaration, ¶ 29.

[15] See http://www.iuslaboris.com/Menu/About+Ius+Laboris and http://www.iuslaboris.com/Menu/International+Practice+Groups.

[16]  See http://www.lexmundi.com/lexmundi/Immigration_Profile.asp and "Lex Mundi Immigration Practice Group Directory," October 3, 2005, available online at http://www.lexmundi.com/images/lexmundi/PDF/PG/immigration%20directory.pdf.

who are major employers of U.S. citizens and foreign nationals."[17]  While the Merger

Guidelines do allow for product markets to be narrowed to certain groups of customers in

the presence of price discrimination,[18] there is no evidence of price discrimination among

the services at issue in this case.  Mr. Kaplan's declaration indicates that pricing to

different customers for the procurement of visas and work permits – the types of services

typically needed for international employee relocations – are generally similar, except that

volume discounts are often provided to large customers.[19]  Volume discounts do not

constitute a form of price discrimination when they reflect cost savings, which is certainly

the case here.[20]

11.    **Geographic market.**  The Plaintiff maintains that "The geographic market is global (the

'Geographic Market')."  In addition, however, the Plaintiff asserts that "There is a

geographic submarket of the Geographic Market which encompasses (i) those countries

where the Plaintiff and the Fragomen Defendants and other service providers in the

Services Submarket have offices; and (ii) those countries where the Plaintiff and the

Fragomen Defendants otherwise provide services ('the Geographic Submarket')."[21]

---

[17] Complaint, ¶ 11.

[18] See Section 1.12 of the Merger Guidelines:  "Existing buyers sometimes will differ significantly in their likelihood of switching to other products in response to a 'small but significant and nontransitory' price increase.  If a hypothetical monopolist can identify and price differently to those buyers ('targeted buyers') who would not defeat the targeted price increase by substituting to other products in response to a 'small but significant and nontransitory' price increase for the relevant product, and if other buyers likely would not purchase the relevant product and resell to targeted buyers, then a hypothetical monopolist would profitably impose a discriminatory price increase on sales to targeted buyers."

[19] Kaplan declaration, ¶ 24.

[20] I expect that cost savings are the source of volume discounts in this case because the incremental costs associated with the visa and work permit application process for a given customer can be spread over a larger volume.  Emigra also offers volume discounts.  See http://www.emigra.com/main/index.php?id=92&op=1&rtid=37.

[21] Complaint, ¶¶ 13-14.

12.    There does not appear to any appreciable difference between the Plaintiff's proposed
       Geographic Market and the Geographic Submarket. Emigra maintains offices in twelve
       countries outside of the U.S.[22] Emigra also indicates that it "has successfully completed
       immigration procedure in 125 different countries" using "a proprietary network of
       immigration professionals around the globe."[23] Fragomen has offices in eleven countries
       outside the U.S., eight of which overlap with countries that Emigra serves.[24] As a result, I
       consider the relevant geographic market to be essentially global in scope.

### MARKET POWER

13.    **Market share.** The Fragomen Defendants are one of many sellers competing in the
       global market for outbound business immigration services. When identifying sellers that
       participate in a market, the Merger Guidelines include not only current sellers, but also
       "uncommitted entrants" (i.e., firms that participate in a market through supply response).[25]

14.    In this case, as Mr. Buffenstein indicates in his declaration, legal professionals who focus
       primarily on inbound business immigration work could readily switch to outbound work
       with minimal adjustment costs, as "many of the core issues and constructs are the same."[26]
       In addition, several publicly available handbooks – including one sponsored by Fragomen

---

[22] See http://www.emigra.com/main/page40.php. Emigra maintains foreign offices in Australia, Belgium, Canada, China, France, Germany, Hong Kong, Japan, Singapore, Spain, Switzerland, and United Kingdom.

[23] See http://www.emigra.com/main/index.php?id=118&op=1&rtid=37.

[24] The Fragomen Defendants maintain foreign offices in Australia, Belgium, China, Costa Rica, France, Germany, Hong Kong, India, New Zealand, Singapore, and United Kingdom. See http://www.fragomen.com/offices/index.shtml.

[25] See Section 1.321 of the Merger Guidelines: "If a firm has existing assets that likely would be shifted or extended into production and sale of the relevant product within one year, and without incurring significant sunk costs of entry and exit, in response to a 'small but significant and nontransitory' increase in price for only the relevant product, the Agency will treat that firm as a market participant."

[26] Buffenstein declaration, ¶ 30.

Global LLP – spell out in detail the various immigration requirements for workers in each country, thus significantly lowering the costs associated with switching.[27]  Given the ease with which business immigration professionals can transition from one topic area to the other, I do not distinguish immigration professionals by specialty when identifying participants in the relevant market.

15.     While a precise measure of market share based on sales or the volume of transactions is not possible at this point, market share is often based on capacity,[28] which in this case is the number of immigration professionals employed by the various sellers.  The capacity shares indicate that the Fragomen Defendants do not have a dominant position in the relevant market.

        15.1.     Mr. Buffenstein's declaration summarizes the number of immigration attorneys employed by the top 25 U.S. law firms with immigration practices.[29]  The 179 immigration attorneys employed by Fragomen represent just 33 percent of the 549 total immigration attorneys employed by the top 25 U.S. law firms.  Even with this unusually narrow list of market participants, Fragomen's share is below the 35 percent threshold typically used by the Department of Justice/FTC in assessing the

---

[27] See Fragomen Global, *Global Business Immigration Handbook*, (Nancy H. Morowitz, ed.), Thomson/West, 2007; American Immigration Lawyers Association, *Global Immigration Guide:  A Country-by-Country Survey*, (Scott M. Borene, ed.), 2005; Baker & McKenzie, *Immigration Manual*, November 2006, available online at http://www.bakernet.com/BakerNet/Practice/Employment/Areas/GlobalMigration/CountryGuidelines/default.htm.

[28] See Section 1.41 of the Merger Guidelines:  "The Agency normally will calculate market shares for all firms (or plants) identified as market participants in Section 1.3 based on the total sales or capacity currently devoted to the relevant market, together with that which likely would be devoted to the relevant market in response to a 'small but significant and nontransitory' price increase."

[29] Buffenstein declaration, ¶ 25.

likelihood that a horizontal merger would result in unilateral price increases.[30]

15.2.    The Buffenstein declaration also shows that there are many immigration attorneys employed outside of the top 25 U.S. law firms, including prominent law firms such as Greenberg Traurig, Reed Smith, Seyfarth Shaw, Sidley Austin, and many others.[31]  Mr. Buffenstein's declaration lists an additional 34 firms that together employ 255 attorneys in their immigration practices.  Adding these 255 attorneys to those employed by the top 25 U.S. law firms further reduces the percentage of the total immigration attorneys employed by Fragomen to 22 percent.[32]  Even if these 59 firms comprised the entire set of market participants, the Herfindahl-Hirschman Index (HHI) used in the Merger Guidelines to measure market concentration would have a value of only 645, which is well within the range considered to be unconcentrated by the Department of Justice/FTC.[33]

---

[30] Merger Guidelines, Sections 2.211 and 2.22.  See also U.S. Department of Justice/FTC, *Commentary on the Horizontal Merger Guidelines*, March 2006, p. 26.  ("As an empirical matter, the unilateral effects challenges made by the Agencies nearly always have involved combined shares greater than 35%.")

[31] Buffenstein declaration, ¶ 25.

[32] The *IndUS Business Journal Survey* included as Exhibit A to the Buffenstein declaration also reports Fragomen as employing 525 immigration paralegals out of a total of 1,240.  Counting both immigration lawyers and paralegals, Fragomen represents less than 34 percent of the 2,044 immigration professionals [(179 + 525)/(549 + 255 + 1240)] employed by the top 25 U.S. law firms and the additional 34 U.S. law firms identified by Mr. Buffenstein.  This share – while still quite modest – substantially overstates Fragomen's true share because Mr. Buffenstein did not report the number of immigration paralegals at the 34 "other" U.S. law firms he examined.

[33] See Merger Guidelines, Section 1.51 ("Post-Merger HHI Below 1000.  The Agency regards markets in this region to be unconcentrated.")  The HHI is computed by squaring the market share of each firm and then summing the resulting values over all firms in the market.

15.3.    Furthermore, Mr. Buffenstein indicates that the American Immigration Lawyers Association (AILA) has over 10,000 attorney members, with a majority identifying themselves as providers of business immigration services.[34]  Fragomen's 179 immigration attorneys (as of January 31, 2008) represent less than 2 percent of AILA members.  In my view, this share illustrates how dramatically the Plaintiff has mischaracterized Fragomen's position in the relevant market.

16.    As discussed previously, non-U.S. law firms also play an important role in providing outbound services.  For example, in the U.K., the Immigration Law Practitioners' Association reports approximately 1,000 members as of February 2008.[35]  Similarly, according to Australia's Migration Agents Registration Authority, there were 3,584 registered migration agents in Australia as of January 2008, of which only 61 (1.7 percent) were associated with Fragomen.[36]

17.    Moreover, none of the market share measures discussed above account for sellers such as the Plaintiff that are not organized as law firms.  In fact, Emigra describes itself on its website as "one of the largest immigration firms worldwide."[37]  Other immigration consulting firms include CIBT, Aries Immigration Consulting, SkillClear Immigration, and Pro-Link Global.[38]

---

[34] Buffenstein declaration, ¶ 22.

[35] See http://www.ilpa.org.uk/.

[36] See http://www.themara.com.au/Online/ARSearchResult.asp?DeptID=140.

[37] See http://www.emigra.com/main/page23.php.

[38] For additional information on these firms, see http://www.us.cibt.com/ (CIBT); http://www.how2immigrate.net/ (Aries); http://www.skillclear.co.uk/ (SkillClear); and http://www.pro-linkglobal.com/ (Pro-Link Global).

18.    In addition, there are a number of providers of business immigration services that will not be completely captured even in comprehensive listings such as the AILA membership directory.  Other important categories of providers discussed in detail below include in-house legal and human resources personnel, major accounting firms, and relocation service providers.

19.    Outside providers of business immigration services face the constant threat of being replaced by corporate decision-makers who decide to handle immigration services in-house.[39]  While outsourcing firms have made significant inroads at many corporations, survey data indicate that the use of in-house legal or human resources personnel remains widespread.  To the extent that in-house personnel are also AILA members, they would of course already be reflected in the base of over 10,000 attorneys discussed previously.  However, the survey data also indicate that the corporate legal department is not routinely involved in business immigration services.  In many corporations, business immigration matters are handled by human resource professionals.

19.1.    According to the Global Visa Services Survey conducted by PricewaterhouseCoopers (PwC) at the end of 2004, only 36 percent of the 131 respondent companies indicated that they outsourced the responsibility for applying for work authorization abroad to external counsel, an immigration services provider, or a relocation provider.  In contrast, 48 percent of the respondents assigned the responsibility for

---

[39] While the Plaintiff does not acknowledge in-house immigration services in its complaint, Emigra's web site indicates that the company is aware of this issue in the normal course of its business.  In the "Frequently Asked Questions," section of its web site, the following question is discussed:  "My company handles all immigration in-house.  Why should we consider outsourcing?"  See http://www.emigra.com/main/index.php?id=79&op=1&rtid=37.

work authorizations to the human resources department of either the host location (35 percent), the head office (8 percent), or the employee's home location (5 percent). The in-house legal department was responsible for work authorization applications for only 5 percent of the respondent companies.[40]

19.2.    Similar results on the prevalence of outsourcing have been reported in the annual Global Relocation Trends Survey cosponsored by GMAC Global Relocation Services, the National Foreign Trade Counsel, and the Society for Human Resources Management Global Forum.[41]  For example, the survey conducted in November 2003 asked respondents whether they outsourced any aspect of their international assignment program.[42]  Of the 134 respondent companies, 42 percent indicated that they did not outsource any components of their program.  Among those respondents that did engage in outsourcing, 64 percent reported outsourcing visa/immigration services.  These results suggest that only 37 percent [(1 - 0.42)(0.64)] of the companies outsourced visa/immigration services, which is consistent with the outsourcing percentage found in the PwC survey discussed previously.

---

[40] PricewaterhouseCoopers, *Empowering Global Business:  2005 Global Visa Services Survey*, p. 11 (Exhibit B to Buffenstein declaration).  The question posed was:  "Who is responsible for making the application for work authorization to the immigration authorities abroad?"

[41] Global Relocation Trends 2003/2004 Survey Report, available online at http://www.nftc.org/default/hr/GRTS%202003-4.pdf.

[42] The Global Relocation Trends Survey Report is also available for 2005 and 2006, but these reports do not contain the percentage of respondents who outsource at least some aspect of their international assignment programs.

20.   Tax issues associated with employee relocation have resulted in major accounting firms such as PwC, Ernst & Young, Deloitte, and KPMG also providing business immigration and other relocation services to many employers.  These accounting firms maintain their own staff of immigration professionals in many countries and represent a highly credible alternative to law firms with global immigration practices.  For example, PwC's Global Visa Services network covers more than 80 countries, while Deloitte has business immigration specialists in more than 52 countries.[43]  Ernst & Young's Global Business Immigration Services group employs over 250 immigration professionals in over 80 countries.[44]  Many of these professionals would not be reflected in counts such as that associated with the AILA membership directory.

21.   Relocation firms offer corporations that need to send employees abroad a diverse set of services such as international compensation administration, home finding, rental assistance, household goods management, language training, work authorization, and other immigration assistance.  There are at least 22 firms that compete on price and quality to provide such services.[45]  A few of the leading relocation firms include Altair Global Relocation, Cartus, GMAC Global Relocation Services, Hewitt Associates, Paragon Relocation Resources, Primacy Relocation, Pricoa, and Weichert Relocation Resources.  Relocation firms may have business relationships with immigration service providers such as Fragomen or Emigra, and so not every firm in this category represents a

---

[43] For information on PwC's immigration practice, see PricewaterhouseCoopers, *Empowering Global Business: 2005 Global Visa Services Survey*, p. 27 (Exhibit B to Buffenstein declaration).  For information on Deloitte's immigration practice, see http://www.deloitte.com/dtt/section_node/0,1042,sid%253D2946,00.html.

[44] See Ernst & Young, *Global Business Immigration Services, An Overview*, available online at http://www.ey.com/global/assets.nsf/Canada/Global_Business_Immigration_Group/$file/GBIS_2005.pdf.

[45] See "The Baker's Dozen,"  *HRO Today*, May 2007, pp. 19-36, available online at http://www.hrotoday.com/pdf/1695-HROT-ReloBakersDozen.pdf.

completely new source of supply for immigration services.[46]  However, given the large

number of firms in this category, it represents an important source of additional business

immigration service providers to the relevant market.

22.    **Demand for business immigration services.**  While a small market share is certainly one

indicator that the Fragomen Defendants lack market power, another important economic

factor that limits market power is price sensitivity among buyers.  From an economic

perspective, it is important to note that the demand for immigration services is really just

an input into the broader demand for relocation services, which in turn comes not from

final consumers, but from other firms.  These firms typically face intense pressure to keep

costs down because of competition they face in their own downstream product markets.[47]

This factor helps to raise the price elasticity of demand facing immigration service

providers.  The more elastic the demand for a product, the less ability a seller has to

exercise significant power over price.

23.    **Easy market entry.**  As the declaration by Mr. Buffenstein indicates, the services

typically needed for international employee relocations – procurement of visas and work

permits – are essentially standardized services that are often carried out by

paraprofessionals with relatively little supervision from licensed attorneys.[48]  As a result,

it is reasonable to expect that legal professionals with no specialized training in

---

[46] Fragomen has a working relationship with Cartus (formerly Cendant Mobility) and Weichert Relocation Resources, while Emigra has a working relationship with Pricoa (formerly Prudential Relocation).

[47] See Merger Guidelines, Section 1.1:  "In considering the likely reaction of buyers to a price increase, the Agency will take into account all relevant evidence, including, but not limited to, the following: (1) evidence that buyers have shifted or have considered shifting purchases between products in response to relative changes in price or other competitive variables; (2) evidence that sellers base business decisions on the prospect of buyer substitution between products in response to relative changes in price or other competitive variables; (3) the influence of downstream competition faced by buyers in their output markets; and (4) the timing and costs of switching products."

[48] Buffenstein declaration, ¶ 31.

immigration law would enter the market in a timely manner with sufficient production

capacity to undercut any significant exercise of market power in the relevant market.[49]

24.    The extent of this potential entry can be readily illustrated by focusing on the *total* number

of attorneys employed at the top 25 immigration law firms, instead of just those

specializing in immigration law (as discussed previously).[50]  For example, the

employment data presented in the Buffenstein declaration suggest that the top 25

immigration law firms employ a total of 3,844 attorneys.[51]  The 179 attorneys at

Fragomen represent only 5 percent of this total (in contrast to 33 percent of the

immigration attorneys at the top 25 U.S. law firms).

25.    **Pricing.**  As Mr. Kaplan indicates in his declaration, pricing of outbound immigration

services involving document procurement is done primarily on a fixed fee basis that

passes through to customers the fees charged by the respective governments, along with a

markup to cover the company's overhead costs and provide a reasonable profit.  Volume

discounts are offered to larger customers.[52]  Both Mr. Kaplan and Mr. Buffenstein indicate

that prices for the most common outbound immigration services have been steady or

falling due to competitive pressures.[53]  Given the similar nature of the business

immigration services provided by all sellers, customers can choose among many suppliers

---

[49] The Merger Guidelines distinguish potential entrants ("committed entrants") from actual market participants that qualify by virtue of supply substitution ("uncommitted entrants") based on the speed of the supply response and the sunk costs involved.  Potential entrants are considered to be those suppliers who would need more than one year to respond and would be required to undertake significant sunk cost expenditures.  Entry is considered timely if it "can be achieved within two years from initial planning to significant market impact."  See Merger Guidelines, Section 3.

[50] See also Buffenstein declaration, ¶ 28.

[51] This total of 3,844 attorneys represents the 179 Fragomen attorneys reported by Mr. Buffenstein plus the total number of attorneys for each top 25 law firm reported in Exhibit A of the Buffenstein declaration.

[52] Kaplan declaration, ¶ 24.

[53] See Kaplan declaration, ¶¶ 25-26, and Buffenstein declaration, ¶ 59.

and readily switch if they are dissatisfied.  Consequently, there is every reason to expect that prices have been maintained in a relatively narrow band around the competitive level.[54]

26. According to Mr. Kaplan's declaration, it is not unusual for businesses to place their immigration services needs up for bid and receive dozens of qualified responses.  In particular, he relates an example of a Fortune 100 multinational pharmaceutical company that invited bids for a well-defined set of services from 48 potential suppliers, 28 of whom submitted a response.  The company then selected 6 suppliers to make formal proposals and interviewed 3 finalists before choosing the eventual winner.[55]  This is a clear example of competition on the merits.  Moreover, Mr. Kaplan's declaration points out that the eventual winner (in this instance, Fragomen Global Immigration Services) remains vulnerable to competition throughout the term of the deal because contracts are non-exclusive.  That is, the contract binds the supplier to the agreed-upon price, but customers are still free to switch suppliers.[56]

27. A necessary condition of a highly competitive market is also good information among both buyers and sellers regarding alternative prices.  Once again, Mr. Kaplan's declaration contains important information on this point.  His declaration indicates that some buyers have begun to place packages of business immigration services up for bid through internet auction sites similar to eBay.  These auction sites subsequently award the business to the low bidder and allow each auction participant to see the current low bid as the auction

---

[54] In fact, the Plaintiff emphasizes in the complaint the necessity of "competitive pricing" for business growth.  See Complaint, ¶ 18.

[55] Kaplan declaration, ¶ 22.

[56] Kaplan declaration, ¶ 23.

unfolds.[57]  When there are many suppliers in a market, this type of price visibility

enhances competition and makes it exceptionally difficult for any supplier to exercise

market power

28.    **Conclusions on monopolization.**  The Plaintiff's claims regarding market definition and

market power are completely unsupported.  There is a well-defined global market for

outbound business immigration services, but that market is unconcentrated and highly

competitive.  There is no credible economic evidence to suggest that the Fragomen

Defendants have sufficient market power to engage in monopolizing behavior.

### VERTICAL RESTRAINT OF TRADE

29.    The Plaintiff alleges that the Fragomen Defendants "entered into a vertical agreement,

contract, or combination with Emigra's former vendor in Japan (i.e., the Vendor

Agreement)" and that the Vendor Agreement "unreasonably restricts competition in the

Service Market and the Service Submarket."[58]  My understanding is that the Plaintiff's

claim relates to an alleged "exclusive dealing" arrangement between one of the Fragomen

Defendants and ILS Shimoda, a local immigration services provider in Japan.[59]

30.    The Plaintiff asserts that as a result of the agreement "customers for business-related

immigration services had fewer options for service providers" and ultimately were forced

---

[57] Kaplan declaration, ¶ 25 and Exhibit B.

[58] Complaint, ¶¶ 150-151.

[59] Kaplan declaration, ¶ 18.  I use the Plaintiff's term "exclusive dealing" in this case even though the alleged restraint applied just to Emigra.  My understanding is that ILS Shimoda was free to work with other firms while also working with Fragomen.

to pay higher prices as a result. This assertion does not make sense from an economic perspective.

31.    An exclusive dealing relationship is one type of vertical contractual relationship that may be established between firms, and such relationships cause no harm to competition provided they do not foreclose a substantial share of the sales outlets for other competitors. In this case, ILS Shimoda is just one of many local suppliers of business immigration services in Japan. Other local suppliers include immigration law firms such as Nakai Immigration Services LPC, Sarkar Office, Futaba Immigration Lawyer's Office, and H&A Noto Legal Office, as well as relocation companies such as Tokyo General Agency, Planners Relocation, and ReloJapan.[60] Consequently, there is no appreciable foreclosure from a vertical agreement between Fragomen and ILS Shimoda. Firms other than Emigra were always free to deal with ILS Shimoda, and Emigra had many other alternatives it could turn to for local immigration services.

32.    An alternative way to think about the issue from an economic perspective is simply to ask whether a vertical merger between one of the Fragomen Defendants and ILS Shimoda would create anticompetitive concerns. Given the large number of local immigration service providers in Japan, I see no reason why such a merger would be problematic. Consequently, the exclusive dealing arrangement at issue here – which is much less restrictive than a formal merger – would certainly cause no harm to competition.

---

[60] For additional information on these firms, see http://www.tokyovisa.co.jp/ (Nakai); http://www.sarkaroffice.com/japan_immigration.html (Sarkar); http://www.futaba-immigration.jp/english/other/japanese-immigration.html (Futaba); http://www.noto-legal.com/english/index.html (H&A Noto); http://www.tga.co.jp/content/view/22/47/ (Tokyo General Agency); http://www.plannersrelocation.com/immigration-assistance (Planners Relocation); and http://www.relojapan.com/services/index.html (ReloJapan).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 22nd day of February, 2008.


_George Kosicki_
George Kosicki

## GEORGE KOSICKI, Ph.D.
### Vice President

Phone:  (617) 425-8162                                        111 Huntington Avenue
Fax:  (617) 425-8001                                                    Tenth Floor
gkosicki@analysisgroup.com                                      Boston, MA  02199

Dr. Kosicki specializes in applied microeconomics and has consulted in the areas of antitrust, mergers and acquisitions, labor economics, pharmacoeconomics, and commercial damages.  He has also served as an expert witness on liability and damages issues.  Dr. Kosicki has worked extensively on issues of cost pass through and damages in indirect purchaser litigation stemming from global price fixing conspiracies.  He is experienced in market definition analyses, including those in the pharmaceutical industry, and the estimation of demand elasticities using retail scanner data.  Dr. Kosicki worked with Analysis Group academic affiliate Robert S. Pindyck on behalf of P&O Princess Cruises plc during the Federal Trade Commission's review of Princess Cruises' merger with Carnival.  For a proposed merger in the telecommunications industry, he analyzed competition and pricing for international long distance service.  Dr. Kosicki's research in pharmacoeconomics has focused on measuring the cost-effectiveness of treatment for cancer patients.

Prior to joining Analysis Group, Dr. Kosicki served as Chair of the Economics Department at the College of the Holy Cross, where he spent 15 years on the faculty teaching principles of economics, microeconomic theory, industrial organization, and labor economics.  He also wrote the book *Labor Market Problems and Applications* to accompany the best selling labor economics textbook *Modern Labor Economics* by Ehrenberg and Smith.  Dr. Kosicki's research has been published in several peer-reviewed journals, including *Southern Economic Journal* and *Journal of Economic Education*.

## PROFESSIONAL EXPERIENCE

College of the Holy Cross, Economics Department (Sept. 1985 – May 2001)
    Assistant Professor (Sept. 1985 – Aug. 1991)
    Associate Professor (Sept. 1991 – May 2001)
    Department Chair (June 1994 – May 1997)

The Brattle Group, Associate (May 1999 – April 2000; while on leave from Holy Cross)

Analysis Group, Inc. (June 2001 – present)
    Senior Associate (June 2001 – Dec. 2002)
    Vice President (Jan. 2003 – present)

## EDUCATION

Ph.D. in Economics, Cornell University, 1985
M.A. in Economics, Cornell University, 1984
B.A. in Economics, John Carroll University, 1981

**SELECTED CASEWORK**

▪ **Executive Airlines v. Electric Boat Corporation**
*United States District Court, District of Connecticut, Civil Action No. 3:02-CV-194 (WWE)*
Expert reports (July 17, 2006 & March 12, 2007) and trial testimony (May 9-10, 2007) regarding lost profits from early termination of contract for air charter service.

▪ **Non Participating Manufacturer (NPM) Adjustment Proceeding Under the Tobacco Master Settlement Agreement Between the Settling States and the Participating Manufacturers**
*Arbitration Proceeding Before Professor Daniel McFadden and the Brattle Group*
On behalf of the Settling States, supported Professors Robert Pindyck and Jonathan Gruber in an analysis of whether the disadvantages of the 1998 Master Settlement Agreement were a "significant factor" contributing to the Market Share Loss of the Participating Manufacturers in 2003 and 2004.

▪ **Pioneer Hi-Bred International, Inc. v. Agrigenetics, Inc. (d/b/a Mycogen Seeds), Mycogen Corporation, and Dow Agrosciences LLC**
*United States District Court, Southern District of Iowa, Central Division*
Economic analysis of lost profit damages in an agricultural market.

▪ **HDC Medical, Inc. v. Minntech Corporation**
*United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
Expert report (August 1, 2005) and deposition testimony (August 26, 2005) in rebuttal of plaintiff's claim of attempted monopolization and anticompetitive tying; report addressed market definition, liability, and damages issues pertaining to defendant's sales of kidney dialysis reprocessing equipment and supplies.  Judge approved defendant's motion for summary judgment, citing expert report.  Decision affirmed by U.S. Court of Appeals, Eighth Circuit.

▪ **Agri-King, Inc., et al. v. Akzo Nobel, Inc., et al.**
*State of Minnesota, District Court, County of Ramsey, Second Judicial District*
**Pratt Feeders, LLC, et al. v. F. Hoffman-La Roche, Ltd., et al.**
**Steven L. Cox, et al. v. Aventis Animal Nutrition, Inc., et al.**
*District Court of Wyandotte County Kansas*
Analyzed damages claims by indirect purchasers of vitamin-containing animal feed products that were artificially inflated in price.

▪ **Remeron Antitrust Litigation**
*United States District Court, District of New Jersey*
Supported Professor Janusz Ordover in an analysis of market definition for antidepressant drugs.

- **Northland Cranberries v. Ocean Spray Cooperative**
  *United States District Court, District of Massachusetts*
  Supported Professor Robert Pindyck in an analysis related to allegations of monopolization and unfair competition pertaining to sales of cranberries, concentrate, and retail juice products.

- **Verizon New England, Inc. v. D.W. White Construction Company, et al.**
  *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
  Deposition testimony (March 14, 2003) evaluated the wage rate and total labor costs billed by Verizon New England in its attempt to recover damages from D.W. White and others for an excavation accident.

- **Kellogg Company v. BASF AG, et al.**
  *United States District Court, District of Columbia*
  Supported Professor Robert Pindyck in an analysis of the lost profits incurred by an indirect purchaser of an input that was artificially inflated in price.

- **P&O Princess Cruises plc**
  *Before the Federal Trade Commission*
  Supported Professor Robert Pindyck in an analysis of the economic effects of a proposed merger in the cruise industry.

- **EF Institute for Cultural Exchange, et al. v. Explorica, Inc., et al.**
  *United States District Court, District of Massachusetts, C.A. No. 01-10645-MEL*
  Expert declaration addressed the economic effect that the electronic collection of publicly available price information by a competitor has on market competition.

- **WorldCom-Sprint Merger**
  *Before the Antitrust Division of the U.S. Department of Justice*
  Analysis of the market power implications of the proposed merger; potential unilateral price increases were predicted through market simulations within a differentiated products framework.

## PRIOR RESEARCH EXPERIENCE

Dr. Kosicki has conducted several empirical studies of the effects of community consumption standards on individual decisions to work and save. These studies utilized large micro data sets, including the Consumer Expenditure Survey, the Current Population Survey, and the National Longitudinal Survey.

## PUBLICATIONS

### Refereed Journals - Economics

"Economics of Cost Pass Through and Damages in Indirect Purchaser Antitrust Cases" (with Miles Cahill), *The Antitrust Bulletin*, Fall 2006, 599-630.

"Exploring Economic Models Using Excel" (with Miles Cahill), *Southern Economic Journal*, January 2000, 770-792.

"Interpersonal Comparisons and Labor Supply:  An Empirical Analysis," *The American Economist*, Spring 1993, 20-34.

"Linking the Production Possibilities Curve, the Supply Curve, and the Competitive Norm," *Journal of Economic Education*, Fall 1991, 307-311.

"Income Redistribution and Aggregate Consumption:  Implications of the Relative Income Hypothesis," *The American Economist*, Spring 1990, 40-44.

"A Note about Savings as a Nonpositional Good," *Eastern Economic Journal*, July-September 1988, 271-276.

"A Test of the Relative Income Hypothesis," *Southern Economic Journal*, October 1987, 422-434.

"The Relative Income Hypothesis:  A Review of the Cross Section Evidence," *Quarterly Journal of Business and Economics*, Autumn 1987, 65-80.

### Refereed Journals – Health Care

"The Direct and Indirect Cost Burden of Atopic Dermatitis:  An Employer-Payer Perspective" (with Joseph F. Fowler, Mei Sheng Duh, Ludmila Rovba, Sharon Buteau, Lisa Pinheiro, Francis Lobo, Jennifer Sung, Joseph J. Doyle, Andrine Swensen, David A. Mallett), *Managed Care Interface*, October 2007, 26-32.

"Cost-Minimization Analysis of Once-Weekly Versus Thrice-Weekly Epoetin Alfa for Chemotherapy-Related Anemia" (with Pierre Y. Cremieux, John M. Fastenau, Catherine T. Piech, A. Mark Fendrick), *Journal of Managed Care Pharmacy*, November/December 2004, 531-537.

### Books

*Student Learning Guide:  Labor Market Problems and Applications* to accompany Ehrenberg and Smith *Modern Labor Economics*, 6th edition.  Reading, MA:  Addison Wesley, 1997.  (5th edition published in 1994 by Harper Collins.)

### Other Articles

"A Framework for Developing Spreadsheet Applications in Economics" (with Miles Cahill), *Social Science Computer Review*, Summer 2001, 186-200 (invited article).

"Using Spreadsheets to Explore Neoclassical Assumptions in a New Keynesian Model" (with Miles Cahill), *Computers in Higher Education Economics Review*, Volume 14, No. 2, 2000.

"Antitrust Policy" and "The Relative Income Hypothesis" in *Survey of Social Science: Economics,* edited by Frank N. Magill, Pasadena: Salem Press, 1991, 55-61 and 1980-1985 (subsequently published as *International Encyclopedia of Economics*, Fitzroy Dearborn Publishers, 1997).

"The Temporary Workforce: An Economic Appraisal," *The Margin*, September/October 1990, 27.

**Book Reviews**

*The Antitrust Revolution*, edited by John E. Kwoka, Jr. and Lawrence J. White, *The American Economist*, Spring 1991.

*The New Unionism: Employee Involvement in the Changing Corporation* by Charles C. Heckscher, *Southern Economic Journal*, October 1989.

*Deindustrialization and Plant Closure,* edited by Paul D. Staudohar and Holly E. Brown, *Southern Economic Journal*, April 1988.

*The New Industrial Organization* by Alexis Jacquemin, *The American Economist*, Fall 1987.

**Poster Abstracts**

"The Impact of Psoriasis on Health Care Costs and Work Loss" and "The Direct and Indirect Cost Burden Associated with Seborrheic Dermatitis" (with Joseph Fowler et al.), *Supplement to Journal of the American Academy of Dermatology*, February 2007, AB6, AB106.


**OTHER PROFESSIONAL ACTIVITIES**

Member of editorial board, *Issues in Competition Law and Policy*, American Bar Association monograph, forthcoming, Wayne Dale Collins, editor.

Referee for the *Journal of Economic Behavior and Organization*, *Journal of Economic Education*, *Quarterly Review of Economics and Business*, *The American Economist*, *Defence and Peace Economics*.

Textbook reviewer for Harper Collins, McGraw Hill, Oxford University Press.

Completed "Law Institute for Economists" program, sponsored by Law & Economics Center, George Mason University School of Law (two-week intensive program held at Dartmouth College), July 1992.

Member of the American Economic Association, associate member of the American Bar Association.

**TESTIMONY IN THE LAST FOUR YEARS**

▪ **HDC Medical, Inc. v. Minntech Corporation**
  *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
  Deposed August 26, 2005.

▪ **Executive Airlines v. Electric Boat Corporation**
  *United States District Court, District of Connecticut, Civil Action No. 3:02-CV-194 (WWE)*
  Testified at trial May 9-10, 2007.