UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                  :

EMIGRA GROUP, LLC,

                  :

           Plaintiff,

                  :        No. 07-cv-10688 (LAK) (HP)

       --against--

                  :        ECF CASE

FRAGOMEN, DEL REY, BERNSEN & LOEWY,
LLP; FRAGOMEN, DEL REY, BERNSEN &
LOEWY II, LLP; FRAGOMEN GLOBAL
IMMIGRATION SERVICES, LLC; FRAGOMEN
GLOBAL LLP; AND RYAN MATTHEW FREEL,

                  :

           Defendants.

                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COVINGTON & BURLING LLP

620 Eighth Avenue

New York, New York 10018

Tel: (212) 841-1000

*Counsel to Defendants Fragomen, Del Rey,
Bernsen & Loewy, LLP; Fragomen, Del Rey,
Bernsen & Loewy II, LLP; Fragomen Global
Immigration Services, LLC; and Fragomen
Global LLP*

GISKAN SOLOTAROFF & ANDERSON LLP

11 Broadway, Suite 2150

New York, New York 10004

Tel: (212) 500-5106

*Counsel to Defendant Ryan Freel*

**Table of Contents**

Preliminary Statement.................................................................................................1

Background .................................................................................................................2

      A.    Nature of Immigration Practice                              2

      B.    The Parties                             4

      C.    Emigra's Claims                             5

      D.    The Nature of Competition for Immigration Services       7

            1.    Competition from Law Firms ......................................................7

            2.    Competition from Accounting Firms...........................................8

            3.    Competition from Relocation Firms ...........................................9

            4.    Competition from Immigration Consulting Firms.....................10

            5.    Competition from In-House Corporation Capabilities ..............10

            6.    Use of "Single Source" Providers..............................................11

            7.    Competition for Immigration Services in Japan .......................11

            8.    Lack of Significant Entry Barriers.............................................12

Standard for Summary Judgment...............................................................................15

Argument ..................................................................................................................16

I.     Emigra Cannot Prevail on its Monopolization Claims. ....................................16

      A.    Emigra Must Establish that Fragomen has Monopoly Market Power.    16

      B.    Fragomen Has No Market Power in Any Properly Defined Market.    17

            1.    Emigra Has Not Properly Defined the Relevant Market. ..........17

            2.    Emigra Cannot Demonstrate that Fragomen Has Monopoly Market Share in a Relevant Market........................................................20

3.    Entry Barriers are Not Significant in the Market for Business Immigration Services. ...............................................................22

4.    The Strength of Competition in the Relevant Market Belies Emigra's Claim that Fragomen Has Market Power. ...................24

II.    Emigra's Vertical Agreement Claim Fails Because Emigra Cannot Establish an Adverse Effect on Competition. ....................................................26

III.    Emigra's Conspiracy Claims Fail as a Matter of Law Because Fragomen Cannot Conspire With Itself. ........................................................29

IV.    Emigra's Pendent State Law Claims Should Be Dismissed For Lack of Subject Matter Jurisdiction ................................................................30

Conclusion ..........................................................................................31

**Table of Authorities**

**Cases**

*Balaklaw v. Lovell,* 922 F.Supp. 892 (N.D.N.Y. 1993) ............................................................ 29, 30

*Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537 (2d Cir. 1993) ................................................................................................................................. 26, 28

*Cohen v. Primerica Corp.*, 709 F. Supp. 63 (E.D.N.Y. 1989) ................................................. 20, 21

*Copperweld Corp.  v. Independence Tube Corp.*, 467 U.S. 752 (1984) .................................. 29, 30

*Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194 (S.D.N.Y. 1986) .............................................. 29, 30

*Int'l Distrib. Ctrs. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987) ......................... 17, 20, 23

*K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995) .... 16, 26, 27, 28

*Kolari v. New York Presbyterian Hospital*, 455 F.3d 118 (2d Cir. 2006) .................................... 30

*NatSource LLC v. GFI Group, Inc.*, 332 F. Supp.2d 626 (S.D.N.Y. 2004) .......................... passim

*Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) ......................................... 15, 16, 17

*Nifty Foods Corp. v. The Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832 (2d Cir. 1980).. 21

*Rosen v Hyundai Group (Korea)*, 829 F. Supp. 41 (E.D.N.Y. 1993) ........................................... 29

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832 (S.D.N.Y. 1988) ............... 29

*Tops Markets Inc. v. Quality Markets, Inc.*, 142 F.3d 90  (2d Cir. 1998) ........................ 22, 26, 28

*United Air Lines v. Austin Travel Corp.*, 867 F.2d 737 (2d Cir. 1989) ....................................... 21

*Valencia v. Lee*, 316 F.3d 299 (2d Cir. 2003) ............................................................................. 30

**Statutes and Rules**

Sherman Act, Section 1 (15 U.S.C. § 1) ............................................................ 2, 26, 29

Sherman Act, Section 2 (15 U.S.C. § 2) ....................................................... 2, 5, 16, 29

28 U.S.C. § 1367(c)(3)............................................................................................ 30

Fed. R. Civ. P. 56 ..................................................................................................... 15

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law, An Analysis of Antitrust Principles and Their
    Application, ¶ 532b (2006) ................................................................................. 21

Horizontal Merger Guidelines of the U.S. Department of Justice and the Federal Trade
    Commission (1992, with 1997 revisions) ................................................. 18, 20, 22

This memorandum of law is respectfully submitted in support of the motion for summary judgment by defendants Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen LLP"); Fragomen Del Rey, Bernsen & Loewy II, LLP ("Fragomen II"); Fragomen Global Immigration Services, LLC ("FGIS"); Fragomen Global LLP ("Fragomen Global") (collectively "Fragomen"); and Ryan Freel.  Defendants seek summary judgment on the federal antitrust claims asserted by plaintiff Emigra Group, LLC ("Emigra").

This motion is based in part on three accompanying declarations.  The Declaration of Daryl Buffenstein, who is a prominent immigration law practitioner and a former President of the American Immigration Lawyers' Association ("AILA"), describes the nature of competition in the business immigration services market and identifies various categories of firms that compete in that market.  The Declaration of George Kosicki provides economic analysis addressing the market definition issues raised by this motion.  The Declaration of Lance Kaplan, who is a practice leader at the Fragomen organization, provides relevant facts concerning, among other things, the corporate structure of the defendant entities and the business they conduct in Japan.

### Preliminary Statement

In its amended complaint, Emigra conjures up an alleged world-wide monopoly by Fragomen of the market for business-related immigration services.  In the real world, however, Fragomen cannot possibly be viewed as a monopolist in any accurately defined market. Legions of well-established law firms, accounting firms, relocation firms, consulting firms, and other competitors offer services similar to the immigration services provided by Fragomen and Emigra, not to mention the substantial in-house immigration capabilities of the multinational corporations Emigra defines as the key customers.  Price competition is vigorous, and there are no barriers to entry in this service business that could be considered significant for antitrust

purposes.  It is implausible under the circumstances that Fragomen could impose supra-competitive prices on its customers for a prolonged period of time without losing business to aggressive rivals who can provide the same services.

Emigra cannot, as a matter of law, establish that Fragomen has market power and has exercised that power to the detriment of competition.  It is thus impossible for Emigra to prevail on its monopoly claims under Section 2 of the Sherman Act, or its claim under Section 1 of the Sherman Act alleging an unlawful vertical agreement with one local services provider in Tokyo.  Meanwhile, Emigra's claims alleging unlawful horizontal agreements are defective because antitrust law does not recognize conspiracies between a company and its own subsidiaries and employees.  Accordingly, Fragomen is entitled to summary judgment dismissing all of Emigra's federal antitrust claims.

With this smokescreen cleared, this case boils down to a much more narrow dispute over alleged state law business torts.  Emigra claims that alleged trade secrets were misappropriated when Mr. Freel resigned his employment at Emigra and came to work at Fragomen five months ago.  Defendants deny this accusation.  But this dispute belongs (if anywhere) in state court, not here – without antitrust claims, there is no federal subject matter jurisdiction over this matter.  The Court should dismiss Emigra's pendent state law claims.

## Background

### A.    Nature of Immigration Practice

In the U.S., immigration services are considered the practice of law, and they can be provided only by lawyers or persons working under the supervision of lawyers.  In contrast, in many foreign countries, immigration services can be provided by non-lawyers.  For firms based in the U.S., services relating to immigration into the U.S. are usually referred to as "inbound"

work. By dollar volume, inbound U.S. work accounts for more than half of worldwide spending for business immigration services, and 80 to 85 percent of the revenues of the Fragomen organization as a whole. Services relating to immigration from the U.S. to a foreign country or between foreign countries are often referred to as "outbound" or "global" immigration work. (Declaration of Daryl Buffenstein ("Buffenstein Decl.") ¶¶ 8-12; Declaration of Lance Kaplan ("Kaplan Decl.") ¶¶ 14-15.)

Competition for business-related immigration services is highly country-specific, because immigration rules and requirements are country-specific. However, it is not necessary for a U.S.-based firm that wishes to service the outbound immigration needs of corporate clients to have an office in every country where its clients may need to send employees. U.S. firms often form alliances or working relationships with local firms in relevant foreign countries. These relationships enable the U.S. firms to provide services abroad without having a physical presence in every possible destination jurisdiction. In most foreign countries, there are many locally licensed immigration service providers who are willing to provide such assistance. This is essentially a form of subcontracting. These local practices usually are eager to attract referrals, as this presents an opportunity for them to grow their own businesses. These relationships typically are not exclusive for either party. In other words, even in situations where a local firm in a foreign country becomes a preferred provider for a U.S. firm, the U.S. firm remains free to use other local providers, and the local provider remains free to work with other firms seeking similar assistance. (Buffenstein Decl. ¶¶ 17-19; Kaplan Decl. ¶ 23.)

Large corporate clients often seek to achieve efficiencies and economies of scale by steering their immigration matters to a limited number of firms. Clients may seek out a single provider to handle all of their global immigration if this helps them realize more economical

pricing or efficiencies.  However, even among large corporations, a significant number of clients do not use a "single-source" provider for all of their outbound immigration needs worldwide.  It is more common for clients to use multiple providers.  In addition, even in situations where a client may seek a "single source" provider, it is rarely if ever the case that the "single source" provider is the only firm that actually delivers the service.  Most firms sub-contract the work in countries where they do not have a direct physical presence.  (Buffenstein Decl. ¶¶ 20-21.)

B.    **The Parties**

Defendant Fragomen LLP is a U.S. law firm that focuses on inbound U.S. immigration services.  Fragomen LLP is owned by the firm's 21 Class A equity partners.  Fragomen LLP has a subsidiary, FGIS, which provides "global" immigration services for relocations of employees to countries outside the U.S.  In a typical case, FGIS provides assistance to corporate clients seeking to obtain visas, work permits, and the like for employees who are being relocated to foreign countries.  In some foreign countries, FGIS maintains satellite offices and can provide the services needed directly.  In other locations, FGIS works with local providers, and essentially sub-contracts the work to those providers.  (Kaplan Decl. ¶¶ 6-7, 10, 16; Buffenstein Decl. ¶¶ 16, 18.)

Defendant Fragomen II is a former wholly-owned subsidiary of Fragomen LLP that no longer exists.  Defendant Fragomen Global is an intermediate holding company for the global business operated by FGIS; Fragomen Global is owned by the same Class A equity partners who own Fragomen LLP.  Defendant Ryan Freel is an employee of Fragomen LLP who previously worked at Emigra.  (Kaplan Decl. ¶¶ 8-13.)

Plaintiff Emigra is a consulting firm that provides business immigration services, including document procurement, consular processing, and related services that assist

corporations in moving employees across national borders. Emigra provides services abroad through its own offices in some countries, and through local providers in other countries. Emigra alleges that FGIS provides services that are similar to Emigra's services, but the Complaint does not make a similar allegation about the work done by Fragomen LLP. Emigra is not a law firm, so it cannot provide "inbound" immigration services in the U.S. directly. If a customer seeks U.S. immigration services from Emigra, the service will be provided by the Ogletree Deakins law firm, which has a formal working relationship with Emigra. Emigra markets itself to clients as a lower cost alternative to using a law firm for global immigration services. (Amended Complaint[1] ("Compl.") ¶ 15; Buffenstein Decl. ¶¶ 14-15, 43; Declaration of George Kosicki ("Kosicki Decl.") ¶ 6 .)

        **C.**        **Emigra's Claims**

Emigra attempts to articulate five different federal antitrust claims. Count I alleges that Fragomen violated Section 2 of the Sherman Act (15 U.S.C. § 2) by acquiring, enhancing, and maintaining monopoly power. Count II alleges that some unspecified combination of defendants conspired to achieve a monopoly. Count III alleges attempted monopolization. Count IV alleges that some combination of the defendants entered into a horizontal agreement to damage competition by harming Emigra. Count V alleges that one or more of the defendants entered into an unlawful vertical agreement with a local service provider in Japan; Emigra asserts that defendants persuaded the local provider to agree not to provide services to Emigra. (Compl. ¶¶ 96-160.)

---

[1] A copy of the Amended Complaint is attached as Exhibit A to the Kaplan Declaration.

The local Japanese provider at issue in Count V is the ILS Shimoda firm, which offers assistance with obtaining visas and other required documents for foreign nationals who wish to work and stay in Japan. (Kaplan Decl. ¶ 18; Buffenstein Decl. ¶ 50.)

Emigra alleges that there is a market, for antitrust purposes, for immigration services needed by corporations that employ U.S. citizens and foreign nationals, with a sub-market for "business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals." Emigra asserts that the geographic market for these services is global, with a geographic submarket consisting of (a) those countries where Emigra, Fragomen, and other competitors have offices and (b) countries where Emigra and Fragomen provide services without having an office. (Compl. ¶¶ 10-11, 13-14.)

Emigra asserts that Fragomen is the world's largest provider in the service market and sub-market, "capturing well over three quarters" of the sub-market, and that Emigra is the second-largest provider. Emigra also asserts that "there are only a few other providers" in the service market and sub-market that can provide the services offered by Fragomen and Emigra, and that "those other providers, in combination, account for only a few percentage points of the total worldwide annual gross revenue" in the sub-market. (Compl. ¶ 21(a)-(d).)

Emigra asserts six pendent state law claims, for trade secret misappropriation, breach of fiduciary duty, tortious interference with contract, tortious interference with prospective business advantage, breach of contract, and unjust enrichment. (Compl. ¶¶ 161-207.)

Emigra's claims relate in part to Mr. Freel. In September 2007, Mr. Freel resigned his position at Emigra and accepted a different position at Fragomen LLP. Emigra

asserts that Mr. Freel disclosed Emigra trade secrets to Fragomen, and that Fragomen has used the purported trade secrets to gain competitive advantages over Emigra. Specifically, Emigra alleges that, based on recommendations from Mr. Freel, Fragomen solicited certain employees at Emigra's London and Madrid offices. As Emigra concedes, none of these employees actually left Emigra for Fragomen. Emigra also alleges that Mr. Freel inappropriately revealed to Fragomen information about Emigra's customers and its plans to start an office in Japan. (Compl. ¶¶ 30-90.)

      **D.    The Nature of Competition for Immigration Services**

        Emigra's antitrust allegations focus on the immigration service needs of multinational corporate clients that frequently relocate employees from one country to another. Undisputed publicly available information demonstrates that there is vigorous competition among many different providers of the inbound and outbound immigration services needed by large corporations and other customers. Emigra's allegations ignore most of these competitors. When these many additional sources of competition are properly taken into account, it becomes clear that Fragomen's market presence does not remotely approach a level that could support monopoly claims.

      **1.    Competition from Law Firms**

        Fragomen LLP currently has approximately 179 U.S. attorneys. This is a small fraction (less than 2 percent) of the approximately 10,000 attorneys who, as of 2007, had identified themselves as American immigration law practitioners by joining the AILA. A significant percentage of the AILA's members have identified themselves as providers of business immigration services. In addition, a large number of U.S. law firms other than Fragomen have well-established business immigration practices, as indicated by a September

2007 survey of the "Top 25" U.S. law firms with immigration attorneys. The 24 other firms identified in the survey represent at least 370 additional practicing immigration lawyers, and the survey did not even include at least 34 other established business immigration law firms with another 255 practicing immigration attorneys. These firms include some of the largest law firms in the country and firms with numerous U.S. and international offices. All of these firms offer inbound immigration services, and many offer outbound services as well, either through their own foreign offices or through relationships with firms located abroad. (Buffenstein Decl. ¶¶ 22-29.)

The ability of U.S. firms to offer global services is enhanced by the availability of international attorney networks. These networks make it possible for a U.S.-based firm to offer services for immigration to foreign countries even if the U.S. firm does not have offices abroad. These networks include (a) *Lex Mundi*, which includes more than 20,000 lawyers in 160 member firms, and has a collective footprint spanning more than 560 offices in 99 countries; (b) *Ius Laboris*, a global network of more than 2,500 labor and employment lawyers that includes immigration lawyers, and has member firms in over 45 countries; (c) ALFA International, a global legal network with 125 member firms that covers immigration law as part of its International Law practice group; and (d) VisaLaw International, a smaller network, which bills itself as the "Global Immigration Lawyers Alliance." (Buffenstein Decl. ¶ 29.)

### 2.    Competition from Accounting Firms

One significant competitive force that Emigra completely ignores is the immigration capabilities of the "Big Four" accounting firms, which benefit both from their large geographic footprints and from their ability to offer immigration services as a complement to the cross-border tax services that invariably are needed for cross-border employee relocations. Ernst

& Young's Global Business Immigration Services division provides services in more than 80 countries, with a staff of over 600 people including more than 250 licensed immigration professionals. PricewaterhouseCoopers ("PwC"), through its International Assignment Services and Global Visa Services divisions, provides immigration services in 80 countries. Deloitte Touche Tohmatsu has immigration specialists in 52 countries. KPMG is a significant competitor for immigration work in Australia. (Buffenstein Decl. ¶¶ 33-38; Kosicki Decl. ¶ 20.)

### 3.    Competition from Relocation Firms

Relocation services firms are best known for moving the household and personal belongings of relocated employees and their families. But many of these organizations also offer global immigration services to clients, and they benefit from cross-selling opportunities when employers retain them to move possessions. Significant competitors include (a) Sirva Relocation, which provides immigration services in 130 countries; (b) Pricoa, an affiliate of Prudential Financial, which can assist with procuring visas and work papers in "almost any country in the world" and provides services in part through Emigra; (c) Santa Fe Relocation, which has extensive experience providing immigration services in the Far East; (d) Primacy Relocation, which provides "proactive immigration management support for the entire work process to expedite the issuance of required documents"; (e) Weichert Relocation Resources, Inc., which has employees in 120 countries; (f) Cartus Corporation (formerly known as Cendant Mobility), which offers immigration services in part through a working relationship with Fragomen; and (g) Expat International, an Australian firm that specializes in relocations to Australia, New Zealand, and the United Kingdom, but also offers services through other providers in the Americas, Continental Europe, Asia, the Middle East, and Africa. (Buffenstein Decl. ¶¶ 39-41; Kosicki Decl. ¶ 21.)

### 4.    Competition from Immigration Consulting Firms

Immigration consultants – firms which are not lawyers, accountants, or relocation specialists – are another significant source of competition in the global immigration services market.  Emigra is a prominent example of an immigration consulting firm. Emigra claims to be the largest immigration consulting firm in the world, with global service centers on three continents covering more than 125 countries.  Emigra has offices in 13 countries that, Emigra believes, represent 80 to 95 percent of most clients' immigration needs.  Other immigration consulting firms, providing business immigration services in dozens of countries across multiple continents, include (a) CBIT, a firm which bills itself as the "Global Visa and Passport Professionals"; (b) Aries Immigration Consulting, LLC, which is based in São Paulo and offers immigration and visa services, directly or through other providers, for moves to Brazil, the U.S., Canada, the United Kingdom, Australia, and New Zealand; (c) Skillclear, a firm based in the United Kingdom, which "assist[s] with all types of immigration inquiries to and from almost 80 countries around the World"; and (d) Pro-Link Global, a firm specializing in global work permits, residence permits, entry visas, immigration documentation and global migration consulting services.  (Buffenstein Decl. ¶¶ 42-44; Kosicki Decl. ¶ 17.)

### 5.    Competition from In-House Corporation Capabilities

Emigra also ignores a business immigration services option for large companies that fills more than half of the overall demand for these services:  the in-house capabilities of those companies.  The sophisticated multinational corporate customers Emigra zeroes in on also tend to have sophisticated, well-staffed legal and human resources departments in multiple countries.  Statistically significant survey data collected by PwC's Global Visa Services division from 131 large corporate clients showed that only 36 percent of clients used external

immigration providers at all; more than half of the companies handled immigration needs through in-house legal or H.R. personnel. Similar findings were made in the Global Relocation Trends Survey cosponsored by GMAC Global Relocation Services, the National Foreign Trade Counsel, and the Society for Human Resources Management Global Forum. Emigra's own website acknowledges this reality. The first item on a list of questions frequently asked by Emigra's clients is the question: "My company handles all immigration in-house. Why should we consider outsourcing?". Emigra has also pitched itself as a way for client representatives who work in human resources to "get out of the visa process." (Buffenstein Decl. ¶¶ 45-48; Kosicki Decl. ¶¶ 19.1-19.2.)

6.    **Use of "Single Source" Providers**

Emigra's premise that multinational corporations only use "single source" providers for their business immigration needs is not consistent with market realities. In fact, when companies do make use of external vendors, they often choose to engage several providers rather than one "single source" provider for all of their global immigration services needs. In the PwC study, for example, only 25 percent of companies stated that they used a single external immigration services vendor globally. (Buffenstein Decl. ¶¶ 20, 61.)

7.    **Competition for Immigration Services in Japan**

As explained above, Emigra alleges that it was improperly foreclosed from using ILS Shimoda as a local provider in Japan. This raises the issue of whether an alleged refusal of one local provider in Japan to do business with one foreign firm could have a meaningful impact on competition. The proliferation of local providers of business immigration services in Japan makes it impossible to support such a finding. (Kosicki Decl. ¶¶ 29-32.)

As an initial matter, the Fragomen organization (unlike Emigra) does not even maintain an office in Japan, and it uses ILS Shimoda as a local provider only for about 20 percent of its immigration needs in that country. Fragomen's working relationship with ILS Shimoda is not exclusive for either party, and ILS Shimoda in fact provides local services for foreign firms other than Fragomen. (Kaplan Decl. ¶¶ 17-19; Buffenstein Decl. ¶¶ 16, 49-50.)

In any event, foreign firms seeking assistance from a "gyoseishoshi" (Japanese immigration lawyer specialist) have an abundance of local provider options including, among others: (a) TGA (Tokyo General Agency), a firm the Fragomen organization uses for 70 percent of its needs in Japan; (b) Planners Relocation, a firm the Fragomen organization uses for 10 percent of its needs in Japan; (c) the Japanese branch of PwC's International Assignment Services division; (d) Nakai Immigration Services LPC, which has provided services to over 100 Japanese and non-Japanese firms; (e) Sarkar Office; (f) ReloJapan; (g) Futaba Immigration Lawyer's Office; (h) the Yamamoto Immigration and Labor Consulting Office; (i) Acroseed Immigration Lawyer's Office, which has serviced more than 8,000 corporate and individual clients and assists corporations wishing to employ foreign nationals in Japan; (j) Hashimoto Legal Accounting Office; (k) H&A Noto Legal Office; (l) Morita Gyoseishoshi Lawyer's Office; (m) Murata Lawyer Office; (n) Asahi Tokyo Law Office; and (o) Office Cosmopolitan, Licensed Immigration Lawyer. (Buffenstein Decl. ¶¶ 49-52; Kaplan Decl. ¶¶ 18-19.)

## 8. Lack of Significant Entry Barriers

Any analysis of market definition for antitrust purposes should take into account the relative ease or difficulty of entry into the market by new competitors. The market for providing business immigration services lacks entry barriers that could be considered significant for antitrust purposes. (Kosicki Decl. ¶¶ 23-24.)

A licensed attorney or other qualified professional generally does not need extensive specialized technical training in order to learn immigration law and develop a practice in it.  In fact, there are many publicly available resources that describe and explain, on a country-by-country basis, the general structure of immigration regulations; the types of visas, work permits, and other documents that are needed for employee relocations; and the procedures for completing and submitting the required application forms.  Examples include: (a) "AILA's Global Immigration Guide: A Country-by-Country Survey," edited by Scott M. Borene (2005), which covers 44 countries; (b) the "Global Business Immigration Handbook," assembled by Fragomen Global and edited by Nancy H. Morowitz (Thomson West Publishing 2007), which covers 15 countries; and (c) the Baker & McKenzie Immigration Manual (2006), a 400-page volume which covers 22 countries and is available for free on that firm's internet site.  The basic knowledge necessary for a global immigration practice thus is generally available and many firms have the ability to acquire it if they so choose, with an investment that is not prohibitive. (Buffenstein Decl. ¶¶ 30-31, 62.)

In addition, when multinational corporations relocate employees to different countries, providers often find that the same types of visas and work permits are needed on a regular basis.  This repetition makes it possible for immigration lawyers to delegate the administrative aspects of preparing documents for these applications to less skilled and lower paid paraprofessionals.  The commoditization of certain types of business immigration services has led to a highly leveraged service delivery model at many immigration firms.  Clients increasingly have come to view the procurement of visas and work permits as a uniform product.  One illustration of this is the recent trend of clients bidding work out to prospective providers through eBay-style internet auctions.  Another illustration is a recent experience where

Fragomen was one of 48 different providers invited by a Fortune 100 multinational pharmaceutical firm to bid to provide global immigration services. Price competition in this business is sharp, and in the past few years prices for global immigration services have remained stable or have fallen as a result of aggressive competition. (Buffenstein Decl. ¶¶ 30-31; Kaplan Decl. ¶¶ 22-25.)

If unusually high prices were to persist for any length of time, the characteristics of the market indicate that competitive pressures would quickly force prices down. For example, many of the U.S. law firms that have immigration practices would be well-positioned to profitably grow their immigration practice groups to take advantage of profit opportunities without significant capital investments. This is a reasonable inference because many of these firms have (a) an established core of experienced immigration lawyers and support personnel, (b) substantial institutional financial resources, (c) large lawyer headcounts, and (d) offices (and/or relationships with local professional service providers) in many locations abroad. Baker & McKenzie LLP, which presently has 11 lawyers specializing in U.S. immigration law, has a total of more than 3,400 lawyers firm-wide – including 70 global migration lawyers – in offices located in 38 countries. Greenberg Traurig LLP, which currently has 19 immigration lawyers, has a total of 1,750 lawyers in 28 offices located in 3 countries (as well as affiliate offices in four additional countries). Reed Smith LLP, which has 11 immigration lawyers at present, has more than 1,600 lawyers in 24 offices in 10 countries. If pricing for global immigration services were to become artificially inflated, firms like these might be able to expand their global immigration practices quickly and without needing to make large additional capital investments. (Buffenstein Decl. ¶¶ 28, 62.)

14

In addition, there is no pattern of exclusive dealing relationships that creates a risk of any meaningful "foreclosure" of relevant segments of the business immigration services market. The agreements that immigration firms reach with local providers in this industry typically are non-exclusive for both sides. The agreements may bind the parties to certain pricing terms and service standards, but both firms generally remain free to do business with others. (Buffenstein Decl. ¶ 19; Kaplan Decl. ¶ 23.)

### Standard for Summary Judgment

Summary judgment should be granted if there is no genuine issue as to a material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party satisfies its burden on a summary judgment motion when it "can point to an absence of evidence to support an essential element of the non-moving party's claim." *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (citation and internal quotation marks omitted). If the moving party meets this burden, the burden then shifts to the nonmovant to come forward with "specific facts showing that there is a genuine issue for trial." *See id.*; Fed.R.Civ.P. 56(e).

Summary judgment is particularly favored in antitrust cases because of the concern that "protracted litigation will chill pro-competitive market forces." *Pepsico*, 315 F.3d at 104 (citation omitted). In addition, summary judgment can be granted prior to discovery in an antitrust case where evidence shows that there can be no finding of market power or injury to competition in any properly defined market. In *NatSource LLC v. GFI Group, Inc.*, 332 F. Supp.2d 626 (S.D.N.Y. 2004), the Court granted summary judgment prior to discovery based on market definition evidence submitted by the defendants. The Court found that the plaintiff "has failed to allege a relevant market, has not shown that [defendant] has sufficient market share to demonstrate market power, has not shown that there are significant barriers to entry, and has not

shown that the challenged conduct would harm consumers." *Id.* at 639.  As explained below, similar findings are warranted here.

**Argument**

I.    **Emigra Cannot Prevail on its Monopolization Claims.**

    A.    **Emigra Must Establish that Fragomen has Monopoly Market Power.**

        To establish monopolization under Section 2 of the Sherman Act, a plaintiff must show that the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Pepsico*, 315 F.3d at 105 (citation and internal quotation marks omitted).  Claims for attempted monopolization require, among other elements, a "dangerous probability" of achieving monopoly market power. *See id.; NatSource*, 332 F. Supp.2d at 633 (summary judgment is appropriate where plaintiff fails to identify a plausible antitrust market and a dangerous probability of monopoly market power).

        Market power generally requires a showing that because of an absence of competitors providing similar goods or services, the defendant has "the ability to raise price significantly above the competitive level without losing all of [its] business." *K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also NatSource*, 332 F. Supp. 2d at 633 (to establish attempted monopolization, plaintiff must establish a dangerous probability that the defendant will be able to raise prices above competitive levels, or to exclude competition in the relevant market).  The Second Circuit has recognized that increased competition leads to a decrease in the influence of any particular company in the market. *See Pepsico*, 315 F.3d at 107-108 ("The more competition a company faces, the less it can control prices because competitors will

undercut its prices to secure market share.") (citation omitted); *Int'l Distrib. Ctrs. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) (noting that "strength of the competition" is among the market characteristics to consider on an attempted monopolization claim in determining whether a company has monopoly power).

### B. Fragomen Has No Market Power in Any Properly Defined Market.

#### 1. Emigra Has Not Properly Defined the Relevant Market.

Emigra's assertions about market power are premised on an artificially narrow conception of the market for business immigration services. Emigra alleges that there is a "Service Submarket" for "business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals". (Compl. ¶ 11.) Emigra asserts that this Service Submarket is "highly concentrated". (*Id.* ¶ 18.) According to Emigra (*id.* ¶ 18):

> In addition to the need for specialized skill on the part of all service providers in the Service Submarket, there is the additional need to provide a broad range of services over a large geographic region at competitive pricing. The requisite relationships with secondary service providers and government agencies can be difficult to establish and enhance, and need to be made in many different regions with quality providers who can handle the requisite volume rapidly and at competitive cost. Substantial expertise and capital and time are required to accumulate the facilities, staff, relationships, and other resources necessary to compete in this market, and multinational corporate clients prefer and can require service providers with large international networks. There are barriers to entering the Service Submarket that include and are not limited to these factors. To date, only the Fragomen Defendants and Emigra and a handful of others have entered this submarket successfully.

These assertions do not accord with market realities, and are not credible when evaluated using the framework for market definition (often referred to as the "hypothetical

17

monopolist" test) specified in the horizontal merger guidelines of the U.S. Department of Justice ("DOJ") and the Federal Trade Commission ("FTC")[2], for several reasons. First, true "single source" provider relationships are not the norm in the industry even among large multinational corporations, and even when a client does use a "single source" vendor, that vendor rarely if ever will be the only firm that will actually deliver the service world-wide. Large companies that frequently relocate employees across borders typically use multiple vendors for their global immigration needs, even if they may establish preferred provider relationships with different vendors in particular regions or countries. The "single source provider" assumption also ignores the reality that many large multinational corporations take care of some immigration needs in-house. (Buffenstein Decl. ¶¶ 20-21, 45-48, 61; Kosicki Decl. ¶¶ 8-9, 9.1.) Focusing on multinational corporations looking for "single-source providers" of immigration services thus defines the market far too narrowly.

Second, while corporate clients can realize economies of scale by concentrating immigration work with a limited number of providers, the various different categories of competitors described above are reasonable substitutes from the perspective of most clients because they can provide similar services. Given the commoditization of the types of immigration services most typically needed for international employee relocations – *e.g.*, procurement of visas and work permits – it is clear that customers do not take the perspective that only "single source" providers can deliver the services they need. (Buffenstein Decl. ¶¶ 20, 59; Kaplan Decl. ¶ 19.) Moreover, while in some cases antitrust markets have been limited to specific channels of distribution, such limitations are unusual in product market definition and

---

[2] The Guidelines can be accessed at http://www.usdoj.gov/atr/public/guidelines/hmg.htm.

require evidence that customers do not view other methods of distribution as close substitutes. (Kosicki Decl. ¶ 9.)

Third, Emigra's conclusion that "only the Fragomen Defendants and Emigra and a handful of others" have entered the market of providing immigration services to multinational corporations ignores the many different varieties of firms that compete in this market all over the world, as described above and in the Buffenstein Declaration. Even if one focuses on firms that can be a "single source" provider, there are many "Big Four" accounting firms, relocation companies, and other law firms that can handle such a role for clients. (Buffenstein Decl. ¶¶ 22-44, 58; Kaplan Decl. ¶ 22.)

Fourth, Emigra overstates the difficulties that would be faced by competitors seeking to enter this market or expand their presence in it. Lawyers or educated non-legal professionals can acquire familiarity with immigration regulatory regimes without tremendous difficulty or a need for specialized technical training. Opening up or expanding business offices in key locations and hiring immigration paralegals generally do not require prohibitively expensive fixed capital investments. In addition, there are many established firms that already have some immigration capacity, and personnel in offices around the world in key business centers; firms in such a position could "ramp up" their immigration practices to take advantage of profit opportunities without the resource investments a new market entrant would need to make. Furthermore, even if a new market entrant were unable to immediately establish physical offices in all other countries where services were likely to be needed, this would not be an insuperable obstacle to development of a global immigration practice. In most countries there are many local firms that can provide services on a subcontracted basis. (Buffenstein Decl. ¶¶ 18, 28-31, 62; Kosicki Decl. ¶ 9.2.)

19

Fifth, Emigra's Service Submarket definition is unusual because it limits the market to a specific group of corporate customers, specifically "large multinational corporations who are major employers of U.S. citizens and foreign nationals."  While the DOJ/FTC Merger Guidelines do allow for product markets to be narrowed to certain groups of customers in the presence of price discrimination, there is no evidence of price discrimination among the services at issue in this case.  Pricing to different customers for the procurement of visas and work permits – the types of services typically needed for international employee relocations – are generally similar, except that volume discounts are often provided to large customers.  Volume discounts do not constitute a form of price discrimination when they reflect cost savings, which is the case here.  (Kosicki Decl. ¶ 10; Kaplan Decl. ¶ 24.)

Accordingly, in view of the legions of well-established law firms, accounting firms, consulting firms, relocation firms, and other competitors that offer services similar to the business immigration services provided by Fragomen and Emigra – not to mention the formidable in-house legal and H.R. department capacities of the multinational corporations Emigra defines as the most relevant customers – there is no way Fragomen could be found to have a dominant position that either constitutes, or is dangerously close to, a monopoly.

**2.      Emigra Cannot Demonstrate that Fragomen Has Monopoly Market Share in a Relevant Market.**

Courts consider market share levels in assessing whether a claim for monopolization or attempt to monopolize can be viable.  *See, e.g., Cohen v. Primerica Corp.*, 709 F. Supp. 63, 66 (E.D.N.Y. 1989).  Courts in this Circuit have granted judgment as a matter of law even where the defendant's market share constituted 50 percent of the relevant market, and claims based on a smaller share routinely are dismissed.  *See, e.g., Walsh*, 812 F.2d at 792 (17% market share was insufficient, and no claim would lie even if market share reached 50%);

*United Air Lines v. Austin Travel Corp.*, 867 F.2d 737, 742 (2d Cir. 1989) (31% market share insufficient to support monopoly claims); *Nifty Foods Corp. v. The Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 841 (2d Cir. 1980) (market share that ranged from 48.3% to 33% was insufficient to support monopoly claim); *Cohen*, 709 F. Supp. at 66 (19% market share insufficient to support monopoly claims); *see generally* Areeda & Hovenkamp, Antitrust Law, An Analysis of Antitrust Principles and Their Application, ¶ 532b (2006) ("Because it would be rare indeed to find that a firm with half of a market could individually control price over any significant period, we would presume that market shares below 50 or 60 percent do not constitute monopoly power.").

Emigra cannot even come close, under any reasonable assessment of the facts, to establishing a Fragomen monopoly share of the market for providing business immigration services to multinational corporations. Based on one sample of prominent U.S. law firms with business immigration practices, Fragomen's 179 attorneys amount to about 22.2 percent of 804 total immigration attorneys at those firms. (Buffenstein Decl. ¶ 26.) This figure, which plainly would not support a monopoly claim, substantially overstates the Fragomen organization's share of the market for providing business immigration services to corporate clients, because this measure completely ignores the presence of accounting firms, relocation firms, immigration consulting firms, and other law firms that can provide comparable services in the global and U.S. markets. Indeed, even if one added only the 250 licensed immigration providers at Ernst & Young to the denominator of this fraction (Buffenstein Decl. ¶ 35), Fragomen's market share would dip to 17 percent. In addition, all of these measures ignore that more than half of the immigration service needs of corporate clients are handled by in-house legal and H.R. capabilities. (*Id.* ¶ 47.) Any measure of Fragomen's market share among different types of

external vendors thus would overstate Fragomen's true share of satisfying overall demand for immigration services by a factor of at least two.

Any plausible Fragomen market share calculation in this case would also fall well below the 35 percent threshold typically used by the DOJ and the FTC in assessing the likelihood that a horizontal merger would result in unilateral price increases. In addition, even if an assessment of Fragomen's market share were based on an artificially narrow class of competitors limited to certain U.S. law firms, the Herfindahl-Hirschman Index used to measure market concentration would have a value of no more than 645, which is well within the range considered to be unconcentrated. (Kosicki Decl. ¶¶ 15.1-15.2.)

Judge Sweet's analysis of market share issues in *NatSource* is instructive. In that case, the plaintiffs alleged a 60 percent market share. *See NatSource*, 332 F. Supp.2d at 635. The Court rejected the plaintiff's unsupported claim, noting that there were at least 10 other competitors in the relevant market, and that a comparison of the number of professionals employed in the field by the defendant as compared to the number employed by competitors yielded a market share for the defendant of approximately 20 percent. *Id.* A similar conclusion is warranted here. Fragomen has significantly more than 10 other competitors who can provide comparable services, and any reasonable calculation of Fragomen's market share would be no more than the level deemed plainly insufficient in *NatSource*, for the reasons explained above.

**3.    Entry Barriers are Not Significant in the Market for Business Immigration Services.**

Even if Emigra could support its allegations as to Fragomen's market share (which it cannot), its monopolization claims nonetheless would fail because of the lack of notable entry barriers. *See Tops Markets Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (no market power despite market share of over 70 percent; "[w]e cannot be blinded by

market share figures and ignore marketplace realities, such as the relative ease of competitive entry"); *Walsh*, 812 F.2d at 792 (even if defendant could have "obtained sufficient power to raise prices in the market temporarily, the competitors from outside the market could easily have surmounted any barriers to entry and competed with [defendant] for business in the Pennsylvania Corridor"); *NatSource*, 332 F. Supp.2d at 635 ("barriers to entry in the voice brokerage market are low, and as such, there can be no dangerous probability of monopolization").

Barriers to entry in the market for providing business-related immigration services to corporations are not significant for antitrust purposes. Emigra's emergence in the last few years as a successful new firm is one illustration of the lack of significant entry barriers in the market for providing global immigration services. Indeed, Emigra boasts in its own pleadings of its "recently developed ability … to compete effectively with Fragomen and win market share" for providing global services. *See* Compl. ¶ 22. In the U.S., meanwhile, immigration services generally must be provided by lawyers. But by one recent count there were at least 10,000 American immigration law practitioners, not to mention untold numbers of other bar-admitted lawyers in other practice areas. (Buffenstein Decl. ¶ 22.)

The immigration services needed for employee relocations are largely commoditized, given that employees typically will need the same types of visas and work permits in each destination country where service is provided. Learning how to provide that service does not require years of specialized technical training; publicly available manuals explain in detail the procedures needed for completing and filing uniform paperwork to obtain the required documents in different countries around the world. In addition, the repetitive and commoditized nature of document applications makes it possible for immigration practitioners to

delegate the administrative aspects of document preparation to lower paid and less skilled paralegals.  (Buffenstein Decl. ¶¶ 22-24, 30, 62; Kosicki Decl. ¶¶ 13-14, 23.)

Nor are substantial investments of capital typically required for a firm to enter or expand its presence in the business immigration services market.  Emigra argues that competitors cannot easily enter the market because they lack the necessary facilities, staff, and relationships, and because "multinational corporate clients prefer and can require service providers with large international networks."  (Compl. ¶ 18.)  But in fact, many U.S. law firms, for example, already have numerous foreign offices in key locations, large numbers of lawyers and staff trained in immigration law, and extensive financial resources.  Firms like these would be well-positioned to expand their immigration practices and compete away excess profits in the event of any temporary inflation of prices in this market.  Even firms without an extensive foreign presence could enter the market without prohibitive capital investments, by following the common practice in the industry of developing affiliations with foreign law firms and other local providers of immigration services.  (Buffenstein Decl. ¶¶ 28-30, 62.)

Given the ease with which new competitors can enter the market and force prices down, Emigra's claim that Fragomen has market power would not be tenable even if Emigra could establish a market share level on the order of magnitude required for a Section 2 claim (which it cannot do in any event, as explained above).

      **4.**      **The Strength of Competition in the Relevant Market Belies Emigra's Claim that Fragomen Has Market Power.**

Competition in the market for providing business immigration services to corporations is robust.  In one recent selection process by a Fortune 100 pharmaceutical company for a global immigration services provider, for example, the company sent requests to

48 potential providers, and 28 responded by submitting bids, indicating the large number of significant players in the market.  (Kaplan Decl. ¶ 22.)

Price competition in this market is vigorous in part because clients can shop among a large variety of providers with relative ease.  *See NatSource*, 332 F. Supp. 2d at 637 (in rejecting an attempted monopolization claim, noting that defendant could not increase prices and remain competitive because customers' relationships with a variety of brokers allowed them to "shop for the best prices").  While immigration services are not quite like buying grain on the Chicago Mercantile Exchange, commoditization of some key services has reached such a degree that some clients are now using eBay-style internet auctions to dispense work, with multiple prospective vendors vying to submit the lowest bid.  When there are many suppliers in a market, this type of price visibility enhances competition and makes it exceptionally difficult for any supplier to exercise market power.  (Kaplan Decl. ¶ 25 & Ex. B; Kosicki Decl. ¶ 27.)

In addition, there is no evidence in this case of a trend of price increases, which one would expect to see if this market truly were dominated by a monopolist that was excluding other competitors through unlawful acts.  To the contrary, prices have remained steady or decreased in the past few years, as clients have been unwilling to accept price increases and in some cases have insisted on price concessions from vendors.  (Buffenstein Decl. ¶ 59; Kaplan Decl. ¶¶ 24, 26.)  The non-exclusive nature of most vendor contracts allows clients to switch to a new vendor at any time, which pressures vendors not to increase prices.  (Kaplan Decl. ¶¶ 19, 22-23.)  As a matter of antitrust economics, these indicia all point to the conclusion that prices have been maintained in a relatively narrow band around the competitive level.  (Kosicki Decl. ¶¶ 25-27.)   In this context, Emigra's claim that Fragomen has hindered competition in the business immigration services market is meritless.

25

In light of Fragomen's low market share, the strength of competition, and the lack of significant entry barriers in the market for providing business immigration services to corporations, Emigra cannot establish that Fragomen has monopoly market power in any properly defined market. Defendants accordingly are entitled to summary judgment on Emigra's claims for monopolization and attempted monopolization.

## II. Emigra's Vertical Agreement Claim Fails Because Emigra Cannot Establish an Adverse Effect on Competition.

Emigra also alleges, under Section 1 of the Sherman Act, that Fragomen entered into an unlawful vertical agreement with one local service provider in Japan, with the provider supposedly agreeing not to do business with Emigra. Fragomen's inability to affect significantly the availability of local services in Japan – a market where it does not even have an office (Kaplan Decl. ¶ 17) – dooms this claim as well.

To establish an unlawful vertical agreement, a plaintiff must show "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) [that] such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Tops*, 142 F.3d at 95-96. Alleged vertical conspiracies not involving price fixing generally are subject to rule of reason analysis. *See K.M.B.*, 61 F.3d at 127.

Under the rule of reason, the plaintiff has the initial burden of establishing that defendant's actions had an adverse effect on competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993). A plaintiff may make an indirect showing of an adverse effect by establishing market power in combination with "other grounds to believe that the defendant's behavior will harm competition marketwide." *K.M.B.*, 61 F.3d at 129.

26

Emigra's inability to demonstrate market power leaves it unable to satisfy this test.  As noted above, Emigra's low market share, the strength of competition, and the low entry barriers establish that Fragomen lacks market power in the business-related immigration services market as a whole.  *See* Argument Part I-B, above.  Fragomen's lack of market power in the Japanese market segment affected by Emigra's claim is even clearer.  The Japanese vendor at issue, ILS Shimoda, does not have an exclusive relationship with Fragomen.  (Kaplan Decl. ¶ 19.)  ILS Shimoda offers and provides services to "many foreign-affiliated firms such as finance companies, manufacturers, food and drink businesses, IT businesses, energy related companies, pharmaceutical manufacturers and food service industry" companies, as well as U.S. law firms other than Fragomen LLP.  (Buffenstein Decl. ¶ 50 & http://www.ils-co.jp/Support_service.htm.)

Fragomen uses three different local service vendors in Japan, and none of them are exclusive to Fragomen.  (Kaplan Decl. ¶¶ 18-19.)  ILS Shimoda handles only about 20 percent of Fragomen's work in Japan.  (*Id.* ¶ 18.)  Moreover, a foreign immigration firm looking for a local service provider in Japan can choose from more than a dozen vendors besides ILS Shimoda.  (Buffenstein Decl. ¶ 51.)   In light of these facts, Emigra cannot show that Fragomen has any market power that would enable it to constrict, to any meaningful degree, the supply of local Japanese service providers available to other firms.  (Kosicki Decl. ¶¶ 29-32.)

Nor can Emigra meet the more onerous test of establishing through direct evidence an "actual adverse effect on competition as a whole in the relevant market."  *K.M.B.*, 61 F.3d at 127-28.  Under this test, the relevant standard "is whether defendants' actions 'diminish overall competition, and hence consumer welfare.'"  *Id.* at 128 (citation omitted).  Passing the inherent implausibility of such a suggestion, Emigra's claims of personal injury are insufficient on their face to meet this standard.  *See id.* at 123 (to fulfill the adverse effect test, "the plaintiff

must show more than just that he was harmed by defendants' conduct"). "Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action …." *Capital Imaging*, 996 F.2d at 543; *see also K.M.B.*, 61 F.3d at 128 (affirming grant of summary judgment on Sherman Act Section 1 claim where plaintiff "cannot show that 'the impact on intrabrand competition was anything but *de minimis.*'") (citation omitted).

Emigra's allegations – that Fragomen solicited certain Emigra employees (who did not actually leave Emigra for Fragomen) (Compl.¶¶ 56-60); that Fragomen contacted certain Emigra customers (*id.* ¶¶ 51-55); that Mr. Freel told Fragomen about Emigra's plans to start an office in Japan (*id.* ¶¶ 77-85); and that Fragomen threatened to terminate a Japanese vendor (*id.* ¶¶ 86-90) – are insufficient to meet this standard. Even if these allegations were true (which they are not), they suggest nothing more than personal injury to Emigra, and provide no support for an "actual adverse effect on competition as a whole in the relevant market."

Objective evidence shows that there has been no such effect. Strong and multi-faceted competition flourishes in the business-related immigration services market, as discussed above. *See* Argument, Part I-B, above. In the past two years, the period during which the alleged actions by Fragomen purportedly occurred (*see* Compl. ¶ 26), prices have either remained steady or decreased, and clients have aggressively shopped for the lowest price, in some cases insisting on price decreases from vendors. (Buffenstein Decl. ¶ 59; Kaplan Decl. ¶¶ 24-26) Given the lack of any adverse effect on competition, Emigra's allegations of misconduct are irrelevant, and its vertical agreement claim cannot succeed. *See Tops*, 142 F.3d at 96 (plaintiff failed to demonstrate a detrimental effect on competition where it could not show a decrease in quality of service or that other competitors were excluded from the market, and

"even if plaintiff were hindered from competing, nothing changed in the relevant product market from the consumer's perspective").

### III.    Emigra's Conspiracy Claims Fail as a Matter of Law Because Fragomen Cannot Conspire With Itself.

Emigra alleges two horizontal conspiracy claims.   Count II alleges, based on Section 2 of the Sherman Act, that some unspecified combination of defendants conspired to achieve a monopoly.   (Compl. ¶¶ 113-123.)   Count IV alleges, based on Section 1 of the Sherman Act, that some combination of the defendants entered into a horizontal agreement to damage competition by harming Emigra.   (*Id.* ¶¶ 137-48.)

These claims are deficient as a matter of law because the Supreme Court has rejected the so called intra-enterprise conspiracy doctrine.  The Court held in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), that a parent company cannot conspire for antitrust purposes with its own wholly-owned subsidiary, because a parent and such a subsidiary share a complete unity of interest.  *See id.* at 776[3].  The same reasoning applies to corporations under common ownership.  *See Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 197 (S.D.N.Y. 1986).  In addition, it has been held that a parent and an 80 percent owned subsidiary cannot conspire with each other under *Copperweld*, where the remaining 20 percent of the subsidiary was owned by one of the parent's managing directors.  *See Rosen v Hyundai Group (Korea),* 829 F. Supp. 41, 45 n.6 (E.D.N.Y. 1993).  The holding in *Copperweld* similarly defeats claims alleging conspiracies between corporations and their own employees.  *See, e.g.*, *Balaklaw v.*

---

[3] Although *Copperweld* was decided under Section 1 of the Sherman Act, the *Copperweld* principle has been applied to conspiracy claims under Section 2 as well.  *See, e.g.*, *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 839 (S.D.N.Y. 1988).

*Lovell,* 922 F.Supp. 892, 900 (N.D.N.Y. 1993) (under *Copperweld*, officers and employees of a corporation cannot conspire with each other or with the corporation for antitrust purposes); *Gucci*, 651 F. Supp. at 197.

These principles scuttle Emigra's horizontal agreement claims. Fragomen LLP and Fragomen Global are owned by the same equity partners. (Kaplan Decl. ¶¶ 6, 9, 12.) Fragomen II was (before it merged into Fragomen LLP) a wholly-owned subsidiary of Fragomen LLP. (*Id.* ¶¶ 8, 12.) FGIS is approximately 93 percent owned by Fragomen Global, with the remaining equity interest owned by a related party: a former senior executive of FGIS. (*Id.* ¶¶ 10-12.) Ryan Freel is an employee of Fragomen. (*Id.* ¶ 13.) Under *Copperweld* and its progeny, none of the defendants can conspire with each other for antitrust purposes.

## IV.    Emigra's Pendent State Law Claims Should Be Dismissed For Lack of Subject Matter Jurisdiction

A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); s*ee also Kolari v. New York Presbyterian Hospital*, 455 F.3d 118, 123-24 (2d Cir. 2006); *Valencia* v. *Lee*, 316 F.3d 299, 305 (2d Cir. 2003). The defective Sherman Act claims are the only basis for federal subject matter jurisdiction that is apparent from Emigra's pleading. (Compl. ¶¶ 4-5.) In determining whether to exercise supplemental jurisdiction over state law claims, courts consider whether doing so would promote the interests of judicial economy, convenience and fairness to litigants. "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon University* v. *Cohill*, 484 U.S. 343, 350 (1988). This

is precisely the situation here.  Emigra's jurisdictionally insufficient state law claims should be dismissed.

**Conclusion**

For the foregoing reasons, defendants' motion should be granted in all respects. The Court should issue an order granting summary judgment in favor of defendants on all of Emigra's antitrust claims, and should dismiss Emigra's state law claims for lack of subject matter jurisdiction.

Dated:    New York, New York
          February 22, 2008


COVINGTON & BURLING LLP              GISKAN SOLOTAROFF & ANDERSON LLP


By: /s/ C. William Phillips          By: /s/ Darnley D. Stewart
    Charles E. Buffon                    Darnley D. Stewart
    C. William Phillips              11 Broadway, Suite 2150
    Andrew A. Ruffino                New York, New York 10004
    Anna E. Lumelsky                 Tel: (212) 500-5106
620 Eighth Avenue
New York, New York 10018             *Counsel to Defendant Ryan Freel*
Tel: (212) 841-1000

*Counsel to Defendants Fragomen, Del Rey,*
*Bernsen & Loewy, LLP; Fragomen, Del*
*Rey, Bernsen & Loewy II, LLP; Fragomen*
*Global Immigration Services, LLC; and*
*Fragomen Global LLP*