UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMIGRA GROUP, LLC,

Plaintiff,

- v -

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP,
FRAGOMEN, DEL REY, BERNSEN & LOEWY II, LLP,
FRAGOMEN GLOBAL IMMIGRATION SERVICES,
LLC, FRAGOMEN GLOBAL LLP, AND
RYAN MATTHEW FREEL,

Defendants.

**DECLARATION OF
A. PENDLETON DUPUIS**

**07-cv-10688 (LAK)(HP)**

ECF CASE

A. Pendleton DuPuis declares pursuant to 28 U.S.C. § 1746:

1. I am the President and Chief Marketing Officer of Emigra Group, LLC, Plaintiff in this case ("Emigra"). I submit this Declaration based upon personal knowledge, in support of Plaintiff's request for disclosure pursuant to Federal Rule of Civil Procedure 56(f) in response to the Fragomen Defendants' motion for summary judgment.

2. I have been employed in the field of immigration services for nearly twenty years, and President of Emigra since 2003. I received a bachelor's degree from Hampden-Sydney College with *magna cum laude* and Phi Beta Kappa honors, and an M.B.A. from the Wharton School of the University of Pennsylvania.

3. I am responsible for review and management of Emigra matters including strategic business planning, marketing, pricing, bidding, contracting, and service delivery. I thus believe I am familiar with all aspects of Emigra's business that are central to Defendants' motion.

4. I have reviewed the allegations of Emigra's Amended Complaint in this case, and I believe those allegations to be true to the best of my knowledge and belief. A copy of the Amended Complaint is attached hereto as Exhibit A.

5. I also reviewed the Declarations submitted in support of Defendants' motion for summary judgment and the exhibits thereto ("Defendants' Declarations"), and I believe many of the allegations of the Defendants' Declarations to be incorrect to the best of my knowledge and belief, as summarized in this Declaration.

6. My primary areas of disagreement with the Defendants' Declarations include, without limitation: (a) the nature of relevant services offered by Emigra and the Fragomen Defendants, (b) customer requirements for single-source services and competitors of Emigra and Fragomen for the provision of those services, (c) barriers to delivery of those services by entities not currently providing the same. These points are expanded upon in later paragraphs of this Declaration.

### *Nature of Uncompleted Discovery*

7. My disagreement with Defendants' Declarations is based in large part upon their lack of an accurate factual basis, an infirmity which is made more difficult to expose because of Emigra's inability to complete, or even commence, discovery in this case.

8. As set forth in the Declaration of economic expert Fredrick Flyer, Senior Vice President of the Compass Lexecon firm, Defendants failed to provide evidence sufficient to fully evaluate their position in the case, much less to support their argument for judgment as a matter of law. *See, e.g.*, Flyer Declaration at ¶ 10. A copy of the Flyer Declaration is attached hereto as Exhibit B, and is adopted in its entirety herein by reference.

9. Evidentiary matters requiring Fragomen disclosure include:

2

a. Information regarding Fragomen competition for work, including content of request for proposals from potential customers, identities of competing bidders and their characteristics as service providers, specific services required by potential customers, specific services offered to customers in proposals from competing vendors, identity of winning bidders, prices in winning bids, margins earned on winning bids, Fragomen internal documents regarding competitors and market share and pricing policies, and related information (Flyer Decl. ¶¶11-17);

b. Information regarding Fragomen customers, including customer lists, annual revenue per customer, customer size, number of customer employees serviced annually, and related information (Flyer Decl. ¶18).

c. Information regarding Fragomen sales, including aggregate sales revenue, aggregate volume of transactions, sales by location, market share, and comparable data regarding competitor sales (Flyer Decl. ¶19).

d. Information regarding Fragomen vendor relationships and dealings, including whether any such relationships are exclusive and whether vendor alternatives are available to Emigra if Fragomen requires exclusivity (Flyer Decl. ¶22).

10. Fragomen's failure to adduce such information, either through discovery or in support of its motion, leaves the court with "insufficient evidence to fully evaluate and much less to dismiss the allegations made by Emigra in this litigation" (Flyer Decl. ¶10).

3

### *Facts Sought are Reasonably Expected to Show Genuine Issues of Material Fact*

11. I believe that discovery regarding such matters will show that Fragomen's actual business is consistent with Emigra's allegations of market structure and Fragomen dominance of the same, and thus disprove Fragomen's contention that Emigra's claims fail as a matter of law:

  a. Information regarding Fragomen competition for work is expected to show that Fragomen's competitors for pertinent work are primarily single-source providers, in a distinct market as alleged by Emigra (Flyer Decl. ¶¶11, 16, 17);

  b. Information regarding Fragomen customers is expected to show that Fragomen's leading customers are large corporations requiring coordinated and geographically diverse services, in a distinct market as alleged by Emigra (Flyer Decl. ¶18);

  c. Information regarding Fragomen sales is expected to show Fragomen's large share and other dominance of the relevant market, as alleged by Emigra (Flyer Decl. ¶19);

  d. Information regarding Fragomen vendor relationships and dealings is expected to show anticompetitive contracts and activity by Fragomen, as alleged by Emigra (Flyer Decl. ¶¶23-24);

  e. Emigra's allegations, with such support, will show "harm to competition . . . as Fragomen through its unlawful acts would have maintained and enhanced its market power by reducing Emigra's ability to compete" (Flyer Decl. ¶6).

### *Emigra Efforts to Obtain Pertinent Facts*

12. Emigra attempted to obtain as many of those facts as possible from public record sources, from extrapolation of Emigra's own experience in the marketplace, and from dealings with Fragomen. Certain of those facts formed the basis for Emigra's detailed Amended

4

Complaint, and for allegations of this Declaration. Examples include Fragomen market share, interference with Emigra customer and vendor relationships, Fragomen appearance as a competitor in Emigra bidding for work, Fragomen predatory pricing and employee solicitation, and others.

13. Emigra intended to supplement those facts with further evidence obtained through discovery in this case.

### Why Those Efforts Were Unsuccessful

14. Those efforts were unsuccessful prior to commencement of the litigation because much of the pertinent information is known only to Fragomen or affiliates of Fragomen, and could not be obtained without compulsory process.

15. Indeed, many of the facts which Defendants describe in their Rule 56.1 Statement as presenting "no genuine issue to be tried" include directly-contested matters that are plainly within Fragomen's sole knowledge, and which should be tested through the discovery process before judgment for Fragomen could be contemplated. Examples include:

    a. ¶¶6, 7, 11-19, 25 regarding Fragomen's ownership and structure and staffing;

    b. ¶¶21, 22, 57-59, 62-64 regarding Fragomen's contractual relationships;

    c. ¶¶35-37 regarding Fragomen's revenues and market share;

    d. ¶¶67-70 regarding Fragomen bidding activity and resultant contracts.

16. These subjects are among those at the core of the issues identified by Dr. Flyer as known only to Fragomen and requiring disclosure before Fragomen's motion can properly be evaluated. They cannot properly be described as uncontested, and so I believe they cannot be assumed for the movant in the context of a motion for summary judgment.

5

17. Emigra was unable to obtain further evidence after commencement of litigation regarding matters known to Fragomen and its affiliates because discovery was stayed at the outset of the case over Emigra's objection.

### *Generally re Need for Additional Discovery*

18. I believe that Defendants' motion lacks merit, and that additional evidence which would tend to further support that conclusion is exclusively within Fragomen's possession. Consequently, I believe that Defendants' motion should be denied outright at this time, or at a minimum in the alternative, that Emigra should be permitted an opportunity to obtain discovery from Fragomen before having to respond.

19. In further support of these conclusions, I provide certain affirmative statements as follows regarding the relevant market and regarding Fragomen dominance of it, as I understand those facts, and thereby refute many of the assertions and inferences of the Defendants' Declarations.

### **Nature of Services**

20. A central concept of Emigra's business plan is to be a single-source provider for large corporations who have needs for coordinated and comprehensive global immigration services. Our intention, and we believe our reality, is to offer superior service at lower cost than Fragomen and other competing service providers.

21. A key component of our ability to service customers in this manner is our provision of Global Case Management regarding international corporate assignments for major corporations. The intention is to provide a complete immigration services solution for those customers, with end-to-end case management, home country support, and host country services. Specific services provided in Global Case Management include document gathering assistance,

6

document conditioning, consular processing, and internet status monitoring. We provide these services through offices in thirteen countries and a large network of outside providers, dispersed in such a manner that we believe we can service the requirements of 80-90% of most customer organizations. Emigra provides close management and client service regardless of whether those services are provided in house or by retained outside providers.

22. Emigra's Global Case Management and related services provide major employers with significant immigration requirements the option of effective and efficient single-source handling of all or nearly all of their immigration consulting and management requirements.

23. Unlike the legal services markets described in the Buffenstein Declaration (¶¶8-10), Emigra does not rely primarily upon U.S. inbound immigration work, but is instead focused upon global immigration services that do not require attorneys for performance.

24. Fragomen offers similarly comprehensive and geographically diverse global immigration consulting and management services, with the additional ability, unlike Emigra, to provide legal services in house.

25. To the best of my knowledge, Fragomen relies upon large corporations with needs for complex and coordinated immigration services for a majority of its revenues, with a minority of Fragomen income for global immigration services obtained from small companies needing regional services only.

### Customer Requirements and Competitors

26. Fragomen's web site states that "We work with companies and multinational corporations to develop and streamline their immigration programs and help them to secure each employee's legal right to work in over 80 countries worldwide."

7

27. To my knowledge, until relatively recently, the only other provider who offered a similarly broad range of immigration services worldwide to those offered by Emigra and Fragomen was the Littler Mendelson law firm.

28. However, as of January 2008, after Emigra commenced this litigation, Fragomen and Littler announced that Fragomen had acquired much of Littler's immigration practice. By this acquisition, Fragomen absorbed one of the world's leading providers of competing services, and thus eliminated one of its few potential contenders for single-source work.

29. According to a joint Fragomen-Littler press release about the transaction, the deal included "an agreement to transfer certain of Littler's high volume immigration facilities and personnel to Fragomen." Austin T. Fragomen, Jr., Chairman of the Fragomen law firm, is quoted to claim that:

> [The Littler acquisition] further enhances our goal of delivering comprehensive world-wide immigration services to large clients with complex needs who benefit from the delivery of consolidated global immigration services across multiple regions. The scale and breadth of our practice facilitates the smooth addition of these [Littler] professionals into our practice and in turn translates into opportunities for large clients to gain even greater efficiencies."[1]

30. According to the press release, Fragomen's Chairman recognizes the special needs of large clients for "consolidated" services "across multiple regions," *i.e.*, the same single-source market that Emigra alleged in its Amended Complaint and that Defendants deny in this motion.

31. The quotation of Mr. Fragomen also acknowledges the barriers to entry alleged by Emigra, noting that "the scale and breadth" of Fragomen's practice "facilitates the smooth addition" of the Littler practice. The Buffenstein Declaration tries to downplay the significance of this "scale and breadth," arguing that Fragomen has only 22% of the immigration lawyers

---

[1] Littler Mendelson Reconfigures Immigration and Migration Practice, January 25, 2008, available at http://www.fragomen.com/about/Littler-Fragomen-Press-Release-1-25-08.pdf. This press release was picked up by news wires and reported through other sources.

employed in the top 25 immigration law firms (¶26). Those same statistics show, however, that Fragomen has more than *five times* the number of immigration lawyers as the second-largest firm in the world. *Id.* More importantly, the Declaration is silent regarding non-lawyer professional staffing. I understand that Fragomen has over 1,000 such professionals, approximately ten times the comparable Emigra staff, and dwarfing the comparable staffs of all other firms I know of.

32. As Mr. Fragomen observed, smaller providers cannot readily merge in order to compete for larger customers, and thus face a barrier to entry to the market for such work. Indeed, a deal of the magnitude of the Littler acquisition would not be easy even for Emigra to manage, and we believe we are second in "scale and breadth" of relevant services only to Fragomen. We thus face the same barrier to growth, although perhaps to a lesser degree, than the many providers described in the Defendants' Declarations.

33. Certainly, there exist in the world a great number of local and regional immigration service providers. Each offers some subset of the services provided comprehensively by Emigra and Fragomen. Each has a certain geographic reach for the services it provides. All have significant constraints upon the volume of work they can handle.

34. Their capabilities are sufficient for many employers, who may not require comprehensive services, or who may need services only in a particular country or region. For example, a company operating primarily in one country with one satellite office in another may have all its needs met well by an immigration services provider operating solely in the country of the satellite office. Further, that customer is more likely to require only specific services, such as work visa applications, and not more comprehensive treatment of employee movement.

35. Emigra's prime customers, in sharp contrast, have needs for placement throughout the world, in sufficient volume that internal management or even monitoring is impractical for the

9

customer. Such customers want a single-source option, which currently is provided primarily, if not solely, by Emigra and Fragomen.

36. Local and regional providers cannot meet the service needs of major international customers due to their limitations of range or reach or capacity, and thus are not direct competition for Emigra or Fragomen for such work.

37. Similarly, I do not believe that small departments of large global firms can compete effectively for such work, as they have not developed the global networks or combinations of local expertise necessary to provide geographically diverse services. For purposes of competing for single-source work, a small immigration department of a huge global law firm is more similar to a boutique immigration practice than it is to a regional immigration services provider, and thus less likely to get the work. It is my understanding that large firms have such departments to facilitate dealings with clients having larger needs for other services, and not to try to build a global practice of comprehensive immigration services.

38. The Defendant Declarations assert that Emigra and Fragomen have many competitors because there are many service providers, trying to paint a portrait of this business with a very broad brush, but they ignore the important distinction between large and small providers that is recognized, even touted, in Mr. Fragomen's quote describing the pertinent market.[2] This includes the many providers described in the Defendant Declarations, such as small firms, or small departments of law or accounting[3] or relocation[4] or consulting firms. Even such of those

---

[2] It seems significant that the Declarants, despite their analysis of the supposedly-competing firms in this industry, did not mention the Little acquisition that had occurred just weeks before they swore out their statements.
[3] The assertions of the Buffenstein Declaration regarding hundreds of immigration professionals deployed in scores of countries by accounting firms (¶¶35-38) bears no relationship to the reality of my work. The accuracy of these numbers must be tested through third-party discovery and other means before they can be afforded any significance. Even then, as stated herein, those firms do not appear as competitors for the single-source work Emigra seeks, a reality that would make no sense if the numbers reported by Buffenstein correctly state the pertinent resources of those firms.

10

firms that have global reach in other areas do not have global reach in the provision of single-source immigration services.

39. Those firms simply are not competition for single-source work provided by Fragomen and Emigra. When bidding for work with major corporations, Emigra does not compete with immigration service departments of accounting firms, or with relocation firms, or with consortia of smaller providers, it generally competes with Fragomen. Indeed, certain of the entities identified as Emigra competitors by Defendants' experts are more accurately described as Emigra vendors or subcontractors.

40. My belief that the market for large corporations is met only by single-source providers is supported by Emigra's actual bidding experience. Request for Proposals received from Fortune 100 and other large companies have, in the past few years, increasingly required the ability to provide consolidated global immigration services. Inability to provide such services blocks smaller providers from access to such customers, and thus from access to the market defined by Emigra.

41. In this regard, the Buffenstein Declaration concedes that "clients may seek out a single provider" for global immigration services (¶20-21). The reality in my experience is that many such customers, including the largest among them, don't just "seek out" a single provider, they require one. The Declaration's further point regarding subcontracting of services misses the point – the contract is awarded to the single-source provider, not the subcontractor. Inability to service the customer globally moots the subcontractor point, because the work will be awarded to someone else.

---

[4] Relocation firms have an inherently narrow skill set. The examples in the Buffenstein Declaration prove Emigra's point regarding their inability to compete in the relevant market. I understand that Sirva Relocation is in bankruptcy, and Emigra is servicing many of its former clients. Santa Fe Relocation practices in Asia, without global reach. Pricoa, Primacy, Weichert, and Cartus offer services through Fragomen and/or Emigra, and do not compete with them.

42. Much of the empirical data relied upon in the Defendants' Declarations fails to take this relatively recent RFP trend into account. Data that is more than two to three years old does not reflect the current market reality of a greater demand for global reach in my opinion. It appears that all of the market data relied upon by Defendants' experts, such as the expressly-referenced 2003-2004 survey data, suffers from this fatal infirmity (as well as failing to distinguish between inbound U.S. work versus outbound or transnational work). Certainly, at a minimum, the experts' conclusions cannot be relied upon until this important issue regarding the factual basis for their opinions has been explored.

43. The Defendants' example of an auction provides insufficient facts to support its suggested conclusion. Many parties competed for the work, but Fragomen won it. Defendants provided no data regarding the other bidders' size or bids, or performance of the contract. This example can thus benefit Fragomen only if the Court infers the circumstances favorably to Fragomen, that the undisclosed bidders offered comparable services and that Fragomen won the bid by tough but fair bidding. It also can reasonably be inferred that Fragomen won the auction due to its status as the only single-source provider in the bidding, or because of predatory pricing, or that Fragomen won the auction but then succeeded in driving up the price with contract additions.

44. The Buffenstein Declaration's many loose assertions about what "many" or "most" providers or customers do, averred without apparent statistical support, are often not consistent with my understanding of actual conduct in the relevant markets. *See, e.g.* Buffenstein Decl. ¶¶1 ("generally"), 2 ("common"), 3 ("most"), 5 ("substantial majority"), 22 ("common"), 24 ("rarely"), 26 ("numerous"), 30 ("not all"). To the extent the frequency or magnitude of the

issues referenced by such vague descriptions are material, they are insufficiently supported and are stated in a manner that appears to me to slant the issues improperly.

45. The Buffenstein Declaration includes outright admissions of a lack of evidentiary basis, expressly asking the Court to improperly draw inferences in favor of the moving party in this motion for summary judgment. *See* Buffenstein Decl. ¶ 30 (it "is a reasonable inference" that many firms are well positioned to grow in response to "unusually high prices" of undefined magnitude); 32 (cost to add global reach "should not be prohibitive"). Such inferences are guesswork contrary to fact in my opinion, as I believe barriers other than cost are much more difficult to surmount in order to achieve growth globally (as discussed more fully below), and foreseeable movement in price will not cure those barriers.

### Barriers to Entry

46. The single-source market is substantial, recurring, and served primarily by only two players, one much smaller than the other.[5] The Defendants' Declarations contend an absence of barriers to entry to this market, and they identify many hundreds of providers who supposedly could grow or merge into this business easily. If that were true, given the size of the market, one would expect a crowded field of single-source providers, not just two. In my opinion, there are only two providers at present because the Declarants are wrong, and there are very real barriers to developing a single-source immigration services business.

47. Tellingly, the Defendants' Declarations do not state that any global providers capable of providing single-source services to large corporations, other than Fragomen and Emigra, actually *exist*. They argue instead that many smaller providers exist, and they infer that it would be easy for those providers to merge or grow themselves into being competitive in that larger

---

[5]  The Buffenstein Declaration does not dispute the size of this market, and its discussion of revenues derived from inbound work (¶12) by Fragomen and other providers is of no apparent relevance.

market. That speculative argument by Defendants' hired experts is contrary to years of my own personal experience in this specific market. The Defendant Declarations do not include a single customer declaration, or even name any customer, attesting to robust competition in a price sensitive market for single-source immigration services. The Defendant Declarations do not deny that Fragomen targets single-source work, or that it derives high profits from such work, or that it has manipulated its pricing to deprive Emigra of work in the market.

48. Building Emigra's business has not been easy, requiring great investment of capital and time and talent and risk tolerance. I know there are many barriers to entry to this market because Emigra has had to climb over them. Even Mr. Fragomen acknowledged their existence when boasting of Fragomen's ability to pull off the Littler acquisition in a manner not possible for smaller firms.

49. Defendants' experts attempt to waive away the reality of the difficulty by suggesting implausible means of growth. For example, Mr. Buffenstein suggests that U.S. based providers could form relationships with foreign offices managed from the U.S. base. From my personal experience, this concept simply does not work in practice. Emigra tried the approach for a while, and abandoned it as unworkable. To my knowledge, no other provider is utilizing this method successfully to accomplish anything approaching a global reach.

50. However, the expertise required is not easy to find, even if the cost can be borne. In my experience, the most difficult part of expanding this business is to identify and retain the most talented people with strong local expertise and relationships.

51. The Buffenstein Declaration waves a wand at this critical problem, referencing a list of textbooks and similar references regarding immigration services, as if one could just read a treatise and know what is required in order to practice in the field. (¶30). Certainly, there are

14

many books available that describe how to practice law, but reading those books does not make it easy to do so, much less to create a full-service law firm with offices worldwide. To simply restate the argument is to reveal its foolishness.

52. Another very significant barrier to entry that must be noted is Fragomen's business conduct. As described in the Amended Complaint, that conduct has included hiring of Emigra's former COO and senior Hong Kong officer, use of trade secrets obtained thereby, attempted hiring of all key Emigra staff in Europe, interference with customer contracts, and interference with vendor relationships. Fragomen does not deny much of the conduct, only its legal significance. For purposes of competitive analysis, such conduct is a force to be reckoned with.

### Conclusion

53. I have not attempted here to provide a point-by-point refutation of the Defendants' Declarations, or the arguments made therefrom in Defendants' papers. On the contrary, I have many more points of disagreement that were omitted here as outside the necessary scope of our application for disclosure prior to responding to the motion, and this Declaration is thus far short of a comprehensive treatment of the issues. More can and will be said in opposition to Defendants' contentions if and when Emigra ever is required to respond to the merits of Defendants' motion.

For the foregoing reasons, I request respectfully that the Court find Defendants' motion to be insufficiently supported, and to grant Emigra a reasonable opportunity for discovery in this case before causing Emigra to respond further to this motion.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 30, 2008.

A. Pendleton DuPuis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMIGRA GROUP, LLC,

                                 Plaintiff,

           - v -

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP,
FRAGOMEN, DEL REY, BERNSEN & LOEWY II, LLP,
FRAGOMEN GLOBAL IMMIGRATION SERVICES,
LLC, FRAGOMEN GLOBAL LLP, AND
RYAN MATTHEW FREEL,

                              Defendants.

---

**AMENDED COMPLAINT**

**07-cv-10688 (LAK)(HP)**

ECF CASE

FOR TRIAL BY JURY

        Emigra Group, LLC ("Emigra" or "Plaintiff") by its attorneys, Pinnisi &

Anderson, LLP, as and for its Complaint, alleges as follows:

## THE PARTIES

        1.   Emigra is a Delaware limited liability corporation with its principal place of business

in Vienna, Virginia. Emigra is a provider of business-related immigration services, offering a

wide range of consultation in immigration matters, document procurement, consular processing,

general immigration case management and monitoring, and related services, to assist

corporations in their movement of employees across national borders.

        2.   Upon information and belief:

           a.   Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen LLP" or "Defendant")

               is a Delaware limited liability partnership registered in New York as a foreign

limited liability partnership with its principal place of business in New York, New York;

b.   Fragomen, Del Rey, Bernsen & Loewy II, LLP (õFragomen LLP IIö or õDefendantö) is a Delaware limited liability partnership registered in New York as a foreign limited liability partnership with its principal place of business in New York, New York;

c.   Fragomen Global LLP (õFragomen Globalö or õDefendantö) is a Delaware limited liability corporation with its principal place of business in New York, New York;

d.   Fragomen Global Immigration Services, LLC (õFragomen Global Immigrationö or õDefendantö) is a Delaware limited liability corporation with its principal place of business in New York, New York;

e.   The above-named Defendants are referred to collectively herein as the õFragomen Defendantsö;

f.   Fragomen Global and Fragomen Global Immigration are providers of business-related immigration services that are the same and/or substantially the same as those offered by Emigra, and both are affiliates of Fragomen LLP and Fragomen LLP II; and

g.   Fragomen LLP and Fragomen LLP II also provide business-related immigration services.  In addition, these Fragomen Defendants provide legal advice and representation in immigration law matters and in other international law matters such as transnational mergers and acquisitions, and import/export and other regulatory compliance.

2

3.    Upon information and belief, Ryan Matthew Freel ("Freel" or "Defendant") is a

resident of the State of Illinois, an attorney admitted to the New York Bar, and an

employee of one or more of the Fragomen Defendants.

**JURISDICTION AND VENUE**

4.   This action is brought, *inter alia,* pursuant to 15 U.S.C. §§ 1, 2, 15, and 26 and New

York common law.

5.   This Court has jurisdiction over the federal and pendent state law claims in this case

pursuant to 28 U.S.C. §§ 1332, 1337, and 1367.

6.   This Court has personal jurisdiction over Defendants pursuant to federal law and New

York CPLR §§ 301 and 302 because Defendants, personally and/or through their agent or agents,

transact business in the State of New York and in this judicial district; contract to supply services

in the State of New York and in this judicial district; committed tortious acts within the State of

New York and in this judicial district; or, own, use, or possess real property situated within the

State of New York and in this judicial district.

7.   Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2), as the

judicial district in which a substantial part of the events or omissions giving rise to the claim

occurred; and pursuant to 15 U.S.C. §§ 15 and 22.

8.   Plaintiff and the Fragomen Defendants are engaged in interstate commerce and in

activities substantially affecting interstate commerce.  The Fragomen Defendants offer services

throughout the United States assisting moves of U.S. employees across international boundaries.

The business activities of the Fragomen Defendants represent a regular, continuous and

substantial flow of interstate commerce, and have had a substantial effect upon interstate

commerce as well as upon commerce within the State of New York.

3

# FACTUAL BACKGROUND

9.    In today's global economy, large multinational corporations move many employees around the world each year, at substantial expense.  Smaller corporations that move only a few employees internationally have very different immigration service needs than the corporations that frequently move many employees cross-border.  Those latter corporations need large immigration service vendors who have extensive international networks of supporting secondary vendors, knowledge of the differing immigration requirements of many jurisdictions, and purchasing power that permits competitive pricing.  Customers for such services currently have few choices of suitable immigration service providers.  At present, the companies which satisfy those requirements are limited to the Fragomen Defendants, Emigra, and a small handful of other companies, with all players dominated by the Fragomen Defendants.  At issue in this case are actions by the Fragomen Defendants to maintain and increase that market dominance by improper means.

## The Markets

10. There is a product/service market for immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals (the "Service Market").

11. There is a product/service submarket for business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals (the "Service Submarket").

12.  The services provided in the Service Market and the Service Submarket are intended to speed and reduce the cost of international employee placements, and effective provision of such services has become an important part of conducting international commerce and domestic U.S. commerce that has an international component.

13. The geographic market is global (the "Geographic Market").

14. There is a geographic submarket of the Geographic Market which encompasses (i) those countries where the Plaintiff and the Fragomen Defendants and other service providers in the Services Submarket have offices; and (ii) those countries where the Plaintiff and the Fragomen Defendants otherwise provide services (the "Geographic Submarket").

15. The Fragomen Defendants' website indicates it has offices within the United States in Massachusetts, Illinois, New York, Florida, Pennsylvania, Texas, California, New Jersey, Michigan and the District of Columbia; and offices abroad in Australia, Belgium, China, France, Germany, India, New Zealand, Singapore, and the United Kingdom.  Emigra has offices within the United States in North Carolina, Texas, and Virginia; and offices abroad in Australia, Belgium, Canada, China, France, Germany, Japan, Singapore, Spain, Switzerland, and the United Kingdom.  Both Emigra and the Fragomen Defendants conduct business in many countries outside of those where they maintain offices.

16. Annual gross revenue in the Service Submarket is estimated to exceed $100 million.

## Market Structure

17. The services provided in the Service Market require specialized skill on the part of the service providers.  Service providers also need to develop relationships with secondary service providers and government agencies in the areas they serve.

18. The Service Submarket is highly concentrated.  In addition to the need for specialized skill on the part of all service providers in the Service Submarket, there is the additional need to provide a broad range of services over a large geographic region at competitive pricing.  The requisite relationships with secondary service providers and government agencies can be difficult to establish and enhance, and need to be made in many different regions with quality providers

5

who can handle the requisite volume rapidly and at competitive cost.  Substantial expertise and

capital and time are required to accumulate the facilities, staff, relationships, and other resources

necessary to compete in this market, and multinational corporate clients prefer and can require

service providers with large international networks.  There are barriers to entering the Service

Submarket that include and are not limited to these factors.  To date, only the Fragomen

Defendants and Emigra and a handful of others have entered this submarket successfully.

**Fragomen Dominance of Relevant Markets**

19. Although separate legal entities, the Fragomen Defendants function effectively as one

entity with consequent cumulative market power.  There exist both commonality of ownership

interests in the Fragomen Defendants and coordinated action among the Fragomen Defendants.

As stated in the Fragomen LLP web site:  "Fragomen Global is designed to function as a natural

adjunct to Fragomen, Del Rey, Bernsen & Loewy to ensure a coordinated and effective overall

representation of immigration matters, regardless of destination."

20. Upon information and belief, the Fragomen Defendants are by far the world's largest

provider in both the Service Market and in the Service Submarket.

      a.   As the Fragomen Defendants recently advertised in the December 5, 2007 issue of

            <u>Globility</u>, "Fragomen is the world's largest firm practicing exclusively in the area

            of global immigration law for the corporate sector."

      b.   The Fragomen LLP web site similarly boasts that this Defendant alone "is the

            leading provider of corporate immigration services and solutions," noting its

            continuous service in the industry for more than fifty years, and its employment of

            "over 130 attorneys and over 1000 professional immigration specialists and staff

            located in more than 30 offices in the Americas, Asia Pacific, and Europe."

c. That same web site notes the integrated work of Fragomen LLP with other Fragomen Defendants to provide "guidance and assistance to clients on immigration matters for the international movement and relocation of employees and new hires and between countries worldwide."

21. The market share and resources and coordinated action of the Fragomen Defendants evidence market dominance in both the Service Market and the Service Submarket.

a. Upon information and belief, the Fragomen Defendants are the world's largest provider in the Service Market and the Service Submarket, capturing well over three quarters of the Service Submarket.

b. Upon information and belief, Emigra is the world's second-largest provider in the Service Market and in the Service Submarket. Even so, Emigra has a minor fraction of the staff and revenues of the Fragomen Defendants.

c. Emigra's profitability and growth have been stunted by actions of the Fragomen Defendants complained of here.

d. Upon information and belief, there are only a few other providers in the Service Market and the Service Submarket that are able to provide the comprehensive services offered by the Fragomen Defendants and Emigra, and those other providers, in combination, account for only a few percentage points of the total worldwide annual gross revenue in the Service Submarket.

e. Until recent years, no provider has challenged the Fragomen Defendants' lead position in the Service Market or powerful dominance in the Service Submarket.

22. Upon information and belief, it is the recently-developed ability of Emigra to compete effectively with Fragomen and win market share that has prompted the Fragomen

Defendants, singly and in combination, to engage in unlawful practices that are intended to weaken Emigra before it becomes able to truly challenge Fragomen's position.

23. The conduct of the Defendants is substantially restraining trade in those markets and unlawfully enhancing and maintaining Fragomen's monopoly position in those markets, and thus in interstate commerce.

24. Upon information and belief, if Emigra and others are not protected against the unlawful actions of the Defendants, the result will be further diminished competition, reduction in the quality of services, and increases in price for all consumers of the services in the Service Market and the Service Submarket, both in the United States and abroad.

25. Emigra conducts substantial business with United States corporations. Defendants' actions complained of here have had a direct and substantial negative impact upon Emigra's ability to service those clients in their conduct of domestic and international trade, and such impact was a reasonably foreseeable effect of Defendants' actions.

**Fragomen Market Dominance Actions**

26. Approximately over the past two years, the Fragomen Defendants have engaged in a targeted, escalating pattern of activity against Emigra that, when viewed as a whole and in conjunction with the tortious acts pled here, goes beyond lawful competition.  Those actions have included, without limitation:

   a.  Interference with Emigra bidding for new work;

   b.  Interference with Emigra dealings with existing customers (by means including, without limitation, predatory pricing and threatened interruption of Fragomen use or delivery of services to those of its vendors and customers using or planning to use the services of Emigra in other dealings);

c.  Recruiting and hiring Freel, who is described in Fragomen's current website as previously being "the Vice President of global operations for a leading immigration provider where he was responsible for overall profitability and management of its worldwide operations," and then attempting to recruit and hire simultaneously several key Emigra employees in Europe for purposes of disrupting and/or damaging Emigra and its business;

d.  Misuse of Emigra's trade secrets and other confidential information;

e.  Inducing Emigra's customers to breach or otherwise modify their contracts with Emigra;

f.  Exclusive dealing and entering into agreements in restraint of trade with Emigra's vendors; and

g.  Conspiring or attempting to conspire to damage Emigra.

27. Examples of such conduct include causing and precipitating a re-bid of a contract Emigra had won; causing a carve-out of a geographic region from an existing contract Emigra has with a major customer; hiring Emigra's then-director of an Asian office and receiving Emigra trade secrets and confidential information from that former director; and using those misappropriated trade secrets to Fragomen's competitive advantage.

28. The Fragomen Defendants' recent recruiting of and communications with Defendant Freel and the use made of information received from him are part of that same pattern of activity, and constitute an alarming escalation in the nature and consequences of Fragomen's prior anticompetitive activity.

29. Viewed as a whole, this pattern of activity has had a substantial adverse impact upon Emigra's ability to win business, retain customers, retain employees, contain costs, and

otherwise prosper. The result has been a slowing of Emigra growth that has directly benefited Fragomen, and that has deprived (and has the potential to further deprive) the relevant markets of the benefits of full and fair competition.

**-- Acquisition of Emigra Trade Secrets by Freel and Fragomen Defendants**

30. On or about August 16, 2005, Freel commenced employment as Emigra's Vice President of Operations.

31. As Vice President of Operations, Freel was an officer of Emigra and a member of Emigra's highest management team, reporting directly to Emigra's CEO.

32. As Vice President for Operations and as an Officer of Emigra, Freel was in a position of responsibility, trust, and confidence with Emigra.

33. As Vice President for Operations and as an officer of Emigra and otherwise, Freel was granted access to and acquired knowledge of virtually all aspects of Emigra business, trade secrets, and other confidential information, including but not limited to the following: Emigra's strategies to maintain and expand its business, deal with competitors, and satisfy customers; its methods of pricing and actual pricing, marketing, promotion, and client management; receivables and collections; sales figures; profit and loss figures; key suppliers; the number, qualifications, attributes, value to Emgira, and salaries of its employees; the identities, addresses, contacts, plans, histories, and needs of Emigra's customers; and other confidential information.

34. Emigra has invested great expense and effort over several years to create, develop, compile and maintain its trade secrets and other confidential information.

35. This above-referenced trade secrets and other confidential information are not publicly available, and are not otherwise readily available to Emigra's competitors.

36. The above-referenced trade secrets and other confidential information were and are highly confidential, and known to be so by Freel at the time he received that information.

37. Emigra's trade secrets and other confidential information had and have economic value in that their use is vital to Emigra's success and the continued viability of its business.

38. Emigra had and has taken reasonable steps to protect the confidentiality of the information described above by means including but not limited to the following: restricting access to the information; informing and reminding employees including Freel that the information was confidential and was required to remain confidential; and requiring employees including Freel to sign agreements indicating that they would protect confidential information.

39. Those steps included, without limitation, specific measures taken to ensure that Freel would not disclose such information outside of Emigra, either during or after his employment by Emigra.

40. At the time Freel commenced employment by Emigra, he signed Emigra's "Client Confidentiality Statement."

41. By doing so, Freel agreed expressly that he would not disclose Emigra confidential information to anyone outside Emigra, that all such information was Emigra property and was not to be used by Freel for personal gain, and that these obligations would continue indefinitely after termination of his employment.

42. Also at the time Freel commenced employment by Emigra, he received Emigra's "Employee Handbook."

43. The Employee Handbook stated in part that "[p]rotecting our company's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed.  Do not discuss the company's confidential business

11

with anyone who does not work for us." It stated further: "employees must never use their positions within the company, or any of its clients, for private gain, to advance personal interests or to obtain favors or benefits for themselves, members of their families or any other individuals, corporations, or business entities ... . Employees of the company shall conduct their personal affairs in such a fashion that their duties and responsibilities to the company are not jeopardized and/or legal questions do not arise with respect to their association or work with the company."

44. Freel provided signed acknowledgement of his receipt and understanding of these Employee Handbook terms to Emigra.

45. On or about September 19, 2007, Freel resigned from his employment with Emigra and undertook employment with one or more of the Fragomen Defendants.

46. Freel negotiated such employment while still an employee and officer of Emigra.

47. Freel did not disclose to Emigra the fact that he had been solicited by Fragomen or that he was negotiating with Fragomen for a high-level position there while Freel continued to participate in meetings with other members of the Emigra management team and while he continued to supervise and conduct other Emigra business.

48. Upon information and belief, in the course of those negotiations, Freel disclosed to one or more of the Fragomen Defendants that he possessed extensive trade secrets and other confidential information about Emigra's business that could be used to take Emigra customers and key employees, interfere with Emigra's business relationships, and otherwise damage and disrupt Emigra's business.

49. Upon information and belief, in the course of those negotiations, Freel disclosed Emigra trade secrets and other confidential information about Emigra's business to one or more of the Fragomen Defendants.

50. Upon information and belief, shortly after he resigned from Emigra, Freel disclosed Emigra trade secrets and other proprietary information about Emigra's business to one or more of the Fragomen Defendants.

## -- Misuse of Emigra Trade Secrets - Customers

51. Within days after Freel became employed by the Fragomen Defendants, Freel contacted certain Emigra customers on behalf of the Fragomen Defendants.

52. Upon information and belief, Freel disclosed Emigra's customer list to one or more of the Fragomen Defendants.

53. Upon information and belief, Freel disclosed Emigra's confidential pricing information to one or more of the Fragomen Defendants.

54. Upon information and belief, Freel and the Fragomen Defendants used Emigra's confidential customer information obtained from Freel to target Emigra's customers, damage Emigra and its business, and advance their own business and business planning.

55. Upon information and belief, the Fragomen Defendants will continue to do so unless restrained by this Court.

## -- Misuse of Emigra Trade Secrets - Employees

56. Within days after Freel became employed by the Fragomen Defendants, Fragomen Defendants solicited certain key employees at Emigra's London and Madrid offices, and extended offers of employment to many of them.

57. The offers all were made to Emigra employees who formerly reported directly or indirectly to Freel and for whom Freel had participated in employment reviews and compensation decisions.

58. The offers all were for salaries that were significantly above the compensation those employees were receiving from Emigra.

59. Offers were not extended to all Emigra employees formerly under Freel's review, or to all similarly situated Emigra employees, but rather, only to those employees whom Freel had known and reviewed favorably while he was employed by Emigra.

60. The offers were rejected by the Emigra employees for reasons other than compensation.

61. If the offers had been accepted, the effect on Emigra's operations in Europe would have been disastrous, likely causing destabilization of Emigra's European business, and with consequent negative impact upon Emigra's worldwide operations.

62. Upon information and belief, Freel was fully aware that such consequences would have followed acceptance of the offers.

63. Upon information and belief, Freel communicated this likely effect to the Fragomen Defendants.

64. Upon information and belief, Freel disclosed Emigra's confidential information regarding employee identification, performance, and compensation to one or more of the Fragomen Defendants.

65. Upon information and belief, Freel and the Fragomen Defendants have used Emigra's confidential employee information to target Emigra employees for solicitation of Fragomen hiring.

66. Upon information and belief, the Fragomen Defendants attempted such hiring at least in part to injure Emigra.

67. Upon information and belief, the Fragomen Defendants will continue to do so unless restrained from doing so by this Court.

68. Upon information and belief, one or more of the Fragomen Defendants have offers of employment outstanding to Emigra employees even now.

69. By utilizing Freel's knowledge of Emigra's employees and employee compensation, and by extending offers to key employees identified by Freel, the Fragomen Defendants unlawfully used Emigra trade secrets and other confidential information they had obtained unlawfully from Freel.

70. Emigra has been injured by this conduct by, without limitation, negative impact upon employee morale, increased compensation costs, investigation expense and distraction, and loss of productivity and business opportunity.

71. Upon information and belief, the Fragomen defendants will continue to so injure Emigra unless restrained by this Court.

**-- Misuse of Emigra Trade Secrets - Contracts**

72. While Freel was an officer and employee of Emigra, he was aware of and involved in confidential plans to open an Emigra office in Japan.

73. The plan to open the office, and the specifics regarding execution of the plan, all were trade secrets of Emigra.

74. One confidential aspect of the plan was to utilize a particular vendor for certain of the services to be provided through the office, a vendor who, upon information and belief, also provided such services for other immigration service companies including but not limited to certain Fragomen Defendants.

75. Freel was aware of all such Emigra plans for a Japanese office, and was integrally involved in the planning and execution of the opening of that office.

76. Within days after Freel became employed by the Fragomen Defendants, the above-described vendor contacted Emigra and advised, in part and substance, that it had been contacted by a Fragomen representative and told that, if the vendor provided services for Emigra, that Fragomen would terminate that vendor from further Fragomen business.

77. The vendor advised further that, because of this threat from a Fragomen Defendant, it would no longer do business with Emigra.

78. Upon information and belief, Freel, who was heavily involved in creating and structuring this relationship while with Emigra, anticipated that the vendor would terminate services to Emigra if Fragomen threatened to terminate its business.

79. Loss of this vendor had a material negative impact upon Emigra's plans for an office in Japan for reasons including without limitation, increased expense and delay in entry to market.

80. Upon information and belief, Freel was fully aware that such consequences would follow from interference with Emigra's dealings with this vendor.

81. Upon information and belief, Freel communicated this likely effect to the Fragomen Defendants.

82. Upon information and belief, prior to being advised of the same by Freel, the Fragomen Defendants were not aware of Emigra's plans to open an office in Japan, or to use the above-referenced vendor in such business.

83. Upon information and belief, Freel disclosed Emigra's confidential information regarding plans for the Japan office to one or more of the Fragomen Defendants.

84. Upon information and belief, Freel and the Fragomen Defendants used Emigra's confidential information about plans for a Japan office in order to disrupt Emigra's plans for that office and thereby cause Emigra immediate and continuing injury.

85. Upon information and belief, the Fragomen Defendants will continue to attempt to disrupt Emigra business plans utilizing information provided by Freel unless restrained from doing so by this Court.

### -- Misuse of Emigra's Trade Secrets – Exclusive Dealing in Restraint of Trade

86. The fact that Fragomen reportedly threatened Emigra's Japanese vendor with termination of Fragomen business if that vendor continued dealings with Emigra, combined with the vendor's consequent refusal to do business with Emigra, is evidence that the Defendants entered into an agreement in restraint of trade.

87. In so doing, one or more of the Fragomen Defendants used Fragomen's monopoly power with the purpose of inducing the vendor to deal exclusively with Fragomen, to the exclusion of Emigra.

88. At least one of the Fragomen Defendants thereby entered into a vertical agreement, contract, or combination with the Japanese vendor (the "Vendor Agreement").

89. The essence of the Vendor Agreement was that vendor would not provide services to Emigra, in order to avoid Fragomen termination of doing business with the vendor.

90. The Vendor Agreement imposed by the Fragomen Defendants unreasonably restrains trade or commerce and unreasonably restricts competition in the relevant Markets.

**Generally**

91. Defendants' conduct in misappropriating Emigra's trade secrets and other confidential information, and wrongfully using that information, has caused and, unless and until restrained by Order of this Court, will continue to cause, great and irreparable harm to Emigra.

92. Such irreparable harm includes and will include (a) disruption of business plans; (b) slowed growth and reduced market share; (c) diminished employee morale and recruiting; (d) loss of confidence and trust of clients, with consequent loss of business reputation and good will generally; and (e) incalculable economic loss.

93. Upon information and belief, Defendants' wrongful conduct has unjustly enriched and will continue to unjustly enrich Defendants.

94. Emigra believes that the above-mentioned acts and omissions of Defendants were willful, malicious, oppressive, unconscionable, and done with an intent to injure Emigra, and with full knowledge of the adverse effects such acts would have on Emigra, or with a conscious disregard of Emigra's rights and willful and deliberate disregard for the substantial economic consequences to Emigra, such as to constitute oppression, fraud, or malice, thus entitling Emigra to exemplary and punitive damages.

95. The conduct of the Defendants has restrained and is restraining trade in the markets identified above with Defendants' full knowledge of the effects such conduct would have on those markets; and such conduct is unlawfully maintaining and enhancing the Fragomen Defendants' monopoly position in those markets, and is causing harms to consumers that follow from diminished competition in those markets.

## COUNT I

### (Acquiring, Enhancing and Maintaining Monopoly Power)

96. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

97. The Fragomen Defendants possess monopoly power in the Service Market and Service Submarket.

98. The Fragomen Defendants willfully and intentionally acquired, enhanced and maintain monopoly power in those markets.

99. The Fragomen Defendants have willfully and unlawfully engaged in a pattern and practice of exclusionary and predatory conduct including but not limited to bidding interference, contract interference, interference with employment relationships, interference with vendor and customer relationships, misappropriation of trade secrets, use of misappropriated trade secrets, and predatory pricing.

100. The Fragomen Defendants so acted with the intention to maintain and preserve and enhance monopoly power in the Service Market and Service Submarket.

101. The Fragomen Defendants so acted with the specific anticompetitive purpose of foreclosing a substantial share of the relevant market from competitors including, but not limited to, Emigra.

102. The Fragomen Defendants have employed a pattern of anticompetitive, predatory, exclusionary, and economically coercive practices to damage Emigra and to force customers to make purchasing decisions in a less-than-fully-competitive market.

103. The Fragomen Defendants have not acquired, enhanced or maintained their monopoly power as a consequence of superior product offerings, good faith business acumen, or historical accident.

19

104.    The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification relating to the enhancement of consumer welfare.  The anticompetitive harm outweighs the procompetitive benefit, if any (which benefit is not admitted), and hinders competition in an unnecessarily restrictive way.

105.    In acting as set forth above, the Fragomen Defendants have monopolized part of the trade or commerce among the several states, and with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

106.    The effect of the above-described acts and practices of Defendants, assessed in combination or in the aggregate, is likely to be anticompetitive and to lead to a substantial lessening of competition through the acquisition, enhancement and/or maintenance of a monopoly in the relevant markets.

107.    Defendantsø actions have caused Emigra injury and damage in an amount to be determined at trial.

108.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

109.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

110.    Defendantsø actions have causally harmed and threaten to harm competition and the general public by unreasonably reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

111. As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services in some instances (and will pay higher prices if Emigra is further disrupted or eliminated), than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

112. Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT II

### (Conspiracy to Monopolize)

113. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

114. There is a combination or conspiracy between two or more of the Defendants to target and damage Emigra.

115. There have been overt acts in furtherance of that conspiracy, including but not limited to the hiring of Freel, misappropriation and use of Emigra's trade secrets and other confidential information, inducing Emigra's customers to breach or modify their contracts with Emigra, engaging in exclusive dealing to induce Emigra's Japanese vendor not to do business with Emigra, and otherwise as set forth at ¶¶ 26-29 above.

116. At least two of the Defendants have had the specific intent to monopolize the Service Market and Service Submarket.

117. In acting as set forth above, Freel and the Fragomen Defendants (and, to the extent that the Fragomen Defendants do not have complete common ownership, the Fragomen Defendants themselves) have engaged in a conspiracy to monopolize part of the trade or commerce among the several states, and with foreign nations, to wit, the provision of services

21

within the Service Market and the Service Submarket, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

118.    Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

119.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

120.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

121.    Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

122.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

123.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

### COUNT III

**(Attempt to Monopolize)**

124.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

125.    To the extent Defendants do not already have a monopoly and monopoly power, which Plaintiff does not admit, the Fragomen Defendants have willfully and unlawfully used

exclusionary and predatory conduct to obtain such power by means including but not limited to bidding interference, contract interference, interference with employment relationships, interference with vendor relationships, misappropriation of trade secrets, use of misappropriated trade secrets, predatory pricing, and otherwise as set forth at ¶¶ 26-29 above.

126.    Defendants had a specific intent to destroy competition with respect to part of commerce or to build monopoly.  Defendants' intent can be proven either by direct evidence and/or by inference from evidence of Defendants' anticompetitive conduct.

127.    Defendants' anticompetitive conduct was directed to accomplishing their unlawful purpose.

128.    The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification, the anticompetitive harm outweighs the procompetitive benefit, if any (which benefit Plaintiff does not admit), and hinders competition in an unnecessarily restrictive way.

129.    To the extent that they have not already done so, which is not admitted, Defendants have the ability to lessen or destroy competition in the Service Market and Service Submarket.  Defendants' attempts to monopolize those markets have a dangerous probability of success.

130.    In acting as set forth above, Defendants have attempted to monopolize  part of the trade or commerce among the several states, and with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

131.    Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

132.    Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

133.    Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

134.    Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

135.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

136.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT IV

### (Unlawful Horizontal Agreement In Restraint of Trade)

137.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

138.    Two or more of the Defendants, not having complete common ownership (upon information and belief), entered into a contract, agreement, arrangement or combination whereby they formed a conspiracy or reciprocal relationship to target and damage Emigra using unlawful means.

139.     The Defendants' actions taken in furtherance of that conspiracy or reciprocal relationship unreasonably restrain trade or commerce and unreasonably restrict or affect competition in the Service Market and the Service Submarket.

140.     The purpose of the restraint is unlawful.

141.     In so acting, the Defendants have entered into an unlawful agreement in restraint of trade or commerce which affects interstate commerce, and commerce with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

142.     The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification relating to the enhancement of consumer welfare.  The anticompetitive harm outweighs the procompetitive benefit, if any (which benefit is not admitted), and hinders competition in an unnecessarily restrictive way.

143.     Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

144.     Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

145.     Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

146.     Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

147.    As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

148.    Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT V

### (Unlawful Vertical Agreement In Restraint of Trade)

149.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

150.    At least one of the Defendants has entered into a vertical agreement, contract, or combination with Emigra's former vendor in Japan (*i.e.*, the Vendor Agreement).

151.    The Vendor Agreement unreasonably restrains trade or commerce and unreasonably restricts competition in the Service Market and the Service Submarket.

152.    The purpose of the restraint is unlawful.

153.    In so acting, Defendants have entered into an unlawful agreement with another person or persons in restraint of trade or commerce which affects interstate commerce, and commerce with foreign nations, to wit, the provision of services within the Service Market and the Service Submarket, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

154.    The conduct of the Fragomen Defendants goes beyond vigorously competitive legal conduct.  The conduct of the Fragomen Defendants lacks a procompetitive justification relating to the enhancement of consumer welfare.  The anticompetitive harm outweighs the procompetitive benefit, if any (which benefit is not admitted), and hinders competition in an unnecessarily restrictive way.

155. Defendants' actions have caused Emigra injury and damage in an amount to be determined at trial.

156. Emigra has no adequate remedy at law or otherwise for certain harm or damage done and threatened by Defendants, as set forth above.

157. Emigra will suffer irreparable harm, damage and injury unless the acts and conduct of Defendants are enjoined and restrained.

158. Defendants' actions have causally harmed and threaten to harm competition and the general public by reducing competition among immigration service providers, decreasing the number of immigration service providers, and thus increasing cost and decreasing quality of such services.

159. As a result of the foregoing, customers for business-related immigration services have had fewer options for service providers, and have been forced to pay higher prices for such services, than they would have experienced in the absence of unlawful conduct by the Fragomen Defendants.

160. Such effects upon the market are likely to continue unless the Defendants are enjoined and restrained from further anticompetitive conduct by this Court.

## COUNT VI

### (Unfair Competition – Misappropriation of Trade Secrets)

161. Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

162. Under New York law, a trade secret is defined as "any formula, pattern, compilation, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," or

õany information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others.ö

163. Emigra possessed trade secrets as defined under New York law.

164. Emigraøs trade secrets and other confidential information were critically valuable to Emigra, and potentially to its competitors if disclosed.

165. Emigra expended substantial resources of time and money to develop its trade secrets and its other confidential information.

166. Emigra took substantial measures to guard the secrecy of its trade secrets and its other confidential information.

167. Emigraøs trade secrets and other confidential information were generally not known outside of Emigra.

168. Many of Emigraøs trade secrets and other confidential information were not generally known even within Emigra, as access to them was limited to officers, directors, and key employees of Emigra.

169. Emigraøs trade secrets and other confidential information could not be readily acquired or duplicated by others, and were not readily obtainable by persons, businesses, or entities outside Emigra unless illegally obtained.

170. Defendant Freel, as an Emigra Officer and as Vice President of Operations for Emigra, was privy to the highest level of Emigra trade secrets and other confidential information.

171. Defendant Freel knew that that his knowledge of Emigra trade secrets and other confidential information was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

172.     Defendant Freel nonetheless provided one or more Fragomen Defendants with trade secrets and other confidential information obtained from Emigra.

173.     The Fragomen Defendants knew that Defendant Freel owed a duty to Emigra to maintain the secrecy of the Emigra trade secrets and other confidential information that Freel transmitted to Defendants.

174.      Defendants' conduct as set forth above constitutes actionable misappropriation of trade secrets and unfair competition under New York law.

175.     As a result of Defendants' actionable misappropriation and unfair competition, Emigra has been damaged in an amount to be determined at trial.

176.     Unless Defendants are restrained and enjoined from further misappropriation and use of Emigra's trade secrets and other confidential information, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT VII

### (Breach of Fiduciary Duty)

177.     Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

178.     Defendant Freel, as Vice President of Operations and Officer of Emigra, owed Emigra a fiduciary duty and a duty of loyalty.

179.     Pursuant to those duties, Freel was prohibited from acting in any manner inconsistent with Emigra's best interests, and was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

180.     Freel violated his fiduciary duty and his duty of loyalty to Emigra by acts that included but are not limited to the following: disclosing trade secrets and other confidential information to one or more of the Fragomen Defendants; and using Emigra time, facilities,

equipment, and trade secrets and confidential information for personal gain, including but limited to obtaining employment by and currying favor with the Fragomen Defendants.

181.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

182.    Unless Defendants are restrained and enjoined from further misappropriation and use of Emigra's trade secrets and other confidential information, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT VIII

### (Tortious Interference with Contract)

183.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

184.    Emigra had contracts with certain customers.

185.    Defendants had knowledge of those contracts.

186.    Defendants intentionally interfered with those contracts, inducing or causing amendment or breach or termination of those contracts.

187.    Defendants' actions were unjustified and unprivileged.

188.    Defendants acted with malice and used wrongful means.

189.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## COUNT IX

### (Tortious Interference with Prospective Advantage)

190.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

191.    Freel knew of a business relationship and proposed contract between Emigra and its vendor in Japan with a probability of future economic benefit to Emigra.

192.    Defendants intentionally interfered with that business relationship and proposed contract.

193.    Were it not for Freel's disclosure and Defendants' interference, the business relationship would have continued and the proposed contract would have been entered into.

194.    Defendants' interference was accomplished by wrongful means, specifically, through use of misappropriated trade secrets and confidential information, and was aimed at injuring Emigra's business.

195.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

196.    Unless Defendants are restrained and enjoined from further interference with Emigra's business relationships, Emigra will suffer immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT X

### (Breach of Contract)

197.    Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

198.    The "Client Confidentiality Statement" signed by Freel was a contract.

199.    Emigra fully performed its obligations under the contract.

200.    Freel failed to fully perform his obligations under the contract.

201.    Freel breached his duty of good faith and fair dealing with respect to the contract.

202.    As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

31

## COUNT XI

### (Unjust Enrichment)

203.　　Emigra repeats and reavers the foregoing allegations as if fully set forth herein.

204.　　Emigra conferred a benefit upon Freel.

205.　　Freel knew that Emigra was conferring a benefit upon him.

206.　　Freel has accepted and retained that benefit under circumstances that render it inequitable for Freel to retain the benefit without paying for its value.

207.　　As a result of the foregoing, Emigra has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Emigra respectfully requests that this Court enter judgment for the following relief:

(a) awarding compensatory damages in an amount to be determined at trial;

(b) awarding treble damages pursuant to 15 U.S.C. § 15;

(c) awarding pre-judgment and post-judgment interest on its damages;

(d) imposing a preliminary and a permanent injunction pursuant to 15 U.S.C. §26, restraining Defendants and all those acting in concert or participation with them, from, among other things:

(1) soliciting, or attempting to solicit, any of Emigra's customers;

(2) acquiring, seeking to acquire, misappropriating, using and/or disclosing any trade secrets or other confidential business information of Emigra;

32

(3) soliciting, encouraging, or otherwise inducing current Emigra employees to leave employment by Emigra and/or to accept employment with any Fragomen Defendant or any Defendant-related or associated entity or individual;

(4) ordering Defendants, and all persons working in concert with Defendants, including, but not limited to, any officer, agent, representative, or employee of the Fragomen Defendants, to return to Emigra all trade secrets and other confidential information of Emigra in their possession, custody, or control;

(e)     granting Emigra's costs, including a reasonable attorney fee, as provided by law;

(f)     awarding punitive damages in an amount to be determined by this Court, including but not limited to trebling of compensatory damages pursuant to 15 USC § 15;

(g)     such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Dated: December 21, 2007         EMIGRA GROUP, LLC
                                 By its attorneys,

                                 PINNISI & ANDERSON, LLP

                        By:      s/ Michael D. Pinnisi_____
                                 Michael D. Pinnisi (MP-5075)
                                 111 North Tioga Street, Suite 200
                                 Ithaca, New York 14850
                                 Telephone:  (607) 257-8000
                                 Facsimile:  (607) 257-0990

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMIGRA GROUP, LLC,

Plaintiff,

- v -

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP,
FRAGOMEN, DEL REY, BERNSEN & LOEWY II, LLP,
FRAGOMEN GLOBAL IMMIGRATION SERVICES,
LLC, FRAGOMEN GLOBAL LLP, AND
RYAN MATTHEW FREEL,

Defendants.

---

**DECLARATION OF
FREDRICK FLYER, PH.D.**


**07-cv-10688 (LAK)(HP)**


ECF CASE

Fredrick A. Flyer hereby declares pursuant to 28 U.S.C. § 1746:


I.      **QUALIFICATIONS**

1.      My name is Fredrick A. Flyer. I am a Senior Vice President of Compass Lexecon,

an internationally recognized economic consulting firm. I received a B.S. in Economics from the

University of Wisconsin, a M.S. in Labor and Industrial Relations from the University of Illinois,

and a Ph.D. in Economics from the University of Chicago. I specialize in the fields of Industrial

Organization, Applied Microeconomics, and Econometrics.

2.      Prior to joining Compass Lexecon, I served on the faculty at the Leonard N. Stern

School of Business of New York University. I also have served on the faculty of the Department

of Economics at Northwestern University. My academic publications, analyses as a testifying

expert, and engagements as a consulting expert have involved the application of microeconomic theory and econometrics to assess the economic implications associated with various industry structural events. This work includes extensive antitrust analyses of many different industries.

3.    I have been retained to assess the competitive and antitrust implications of industry structural changes by corporations including Pfizer, Philip Morris, Microsoft, Verizon, EBay, PepsiCo, Reuters PLC, Whirlpool, Monsanto, Walgreens, the Tribune Corporation and by government agencies, namely the U.S. Federal Trade Commission and the U.S. Department of Energy. Additionally, I have provided economic analyses to the U.S. Department of Justice ("DOJ") as well as regulatory agencies in other countries. A copy of my vita, which contains a list of my previous testimony, is attached to this report as Exhibit A.  Compass Lexecon bills my time at $650 per hour.


**II.    TASK**

4.    I have been retained by Counsel for Emigra Group, LLC ("Emigra") to assess (1) whether Emigra's allegations in the Amended Complaint filed in this litigation, if supported, would result in harm to competition; and (2) whether the evidence put forth by Fragomen defendants ("Fragomen") constitutes a reliable evidentiary basis to dismiss Emigra's claims.

5.    For the purpose of this analysis, I have reviewed the Amended Complaint, the declarations of Dr. Kosicki, Mr. Buffenstein, and Mr. Kaplan including exhibits, and Defendants' Memorandum of Law in Support of Motion for Summary Judgment.

### III.    ANALYSIS AND CONCLUSIONS

6.    Emigra, in its Amended Complaint, alleges that Fragomen possesses "monopoly power" in the relevant market for immigration services,[1] and that Emigra is one of only a few alternatives available to consumers in this market.[2]  The Amended Complaint further alleges that "[t]he conduct of the Defendants has restrained and is restraining trade" in the relevant market(s) and that this conduct is "unlawfully maintaining and enhancing the Fragomen Defendants' monopoly position" in the relevant market(s).[3,4]  *These allegations constitute harm to competition, if factually accurate, as Fragomen through its unlawful acts would have maintained and enhanced its market power by reducing Emigra's ability to compete.*[5]

7.    In terms of evaluating whether the evidence provided by Fragomen reliably supports the conclusion that its actions did not result in harm to competition, I examine the following: (a) whether Fragomen's evidence shows that it has no monopoly power in the relevant market for immigration services; and (b) whether this evidence shows that Fragomen's actions did not lead to an unlawful reduction in competition.  Specifically, to determine whether there is a reliable economic basis to dismiss the antitrust claims made in the Amended Complaint, I

---

[1] See ¶ 97 of Amended Complaint.
[2] The companies that compete in the relevant market are "limited to the Fragomen Defendants, Emigra, and a small handful of other companies, with all players dominated by the Fragomen Defendants" (¶ 9, Amended Complaint).
[3] See ¶ 95 of Amended Complaint.
[4] In particular, Emigra claims that "[t]here is a product/service market for immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals (the "Service Market")" [Amended Complaint, ¶ 10].  It further claims that "[t]here is a product/service submarket for business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals (the "Service Submarket")" [Amended Complaint, ¶ 11].
[5] Section 2 of the Sherman Act outlaws conduct that "improperly maintains or facilitates acquiring, or attempting to acquire, a monopoly" and "a crucial distinction in Section 2 enforcement entails whether a firm's conduct represents competition on the merits or improper "exclusionary" conduct" (see Chapter 1.C: Exclusionary Conduct from the Antitrust Modernization Committee Report and Recommendations, April 2007).  Exclusionary conduct is defined as "acts that (1) are reasonably capable of creating, enlarging, or prolonging monopoly power by impairing the opportunities of rivals; and (2) that either (2a) do not benefit consumers at all, or (2b) are unnecessary for particular consumer benefits that the acts produce, or (2c) produce harms disproportionate to the resulting benefits" (see Antitrust Law: An Analysis of Antitrust Principles and Their Application, Volume III, Second Edition, by Phillip E. Areeda and Herbert Hovenkamp, 2002).

assess whether the evidence contradicts Emigra's claims that: (1) the competitors in their relevant market are geographically dispersed "single-source" providers of business related immigration services; (2) the customers in this market are major employers with workforces comprised of citizens of many countries; (3) Fragomen possesses monopoly power in the market for immigration services; and (4) Fragomen used this monopoly power to diminish competition in this market.

8.     The first two of Emigra's claims above are economically significant because, if factually accurate, they would indicate that the relevant market for the services provided by Fragomen and Emigra is limited to geographically dispersed providers of services.  In other words, the relevant market consists of competitors that have large service networks in place, spanning across multiple regions, whose customers are large corporations with diverse workforces coming from many different countries.  These large corporations with diverse workforces might be most efficiently served by providers of immigration services with a geographically dispersed network of immigration service practitioners.[6]  As a consequence, regional and local providers of immigration services are not close substitutes for the services provided by Fragomen and Emigra, since these regional providers do not offer "one-stop-shopping" for the immigration service needs of these large employers.

9.     Fragomen claims that "[b]arriers to entry in the market for providing business-related immigration services to corporations are not significant."[7]  In order to assess this claim, first we would need to know the resources that a firm requires to compete in the relevant market.

---

[6] This is consistent with Fragomen's own description of its capabilities.  In a press release, Fragomen claims that it can deliver "comprehensive world-wide immigration services to large clients with complex needs who benefit from the delivery of consolidated global immigration services across multiple regions. The scale and breadth of our practice….translates into opportunities for large clients to gain even greater efficiencies" (see www.**fragomen**.com/about/**Littler-Fragomen**-Press-Release-1-25-08.pdf).
[7] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 23.

If competitors in the relevant market are comprised of firms with geographically dispersed

network, then we need information on the ease with which firms have been able to enter the

market for immigration services and quickly establish geographically dispersed network in a

short period of time.  Therefore, this claim remains unsubstantiated without first defining the

relevant market.

10.    Based on the evidence provided by Fragomen, I conclude that *there is insufficient evidence to fully evaluate and much less to dismiss the allegations made by Emigra in this litigation*.  Below, I explain in detail why the evidence put forth by Fragomen does not provide a sufficient basis to dismiss the allegations made by Emigra.


**A.    Assessing Whether the Competitors in the Relevant Market are Geographically Dispersed "Single-Source" Providers of Immigration Services**

11.    Assessing whether competitors in the relevant market are geographically

dispersed "single-source" providers of immigration services requires identifying the providers

that serve Emigra and Fragomen customers.  For this task, we would need information on past

instances of competition in which Fragomen competed for customers (e.g. Request for

Proposals).   Specifically, we would need information on the immigration service providers that

participated in the bid, characteristics of their business operations, the specifics of the services

they offered in their proposal, the identity of the winning bidder, the price corresponding to the

winning bid, the margins earned on those winning bids, and the characteristics of the services

requested by the customer.  This information would allow us to identify the competitors of

Fragomen, the relevant characteristics of these competitors, the degree to which winning bids are

concentrated among few firms, whether Fragomen's bids depend on other bidding parties, and

the frequency and the speed with which customers switch across these service providers.

12.    Such detailed information on past bids would also be informative in evaluating Fragomen's assertion that "[c]ompetition in the market for providing business immigration services to corporations is robust."[8] This assertion is based on a recent experience in which a Fortune 100 multinational pharmaceutical company sent out request for information to 48 potential providers, of which 28 providers responded with a bid.  Six of them were invited to participate in a formal request for proposal (RFP) and three of these were designated as finalist. Eventually, Fragomen is reported to have won the bid.[9]  The mere fact that a multinational company sent out request for information to 48 service providers and 28 of these providers responded with a bid does not provide a reliable basis to conclude that competition for immigration services is robust.

13.    However, detailed bid data described above will allow us to answer pertinent questions such as how many of these 48 service providers are capable of providing geographically dispersed single-source immigration services; what selection criteria were used to select the three finalist; whether Fragomen won the bid because of its price or its unique ability to provide geographically dispersed single-source immigration services; and finally, whether it is common for multinational firms to request bids from a large number of service providers or is this a rare occurrence.

14.    It would also be informative to receive Fragomen's strategic internal documents that identify (a) the main competitors of Fragomen, (b) the competitors to whom it loses business, (c) market shares of main competitors; and (d) describe Fragomen's pricing policies.

15.    Fragomen, however, simply claims that there are a large number of alternative competitors that serve this market.  For example, based on a sample of "prominent U.S. law

---

[8] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 24.
[9] See Declaration of Kaplan, ¶22.

firms with business immigration practices, Fragomen's 179 attorneys amount to about 22.2 percent of 804 total immigration attorneys at those firms."[10]   The fact that the number of lawyers at Fragomen is a small fraction of lawyers at prominent U.S. law firms does not provide conclusive evidence that Fragomen does not dominate the market for business immigration services.  To make that assessment it is necessary to determine whether any of these 804 total immigration attorneys at these "prominent" U.S. law firms compete in the same product and geographic market.

16.     Fragomen also simply claims that other competitors such as accounting firms, relocation firms, consulting firms, and in-house capabilities of the multinational corporations provide services that are similar to the immigration services provided by Fragomen and Emigra.[11]   To determine whether these alternative competitors compete directly with Fragomen and Emigra, it is necessary to evaluate whether these firms compete in the same product and geographic market.  To evaluate this, we need Fragomen's internal documents that describe the extent to which these alternative firms are considered by Fragomen to be its direct competitors.  Also, the bid data described in paragraph 9 can be used to systematically analyze whether these alternative service providers compete directly with Fragomen in the same relevant market.

17.     Therefore, Fragomen does not provide sufficient evidence to refute Emigra's claim of a geographically dispersed relevant market served by "single-source" providers of immigration services.

---

[10] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 21.  Even though Fragomen describes these firms as "prominent" U.S. law firms, the rest of the firms on the list have much smaller relative shares as compared to Fragomen.  For instance, the second largest firm in the list has a market share of only 4.4 percent (35 attorneys out of 804) which represents less than $1/5^{th}$ of Fragomen's size.  The smallest firm in the list has a market share of only 0.25 percent (2 attorneys out of 804) which represents less than $1/75^{th}$ of Fragomen's size (see Buffenstein's Declaration, Pages 9-11).  The fact that the rest of the "prominent" firms are much smaller than Fragomen suggests that Fragomen is uniquely positioned to provide geographically dispersed immigration services and may have monopoly power.  Further, this fact indicates that some of these firms may not compete in the same relevant market.

[11] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 1.

**B.**     **Assessing Whether the Customers in this Market are Major Employers with Workforces Comprised of Citizens of Many Countries**

18.     To assess whether customers of Fragomen are major employers with workers comprised of citizens from many countries, we would need a list of customers of Fragomen along with data on (a) total revenue generated by the customer by year, (b) the number of customer's employees served by year, (c) the total number of customer's employees by year, and (d) the size of the customer in terms of total revenue by year.   This data would allow us to systematically analyze whether these customers are large multinationals, employ citizens of many countries, and the extent to which these customers switch companies that provide immigration services.

**C.**     **Assessing Whether Fragomen Possesses Market Power in their Relevant Market**

19.     An initial step in assessing whether Fragomen has market power in their relevant market involves accurately measuring the market share of Fragomen and other competing providers of immigration services.  Useful empirical measures of market shares could be developed if we obtained data on aggregate sales (both revenue and volume of transactions) by location for Fragomen and other competitors that participate in the relevant market.

20.     Instead of developing reliable market shares for the relevant market, Fragomen relies on share of its attorneys among attorneys employed by top U.S. law firms that provide immigration services.  These measures are unreliable because they do not carefully address the issue of whether all of these attorneys at "prominent" U.S. law firms compete in the same relevant market.

**D.    Assessing Whether Fragomen Used Its Market Power to Diminish Competition**

21.    Analyzing whether Fragomen used its market power to diminish competition also would require additional information.  For example, Fragomen denies Emigra's claim that Fragomen has entered into an exclusive vertical contract with a Japanese vendor.[12]  Fragomen further asserts that there are at least a dozen Japanese vendors that provide immigration services in Japan, and therefore, Fragomen cannot measurably restrict the supply of Japanese service providers available to other firms.

22.    To assess whether Fragomen entered into an exclusive agreement with Shimoda, it would be informative to review the contract between Fragomen and Shimoda.    If the contract has an exclusivity clause, then it would be informative to get Fragomen's documents that explain the rationale behind the exclusivity clause.

23.    The validity of the argument that Fragomen cannot measurably restrict competition because there are at least a dozen Japanese immigration service vendors depends on whether these alternative firms in Japan provide services that are close substitute to Shimoda's services. If indeed Shimoda's services are unique, then limiting access to these services could diminish competition between Fragomen and its competitors.

**IV.    MAIN CONCLUSIONS**

24.    For reasons delineated in this affidavit, I conclude that:

i.    Emigra's allegations constitute harm to competition, if factually accurate, as Fragomen through its unlawful acts would have maintained and enhanced its market power by reducing Emigra's ability to compete; and

---

[12] Fragomen infers that the referenced Japanese firm is Shimoda.

    ii.      The evidence put forth by Fragomen is insufficient to fully evaluate and

much less to dismiss the allegations made by Emigra in this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 30, 2008.

_____
Fredrick A. Flyer

**EXHIBIT A**

**FREDRICK A. FLYER**                                                    **May 2008**

Senior Vice President
Lexecon Inc.
332 South Michigan Avenue
Chicago, Illinois 60604-4937
(312) 322-0231 (direct)
(312) 322-0218 (fax)
fflyer@lexecon.com

## AREAS OF SPECIALIZATION

Applied Microeconomics and Econometrics, with a focus on antitrust, industrial organization, labor, valuation analysis and intellectual property. These economic analyses have been conducted for litigation, federal commission filings, corporate and governmental entities, and for publication in scholarly journals.

## EDUCATION

Ph.D., University of Chicago, Economics, August 1993.

M.S., University of Illinois at Urbana-Champaign, Labor and Industrial Relations, May 1988.

B.S., University of Wisconsin-Madison, Economics, December 1985.

## HONORS AND FELLOWSHIPS

Stern Faculty Research Stipend, Stern School of Business, 1995-1998

Research Fellowship, New York University, 1994-1996, 1998

Research Grant, Russell Sage Foundation, 1994

Research Fellowship, National Opinion Research Center 1990-1993

Center for the Study of the Economy and the State Doctoral Fellowship, University of Chicago, 1989-91

Bradley Fellowship, Bradley Foundation 1991-92

UU/Phoenix Fellowship, University of Chicago, 1989-92

McNatt Award in Labor Economics, University of Illinois, 1988

## PROFESSIONAL EXPERIENCE

Lexecon Inc., Chicago, Illinois (1999 - present)*:* Current Position: Senior Vice President

New York University, New York, New York; (1993 - 1997 and 1998 - 1999): Assistant Professor in Economics at the Stern School of Business, with a research emphasis in industrial organization, labor, and applied microeconomic analysis. Courses Taught – Masters and Ph.D. Level: Microeconomic Theory and Application, Econometric Theory and Application

Northwestern University, Evanston, Illinois (1997 – 1998): Visiting Professor in the Department of Economics, with a research emphasis in industrial organization, labor, and applied microeconomic analysis. Courses Taught - Advanced and Introductory Level: Microeconomic Theory and Application, Labor Economics Theory and Application

University of Chicago, Chicago, Illinois (1990 – 1993): Lecturer in the Department of Economics. Courses Taught - Undergraduate Microeconomic Theory and Application

## ARTICLES

The New Economics of Teachers and Education, co-authored with Sherwin Rosen, *National Bureau of Economics Research*, Paper No. W4828, August 1994.
Reprinted in: *The National Opinion Research Center*, ERC-Paper Series, 94-1.
Summarized by Lindley H. Clark Jr. in: *The Wall Street Journal*, "Speaking of Business: The High Cost of High (and Lower) Schools", Pg. A18, October 4, 1994.

Some Economics of Precollege Teaching, co-authored with Sherwin Rosen, in *Assessing Educational Practices: The Contribution of Economics*, edited by William Baumol and William Becker, MIT Press: 1995.

Technical Standards Coalitions for Network Goods, co-authored with Nicholas Economides, *The Study of Financial Markets and Institutions*, Salomon Center Press: November 1995.

The Economics of Education, co-authored with Sherwin Rosen, *Journal of Labor Economics*, January 1997.

The Influence of Higher Moments of Earning Distributions On Career Decisions, *Journal of Labor Economics*, October 1997.

Agglomeration Economies, Heterogeneity, and Firm Location Choice, co-authored with Myles Shaver, December 1997, Paper IB-97-10, *Stern School of Business*, New York University

Compatibility and Market Structure for Network Goods, co-authored with Nicholas Economides, February 1998, Paper EC-98-02, *Stern School of Business*, New York University.

Equilibrium Coalition Structures in Markets for Network Goods, co-authored with Nicholas Economides, *Annales d'Economie et de Statistique*, July 1998.

<u>Parental Optimizing Behavior and the Measurement of School Quality</u>, joint with Paul Wachtel, Working Paper, August 2000.

<u>Agglomeration Economies, Firm heterogeneity, and Foreign Direct Investment in the United States</u>, co-authored with Myles Shaver, *Strategic Management Journal*, December 2000.

<u>The Economics of Industry Geographical Organization Under Agglomeration Externalities</u>, co-authored with Myles Shaver, *Advances in Strategic Management*, Vol. 20, August 2003.

<u>Local Market Human Capital and the Spatial Distribution of Productivity in Malaysia</u>, co-authored with Timothy Conley and Grace Tsiang, *Contributions to Economic Analysis and Policy*, Vol. 3, December 2003.

<u>Compatibility and Market Structure for High-Technology Goods</u>, co-authored with Nicholas Economides, currently under second-round review at the *Journal of Industrial Economics*.

<u>An Assessment of Causal Inferences in Smoking Initiation Research and a Framework for Future Research</u>, co-authored with James Heckman and Colleen Loughlin, *Economic Inquiry,* Vol. 46, January 2008.

<u>Agglomeration Economies, Firm heterogeneity, and Foreign Direct Investment</u>, co-authored with Myles Shaver, in *Multinational Enterprise Theory*, Vol. 1, edited by Jeffrey A. Krug and John D. Daniels, SAGE Publications: 2008.


## EXPERT RETENTION, REPORTS AND TESTIMONY

In Re: *United States of America v. National Association of Realtors;* US District Court for the Northern District of Illinois Eastern Division.  Expert Reports filed in August 2007 and in February 2008 on behalf of National Association of Realtors.  Evaluated claims of anti-competitive harm due to rules and policies promulgated by National Association of Realtors. Depositions in October of 2007 and April of 2008.


In Re: *Copper Tubing Litigation (Class Action); U.*S. District Court for the Western District of Tennessee, Expert Report filed in November 2006 on behalf of defendants (Mueller Industries, Inc. and other copper tubing manufacturers).  Provided an economic evaluation of the evidence regarding alleged collusive pricing by the defendants.  Also, evaluated the implications for the U.S. marketplace of the EU's Decision on conspiratorial pricing for European copper plumbing tubing sales by these manufacturers.


In Re: *P.J. Carroll & Co. and other tobacco companies  v. The Minister For Health And Children, The Attorney General And The Office Of Tobacco Control of Ireland*; The High Court - Commercial,  Dublin, Ireland. Testimony provided in November 2006 on behalf of British American Tobacco.  Evaluated the impact of the government's proposed bans on tobacco company promotional activities on market competition, industry profitability and aggregate sales of cigarettes.

In Re:  *Spartanburg Regional Healthcare Systems and the other class members. v.  Hillenbrand Industries Inc, Hill-Rom Inc., and Hill-Rom Co. Inc.*; U.S. District Court for the District of South Carolina, Declaration filed in October 2005 on behalf of Plaintiff.  Conducted various statistical analyses on Hill-Rom economic data.

In Re:  *Great Lakes Chemical Corp. v.  Arkansas Oil and Gas Commission*; Circuit Court Of Union County, Arkansas, Expert Report filed in July 2005 on behalf of Great Lakes Chemical Corp.  Deposition in August 2005.  Analyzed the economic efficiency of Final Order No. 2-2003-01 of the Arkansas Oil and Gas Commission.

In Re: *Regulatory Inquiry of Penn National Gaming, Inc.'s Acquisition of Argosy Gaming Co.*; Illinois Gaming Board ("IGB"), Expert Report filed in May 2005 on behalf of Penn National. Analyzed the effects that the acquisition would have on gaming competition in Illinois in response to Section 3000.232 of the IGB Regulations.

In Re: *Teva Pharmaceuticals v. Pfizer Inc*; U.S. District Court for the District of Columbia , Affidavit filed in October 2004 on behalf of Teva Pharmaceuticals. Analyzed the effects that Pfizer's introduction of a generic version of Neurontin during the 180-exclusivity period would have on competitive entry in Gabapentin market.

In Re: *Generic Drug Manufactures v. Lester M. Crawford (Acting Commissioner of the U.S. Food and Drug Administration), the U.S. Food and Drug Administration ("FDA"), and Tommy G. Thompson (Secretary of Health and Human Services)*; U.S. District Court for the District of Columbia, Affidavit filed in October 2004 on behalf of Teva Pharmaceuticals. Analyzed how the FDA's denial of a Citizens Petition to limit entry of branded-generics after successful Paragraph IV filings would affect competition in current and future markets for generic drugs.

In Re: *Tribune Co. v. Internal Revenue Service*; U.S. Tax Court, Expert Report filed July 2004 and Rebuttal Report filed August 2004, both on behalf of the Tribune Co. Testified in trial December 2004. Analyzed the economics of the Matthew Bender transaction between Times Mirror and Reed Elsevier.

In Re: *Teva Pharmaceuticals v. Pfizer Inc.*; U.S. District Court of New Jersey; Affidavit filed in June 2004 on behalf of Teva Pharmaceuticals.  Analyzed how Pfizer's marketing of a branded-generic version of Accupril affects competition in the market for generic quinapril during the 180-exclusivity period (granted to successful Abbreviated New Drug Applications with Paragraph IV certifications).

In Re: *AT&T Broadband v. CSG Systems, Inc.*, American Arbitration Association, Denver Colorado; Report filed January 2003, Declaration filed March 2003, Rebuttal Report filed March 2003 all on behalf of CSG Systems, Inc., Deposition in March 2003.  Conducted an analysis to evaluate the allegation of a MFN violation.

In Re: *Relafen Antitrust Litigation*, U. S. District Court of Massachusetts; Retained in January 2003 by Teva Pharmaceuticals. Evaluated damages from the delay in the launch of generic Nabumetone associated with GlaxoSmithKline PLC's invalid patent claim.

In Re: *Elizabeth Sadati vs. Ameritech Inc. et. al.*, Circuit Court of Cook County, Illinois, Expert Findings filed June 2002 on behalf of Ameritech. Conducted an analysis to determine level of damages.

In Re: *David E. Crooke vs. Value City Furniture*, U.S. District Court for the Northern District of Illinois, Eastern Division; Expert Report filed February 2002 on behalf Plaintiff, Deposition in May 2002. Conducted an analysis to determine level of damages.

In Re: *Linda Cichowski vs. Evanston Northwestern Healthcare*, Circuit Court of the Nineteenth Judicial Circuit of Illinois, Expert Findings filed October 2001 on behalf of Evanston Northwestern Healthcare. Conducted an analysis to determine level of damages.

In Re: *Carletta L. Martinsen vs. Lockheed-Martin*, U.S. District Court for the Eastern District of Wisconsin, Expert Report filed November 2000 on behalf of Lockheed-Martin. Conducted a statistical analysis on company data to determine whether there was evidence of age discrimination.

In Re: *Nine West Shoes Antitrust Litigation (Class Action)*, U.S. District Court for the Southern District of New York. Prepared affidavit in July 2000 on behalf of Nine West Shoes. My analysis addressed whether there was any statistical evidence of a pricing conspiracy between Nine West Shoes and other major retailers regarding certain lines of women shoes.

## *Merger Analyses During Government Regulatory Reviews*

*Thomson Financials Acquisition of Reuters Group PLC, 2007.* On behalf of the companies, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Houghton Mifflin Co's Acquisition of Harcourt Publishing, 2007.* On behalf of the companies, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Monsanto Company Acquisition of Delta & Pine Land Company, 2007.* On behalf of Monsanto, conducted economic analyses of prospective efficiencies of the transaction during the DOJ's merger review process.

*Sherwin-Williams Co. Acquisition of MAB Paints, 2007.* On behalf of Sherwin-Williams, conducted economic analyses of the antitrust implications for various local markets during the FTC's merger review process.

*Getty Images Acquisition of MediaVast (WireImages), 2007.* On behalf of Getty Images, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Hoover Co. Acquisition by Techtronic Industries Co.Ltd. (TTI), 2007.* On behalf of Whirlpool (Hoover), conducted economic analyses of the antitrust implications of the transaction during the DOJ's and State of Ohio's merger review process.

*EnergySolutions Acquisition of Duratek, 2006.*  On behalf of Energy*Solutions* (Envirocare of Utah), conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Whirlpool Corp. Acquisition of Maytag Corp., 2006.*  On behalf of Whirlpool, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*The Home Depot Acquisition of Hughes Supply, 2006.*   On behalf of both parties, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*SemGroup Proposed Acquisition of TransMontaigne, 2006.*   On behalf of SemGroup, conducted economic analyses of the antitrust implications of the transaction during the FTC's merger review process.

*Teva Pharmaceuticals Acquisition of Ivax Corp., 2005.* On behalf of the merging parties, conducted economic analyses of the antitrust implications relating to the acquisition during the FTC's merger review process.

*GameStop Corp. Acquisition of Electronics Boutique Holdings Corp ("EB"), 2005.* On behalf of EB, conducted an economic analysis of the antitrust implications relating to the acquisition during the FTC merger investigation.

*Kodak Polychrome Graphics ("KPG") Acquisition of Creo Inc., 2005.*  On behalf of KPG, conducted an economic analysis of the antitrust implications relating to the acquisition during the U. S. Department of Justice ("DOJ") and European Union ("EU") merger investigation.

*Crompton Corp. Acquisition of Great Lake Chemical's Corp, 2005.*  On behalf of Crompton, conducted an economic analysis of the antitrust implications relating to the acquisition during the FTC and EU merger investigation.

*Reuters Group PLC. Acquisition of Moneyline Telerate, 2005.*  On behalf of Reuters, conducted an economic analysis of the antitrust implications relating to the acquisition during the DOJ and EU merger investigation.

*Sherwin-Williams Co. Acquisition of Duron Inc., 2004.* On behalf of both companies, conducted an economic analysis of the antitrust implications relating to Sherwin-Williams' proposed acquisition of Duron's paint distribution business during the FTC investigation.

*FTC investigation of Itron Inc. acquisition of SEM*; Retained in January 2004 by the U.S. Federal Trade Commission ("FTC") to provide an analysis and testimony regarding the antitrust implications of the proposed acquisition.

*Vestas Wind Systems A/S Acquisition of NEG Micon A/S, 2004.* On behalf of both companies, conducted and presented an economic analysis of the antitrust implications relating to Vestas' proposed acquisition of NEG Micon's wind turbine business during the DOJ and EU investigation.

*Kluwer Academic Publisher's Acquisition of Bertelsmann AG's academic publishing division,* 2003. On behalf of Kluwer, conducted and presented an economic analysis of the business rationale and antitrust implications relating to Kluwer's proposed acquisition of Bertelsmann's academic journal publishing division during the DOJ investigation.

*Pfizer Inc. Acquisition of Pharmacia Corp.*, 2002. On behalf of Pfizer, conducted an economic analysis on the antitrust implications associated with the merger and various licensing agreements during the FTC investigation.

*Medtronic Inc. Acquisition of Spinal Dynamics Corp.*, 2002. On behalf of Medtronics, conducted an economic analysis of the business rationale and antitrust implications of the acquisition regarding the companies' artificial cervical disc businesses during the FTC investigation.

*EBay Inc.'s Acquisition of PayPal Inc.*, 2002. On behalf of EBay, conducted and presented an economic analysis of the business rationale and antitrust implications of EBay's acquisition of PayPal's electronic payment system during the DOJ investigation.

*Zebra Technology Corp.'s Proposed Acquisition of Fargo Electronics Inc.*, 2001. On behalf of both companies, conducted and presented an economic analysis on the acquisition's antitrust implications for ID printers during the FTC and EU investigation.

*Bayer Aktiengesellschaft Acquisition of Lyondell Chemical Co.'s Polyether Polyols Division, 2000.* On behalf of the companies, conducted an economic analysis on the acquisition's antitrust implications for the polyol industry during the FTC and EU investigation.


## *Other Significant Engagements*

In Re: *Maine Yankee Atomic Power Co. v. United States,* United States Court of Federal Claims; Conducted an economic analysis on behalf of the DOJ and U.S. Department of Energy to assess the efficiency and estimated pricing of Plaintiff's economics experts proposed waste disposal scheme.

In Re: *CSC Holdings, Inc. v. Yankees Entertainment and Sports, LLC.*, American Arbitration Association, New York NY; Arbitration Proceeding in March 2004. On behalf of Yankees Entertainment and Sports, help develop and evaluate survey of New York area cable viewers. Analyzed CSC's economic experts' reports and testimony.

*Relevant Antitrust Market for PepsiCo Products*, 2004. On behalf of the company conducted an econometric analysis to assess the relevant markets for some of its drink and food offerings.

*Relevant Antitrust Market for Purdue Pharma L.P Products*, 2001. On behalf of the company conducted an analysis to assess the relevant market for its drug offerings.

In Re: *Falise, et al. vs. American Tobacco Co., et al.*, U.S. District Court for the Eastern District

of New York. Conducted a statistical analysis supporting Nobel Laureate James Heckman's expert report and testimony regarding the responsiveness of smoker's initiation and quit rates to information regarding the dangers of smoking. Report filed on behalf of the cigarette companies in June 2000.

In Re: *Blue Cross and Blue Shield of New Jersey vs. Philip Morris Inc. et al.*, U.S. District Court For the Eastern District of New York. Conducted a statistical analysis in support of Nobel Laureate James Heckman's expert report and testimony on behalf of the cigarette companies. Report filed October 1999.

## **RESEARCH PRESENTED AT THE FOLLOWING PROFESSIONAL SEMINARS**

### *CONFERENCE PROCEEDINGS*

*Atlantic Economics Society Conference*, Philadelphia, Pennsylvania, October 1993.

*Conference in Memory of Yoram Ben Porath*, Jeruslem, Israel, October 1993.

*Conference on the Interoperability and the Economics of Information Infrastructure*, Strasbourg, France, June 1996.

*Telecommunications Policy Research Conference*, Alexandria, Virginia, September 1997.

*Academy of International Business Annual Meetings*, Monterrey, Mexico, October 1997.

*Econometrica North American Summer Meetings*, Montreal, Canada, June 1998.

*Western Economic Association Summer Meetings*, San Diego, California, July 2006.  Chaired session on the empirical evidence linking cigarette advertising to youth smoking.

### *UNIVERSITY SEMINARS 1993-PRESENT*

Baruch College
Columbia University
Duke University
Harvard University
Michigan State University
New York University
Northwestern University
Princeton University
Stanford University
State University of New York-Albany
University of Alberta
University of California-Berkley

University of California-Irvine

University of Chicago

University of Miami

University of Michigan-Ann Arbor

University of Wisconsin-Madison

Western Ontario University

### *PRESENTATIONS AT OTHER RESEARCH INSTITUTIONS 1993-PRESENT*

U.S. Department of Labor - Bureau of Labor Statistics

Rand Corporation

American Medical Association

U.S. Department of Justice

U. S. Federal Trade Commission

## **PROFESSIONAL MEMBERSHIP AND SERVICES**

### *MEMBERSHIP IS PROFESSIONAL SOCIETIES*

American Bar Association
American Economic Association
Atlantic Economic Society (1993-1994)
Society of Labor Economists (1996-1997)

### *REFEREE FOR THE FOLLOWING PROFESSIONAL JOURNALS (1995-PRESENT):*

Atlantic Economic Journal
Journal of Political Economy
Journal of Labor Economics
International Journal of Industrial Organization
Quarterly Journal of Economics
Review of Economics and Statistics
Journal of Human Resources
Journal of Law and Economics
Journal of Industrial Economics
Japan and the World Economy