UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMIGRA GROUP, LLC,

                                        Plaintiff,

          - v -


FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP,
FRAGOMEN, DEL REY, BERNSEN & LOEWY II, LLP,
FRAGOMEN GLOBAL IMMIGRATION SERVICES,
LLC, FRAGOMEN GLOBAL LLP, AND
RYAN MATTHEW FREEL,

                                        Defendants.

---

**DECLARATION OF
FREDRICK FLYER, PH.D.**


**07-cv-10688 (LAK)(HP)**


ECF CASE


Fredrick A. Flyer hereby declares pursuant to 28 U.S.C. § 1746:


I.      **QUALIFICATIONS**

1.      My name is Fredrick A. Flyer. I am a Senior Vice President of Compass Lexecon, an internationally recognized economic consulting firm. I received a B.S. in Economics from the University of Wisconsin, a M.S. in Labor and Industrial Relations from the University of Illinois, and a Ph.D. in Economics from the University of Chicago. I specialize in the fields of Industrial Organization, Applied Microeconomics, and Econometrics.

2.      Prior to joining Compass Lexecon, I served on the faculty at the Leonard N. Stern School of Business of New York University. I also have served on the faculty of the Department of Economics at Northwestern University. My academic publications, analyses as a testifying

expert, and engagements as a consulting expert have involved the application of microeconomic theory and econometrics to assess the economic implications associated with various industry structural events. This work includes extensive antitrust analyses of many different industries.

3.      I have been retained to assess the competitive and antitrust implications of industry structural changes by corporations including Pfizer, Philip Morris, Microsoft, Verizon, EBay, PepsiCo, Reuters PLC, Whirlpool, Monsanto, Walgreens, the Tribune Corporation and by government agencies, namely the U.S. Federal Trade Commission and the U.S. Department of Energy. Additionally, I have provided economic analyses to the U.S. Department of Justice ("DOJ") as well as regulatory agencies in other countries. A copy of my vita, which contains a list of my previous testimony, is attached to this report as Exhibit A.  Compass Lexecon bills my time at $650 per hour.

## II.    TASK

4.      I have been retained by Counsel for Emigra Group, LLC ("Emigra") to assess (1) whether Emigra's allegations in the Amended Complaint filed in this litigation, if supported, would result in harm to competition; and (2) whether the evidence put forth by Fragomen defendants ("Fragomen") constitutes a reliable evidentiary basis to dismiss Emigra's claims.

5.      For the purpose of this analysis, I have reviewed the Amended Complaint, the declarations of Dr. Kosicki, Mr. Buffenstein, and Mr. Kaplan including exhibits, and Defendants' Memorandum of Law in Support of Motion for Summary Judgment.

## III.    ANALYSIS AND CONCLUSIONS

6.      Emigra, in its Amended Complaint, alleges that Fragomen possesses "monopoly power" in the relevant market for immigration services,[1] and that Emigra is one of only a few alternatives available to consumers in this market.[2]  The Amended Complaint further alleges that "[t]he conduct of the Defendants has restrained and is restraining trade" in the relevant market(s) and that this conduct is "unlawfully maintaining and enhancing the Fragomen Defendants' monopoly position" in the relevant market(s).[3,4]  *These allegations constitute harm to competition, if factually accurate, as Fragomen through its unlawful acts would have maintained and enhanced its market power by reducing Emigra's ability to compete.*[5]

7.      In terms of evaluating whether the evidence provided by Fragomen reliably supports the conclusion that its actions did not result in harm to competition, I examine the following: (a) whether Fragomen's evidence shows that it has no monopoly power in the relevant market for immigration services; and (b) whether this evidence shows that Fragomen's actions did not lead to an unlawful reduction in competition.  Specifically, to determine whether there is a reliable economic basis to dismiss the antitrust claims made in the Amended Complaint, I

---

[1] See ¶ 97 of Amended Complaint.

[2] The companies that compete in the relevant market are "limited to the Fragomen Defendants, Emigra, and a small handful of other companies, with all players dominated by the Fragomen Defendants" (¶ 9, Amended Complaint).

[3] See ¶ 95 of Amended Complaint.

[4] In particular, Emigra claims that "[t]here is a product/service market for immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals (the "Service Market")" [Amended Complaint, ¶ 10].  It further claims that "[t]here is a product/service submarket for business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals (the "Service Submarket")" [Amended Complaint, ¶ 11].

[5] Section 2 of the Sherman Act outlaws conduct that "improperly maintains or facilitates acquiring, or attempting to acquire, a monopoly" and "a crucial distinction in Section 2 enforcement entails whether a firm's conduct represents competition on the merits or improper "exclusionary" conduct" (see Chapter 1.C: Exclusionary Conduct from the Antitrust Modernization Committee Report and Recommendations, April 2007).  Exclusionary conduct is defined as "acts that (1) are reasonably capable of creating, enlarging, or prolonging monopoly power by impairing the opportunities of rivals; and (2) that either (2a) do not benefit consumers at all, or (2b) are unnecessary for particular consumer benefits that the acts produce, or (2c) produce harms disproportionate to the resulting benefits" (see Antitrust Law: An Analysis of Antitrust Principles and Their Application, Volume III, Second Edition, by Phillip E. Areeda and Herbert Hovenkamp, 2002).

assess whether the evidence contradicts Emigra's claims that: (1) the competitors in their relevant market are geographically dispersed "single-source" providers of business related immigration services; (2) the customers in this market are major employers with workforces comprised of citizens of many countries; (3) Fragomen possesses monopoly power in the market for immigration services; and (4) Fragomen used this monopoly power to diminish competition in this market.

8.     The first two of Emigra's claims above are economically significant because, if factually accurate, they would indicate that the relevant market for the services provided by Fragomen and Emigra is limited to geographically dispersed providers of services.  In other words, the relevant market consists of competitors that have large service networks in place, spanning across multiple regions, whose customers are large corporations with diverse workforces coming from many different countries.  These large corporations with diverse workforces might be most efficiently served by providers of immigration services with a geographically dispersed network of immigration service practitioners.[6]   As a consequence, regional and local providers of immigration services are not close substitutes for the services provided by Fragomen and Emigra, since these regional providers do not offer "one-stop-shopping" for the immigration service needs of these large employers.

9.     Fragomen claims that "[b]arriers to entry in the market for providing business-related immigration services to corporations are not significant."[7]   In order to assess this claim, first we would need to know the resources that a firm requires to compete in the relevant market.

---

[6] This is consistent with Fragomen's own description of its capabilities.  In a press release, Fragomen claims that it can deliver "comprehensive world-wide immigration services to large clients with complex needs who benefit from the delivery of consolidated global immigration services across multiple regions. The scale and breadth of our practice….translates into opportunities for large clients to gain even greater efficiencies" (see www.**fragomen**.com/about/**Littler-Fragomen**-Press-Release-1-25-08.pdf).

[7] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 23.

If competitors in the relevant market are comprised of firms with geographically dispersed network, then we need information on the ease with which firms have been able to enter the market for immigration services and quickly establish geographically dispersed network in a short period of time.  Therefore, this claim remains unsubstantiated without first defining the relevant market.

10.     Based on the evidence provided by Fragomen, I conclude that *there is insufficient evidence to fully evaluate and much less to dismiss the allegations made by Emigra in this litigation*.  Below, I explain in detail why the evidence put forth by Fragomen does not provide a sufficient basis to dismiss the allegations made by Emigra.


**A.     Assessing Whether the Competitors in the Relevant Market are Geographically Dispersed "Single-Source" Providers of Immigration Services**

11.     Assessing whether competitors in the relevant market are geographically dispersed "single-source" providers of immigration services requires identifying the providers that serve Emigra and Fragomen customers.  For this task, we would need information on past instances of competition in which Fragomen competed for customers (e.g. Request for Proposals).   Specifically, we would need information on the immigration service providers that participated in the bid, characteristics of their business operations, the specifics of the services they offered in their proposal, the identity of the winning bidder, the price corresponding to the winning bid, the margins earned on those winning bids, and the characteristics of the services requested by the customer.  This information would allow us to identify the competitors of Fragomen, the relevant characteristics of these competitors, the degree to which winning bids are concentrated among few firms, whether Fragomen's bids depend on other bidding parties, and the frequency and the speed with which customers switch across these service providers.

12.     Such detailed information on past bids would also be informative in evaluating Fragomen's assertion that "[c]ompetition in the market for providing business immigration services to corporations is robust."[8] This assertion is based on a recent experience in which a Fortune 100 multinational pharmaceutical company sent out request for information to 48 potential providers, of which 28 providers responded with a bid.  Six of them were invited to participate in a formal request for proposal (RFP) and three of these were designated as finalist. Eventually, Fragomen is reported to have won the bid.[9]  The mere fact that a multinational company sent out request for information to 48 service providers and 28 of these providers responded with a bid does not provide a reliable basis to conclude that competition for immigration services is robust.

13.     However, detailed bid data described above will allow us to answer pertinent questions such as how many of these 48 service providers are capable of providing geographically dispersed single-source immigration services; what selection criteria were used to select the three finalist; whether Fragomen won the bid because of its price or its unique ability to provide geographically dispersed single-source immigration services; and finally, whether it is common for multinational firms to request bids from a large number of service providers or is this a rare occurrence.

14.     It would also be informative to receive Fragomen's strategic internal documents that identify (a) the main competitors of Fragomen, (b) the competitors to whom it loses business, (c) market shares of main competitors; and (d) describe Fragomen's pricing policies.

15.     Fragomen, however, simply claims that there are a large number of alternative competitors that serve this market.  For example, based on a sample of "prominent U.S. law

---

[8] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 24.
[9] See Declaration of Kaplan, ¶22.

firms with business immigration practices, Fragomen's 179 attorneys amount to about 22.2 percent of 804 total immigration attorneys at those firms."[10]  The fact that the number of lawyers at Fragomen is a small fraction of lawyers at prominent U.S. law firms does not provide conclusive evidence that Fragomen does not dominate the market for business immigration services.  To make that assessment it is necessary to determine whether any of these 804 total immigration attorneys at these "prominent" U.S. law firms compete in the same product and geographic market.

16.     Fragomen also simply claims that other competitors such as accounting firms, relocation firms, consulting firms, and in-house capabilities of the multinational corporations provide services that are similar to the immigration services provided by Fragomen and Emigra.[11]  To determine whether these alternative competitors compete directly with Fragomen and Emigra, it is necessary to evaluate whether these firms compete in the same product and geographic market.  To evaluate this, we need Fragomen's internal documents that describe the extent to which these alternative firms are considered by Fragomen to be its direct competitors.  Also, the bid data described in paragraph 9 can be used to systematically analyze whether these alternative service providers compete directly with Fragomen in the same relevant market.

17.     Therefore, Fragomen does not provide sufficient evidence to refute Emigra's claim of a geographically dispersed relevant market served by "single-source" providers of immigration services.

---

[10] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 21.  Even though Fragomen describes these firms as "prominent" U.S. law firms, the rest of the firms on the list have much smaller relative shares as compared to Fragomen.  For instance, the second largest firm in the list has a market share of only 4.4 percent (35 attorneys out of 804) which represents less than $1/5^{th}$ of Fragomen's size.  The smallest firm in the list has a market share of only 0.25 percent (2 attorneys out of 804) which represents less than $1/75^{th}$ of Fragomen's size (see Buffenstein's Declaration, Pages 9-11).  The fact that the rest of the "prominent" firms are much smaller than Fragomen suggests that Fragomen is uniquely positioned to provide geographically dispersed immigration services and may have monopoly power.  Further, this fact indicates that some of these firms may not compete in the same relevant market.
[11] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Page 1.

**B.**     **Assessing Whether the Customers in this Market are Major Employers with Workforces Comprised of Citizens of Many Countries**

18.     To assess whether customers of Fragomen are major employers with workers comprised of citizens from many countries, we would need a list of customers of Fragomen along with data on (a) total revenue generated by the customer by year, (b) the number of customer's employees served by year, (c) the total number of customer's employees by year, and (d) the size of the customer in terms of total revenue by year.   This data would allow us to systematically analyze whether these customers are large multinationals, employ citizens of many countries, and the extent to which these customers switch companies that provide immigration services.

**C.**     **Assessing Whether Fragomen Possesses Market Power in their Relevant Market**

19.     An initial step in assessing whether Fragomen has market power in their relevant market involves accurately measuring the market share of Fragomen and other competing providers of immigration services.  Useful empirical measures of market shares could be developed if we obtained data on aggregate sales (both revenue and volume of transactions) by location for Fragomen and other competitors that participate in the relevant market.

20.     Instead of developing reliable market shares for the relevant market, Fragomen relies on share of its attorneys among attorneys employed by top U.S. law firms that provide immigration services.  These measures are unreliable because they do not carefully address the issue of whether all of these attorneys at "prominent" U.S. law firms compete in the same relevant market.

**D.      Assessing Whether Fragomen Used Its Market Power to Diminish Competition**

21.      Analyzing whether Fragomen used its market power to diminish competition also would require additional information.  For example, Fragomen denies Emigra's claim that Fragomen has entered into an exclusive vertical contract with a Japanese vendor.[12]  Fragomen further asserts that there are at least a dozen Japanese vendors that provide immigration services in Japan, and therefore, Fragomen cannot measurably restrict the supply of Japanese service providers available to other firms.

22.      To assess whether Fragomen entered into an exclusive agreement with Shimoda, it would be informative to review the contract between Fragomen and Shimoda.    If the contract has an exclusivity clause, then it would be informative to get Fragomen's documents that explain the rationale behind the exclusivity clause.

23.      The validity of the argument that Fragomen cannot measurably restrict competition because there are at least a dozen Japanese immigration service vendors depends on whether these alternative firms in Japan provide services that are close substitute to Shimoda's services. If indeed Shimoda's services are unique, then limiting access to these services could diminish competition between Fragomen and its competitors.

**IV.     MAIN CONCLUSIONS**

24.      For reasons delineated in this affidavit, I conclude that:

      i.      Emigra's allegations constitute harm to competition, if factually accurate, as Fragomen through its unlawful acts would have maintained and enhanced its market power by reducing Emigra's ability to compete; and

---

[12] Fragomen infers that the referenced Japanese firm is Shimoda.

      ii.      The evidence put forth by Fragomen is insufficient to fully evaluate and much less to dismiss the allegations made by Emigra in this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 30, 2008.

_____
Fredrick A. Flyer

**EXHIBIT A**

**FREDRICK A. FLYER**                                                             **May 2008**

Senior Vice President
Lexecon Inc.
332 South Michigan Avenue
Chicago, Illinois 60604-4937
(312) 322-0231 (direct)
(312) 322-0218 (fax)
fflyer@lexecon.com

## AREAS OF SPECIALIZATION

Applied Microeconomics and Econometrics, with a focus on antitrust, industrial organization, labor, valuation analysis and intellectual property. These economic analyses have been conducted for litigation, federal commission filings, corporate and governmental entities, and for publication in scholarly journals.

## EDUCATION

Ph.D., University of Chicago, Economics, August 1993.

M.S., University of Illinois at Urbana-Champaign, Labor and Industrial Relations, May 1988.

B.S., University of Wisconsin-Madison, Economics, December 1985.

## HONORS AND FELLOWSHIPS

Stern Faculty Research Stipend, Stern School of Business, 1995-1998

Research Fellowship, New York University, 1994-1996, 1998

Research Grant, Russell Sage Foundation, 1994

Research Fellowship, National Opinion Research Center 1990-1993

Center for the Study of the Economy and the State Doctoral Fellowship, University of Chicago, 1989-91

Bradley Fellowship, Bradley Foundation 1991-92

UU/Phoenix Fellowship, University of Chicago, 1989-92

McNatt Award in Labor Economics, University of Illinois, 1988

## PROFESSIONAL EXPERIENCE

Lexecon Inc., Chicago, Illinois (1999 - present): Current Position: Senior Vice President

New York University, New York, New York; (1993 - 1997 and 1998 - 1999): Assistant Professor in Economics at the Stern School of Business, with a research emphasis in industrial organization, labor, and applied microeconomic analysis. Courses Taught – Masters and Ph.D. Level: Microeconomic Theory and Application, Econometric Theory and Application

Northwestern University, Evanston, Illinois (1997 – 1998): Visiting Professor in the Department of Economics, with a research emphasis in industrial organization, labor, and applied microeconomic analysis. Courses Taught - Advanced and Introductory Level: Microeconomic Theory and Application, Labor Economics Theory and Application

University of Chicago, Chicago, Illinois (1990 – 1993): Lecturer in the Department of Economics. Courses Taught - Undergraduate Microeconomic Theory and Application

**ARTICLES**

The New Economics of Teachers and Education, co-authored with Sherwin Rosen, *National Bureau of Economics Research*, Paper No. W4828, August 1994.
Reprinted in: *The National Opinion Research Center*, ERC-Paper Series, 94-1.
Summarized by Lindley H. Clark Jr. in: *The Wall Street Journal*, "Speaking of Business: The High Cost of High (and Lower) Schools", Pg. A18, October 4, 1994.

Some Economics of Precollege Teaching, co-authored with Sherwin Rosen, in *Assessing Educational Practices: The Contribution of Economics*, edited by William Baumol and William Becker, MIT Press: 1995.

Technical Standards Coalitions for Network Goods, co-authored with Nicholas Economides, *The Study of Financial Markets and Institutions,* Salomon Center Press: November 1995.

The Economics of Education, co-authored with Sherwin Rosen, *Journal of Labor Economics*, January 1997.

The Influence of Higher Moments of Earning Distributions On Career Decisions, *Journal of Labor Economics*, October 1997.

Agglomeration Economies, Heterogeneity, and Firm Location Choice, co-authored with Myles Shaver, December 1997, Paper IB-97-10, *Stern School of Business*, New York University

Compatibility and Market Structure for Network Goods, co-authored with Nicholas Economides, February 1998, Paper EC-98-02, *Stern School of Business*, New York University.

Equilibrium Coalition Structures in Markets for Network Goods, co-authored with Nicholas Economides, *Annales d'Economie et de Statistique*, July 1998.

<u>Parental Optimizing Behavior and the Measurement of School Quality</u>, joint with Paul Wachtel, Working Paper, August 2000.

<u>Agglomeration Economies, Firm heterogeneity, and Foreign Direct Investment in the United States</u>, co-authored with Myles Shaver, *Strategic Management Journal*, December 2000.

<u>The Economics of Industry Geographical Organization Under Agglomeration Externalities</u>, co-authored with Myles Shaver, *Advances in Strategic Management*, Vol. 20, August 2003.

<u>Local Market Human Capital and the Spatial Distribution of Productivity in Malaysia</u>, co-authored with Timothy Conley and Grace Tsiang, *Contributions to Economic Analysis and Policy*, Vol. 3, December 2003.

<u>Compatibility and Market Structure for High-Technology Goods</u>, co-authored with Nicholas Economides, currently under second-round review at the *Journal of Industrial Economics*.

<u>An Assessment of Causal Inferences in Smoking Initiation Research and a Framework for Future Research</u>, co-authored with James Heckman and Colleen Loughlin, *Economic Inquiry,* Vol. 46, January 2008.

<u>Agglomeration Economies, Firm heterogeneity, and Foreign Direct Investment</u>, co-authored with Myles Shaver, in *Multinational Enterprise Theory*, Vol. 1, edited by Jeffrey A. Krug and John D. Daniels, SAGE Publications: 2008.


**EXPERT RETENTION, REPORTS AND TESTIMONY**

In Re: *United States of America v. National Association of Realtors;* US District Court for the Northern District of Illinois Eastern Division.  Expert Reports filed in August 2007 and in February 2008 on behalf of National Association of Realtors.  Evaluated claims of anti-competitive harm due to rules and policies promulgated by National Association of Realtors. Depositions in October of 2007 and April of 2008.


In Re: *Copper Tubing Litigation (Class Action); U*.S. District Court for the Western District of Tennessee, Expert Report filed in November 2006 on behalf of defendants (Mueller Industries, Inc. and other copper tubing manufacturers).  Provided an economic evaluation of the evidence regarding alleged collusive pricing by the defendants.  Also, evaluated the implications for the U.S. marketplace of the EU's Decision on conspiratorial pricing for European copper plumbing tubing sales by these manufacturers.


In Re:  *P.J. Carroll & Co. and other tobacco companies  v.  The Minister For Health And Children, The Attorney General And The Office Of Tobacco Control of Ireland*; The High Court - Commercial,  Dublin, Ireland. Testimony provided in November 2006 on behalf of British American Tobacco.  Evaluated the impact of the government's proposed bans on tobacco company promotional activities on market competition, industry profitability and aggregate sales of cigarettes.

In Re:  *Spartanburg Regional Healthcare Systems and the other class members. v.  Hillenbrand Industries Inc, Hill-Rom Inc., and Hill-Rom Co. Inc.*; U.S. District Court for the District of South Carolina, Declaration filed in October 2005 on behalf of Plaintiff.  Conducted various statistical analyses on Hill-Rom economic data.

In Re:  *Great Lakes Chemical Corp. v.  Arkansas Oil and Gas Commission*; Circuit Court Of Union County, Arkansas, Expert Report filed in July 2005 on behalf of Great Lakes Chemical Corp.  Deposition in August 2005.  Analyzed the economic efficiency of Final Order No. 2-2003-01 of the Arkansas Oil and Gas Commission.

In Re: *Regulatory Inquiry of Penn National Gaming, Inc.'s Acquisition of Argosy Gaming Co.*; Illinois Gaming Board ("IGB"), Expert Report filed in May 2005 on behalf of Penn National. Analyzed the effects that the acquisition would have on gaming competition in Illinois in response to Section 3000.232 of the IGB Regulations.

In Re: *Teva Pharmaceuticals v. Pfizer Inc*; U.S. District Court for the District of Columbia , Affidavit filed in October 2004 on behalf of Teva Pharmaceuticals. Analyzed the effects that Pfizer's introduction of a generic version of Neurontin during the 180-exclusivity period would have on competitive entry in Gabapentin market.

In Re: *Generic Drug Manufactures v. Lester M. Crawford (Acting Commissioner of the U.S. Food and Drug Administration), the U.S. Food and Drug Administration ("FDA"), and Tommy G. Thompson (Secretary of Health and Human Services)*; U.S. District Court for the District of Columbia, Affidavit filed in October 2004 on behalf of Teva Pharmaceuticals. Analyzed how the FDA's denial of a Citizens Petition to limit entry of branded-generics after successful Paragraph IV filings would affect competition in current and future markets for generic drugs.

In Re: *Tribune Co. v. Internal Revenue Service*; U.S. Tax Court, Expert Report filed July 2004 and Rebuttal Report filed August 2004, both on behalf of the Tribune Co. Testified in trial December 2004. Analyzed the economics of the Matthew Bender transaction between Times Mirror and Reed Elsevier.

In Re: *Teva Pharmaceuticals v. Pfizer Inc.*; U.S. District Court of New Jersey; Affidavit filed in June 2004 on behalf of Teva Pharmaceuticals.  Analyzed how Pfizer's marketing of a branded-generic version of Accupril affects competition in the market for generic quinapril during the 180-exclusivity period (granted to successful Abbreviated New Drug Applications with Paragraph IV certifications).

In Re: *AT&T Broadband v. CSG Systems, Inc.*, American Arbitration Association, Denver Colorado; Report filed January 2003, Declaration filed March 2003, Rebuttal Report filed March 2003 all on behalf of CSG Systems, Inc., Deposition in March 2003.  Conducted an analysis to evaluate the allegation of a MFN violation.

In Re: *Relafen Antitrust Litigation*, U. S. District Court of Massachusetts; Retained in January 2003 by Teva Pharmaceuticals. Evaluated damages from the delay in the launch of generic Nabumetone associated with GlaxoSmithKline PLC's invalid patent claim.

In Re: *Elizabeth Sadati vs. Ameritech Inc. et. al.*, Circuit Court of Cook County, Illinois, Expert Findings filed June 2002 on behalf of Ameritech. Conducted an analysis to determine level of damages.

In Re: *David E. Crooke vs. Value City Furniture*, U.S. District Court for the Northern District of Illinois, Eastern Division; Expert Report filed February 2002 on behalf Plaintiff, Deposition in May 2002. Conducted an analysis to determine level of damages.

In Re: *Linda Cichowski vs. Evanston Northwestern Healthcare*, Circuit Court of the Nineteenth Judicial Circuit of Illinois, Expert Findings filed October 2001 on behalf of Evanston Northwestern Healthcare. Conducted an analysis to determine level of damages.

In Re: *Carletta L. Martinsen vs. Lockheed-Martin*, U.S. District Court for the Eastern District of Wisconsin, Expert Report filed November 2000 on behalf of Lockheed-Martin. Conducted a statistical analysis on company data to determine whether there was evidence of age discrimination.

In Re: *Nine West Shoes Antitrust Litigation (Class Action)*, U.S. District Court for the Southern District of New York.  Prepared affidavit in July 2000 on behalf of Nine West Shoes. My analysis addressed whether there was any statistical evidence of a pricing conspiracy between Nine West Shoes and other major retailers regarding certain lines of women shoes.


## *Merger Analyses During Government Regulatory Reviews*

*Thomson Financials Acquisition of Reuters Group PLC, 2007.*  On behalf of the companies, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Houghton Mifflin Co's Acquisition of Harcourt Publishing, 2007.*  On behalf of the companies, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Monsanto Company Acquisition of Delta & Pine Land Company, 2007.*  On behalf of Monsanto, conducted economic analyses of prospective efficiencies of the transaction during the DOJ's merger review process.

*Sherwin-Williams Co. Acquisition of MAB Paints, 2007.*  On behalf of Sherwin-Williams, conducted economic analyses of the antitrust implications for various local markets during the FTC's merger review process.

*Getty Images Acquisition of MediaVast (WireImages), 2007.*  On behalf of Getty Images, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Hoover Co. Acquisition by Techtronic Industries Co.Ltd. (TTI), 2007.*  On behalf of Whirlpool (Hoover), conducted economic analyses of the antitrust implications of the transaction during the DOJ's and State of Ohio's merger review process.

*EnergySolutions Acquisition of Duratek, 2006.*  On behalf of Energy*Solutions* (Envirocare of Utah), conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*Whirlpool Corp. Acquisition of Maytag Corp., 2006.*  On behalf of Whirlpool, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*The Home Depot Acquisition of Hughes Supply, 2006.*   On behalf of both parties, conducted economic analyses of the antitrust implications of the transaction during the DOJ's merger review process.

*SemGroup Proposed Acquisition of TransMontaigne, 2006.*   On behalf of SemGroup, conducted economic analyses of the antitrust implications of the transaction during the FTC's merger review process.

*Teva Pharmaceuticals Acquisition of Ivax Corp., 2005.* On behalf of the merging parties, conducted economic analyses of the antitrust implications relating to the acquisition during the FTC's merger review process.

*GameStop Corp. Acquisition of Electronics Boutique Holdings Corp ("EB"), 2005.* On behalf of EB, conducted an economic analysis of the antitrust implications relating to the acquisition during the FTC merger investigation.

*Kodak Polychrome Graphics ("KPG") Acquisition of Creo Inc., 2005.*  On behalf of KPG, conducted an economic analysis of the antitrust implications relating to the acquisition during the U. S. Department of Justice ("DOJ") and European Union ("EU") merger investigation.

*Crompton Corp. Acquisition of Great Lake Chemical's Corp, 2005.*  On behalf of Crompton, conducted an economic analysis of the antitrust implications relating to the acquisition during the FTC and EU merger investigation.

*Reuters Group PLC. Acquisition of Moneyline Telerate, 2005.*  On behalf of Reuters, conducted an economic analysis of the antitrust implications relating to the acquisition during the DOJ and EU merger investigation.

*Sherwin-Williams Co. Acquisition of Duron Inc., 2004.* On behalf of both companies, conducted an economic analysis of the antitrust implications relating to Sherwin-Williams' proposed acquisition of Duron's paint distribution business during the FTC investigation.

*FTC investigation of Itron Inc. acquisition of SEM*; Retained in January 2004 by the U.S. Federal Trade Commission ("FTC") to provide an analysis and testimony regarding the antitrust implications of the proposed acquisition.

*Vestas Wind Systems A/S Acquisition of NEG Micon A/S, 2004.* On behalf of both companies, conducted and presented an economic analysis of the antitrust implications relating to Vestas' proposed acquisition of NEG Micon's wind turbine business during the DOJ and EU investigation.

*Kluwer Academic Publisher's Acquisition of Bertelsmann AG's academic publishing division,* 2003. On behalf of Kluwer, conducted and presented an economic analysis of the business rationale and antitrust implications relating to Kluwer's proposed acquisition of Bertelsmann's academic journal publishing division during the DOJ investigation.

*Pfizer Inc. Acquisition of Pharmacia Corp.*, 2002. On behalf of Pfizer, conducted an economic analysis on the antitrust implications associated with the merger and various licensing agreements during the FTC investigation.

*Medtronic Inc. Acquisition of Spinal Dynamics Corp*., 2002. On behalf of Medtronics, conducted an economic analysis of the business rationale and antitrust implications of the acquisition regarding the companies' artificial cervical disc businesses during the FTC investigation.

*EBay Inc.'s Acquisition of PayPal Inc.*, 2002. On behalf of EBay, conducted and presented an economic analysis of the business rationale and antitrust implications of EBay's acquisition of PayPal's electronic payment system during the DOJ investigation.

*Zebra Technology Corp.'s Proposed Acquisition of Fargo Electronics Inc.*, 2001. On behalf of both companies, conducted and presented an economic analysis on the acquisition's antitrust implications for ID printers during the FTC and EU investigation.

*Bayer Aktiengesellschaft Acquisition of Lyondell Chemical Co.'s Polyether Polyols Division, 2000*. On behalf of the companies, conducted an economic analysis on the acquisition's antitrust implications for the polyol industry during the FTC and EU investigation.

<u>*Other Significant Engagements*</u>

In Re: *Maine Yankee Atomic Power Co. v. United States,* United States Court of Federal Claims; Conducted an economic analysis on behalf of the DOJ and  U.S. Department of Energy to assess the efficiency and estimated pricing of Plaintiff's economics experts proposed waste disposal scheme.

In Re: *CSC Holdings, Inc. v. Yankees Entertainment and Sports, LLC*., American Arbitration Association, New York NY; Arbitration Proceeding in March 2004. On behalf of Yankees Entertainment and Sports, help develop and evaluate survey of New York area cable viewers. Analyzed CSC's economic experts' reports and testimony.

*Relevant Antitrust Market for PepsiCo Products*, 2004. On behalf of the company conducted an econometric analysis to assess the relevant markets for some of its drink and food offerings.

*Relevant Antitrust Market for Purdue Pharma L.P Products*, 2001. On behalf of the company conducted an analysis to assess the relevant market for its drug offerings.

In Re: *Falise, et al. vs. American Tobacco Co., et al.*, U.S. District Court for the Eastern District

of New York. Conducted a statistical analysis supporting Nobel Laureate James Heckman's expert report and testimony regarding the responsiveness of smoker's initiation and quit rates to information regarding the dangers of smoking. Report filed on behalf of the cigarette companies in June 2000.

In Re: *Blue Cross and Blue Shield of New Jersey vs. Philip Morris Inc. et al.*, U.S. District Court For the Eastern District of New York. Conducted a statistical analysis in support of Nobel Laureate James Heckman's expert report and testimony on behalf of the cigarette companies. Report filed October 1999.


## RESEARCH PRESENTED AT THE FOLLOWING PROFESSIONAL SEMINARS

### *CONFERENCE PROCEEDINGS*

*Atlantic Economics Society Conference*, Philadelphia, Pennsylvania, October 1993.

*Conference in Memory of Yoram Ben Porath*, Jeruslem, Israel, October 1993.

*Conference on the Interoperability and the Economics of Information Infrastructure*, Strasbourg, France, June 1996.

*Telecommunications Policy Research Conference*, Alexandria, Virginia, September 1997.

*Academy of International Business Annual Meetings*, Monterrey, Mexico, October 1997.

*Econometrica North American Summer Meetings*, Montreal, Canada, June 1998.

*Western Economic Association Summer Meetings*, San Diego, California, July 2006.  Chaired session on the empirical evidence linking cigarette advertising to youth smoking.


### *UNIVERSITY SEMINARS 1993-PRESENT*

Baruch College

Columbia University

Duke University

Harvard University

Michigan State University

New York University

Northwestern University

Princeton University

Stanford University

State University of New York-Albany

University of Alberta

University of California-Berkley

University of California-Irvine

University of Chicago

University of Miami

University of Michigan-Ann Arbor

University of Wisconsin-Madison

Western Ontario University


### *PRESENTATIONS AT OTHER RESEARCH INSTITUTIONS 1993-PRESENT*

U.S. Department of Labor - Bureau of Labor Statistics

Rand Corporation

American Medical Association

U.S. Department of Justice

U. S. Federal Trade Commission


## **PROFESSIONAL MEMBERSHIP AND SERVICES**

### *MEMBERSHIP IS PROFESSIONAL SOCIETIES*

American Bar Association
American Economic Association
Atlantic Economic Society (1993-1994)
Society of Labor Economists (1996-1997)


### *REFEREE FOR THE FOLLOWING PROFESSIONAL JOURNALS (1995-PRESENT):*

Atlantic Economic Journal
Journal of Political Economy
Journal of Labor Economics
International Journal of Industrial Organization
Quarterly Journal of Economics
Review of Economics and Statistics
Journal of Human Resources
Journal of Law and Economics
Journal of Industrial Economics
Japan and the World Economy