UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
:
EMIGRA GROUP, LLC,
:
                       Plaintiff,
:           No. 07-cv-10688 (LAK) (HP)
          --against--
:           ECF CASE
FRAGOMEN, DEL REY, BERNSEN & LOEWY,
LLP; FRAGOMEN, DEL REY, BERNSEN &    :
LOEWY II, LLP; FRAGOMEN GLOBAL
IMMIGRATION SERVICES, LLC; FRAGOMEN   :
GLOBAL LLP; AND RYAN MATTHEW FREEL,
:
                       Defendants.
:
----------------------------------------x

       GEORGE KOSICKI declares pursuant to 28 U.S.C. § 1746:

1.      I previously submitted a declaration in this matter on February 22, 2008. My background and qualifications are described in my earlier declaration. I have been asked by counsel for the Fragomen Defendants to review and evaluate from an economic perspective the May 30, 2008 declarations of Mr. Fredrick A. Flyer, Ph.D. and Mr. A. Pendleton DuPuis (hereafter "Plaintiff's declarations").

2.      In my view, the Plaintiff's declarations fail to establish that there is a plausible antitrust claim against the Fragomen Defendants or that additional economic information from the Fragomen Defendants is necessary to evaluate the Plaintiff's antitrust claim. The Plaintiff's declarations have not caused me to revise any of the opinions contained in my earlier declaration.

**MARKET DEFINITION AND MARKET POWER ISSUES**

3.  The Plaintiff's antitrust claim rests on the assertion that the relevant product market is limited to the business immigration services purchased by large multinational corporations from geographically dispersed "single-source" providers.[1] This market definition is not supported by any systematic economic analysis. Instead, the Plaintiff's market definition appears to be dictated by Emigra's business plan, which is to provide large multinational corporations with a single source of supply for their global immigration service needs.[2] Emigra alleges that Fragomen pursues essentially the same business plan, and that no other significant providers have been successful in implementing this plan. Consequently, the Plaintiff maintains that Emigra and Fragomen are the only two suppliers in the relevant market, and that Fragomen dominates this market by virtue of its large size relative to Emigra.[3]

4.  The essential problem with the Plaintiff's view of the relevant market is that it ignores well established principles of market definition, including those specified in the horizontal merger guidelines of the U.S. Department of Justice and the Federal Trade Commission (hereafter "Merger Guidelines").

    4.1.  The Plaintiff's attempt to restrict the market definition to certain groups of customers requires evidence of price discrimination.[4] In this case, there is no evidence of price discrimination with respect to business immigration

---

[1] Flyer declaration, ¶ 7.

[2] DuPuis declaration, ¶ 20.

[3] DuPuis declaration, ¶¶ 31, 35, 46.

[4] Merger Guidelines, Section 1.12.

services. The Kaplan declaration describes the provision of visas and work permits – the most common types of business immigration services – as commodities that are priced in a generally similar way to all customers.[5] The only exception noted by Mr. Kaplan is the volume discounts earned by large customers, but these discounts do not represent price discrimination in an economic sense.[6] Consequently, there is no basis for limiting attention to the behavior of large multinational corporations when defining the relevant market.

4.2. The Plaintiff's attempt to restrict attention to specific types of suppliers requires evidence that customers do not view other types of suppliers as viable substitutes. Market definition as specified in the Merger Guidelines is a forward-looking exercise that focuses on customer responses to prospective price increases. In applying the "hypothetical monopolist" test of the Merger Guidelines, the relevant question for market definition is what would happen if Emigra and Fragomen acted jointly and instituted "a small but 'significant and nontransitory' increase in price."[7]

4.3. In this case, customers have so many alternatives to obtaining immigration services from Emigra or Fragomen that it is not plausible to maintain that customers would remain with them if faced with a small but significant

---

[5] Kaplan declaration, ¶ 24.

[6] The volume discounts described by Mr. Kaplan cannot be related to the exercise of market power because Emigra also offers volume discounts. See http://www.emigra.com/main/index.php?id=92&op=1&rtid=37. In my view, the discounts are most likely related to cost savings that result when the incremental costs associated with the visa and work permit application process for a given customer are spread over a larger volume.

[7] Merger Guidelines, Section 1.1.

and nontransitory increase in price. As I described in my earlier declaration, customers can turn to other well established law firms with immigration practices, local immigration service specializing in particular countries, accounting firms with immigration practices, relocation firms, in-house legal counsel, or in-house human resources personnel.[8] Mr. Kaplan's declaration provides details on the bidding process, including an example in which a Fortune 100 multinational pharmaceutical company received responses to a request for proposals from 28 potential suppliers of immigration services, and then selected six of the suppliers to make formal proposals.[9]

5. The Plaintiff also maintains that there are significant barriers to entry in the relevant market. The Plaintiff's position appears to rest on the testimony of Mr. DuPuis that "Building Emigra's business has not been easy, requiring great investment of capital and time and talent and risk tolerance."[10] The basic problem here is that this description of the entry process, even if it were true, does not represent an entry barrier that would lead to market power in the long-run. Long-run market power can be achieved only if entrants face costs that incumbents do not – or have not had to – incur.[11] Under the Plaintiff's implicit definition of a barrier to entry, essentially every industry would be characterized

---

[8] Kosicki declaration (February 22, 2008), ¶¶ 13-22.

[9] Kaplan declaration, ¶ 22.

[10] DuPuis declaration, ¶ 48.

[11] See Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th ed., Addison Wesley, 2005, pp. 76-77. ("Because long-run profits can only persist if a firm has an advantage over potential entrants, a logical definition of a long-run barrier to entry is a cost that must be incurred by a new entrant that incumbents do not (or have not had to) bear.")

by entry barriers because every new business requires some investment of capital and labor and has an uncertain payoff.

**ECONOMIC INFORMATION REQUESTED BY THE PLAINTIFF**

6. The Plaintiff's declarations maintain that additional discovery should be required of the Fragomen Defendants in order to establish the validity of the Plaintiff's antitrust claim. From an economic perspective, much of the information requested in the Plaintiff's declarations is largely irrelevant to the fundamental issues of this case. The requests that do have some merit from an economic perspective (e.g., those related to the bidding process) relate to information that Emigra must have had in its possession at one time. Consequently, I see no reason that additional discovery is necessary from the Fragomen Defendants.

7. The DuPuis declaration states that a market comprised solely of single-source providers "is supported by Emigra's actual bidding experience."[12] However, no specific evidence is provided based on Emigra's experience. Instead, the Plaintiff's declarations request detailed bid data from the Fragomen Defendants. These requests include the "content of requests for proposals from potential customers, identities of competing bidders and their characteristics as service providers, specific services required by potential customers, specific services offered to customers in proposals from competing vendors, identity of winning bidders, pricing in winning bids, margins earned on winning bids."[13] Under the Plaintiff's theory of the case, Emigra would be at least as likely as the Fragomen

---

[12] DuPuis declaration, ¶ 40.

[13] DuPuis declaration, ¶ 9.

Defendants to have this information given that Emigra and Fragomen are supposedly the only two suppliers in the Plaintiff's alleged market. If the Plantiff's theory were correct, Emigra should already be able to document numerous instances in which requests for proposals are limited to single-source providers and only Emigra and Fragomen bid for the business.

8. While the Plaintiff's declarations fail to make use of any specific bid data retained by Emigra, they also dismiss or ignore the specific examples of highly competitive bidding provided in the Kaplan declaration.[14] Such bidding would ensure that the "small but significant and nontransitory increase in price" contemplated in the market definition test of the Merger Guidelines would result in so many lost sales for Emigra and Fragomen that the price increase would be unprofitable. The sole basis for dismissing Mr. Kaplan's example of a bidding process in which there were 28 actual respondents appears to be that Fragomen won the auction.[15] Moreover, the Plaintiff's declarations provide no evidence to counter the straightforward interpretation that in this environment Fragomen's winning bid reflected competition on the merits. Instead, the DuPuis declaration speculates that Fragomen won the auction "due to its status as the only single-source provider in the bidding, or because of predatory pricing, or that Fragomen won the auction but then succeeded in driving up the price with contract additions."[16] The DuPuis declaration provides no explanation for why Emigra may not have participated in the auction, or why 27 firms with allegedly no chance of winning the auction would have participated. The speculative nature of this response strongly suggests that the Plaintiff has not produced a

---

[14] Kaplan declaration, ¶¶ 22, 25.

[15] DuPuis declaration, ¶ 43.

[16] DuPuis declaration, ¶ 43.

valid antitrust claim in which there is the potential for harm to the competitive process, but rather that the Plaintiff is disgruntled with the way in which the competitive process has played out over time.

9. The Plaintiff's declarations also request a variety of other economic data from the Fragomen Defendants, including customer lists, annual revenue per customer, customer size, aggregate sales and volume, and sales by location.[17] In my view, these requests would not be useful in resolving the central issues that are in dispute. These data will not resolve the product market definition or market power issues that are the crucial threshold issues in this case because they only pertain to Fragomen's business and do not address issues of competitive interaction.

10. At the same time that the Plaintiff's declarations request largely unnecessary information from the Fragomen Defendants, the declarations dismiss useful survey evidence collected by third-parties that directly address the ways in which customers satisfy their needs for business immigration services.[18] For example, both the PricewaterhouseCoopers Global Visa Services Survey and the GMAC Global Relocation Trends Survey cited in my earlier declaration show that many companies prefer not to outsource their business immigration services and instead use in-house legal or human resource specialists for these tasks.[19]

11. Finally, the Plaintiff's declarations maintain that it would be informative to (a) review the contract between Fragomen and ILS Shimoda to determine if the contract had an exclusivity clause; and (b) obtain any documents related to Fragomen's rationale for the

---

[17] DuPuis declaration, ¶ 9.

[18] DuPuis declaration, ¶ 42.

[19] Kosicki declaration (February 22, 2008), ¶¶ 19, 19.1, 19.2.

agreement.[20] The Plaintiff's declarations appear to ignore the public evidence already provided by Mr. Buffenstein that ILS Shimoda serves as a local provider to at least one other immigration law firm.[21] Moreover, from an economic perspective, the specific details of any vertical agreement between Fragomen and ILS Shimoda are largely irrelevant. As I indicated in my earlier declaration, the issue is not the alleged exclusivity of the contract, but rather the extent to which the arrangement forecloses a substantial share of the sales outlets for other competitors. Given that there are many local suppliers in Japan offering generally similar business immigration services, there is no appreciable foreclosure from a vertical agreement between Fragomen and ILS Shimoda, regardless of the exact nature of the agreement between them.

## OTHER ISSUES RAISED BY THE PLAINTIFF

12. The Plaintiff's declarations emphasize that even if market shares were properly calculated based on the number of lawyers employed by major U.S. law firms with immigration practices, Fragomen has five times as many lawyers as the next largest competitor, and this "suggests that Fragomen is uniquely positioned to provide geographically dispersed immigration services and may have monopoly power."[22] This assertion makes no sense from an economic perspective. There is no basis for focusing solely on the size dispersion of suppliers when assessing market structure.

    12.1. For example, the widely used Hefindahl-Hirschman Index (HHI) of market concentration reflects *both* the size dispersion of suppliers and the

---

[20] DuPuis declaration, ¶ 9; Flyer declaration, ¶ 22.
[21] Buffenstein declaration, ¶ 50.
[22] Flyer declaration, note 10; see also DuPuis declaration, ¶ 31.

number of suppliers in a market.[23] Incorporating both the size dispersion and the number of sellers helps to ensure that the value of the index is not sensitive to size disparities among sellers when market shares are generally very low, as is the case here. As I indicated in my earlier declaration, if one views the market capacity for outbound business immigration services as the number of immigration attorneys employed at the 59 law firms identified in the Buffenstein declaration, the corresponding HHI value is only 645.[24] Even though Fragomen has five times as many immigration attorneys as the second largest immigration practice, there are so many suppliers in this market with generally small shares that the HHI value is well within the unconcentrated range of values specified in the Merger Guidelines (HHI below 1,000).[25] Moreover, this HHI calculation would overstate the true market concentration because it does not account for sellers such as the Plaintiff that are not organized as law firms, or other classes of competitors such as the immigration departments of major accounting firms.

12.2.   To further illustrate the flaw in the Plaintiff's position regarding the disparity in size between Fragomen and the next largest immigration practice, suppose that Fragomen's market share were to remain the same as in the Buffenstein declaration (22.26 percent), but the other 58 law

---

[23] See, e.g., W. Kip Viscusi, John M. Vernon, and Joseph E. Harrington, Jr., *Economics of Regulation and Antitrust*, 4th ed. MIT Press, 2005, pp. 159-161.

[24] Kosicki declaration (February 22, 2008), ¶ 15.2.

[25] Merger Guidelines, Section 1.51 ("Post-Merger HHI Below 1000. The Agency regards markets in this region to be unconcentrated.")

firms identified by Buffenstein were to split the remainder of the market equally (1.34 percent each). In this example, the size disparity between Fragomen and its next largest competitor would grow to a ratio of almost 17 to 1 [22.26/1.34 = 16.6], but the overall market concentration as measured by the HHI would actually decrease from 645 to 600.[26] This example indicates that focusing on size disparities alone is inconsistent with commonly accepted measures of market structure such as the HHI.

13. The DuPuis declaration criticizes the Buffenstein market share analysis for being "silent regarding non-lawyer professional staffing."[27] While it is true that Mr. Buffenstein did not incorporate paralegals into his share calculations, the data sources he used contained some information on paralegal employment, and I incorporated these data into the market power analysis presented in my earlier declaration.[28] The paralegal data do not affect my basic conclusion that the Fragomen Defendants lack sufficient market power to engage in monopolizing behavior. In addition, the comment by Mr. DuPuis regarding paralegal data exposes an inconsistency in the Plaintiff's argument. The more that paralegals represent an important source of market capacity, the greater the degree of product homogeneity and the lower the costs of new entry. Both of these factors are consistent with a more competitive market.

14. The DuPuis declaration dismisses competition from relocation firms in part because some relocation firms offer immigration services through Fragomen or Emigra and so do not

---

[26] The HHI value in this example is computed as follows: $HHI = 22.26^2 + 58(1.34^2) = 600$.

[27] DuPuis declaration, ¶ 31.

[28] Kosicki declaration (February 22, 2008), note 32.

represent a completely new source of supply for immigration services.[29] This point was acknowledged in my earlier declaration, and it applies only to a small subset of relocation firms.[30] Strangely, the DuPuis declaration also characterizes relocation firms as having "an inherently narrow skill set" that distinguishes them from Emigra and Fragomen. In fact, relocation firms provide customers with a very broad range of services (e.g., international compensation administration, home finding, rental assistance, household goods management, language training, work authorization, and other immigration assistance) and so can be thought of as an extension of the single-source provider concept that is at the heart of Emigra's business plan. Consequently, it is inconsistent for the Plaintiff to emphasize the importance of single-source providers for purposes of market definition, and then dismiss the competition provided by relocation firms when assessing market power.

15. Finally, the DuPuis declaration criticizes the Defendants' declarations for failing to recognize that Emigra focuses on outbound immigration services.[31] This point is simply incorrect. My earlier declaration explicitly notes that Emigra is not a law firm and is therefore precluded under U.S. law from directly providing inbound immigration services.[32] I also address the distinction between inbound and outbound services in my market share analysis.[33] Ultimately, I conclude that lawyers with inbound practices represent relevant capacity that should be included when calculating market shares in this

---

[29] DuPuis declaration, note 4.

[30] Kosicki declaration (February 22, 2008), ¶ 21.

[31] DuPuis declaration, ¶¶ 23, 42.

[32] Kosicki declaration (February 22, 2008), ¶ 6.

[33] Kosicki declaration (February 22, 2008), ¶ 13-14.

case. Legal professionals with established immigration practices can readily obtain the information necessary to provide outbound services, and so these professionals represent sources of supply that can be readily shifted into the relevant market. This supply-side response is particularly likely for services involving the procurement of visas and work permits, which are the services typically needed for international employee relocations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27th day of June, 2008.

_____
George Kosicki