UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
EMIGRA GROUP, LLC,

                    Plaintiff,

          -against-                           07 Civ. 10688 (LAK)

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

           Michael D. Pinnisi
           PINNISI & ANDERSON, LLP
           *Attorneys for Plaintiff*

           William D. Phillips
           Charles E. Buffon
           Andrew A. Ruffino
           COVINGTON & BURLING LLP
           *Attorneys for Defendants Other Than Ryan Freel*

           Darnley D. Stewart
           GISKAN, SOLOTAROFF, ANDERSON & STEWART LLP
           *Attorneys for Defendant Ryan Freel*

Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Immigration Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Background of the Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        The Antitrust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        The Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . 6

        1.     The Theory of the Motion . . . . . . . . . . . . . . . . . . . . . 7

            (a)    The Section 2 Claims . . . . . . . . . . . . . . . . . . . . . 7

            (b)    The Section 1 Claims . . . . . . . . . . . . . . . . . . . . . 8

        2.     The Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.     Emigra's Response . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            (a)    The DuPuis Declaration . . . . . . . . . . . . . . . . . . . 10

            (b)    The Flyer Declaration . . . . . . . . . . . . . . . . . . . . 12

*Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.     The Law Governing Summary Judgment . . . . . . . . . . . . . . . . . . . . 16

        A.    General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.    S.D.N.Y. CIV. R. 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    II.    The Section 1 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        A.    Intra-enterprise Conspiracy . . . . . . . . . . . . . . . . . . . . . 24

        B.    Vertical Restraint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    III.   Monopolization and Attempted Monopolization -- Relevant Markets . . . . . . . . 28

        A.    Cluster Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        B.    The *Brown Shoe* Criteria . . . . . . . . . . . . . . . . . . . . . . . 35

            1.     Industry or Public Recognition . . . . . . . . . . . . . 36

            2.     Special Characteristics and Uses . . . . . . . . . . . . 38

            3.     Distinct Customers . . . . . . . . . . . . . . . . . . . . . . 40

            4.     Distinct Prices . . . . . . . . . . . . . . . . . . . . . . . . . 41

            5.     Sensitivity to Price Changes . . . . . . . . . . . . . . . 41

            6.     Specialized Vendors . . . . . . . . . . . . . . . . . . . . . 43

        C.    Conclusion - Market Definition . . . . . . . . . . . . . . . . . . 43

    IV.   Monopolization and Attempted Monopolization – Monopoly Power . . . . . . . . 46

    V.    The Conspiracy to Monopolize Claim . . . . . . . . . . . . . . . . . . . . 49

    VI.   The Rule 56(f) Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        A.    Section 1 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        B.    The Service Submarket – Market Definition . . . . . . . . . . 55

        C.    The Service Market – Monopoly Power . . . . . . . . . . . . . 59

    VII.  The Pendent State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . 61

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

LEWIS A. KAPLAN, *District Judge.*

This is a dispute over the hiring by one competitor of an employee of another that has been dressed in the raiment of an antitrust case. The antitrust claims are the only basis of federal subject matter jurisdiction. The matter is before the Court on the defendants' motion for summary judgment dismissing the antitrust claims on the merits, thus sending the state law tort claims to state court.

Plaintiff has offered very little evidence in support of its allegations. It resists dismissal chiefly by contending that it is entitled to discover defendants' sensitive business information, purportedly to test the reliability of defendants' declarations.

Plaintiff's opposition to the motion rests on at least two fundamental misconceptions. First, it mistakenly asserts that it is defendants' burden to prove conclusively the negative of the allegations of the complaint. Second, it supposes, again wrongly. that summary judgment is categorically improper prior to discovery rather than something that is permissible in the perhaps rare appropriate case. After stripping away these mistaken views and carefully considering both the evidence of record and plaintiff's proposed discovery, the Court has concluded that there is no genuine issue of material fact, that plaintiff has not satisfied the requirements of Fed. R. Civ. P. 56(f) and therefore is not entitled to discovery, and that defendants are entitled to judgment as a matter of law. In other words, this is one of those unusual cases in which summary judgment prior to discovery is warranted.

*Facts*

*The Parties*

Plaintiff Emigra Group LLC ("Emigra") is a provider of business-related immigration services.  It claims to offer a wide range of consultation in immigration matters, document procurement, consular processing, and related services to assist corporations in their movement of employees across national borders.  Its business plan is to be a single source provider of immigration services for large corporations around the world.

The defendants are Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen LLP"), Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen II"), Fragomen Global LLP ("Fragomen Global"), Fragomen Global Immigration Services, LLC ("FGIS") (collectively, the "Fragomen Organization"), and Ryan Freel.

Fragomen LLP is a law firm headquartered in New York that specializes in providing legal advice and services concerning U.S. immigration laws to domestic and foreign clients, typically companies seeking to relocate foreign employees to the United States.[1]  Fragomen Global is an intermediate holding company owned by the Class A equity partners of Fragomen LLP.  It owns 93 percent of FGIS, which is a vehicle for providing information, guidance, and assistance to clients concerning the immigration requirements and procedures of various foreign countries.  Thus, the Fragomen Organization offers immigration services with respect to persons seeking to enter the United States from abroad (inbound work) and to persons seeking to enter foreign countries (out-bound work), the former principally through Fragomen LLP and the latter principally through FGIS.  Defendants say that inbound work accounts for 80 to 85 percent of the revenues of the Fragomen

---

[1] It is also the successor by merger of Fragomen II, which no longer exists.

3

Organization as a whole.

*Immigration Services*

Within the United States, immigration services generally are considered the practice of law and may be provided only by licensed attorneys or people working under their supervision. Outside the United States, some categories of immigration services are provided by non-lawyers, presumably in competition with lawyers.

There is no internationally uniform set of immigration laws and procedures. Even where regional or supra-national immigration arrangements exist, local implementation varies among member states. However, U.S. firms wishing to meet the outbound immigration needs of corporate clients need not maintain an office in every country where its clients might need to send employees. They can form alliances or working relationships with local firms in relevant foreign countries, enabling them to provide outbound services abroad without maintaining a physical presence in every potential foreign jurisdiction.

*The Background of the Dispute*

Defendant Ryan Freel is a lawyer who first worked for Fragomen LLP from August 1999, following his graduation from law school, until January 2005. On August 16, 2005, however, he began work at Emigra as its vice president of operations.

During his tenure at Emigra, Freel allegedly was a member of Emigra's highest management team. He reported to the chief executive officer and allegedly had access to all aspects of its business, trade secrets, and confidential information including, among other things, its strategies, customer lists, pricing, profit and loss data, and the like.

4

Freel resigned from Emigra on or about September 19, 2007, and returned to Fragomen on October 1, 2007.  Emigra claims – on "information and belief" – that Freel disclosed Emigra confidential information to Fragomen and, after beginning work at Fragomen, began contacting certain Emigra customers on Fragomen's behalf.

*This Lawsuit*

Companies who feel that their trade secrets and confidential information are being betrayed by former employees hired by competitors typically file suit and promptly seek preliminary injunctions.  Such controversies often are quickly resolved, at least on a preliminary injunction basis and often by accelerated plenary trial.[2]  Emigra, however, did not follow that path.

It filed this action on November 29, 2007, about two months after Freel began work at Fragomen, and asserted the usual state law claims for misappropriation of trade secrets, unfair competition, and the like. But it did not seek a preliminary injunction.  Rather, its complaint asserts also five antitrust claims relating principally to what Emigra claims are relevant markets for immigration services.  As will appear, there is reason to believe that Emigra adopted this strategy at least in part to gain access through pretrial discovery to precisely the sort of competitively sensitive information about Fragomen's business that Emigra claims Freel improperly disclosed to Fragomen about Emigra's business.  Defendants' motion therefore poses, among other questions to be sure, the issue whether Emigra should be permitted to gain that access by asserting antitrust claims rather than being remitted to state court to pursue its trade secret and unfair competition claims, matters as to which this Court lacks subject matter jurisdiction if there is no substantial federal question.

---

[2] *Cf.* FED. R. CIV. P. 65(a)(2).

5

*The Antitrust Claims*

The amended complaint contains five antitrust claims:

- Count I alleges that the Fragomen Organization monopolized an alleged market for immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals (the so-called "Service Market") and an alleged submarket for business-related immigration services provided by single-source providers to large multinational corporations who are major employers of U.S. citizens and foreign nationals (the so-called "Service Submarket")[3] in violation of Section 2 of the Sherman Act.[4]

- Count II alleges that two or more of the defendants have conspired to monopolize the Service Market and the Service Submarket,[5] also in violation of Section 2.

- Count III asserts that the Fragomen Organization has attempted to monopolize the Service Market and the Service Submarket,[6] also in violation of Section 2.

- Count IV contends that "[t]wo or more of the Defendants, not having complete common ownership (upon information and belief)," conspired to

---

[3]    Am Cpt ¶¶ 10-11, 97-112.

[4]    15 U.S.C. § 2.

[5]    Am Cpt ¶¶ 10-11, 114-23.

[6]    *Id.* ¶¶10-11, 125-36.

6

restrain trade and commerce in the Service Market and Service Submarket[7] in violation of Section 1 of the Sherman Act.[8]

• Finally, Count V asserts that the Fragomen Organization violated Section 1 of the Sherman Act by entering into a vertical arrangement with Emigra's former vendor in Japan.[9]

*The Motion for Summary Judgment*

At the initial Rule 16 conference, defendants asserted that Emigra's antitrust claims – the only basis of federal subject matter jurisdiction – are not viable and indicated a desire to move for summary judgment dismissing those claims.  The Court concluded that there was substantial doubt as to whether the case could survive such a motion and that full blown antitrust discovery perhaps would serve only to increase the cost of litigation without any benefit.  Accordingly, it stayed discovery pending the filing and disposition of defendants' motion.[10]

---

[7]     *Id.* ¶¶ 10-11, 138-48.

[8]     15 U.S.C. § 1.

[9]     Am Cpt ¶¶ 150-60.

[10]     Plaintiff never sought to proceed with respect to its state law unfair competition, trade secrets, and other claims.

7

      1.     *The Theory of the Motion*

        (a)     *The Section 2 Claims*

    Section 2 of the Sherman Act makes it unlawful to monopolize or attempt or conspire to monopolize "any part of the trade or commerce among the several States, or with foreign nations . . ."[11]

    In order to establish monopolization, a plaintiff must prove that the defendant (1) possesses monopoly power in the relevant market, and (2) has wilfully acquired or maintained that power.[12]  Monopoly power is the power to control prices or exclude competition.[13]  "[A] plaintiff claiming monopolization [therefore] is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market."[14]  This requirement applies also to attempts to monopolize, as that offence requires proof of a "dangerous probability of achieving monopoly power,"[15] which cannot be evaluated without consideration of the relevant market.[16]  And while rigorous proof of a relevant market and of a

---

[11]

    15 U.S.C. § 2.

[12]

    *Verizon Communs. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407 (2004).

[13]

    *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

[14]

    *Heerwagen v. Clear Channel Communs.*, 435 F.3d 219, 229 (2d Cir. 2006).

[15]

    *Spectrum Sports v. McQuillan,* 506 U.S. 447, 459 (1993).

[16]

    *Tops Markets., Inc. v. Quality Markets., Inc.*, 142 F.3d 90, 100 (2d Cir. 1998) ("Critical to deciding the dangerous probability prong of plaintiff's attempted monopolization claim is defendant's economic power in the relevant market.") (citing *Spectrum Sports*, 506 U.S. at 458-59).

8

dangerous probability of achieving monopoly power are not, in this Circuit, essential elements of conspiracy to monopolize, the relevant market and the likelihood of its monopolization may have a significant bearing on whether the requisite specific intent to monopolize is present.[17]

Defendants seek summary judgment dismissing the Section 2 claims. They tacitly accept for purposes of the motion the existence of a market for immigration services provided to corporations, but dispute that Emigra's alleged Service Submarket is a relevant market for antitrust purposes. They maintain also that the Fragomen Organization manifestly lacks anything approaching monopoly power, or a dangerous probability of acquiring it, in either the alleged Service Market or Service Submarket.

### (b)    The Section 1 Claims

Count IV of the complaint purports to allege a classic conspiracy in restraint of trade among "[t]wo or more of the Defendants, not having complete common ownership." Defendants seek summary judgment of dismissal on the ground that the Fragomen Organization is incapable as a matter of law of conspiring with itself in light of the intra-enterprise conspiracy doctrine.

---

[17]

*E.g., Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.,* 510 F.2d 1140, 1144 (2d Cir. 1975).

There is a circuit split on the necessity of rigorous proof of a relevant market on a conspiracy to monopolize claim. Some circuits hold that it is required. *Compare Doctor's Hosp. of Jefferson, Inc. v. S. E. Medical Alliance*, 123 F.3d 301, 311 (5th Cir. 1997) ("To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant market."); *Bill Beasley Farms, Inc. v. Hubbard Farms*, 695 F.2d 1341, 1343 (11th Cir. 1983) ("In this circuit it is clear that relevant market is a necessary element of a conspiracy to monopolize."), *with Salco Corp. v. General Motors Corp., Buick Motor Div.*, 517 F.2d 567, 576 (10th Cir. 1975) ("Specific intent to monopolize is the heart of a conspiracy charge, and a plaintiff is not required to prove what is the relevant market."). The Second Circuit's position falls between these positions.

9

Finally, defendants seek dismissal of Count V, which purports to allege an unlawful vertical agreement with one local service provider in Japan not to do business with Emigra, on the ground that Emigra cannot establish the requisite adverse effect on competition.

    2.    *The Evidence*

Defendants' motion is supported by two declarations, one by Fragomen partner Lance Kaplan and the other by Darryl Buffenstein, a partner in a large law firm with broad experience in the practice of immigration law and a past president of the American Immigration Lawyers Association.

Mr. Kaplan's declaration sets out the structure of the Fragomen Organization, which is pertinent to the intra-enterprise conspiracy claim in Count IV, and describes its immigration practice. It contains also a description, in broad terms, of competition and pricing in the provision of global immigration services.

Mr. Buffenstein's declaration describes the business of providing business-related immigration services, including the roles of Fragomen and Emigra. His declaration also denies the existence of the Service Submarket alleged by Emigra.

Defendants' motion is accompanied by a detailed Rule 56.1 Statement setting forth the material facts that defendants maintain are undisputed and citing the evidence that they maintain support those facts, all as required by the local rules.[16]

---

[16] S.D.N.Y. Civ. R. 56.1.

3.      *Emigra's Response*

Emigra's response to the motion includes declarations of Emigra's president, A. Pendleton DePuis, and a retained expert, economist Fredrick A. Flyer, Ph.D.  It is accompanied by a purportedly responsive Rule 56.1 Statement.  The response as whole is notable for the extent to which it fails to engage defendants as to the facts that are material to the motion, largely resting instead on the propositions that (1) Emigra should not be required to respond to the motion without extensive discovery, and (2) defendants have not conclusively proved their contentions.

(a)      *The DuPuis Declaration*

Mr. DuPuis's declaration begins with the statement that his primary areas of disagreement with defendants' declarations include (a) the nature of relevant services offered by the two firms, (b) customer requirements for single-source services and competitors of the two firms for their provision – i.e., whether there is a relevant Service Submarket, and (c) barriers to entry thereto.[17] He states that his disagreement is based on an alleged lack of factual basis for defendants' declarations which, he says, "is made more difficult to expose because of Emigra's inability to complete, or even commence, discovery."[18] This is followed by a list, based on the Flyer declaration, of "[e]videntiary matters requiring Fragomen disclosure" including:

> "a.    Information regarding Fragomen competition for work, including content of request for proposals from potential customers, identities of competing bidders and their characteristics as service providers, specific services required by potential customers, specific services offered to customers in proposals from competing vendors, identity of winning bidders, prices in

---

[17]    DuPuis Decl. ¶ 6.

[18]    *Id.* ¶ 7.

winning bids, margins earned on winning bids, Fragomen internal documents regarding competitors and market share and pricing policies, and related information (Flyer Decl. ¶ 11-17);

"b.  Information regarding Fragomen customers, including customer lists, annual revenue per customer, customer size, number of customer employees serviced annually, and related information (Flyer Decl. ¶ 18);

"c.  Information regarding Fragomen sales, including aggregate sales revenue, aggregative volume of transactions, sales by location, market share, and comparable data regarding competitor sales (Flyer Decl. ¶ 19);

"d.  Information regarding Fragomen vendor relationships and dealings, including whether any such relationships are exclusive and whether vendor alternatives are available to Emigra if Fragomen requires exclusivity (Flyer Decl. ¶ 22)."[19]

According to Mr. DuPuis, Emigra sought "many" of these facts from public record sources and says that "[c]ertain" of them formed the basis for its complaint,[20] although he does not tell us what those are.  He claims that these efforts were largely unsuccessful, in part because some are "within Fragomen's sole knowledge," including information regarding Fragomen's (a) ownership, structure and staffing, (b) contractual relationships, (c) revenues and market share, and (d) bidding activity and resultant contracts.[21]

Having thus begun with an attempt to make a case for discovery of commercially sensitive material from Fragomen, Mr. DuPuis's declaration proceeds briefly to the merits.  He begins with the assertion that Emigra's strategy "is to be a single-source provider for large corporations . .

---

[19]  Id. ¶ 9.

[20]  Id. ¶ 12.

[21]  Id. ¶ 15.

. for . . . global immigration services,"[22] a goal it seeks to achieve without primary reliance on U.S. in-bound immigration work and without lawyers.[23] Mr. DuPuis asserts that Fragomen offers similar services "with the additional ability, unlike Emigra, to provide legal services in house."[24]

The DuPuis declaration then asserts that only Fragomen, Emigra and the Littler Mendelson law firm, much of the immigration practice of which recently was acquired by Fragomen, have provided a similar range of immigration services worldwide and argues, based on a Fragomen press release, that the alleged Service Submarket is a relevant market for antitrust purposes.[25]  It passes then to a contention that there are substantial barriers to entry into that market.[26]

(b)    *The Flyer Declaration*

The Flyer declaration states that Dr. Flyer was retained "to assess (1) whether Emigra's allegations . . . , if supported, would result in harm to competition; and (2) whether the evidence put forth by . . . Fragomen . . . constitutes a reliable evidentiary basis to dismiss Emigra's claims.[27] On the latter point, it purports to assess whether the evidence "contradicts Emigra's claims that: (1) the competitors in their relevant market are geographically dispersed 'single-source'

---

[22]

    *Id.* ¶¶ 20-21.

[23]

    *Id.*  ¶ 23.

[24]

    *Id.* ¶ 24.

[25]

    *Id.* ¶¶ 26-30.

[26]

    *Id.* ¶¶ 31-39, 46-52.

[27]

    Flyer Decl. ¶ 4.

providers of business related immigration services, (2) the customers in this market are major employers with workforces comprised of citizens of many countries; (3) Fragomen possesses monopoly power in the market for immigration services; and (4) Fragomen used this monopoly power to diminish competition in this market."[28]   The first two of these claims are said to be significant because, if they are correct, "they would indicate that the relevant market for the services provided by Fragomen and Emigra is limited to geographically dispersed providers of services," i.e., to firms with large multi-region services networks with clients consisting of large corporations with diverse work forces.[29]   The declaration then goes on to say that it is impossible to evaluate Fragomen's claim that there are not significant barriers to entry absent "information on the ease with which firms have been able to enter the market for immigration services and quickly establish geographically dispersed network[s] in a short period of time."[30]   With this prelude, the declaration lays out a detailed list of information that Dr. Flyer claims would be necessary to answer the questions he raises.[31]

Plaintiff's memorandum asserts that Dr. Flyer's declaration "opines that Emigra has alleged valid antitrust claims" and that defendants' position "at its very best, . . . presents only a clash of expert opinion regarding market definition and dominance, and thus cannot possibly justify

---

[28]   *Id.* ¶ 7.

[29]   *Id.* ¶ 8.

[30]   *Id.* ¶ 9.

[31]   *Id.* ¶¶ 11-23.

14

summary judgment."[32]  In fact, however, this assertion takes significant liberties because Dr. Flyer in fact said no such thing.  Rather than offering expert opinion that supports Emigra's allegations, he expresses only the view that the allegations of the complaint, *if true,* would result in harm to competition and that defendants' evidence, in his view, is not a reliable basis for rejecting those allegations.[33]  So what Dr. Flyer in fact said – as opposed to the spin Emigra's memorandum places on it – proceeds from the assumption that defendants have the burden of negating plaintiff's allegations, an assumption that is incorrect for reasons shown below – and adds nothing of an evidentiary nature to plaintiff's opposition to the motion.

*Discussion*

Emigra maintains that summary judgment rarely, if ever, should be granted in an antitrust case before extensive discovery.  But "rarely" does not mean "never."  And, as discussed below, this case arises in a singular posture for several reasons that, both individually and collectively, counsel careful consideration of granting summary judgment in this case.

First, there is reason to suppose that the antitrust claims are insubstantial.  The Court assumes that Fragomen and Emigra have built networks of subcontractors in foreign nations and, in the case of Emigra, perhaps outside lawyers in the United States – through which both offer immigration services across broad geographical areas.  It assumes further that some corporate clients

---

[32]     Pl. Mem. 2.

[33]     Flyer Decl. ¶¶ 4, 10 ("insufficient evidence to . . . dismiss the allegations made by Emigra"), 17 (insufficient "evidence to refute Emigra's claim of a geographically dispersed relevant market served by 'single-source' providers"), 20 (defendants' measure of market share "unreliable"), 24.

15

use one or the other organization, rather than dealing directly with several individual service providers, for the convenience of "one-stop shopping." But thousands of American lawyers provide in-bound immigration services, and thousands of foreign nationals doubtless provide immigration services for those seeking to enter their countries. The likelihood that any one provider or provider network has or threatens to have market power seems remote.

Second, the genesis and conduct of this lawsuit suggests that Emigra's purpose is at least as much to use the discovery process to get at Fragomen's competitively sensitive information for business reasons as to litigate the antitrust claims on their merits.

Third, a great deal of information that Emigra claims it needs to meet Fragomen's motion is in Emigra's hands. Emigra, after all, claims to be the only other single-source provider in the business. It therefore must know who the customers are. It must have copies of their requests for proposals or comparable evidence  It must know at least most of the instances in which it or Fragomen obtained the business. It must know the identities of any local service providers who have declined to serve it as a result of relationships with Fragomen. And it must have a host of other information pertinent to the present motion. Indeed, it must have each of the items on Mr. DuPuis's list of discovery that Emigra wants from Fragomen save that it presumably lacks details concerning Fragomen's profit margins and similar matters confidential to Fragomen. Yet it has come forward with none of that data on this motion.

As the Supreme Court said only recently in *Bell Atlantic*, "the costs of modern federal antitrust litigation and the increasing caseload of federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from

16

the events related in the complaint."[34]  And while *Bell Atlantic* was a pleading case, the concern it

expressed is at least as applicable here as on a motion to dismiss.  As the Second Circuit said in

*PepsiCo, Inc. v. Coca-Cola Co.,*[35] "[i]n the context of antitrust cases, . . . summary judgment is

particularly favored because of the concern that protracted litigation will chill pro-competitive market

forces. "[36]

I.      *The Law Governing Summary Judgment*

    A.      *General Principles*

        Plaintiff's brief begins with the proposition that "[t]he movant has the burden of

adducing proof sufficient to show its entitlement to judgment as a matter of law, even assuming all

factual disputes and inferences in favor of the party opposing the motion."[37]  That assertion, which

underlies plaintiff's entire position, is wrong in one critical respect.  The movant does not have the

---

[34]

    *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1967 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir. 1984) (internal quotation marks omitted).

[35]

    315 F.3d 101 (2d Cir. 2002).

[36]

    *Id.* at 104.  *Accord, Tops Markets, Inc.,* 142 F.3d at 95.

    *Celotex, PepsiCo,* and *Tops Markets,* among other cases, effectively have overruled a large number of earlier cases that indicated that summary judgment was disfavored, especially in antitrust cases.  *See, e.g.*, *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473(1962) ("Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 555 (2d Cir. 1977) ("[b]ecause antitrust actions so integrally involve motive and intent to conspire and injure, they have been said to be particularly inappropriate for summary judgment treatment.").

[37]

    Pl. Mem. 2-3.

17

burden of proving the negative of matters as to which the non-moving party would have the burden of proof at trial. Indeed, the Supreme Court rejected precisely the argument plaintiff makes here in *Celotex Corp. v. Catrett.*[38]

The basic principle, of course, is uncontroversial. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[39] Plaintiff's assertion, however, goes to a different question, viz. the allocation of the burdens of coming forward with evidence on a motion for summary judgment.

In *Celotex Corp.,* the D.C. Circuit had held, as plaintiff contends is the rule, that "the party opposing the motion . . . bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact."[40] The Supreme Court, however, reversed. It held that summary judgment must be entered against a non-moving party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[41] Indeed, it went on to say quite explicitly that the moving party's burden is only to "inform[] the district court of the basis for its motion" and that "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as

---

[38]
    477 U.S. 317 (1986).

[39]
    *E.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.,* 221 F.3d 293, 300 (2d Cir.2000); *see also* FED. R. CIV. P. 56(c).

[40]
    *Catrett v. Johns-Manville Sales Corp.,* 756 F.2d 181, 184 (D.C. Cir. 1985) (emphasis in original), *rev'd, Celotex Corp.,* 477 U.S. 317.

[41]
    *Celotex Corp.,* 477 U.S. at 322-23. *Accord, Virgin At. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir. 2001).

18

whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied."[42]

The fact that the non-movant has the burden of coming forward with admissible evidence sufficient to raise a genuine issue of fact on a matter as to which non-movant would have the burden of proof at trial, regardless of the existence or adequacy of evidence submitted by the movant, has important consequences for Emigra's reliance on Dr. Flyer's declaration.  It proceeds from the premise that the movant is obliged to put forward "a reliable evidentiary basis to dismiss Emigra's claims."[43]  In other words, he proceeds on the assumption that defendants are not entitled to summary judgment unless their evidence "contradicts Emigra's claims."[44]  But that premise is incorrect.  Once defendants put in issue Emigra's ability to get to the jury on essential elements of its claims, the burden fell on Emigra to produce admissible evidence to meet that burden.  In consequence, much of Dr. Flyer's declaration has little if any significance on this motion.

Emigra then makes the assertion that "a party must be afforded reasonable opportunity for discovery before judgment can be imposed."[45]  That proposition  is incorrect as well.

First, antitrust cases may be dismissed under Rule 12(b)(6) on the face of the complaint, without any opportunity for discovery.  In *Bell Atlantic,* for example, the Supreme Court held that a Sherman Act Section 1 complaint will be dismissed absent "allegations plausibly

---

[42]

 *Celotex Corp.*, 477 U.S. at 323.

[43]

 Flyer Decl. ¶¶ 4, 7, 10.

[44]

 *Id.* ¶ 7.

[45]

 Pl. Mem. 3.

suggesting (not merely consistent with) [the requisite] agreement" in restraint of trade.[46]  Nor is *Bell Atlantic* limited to allegations of conspiracy.[47]  Indeed, just a few months ago, our Circuit held that an antitrust complaint may be dismissed pursuant to Rule 12(b)(6) for failure to allege a relevant product market, most notably "[w]here the plaintiff fails to define its proposed relevant market with a reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor.'"[48]

Second, while it is true that summary judgment is not often granted prior to discovery, there is nothing in the Federal Rules of Civil Procedure precluding summary judgment -- in an appropriate case -- prior to discovery.[49]  To the contrary, Rule 56 makes clear that a defendant "may

---

[46]

    *Bell Atl.,* 127 S.Ct. at 1966; *see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007).

[47]

    *See Pac. Bell Tel. Co. v. LinkLine Communs., Inc.,* 129 S. Ct. 1109, 1132 (2009) (applying *Bell Atlantic* to Section 2 claim).  *See also Iqbal,* 490 F.3d at 157 ("We are reluctant to assume that all of the language of *Bell Atlantic* applies only to section 1 allegations based on competitors' parallel conduct.").

[48]

    *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997)); *accord, Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir. 2001).

[49]

    *See, e.g., South Austin Coalition Community Council v. SBC Comm's Inc.,* 274 F.3d 1168, 1171 (7th Cir. 2001) ("District courts may mitigate the expense of litigation by resolving motions for summary judgment early in the case--in advance of discovery, if appropriate."); *Alholm v. Am. Steamship Co.,* 144 F.3d 1172, 1177 (8th Cir. 1998) ("A defendant may move for summary judgment 'at any time,' and the rules do not require that discovery be completed before the motion is heard."); *Duffy v. Wolle,* 123 F.3d 1026, 1040 (8th Cir. 1997) ("Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not require trial courts to allow parties to conduct discovery before entering summary judgment.") (quoting *United States Through Small Bus. Ad. v. Light,* 766 F.2d 394, 397 (8th Cir. 1985) (internal quotation marks omitted)); *Chambers v. Am. Trans Air, Inc.,* 17 F.3d 998, 1002 (7th Cir. 1994) ("The 'fact that discovery is not complete--indeed, has not begun-- need not defeat the motion. A defendant may move for summary judgment at any time.'")

20

move *at any time*, with or without supporting affidavits, for summary judgment on all or part of the claim."[50]   District courts in our Circuit have recognized this, granting summary judgment prior to discovery in a few appropriate cases.[51]

To be sure, there are circumstances in which a non-moving party that has not completed discovery has a legitimate need for discovery to meet a motion for summary judgment. But Rule 56(f) is the mechanism for addressing that need.[52]   If the non-moving party makes a sufficient showing by affidavit, a motion for summary judgment will be denied or delayed to permit discovery that is reasonably expected to create a genuine issue of material fact.[53]

The structure of Rule 56 therefore is clear.   A defendant may move for summary

---

[50] (quoting *Am. Nurses' Ass'n v. Illinois,* 783 F.2d 716, 729 (7th Cir. 1986)); *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1285 (5th Cir. 1991) ("Rule 56 does not require that any discovery take place before summary judgment can be granted.").

[51] Fed. R. Civ. P. 56(b) (emphasis added).   *Accord, Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270, 274 (2d Cir. 1968)*; Aniero Concrete Co. v. New York City Constr. Auth.,* Nos. 94 Civ. 9111, 95 Civ. 3506, 1997 WL 3268, at *17 (S.D.N.Y. Jan. 3, 1997) ("Summary judgment may be sought at any time after a pleading is served."), *aff'd sub nom.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 556 (2d Cir. 2005).

[52] *E.g.*, *Gray v. Garlock Sealing Technologies, LLC*, No. 06-CV-6028 (CJS), 2006 WL 3680567, *8-10  (W.D.N.Y. Dec. 11, 2006); *Natsource LLC v. GFI Group, Inc.*, 332 F. Supp.2d 626, 637-38 (S.D.N.Y. 2004).

[53] *E.g.*, *Allstate Ins. Co.,* 901 F.2d at 1285 ("Rule 56 does not require that any discovery take place before summary judgment can be granted; if a party cannot adequately defend such a motion, Rule 56(f) is his remedy."); *Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.,* 853 F.2d 1557, 1561 (Fed. Cir. 1998) ("A litigant's right to discovery is fully protected by Fed.R.Civ.P. 56(f), which allows a court to refuse summary judgment if a litigant shows, 'by affidavit,' that additional discovery is necessary to uncover 'facts essential to justify his position.'"), *abrogated on other grounds, Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665 (Fed. Cir. 2008) .

*See infra,* page 22-23.

judgment of dismissal at any time.  In many cases, the need for discovery will be evident and a defendant will await the discovery process before doing so.  But where a defendant elects to seek summary judgment, even at an early stage, on the ground that the plaintiff cannot get to a jury on an essential element as to which the plaintiff would have the burden of proof at trial, the plaintiff should suffer dismissal unless it comes forward with either (1) admissible evidence sufficient to raise a genuine issue of fact for trial, or (2) a Rule 56(f) affidavit sufficient to warrant denial or deferral of the motion pending necessary discovery.

\*   \*   \*

In sum, then, an antitrust case in which proof of a relevant market is an element of the plaintiff's claim will be dismissed under *Bell Atlantic* and *Chapman* unless the complaint alleges facts that properly define the proposed relevant market by "reference to the rule of reasonable interchangeability and cross-elasticity of demand."  By parity of reasoning, the same is true of a complaint that alleges market or monopoly power in conclusory terms unless the complaint alleges facts that properly give rise to an inference that such power exists.  Even if such a complaint is not attacked on its face, a plaintiff whose proposed relevant market or allegation of market power is challenged by a motion for summary judgment must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial as to the market definition or the existence of market power, as the case may be, or a sufficient Rule 56(f) affidavit demonstrating, among other things, the need for specific discovery to raise such an issue.

B.      *S.D.N.Y. CIV. R. 56.1*

There is another factor relevant to the proper disposition of this motion.  It is well to state it specifically.

Local Civil Rule 56.1 of this Court, which is substantially similar to antecedents that have been in effect for many years, provides in relevant part as follows:

> "(a)      Upon any motion for summary judgment . . . , there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement may constitute grounds for denial of the motion.

> "(b)      The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

> "(c)      All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

> "(d)      Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."

The purpose of the rule "is to assist the Court in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute."[54]

In order for a Rule 56.1 statement in opposition to a motion for summary judgment to serve this purpose, it must respond appropriately to the movant's statement.  Thus, "[a] proper Rule 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to

---

[54]      *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 317 (S.D.N.Y. 2003) (citing *Rodriguez v. Schneider,* No. 95 Civ. 4083 (RPP), 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999).  *Accord, e.g., Goldstick v. The Hartford, Inc.,* No. 00 Civ. 8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002); *Fernandez v. DeLeno,* 71 F. Supp.2d 224, 227-28 (S.D.N.Y. 1999).

the movant's 56.1 statement, much like an answer to a complaint."[55] It must cite admissible evidence in support of the non-movant's contention that there is admissible evidence creating a genuine issue for trial[56] or, where the non-movant contends that further discovery is required to enable it to raise a genuine issue with admissible evidence, must be accompanied by a Rule 56(f) affidavit that demonstrates such a need with respect to each relevant averment in the movant's Rule 56.1 Statement.

In this case, both sides have submitted Rule 56.1 Statements.  Emigra's responses to defendants' averments, however, frequently do not simply admit or deny defendants' averments. Many fall instead into two categories that bear preliminary consideration.

First, Emigra in many instances neither admits nor denies defendants' averment.  It responds instead by saying that Emigra does not dispute a proposition that is not fully responsive to the averment in question.[57]  To the extent that the defendants' averments go beyond these partially responsive answers and are supported by evidence, defendants' averments are deemed admitted in light of Emigra's failure explicitly to deny them and to adduce admissible evidence in support of the contrary proposition.[58]

Second, Emigra in many cases has responded that it is without sufficient knowledge to admit or deny defendants' averment because it has not had discovery.  Of course, its failure to admit or deny a particular averment – to the extent its Rule 56(f) affidavit sufficiently shows a

---

[55]    *Archie Comics,* 258 F. Supp. 2d 317-18.

[56]    *Id.*

[57]    *See, e.g.*, Pl. Rule 56.1 St. ¶¶ 20, 26, 27, 31.

[58]    Pl. Rule 56.1 St.  ¶¶ 3, 5,11, 36.

24

justified failure to come forward with admissible evidence on the point in question – cannot result in its being deemed to have admitted the averment.  In those instances, however, in which the Rule 56(f) affidavit makes no such showing, the failure to admit or deny is not justified by a general claim that Emigra has not had discovery.  To that extent, it is deemed to have admitted the averments in question.[59]

## II.    The Section 1 Claims

### A.    Intra-enterprise Conspiracy

Count IV alleges a conspiracy in restraint of trade among "[t]wo or more of the Defendants, not having complete common ownership."  Defendants seek summary judgment on the ground that the Fragomen Organization is incapable, under the intra-enterprise conspiracy doctrine, of conspiring with itself.  They principally rely on *Copperweld Corp. v. Independence Tube Corp.*[60] and its progeny.[61]

Emigra's memorandum in opposition to the motion did not contest the propriety of dismissal of Count IV.  At oral argument, it explicitly conceded the point.[62]  Nevertheless, in a letter submitted following oral argument, plaintiff's counsel sought to "clarify" that concession by

---

[59]

    Pl. 56.1 St. ¶¶ 6-7, 12-19, 25, 37, 57-60, 62, 64, 66-68,70.

[60]

    467 U.S. 752 (1984).

[61]

    Def. Mem. 29-30.

[62]

    Tr., Nov. 19, 2008, at 13:11-17 ("THE COURT: Your Count Four alleges a Section 1 claim, based on the allegation that two or more of the defendants entered into a contract[,] combination or agreement to damage your client.  Now, that alleged conspiracy is said to be only among defendants.  And do you agree that that count has to be dismissed on its face under Copperweld?  MR. PINNISI: Yes.")

25

contending that (1) defendants' allegations of common ownership among the constituents of the Fragomen Organization have not been tested by discovery and (2) Count IV in any event states a sufficient claim on the theory that it alleges a conspiracy between Mr. Freel and the Fragomen Organization during the period prior to the commencement of Mr. Freel's employment at Fragomen. These belated contentions are without merit.

First, Emigra's Rule 56(f) submission, whatever its other merits, is of no avail with respect to the defendants' claim of common ownership. This is a matter on which the Fragomen Organization plainly is competent to testify. Emigra has not shown that discovery is "reasonably expected to create a genuine issue of material fact" on this point. It therefore has failed to satisfy at least one element of the standard articulated in *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*,[63] *Gurary v. Winehouse*[64] and other cases.[65]

Second, the contention that Count IV alleges an actionable horizontal conspiracy between Mr. Freel and the Fragomen Organization was not advanced by Emigra in its memorandum

---

[63]

    249 F.3d 136, 146 n.3, (2d Cir. 2001).

[64]

    190 F. 3d 37, 44 (2d Cir. 1999) (Rule 56(f) affidavit must show "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) *how those facts are reasonably expected to create a genuine issue of material fact*, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts) (emphasis added)).

[65]

    Any suggestion that Emigra is entitled to discovery for the purpose of attempting to challenge the credibility of defendants' statements concerning the legal structure of their intra-enterprise relationship would be without merit because there is no basis here for suggesting any substantial question as to their veracity on this point. *See, e.g., Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983); *Desia v. GE Life & Annuity Assur. Co.*, No. 3:05 CV 1395 (MRK), 2008 WL 4724080, at *10 (D. Conn. Oct. 24, 2008); *Wantanabe v. City of New York*, 315 F.Supp.2d 375, 393 n.110 (S.D.N.Y. 2003) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2726, at 445-47 (1998)), *aff'd*, 159 Fed. Appx. 235 (2d Cir. 2005).

in opposition to this motion.[66]  Just as a moving party will not be heard to advance a new argument for the first time in its reply brief,[67] a non-moving party should not be heard to advance a new argument in opposition to a motion after the close of briefing and oral argument.  In any case, the Court sees no reason to relieve Emigra of the consequences of its express concession that Count IV fails in light of *Copperweld* and its progeny.

Accordingly, defendants are entitled to summary judgment dismissing Count IV.

### B.    *Vertical Restraint*

Count V asserts that the Fragomen Organization violated Section 1 of the Sherman Act by entering into an unspecified vertical arrangement with Emigra's former vendor in Japan, whom the parties agree is a firm called ILS Shimoda ("Shimoda").[68]

To establish an unlawful vertical agreement, a plaintiff must show "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) [that] such combination or conduct constituted an unreasonable restraint of trade either *per se* or

---

[66]

Nor does the amended complaint properly allege such a conspiracy.  Count II, the conspiracy to monopolize claim, specifically alleges that Mr. Freel and the Fragomen Organization conspired to monopolize the Service Market and the Service Submarket.  Am Cpt ¶ 117.  But Count IV, in contrast, alleges only that "[t]wo or more of the Defendants, not having complete common ownership (upon information and belief)" entered into a horizontal agreement in restraint of trade and makes no reference to Mr. Freel.  *Id.* ¶ 138.

[67]

*See, e.g.*, *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999); *Playboy Enters. v. Dumas*, 960 F. Supp. 710, 720 (S.D.N.Y. 1997).

[68]

Pl. 56.1 St. ¶ 55.

under the rule of reason."[69]  Non-price vertical restraints are subject to rule of reason analysis.[70]

Here, Emigra claims that there is some unspecified but nonetheless anticompetitive arrangement between the Fragomen Organization and Shimoda.  But it has offered no evidence to support that claim.  Defendants, moreover, although it was not their burden to do so, have come forward with competent evidence that FGIS's relationship with Shimoda is non-exclusive and that Shimoda is only one of three local providers with which FGIS does business.[71]  They have shown also that Shimoda in fact provides services to other customers, including at least one other U.S. immigration law firm.[72]  Finally, they have pointed to a significant number of other Japanese entities that are available to provide local immigration services to foreign firms such as Emigra.[73]  Thus, there is no reason to suppose that there is any anticompetitive arrangement between FGIS and Shimoda, much less an arrangement that violates the rule of reason.

Emigra's response is deficient.  It has offered no evidence of the substance of (1) the Fragomen Organization's relationship with Shimoda, let alone that it is an exclusive relationship, (2) that Shimoda does not provide services to others, including at least one competing U.S. law firm, or (3) that there are not many other Japanese firms available to provide the local immigration services in question.  Its conclusory contention that defendants have not shown that the many other Japanese

---

[69]

*Tops Markets,* 142 F.3d at 95-96.

[70]

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir. 1995).

[71]

Kaplan Decl. ¶¶ 18-20.; Def. 56.1 St. ¶¶ 57-59.

[72]

Buffenstein Decl. ¶ 50; Def. 56.1 St. ¶ 60.

[73]

Buffenstein Decl. ¶ 51; Def. 56.1 St. ¶ 61.

28

providers that they have identified "could undertake the same services and pricing and relationship that Emigra obtained from [] Shimoda"[74] misses the mark because, as we have seen, that was not defendants' burden. Rather, as plaintiff would bear the burden at trial of proving that any arrangement between FGIS and Shimoda is an unreasonable restraint of trade, it is plaintiff's burden to come forward with admissible evidence that the Fragomen Organization has foreclosed Shimoda as a provider to Emigra and that there are not sufficient alternatives to Shimoda for foreign firms seeking local immigration services in Japan. They have not done so. In any case, even if the burden were on defendants on this point, their evidence, which Emigra has not undermined in this respect, would have satisfied that burden. Emigra therefore has not raised a genuine issue of material fact as to whether the Fragomen Organization's relationship with Shimoda, whatever it may be, unreasonably restrains trade in immigration services in Japan. *A fortiori* it has not done so with respect to either of the alleged markets at issue in this case. Accordingly, defendants are entitled to summary judgment dismissing Count V unless Emigra has shown an adequate basis for discovery on this point under Rule 56(f), a matter discussed below.

III.    *Monopolization and Attempted Monopolization -- Relevant Markets*

"Proof of the relevant product market is a necessary element of a cause of action for monopolization or attempted monopolization."[75] Similarly, sufficient proof of a relevant market and

---

[74]

Pl. 56.1 St. ¶ 61.

[75]

*Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co., Inc.,* 614 F.2d 832, 840 (2d Cir. 1980) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1030 (2d Cir. 1976), *cert. denied,* 429 U.S. 1097 (1977)). *Accord, Reisner v. General Motors Corp.,* 671 F.2d 91, 98 (2d Cir. 1982), *cert. denied,* 459 U.S. 858 (1982).

29

of a risk of its monopolization is pertinent to permit an inference of the specific intent to monopolize that is essential to a conspiracy to monopolize claim.[76]

In this case, the amended complaint alleges the existence of (1) a Service Market, consisting of "immigration services provided to corporations who are employers of U.S. citizens and/or foreign nationals,"[77] and (2) a Service Submarket, consisting of "business-related immigration services provided by single-source providers to larger multinational corporations who are major employers of U.S. citizens and foreign nationals."[78] A heading in defendants' memorandum contends that Emigra has not properly defined the relevant market.[79] In fact, however, the memorandum argues only that alleged Service Submarket is not a relevant market for antitrust purposes. Accordingly, the Court assumes for purposes of this motion that the so-called Service Market is a relevant market. It therefore passes to defendants' contention that the alleged Service Submarket is not.

The definition of a relevant market in a Section 2 case serves to identify the area of effective competition in order determine whether a defendant has or threatens to obtain monopoly power.[80] As the Supreme Court said in a classic definition, a product "market is composed of

---

[76]

*See Hudson Valley Asbestos Corp.,* 510 F.2d at 1144.

[77]

Am Cpt ¶ 10.

[78]

*Id.* ¶ 11.

[79]

Def. Mem. 17.

[80]

Defining the relevant market serves essentially the same purpose in cases brought under **§ 7 of the Clayton Act.** *See, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962) ("[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act . . . because the threatened monopoly must be one which will

30

products that have reasonable interchangeability."[81]  Its "outer boundaries. . .are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[82]

The same fundamental principle is recognized in the Justice Department – Federal Trade Commission Horizontal Merger Guidelines[83] (the "Guidelines"), another tool used to define a relevant market.[84]  The Guidelines recognize "buyer substitution as the underlying principle for defining relevant markets."[85]  Accordingly, the Guidelines delineate a relevant market as:

> "a product or group of products such that a hypothetical profit-maximizing firm that was the only present and future seller of those products ('monopolist') likely would impose at least a 'small but significant and nontransitory' increase in price.  That is, assuming that buyers likely would respond to an increase in price for a tentatively identified product group only by shifting to other products, what would happen? If the alternatives were, in the aggregate, sufficiently attractive at their existing terms of sale, an attempt to raise prices would result in a reduction of sales large enough that the price increase would not prove profitable, and the tentatively identified product

---

substantially lessen competition within the area of effective competition.  Substantiality can be determined only in terms of the market affected. The area of effective competition must be determined by reference to a product market and a geographic market").

81    *E.I. du Pont de Nemours & Co.,* 351 U.S. at 404.

82    *Brown Shoe,* 370 U.S. at 325 (footnote omitted).

83    *See* United States Dep't. of Justice & Federal Trade Comm'n, HORIZONTAL MERGER GUIDELINES, 57 Fed. Reg. 41,552 (Sept. 10, 1992) (hereinafter "MERGER GUIDELINES").

84    *See, e.g., United States v. Visa U.S.A., Inc.,* 163 F. Supp.2d 322, 336 (S.D.N.Y. 2001) (applying Merger Guidelines to find that a five percent price increase by a hypothetical monopolist of "general purpose" credit cards would be profitable and that such cards therefore constitute a relevant product market), *aff'd,* 344 F.3d 229 (2d Cir. 2003).

85    1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS: SIXTH 593 (6th ed. 2007) ("ANTITRUST LAW DEVELOPMENTS").

group would prove to be too narrow."[86]

Thus, a market is properly defined under the Guidelines "when a hypothetical profit-maximizing firm selling all of the product in that market could charge significantly more than a competitive price, *i.e.,* without losing so many sales to other products that its price became unprofitable."[87]

Direct evidence of cross-elasticity of demand is rare.[88]  In consequence, courts often look to a number of "criteria designed to focus, directly or indirectly, on cross-elasticity."[89]  And the problem is more complex in this case because Emigra alleges a submarket consisting of a cluster of different services, few if any of which are interchangeable.  As the propriety of this aggregation is a logical antecedent of any discussion of the sufficiency of its evidence of market definition, the Court begins with that question.

### A.    Cluster Markets

The Supreme Court's statement that the outer boundaries of a product market are fixed by interchangeability of use or cross-elasticity of demand implied that a market invariably consists of a single product or service.  But that conclusion has proved unwarranted.

In a long line of cases dating back to 1960's and 1970's challenges to bank mergers,

---

[86]

MERGER GUIDELINES at §1.11.

[87]

*Visa U.S.A., Inc.*, 163 F. Supp. 2d at 335-336.

The Guidelines state that a "small but significant and non-transitory" price increase generally is assumed to be five percent.  MERGER GUIDELINES at §1.11.

[88]

*See* ANTITRUST LAW DEVELOPMENTS at 566.

[89]

*Id.*

courts in appropriate cases have defined relevant markets of clusters of non-interchangeable goods and services.   Accordingly, it is necessary first to explore the boundaries of this cluster market concept beginning analysis of the alleged Service Submarket.

Certainly it is possible to describe any number of related and even unrelated products or services as a single line of business provided only that one adopts a sufficiently high level of generality.  The term "transportation vehicles" for example, reasonably might include such diverse products as planes, automobiles, golf carts, locomotives, horse-drawn carts, submarines, and other conveyances.   But the fact that our language permits such generalization does not justify the uncritical aggregation of distinct products and services into relevant markets for antitrust purposes. Someone interested in an automobile to run local errands and drive four miles to work will not buy an airplane instead, no matter how high the price of automobiles.   So any definition of a cluster market must be responsive to the purpose of the market definition process – identification of an area of competition in which variations in price will affect the demand for alternative products.[90]   As one commentator recently put it:

> "The cluster market approach is inappropriate for market definition because clusters include products and services that are not demand substitutes (or supply substitutes). It can be defended as a matter of analytical convenience: there is no need to define separate markets for a large number of individual hospital services, for example, when market shares and entry conditions are similar for each, or when data limitations will effectively require that the same proxy (such as the number of hospital beds) be employed to estimate the market share for each individual service. Or it could be understood as a way of looking to what the allegedly harmed buyers purchase as a basis for specifying the products and locations in the narrowly defined candidate market with which the market definition algorithm begins.  *But cluster markets may mislead as to competitive effects when competition from sellers of a partial line of products or services constrains the pricing of the full-line sellers*

---

[90]   *See, e.g., Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.,* 275 F.3d 762, 767 (9th Cir. 2001).

*offering the cluster.*

"A similar type of market definition problem could arise when sellers produce both bundled and unbundled products, for example, if software firms sell suites of products (such as an office productivity suite that includes a word processor, spreadsheet, and presentation program) and also sell the individual component programs on a standalone basis. Suppose suites sell for less than the sum of the prices of the components. If two suite suppliers merge, should the product market for analyzing it be limited to suites?

"The answer to this question, as always with market definition issues, turns on the economic force of buyer substitution. If at current prices, one group of buyers (e.g., corporate) purchases office software only as a bundle, and would not consider components, while other buyers (mass market) seek selected software products, the merger might reasonably be analyzed in both a suite market and in markets for the individual components. *But if enough suite buyers would respond to a higher suite price by purchasing instead some components individually, thereby making it unprofitable for a hypothetical suite monopolist to raise price, then the competitive effect of the merger would not be captured by defining a suite market and the transaction should be analyzed in individual component markets only. Here a competitive effects analysis limited to a suites market could mislead by ignoring the competitive constraint imposed by sellers of individual components, particularly if some sellers offer only some components and not suites.*"[91]

Thus, buyer substitution is a fundamental consideration in evaluating a proposed cluster market. If the nature of competition is such that a full line seller would not be constrained in raising prices by competition from partial line or single product sellers, then a cluster market could be appropriate. If, however, buyers could and would respond to a price increase by a full line seller by shifting all or part of their business to partial line or single product sellers, or by making or providing the product or service themselves, then a cluster market would not be appropriate.[92]

---

[91]

Jonathan B. Baker, *Market Definition: An Analytical Overview,* 74 ANTITRUST L. J. 129, 157-59 (2007) (emphasis added).

[92]

*See* IIB PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW  ¶¶ 560 ("A product grouping constitutes a market if a hypothetical defendant controlling its output could maximize profits by charging significantly more than the competitive price for a significant

34

This is the approach taken by the Ninth Circuit in *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*[93]  The plaintiff there argued for markets consisting of (a) original equipment major brand vintage tires, and (b) a range of different sizes of vintage tires.  The Court of Appeals held that there was an issue of fact as to the existence of the alleged original equipment vintage tire market in light of evidence that a significant fraction of the purchasers of tires for vintage vehicles "insists on replacement tires which are duplicative of the tires that were originally on their particular vehicle[s]" and "is generally not concerned with price."[94]  On the other hand, it upheld summary judgment dismissing the plaintiff's claim with respect to the proposed cluster market of a range of different sizes of vintage tires because there was no evidence that "the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately."[95]

In this case, Emigra aspires to provide one-stop shopping for large corporations for immigration services all over the world.  It attempts to define a relevant market in identical terms.  But the fact that Emigra seeks to provide a broad array of immigration services does not mean that the market necessarily or even probably is limited to similar providers.  The fundamental question

---

period."), ¶ 530a ("[A] market is the arena within which significant substitution in consumption or production occurs.") (2007) (hereinafter "AREEDA & HOVENKAMP").

[93]

275 F.3d 762.

[94]

*Id.* at 767-68.

[95]

*Id.* at 768 (quoting *J.B.L. Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 698 F.2d 1011, 1016-17 (9th Cir.), *cert. denied,* 464 U.S. 829 (1983) (internal quotation marks omitted)). *See also Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1204-05 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998); *Westman Commission Co. v. Hobart International, Inc.,*796 F.2d 1219, 1220-21 (10th Cir. 1986).

35

is whether Emigra has offered any admissible evidence that demand by large corporations for immigration services provided by firms that offer one-stop shopping for services all over the world is sufficiently inelastic to make that a distinct market.  In other words, assuming for the sake of argument that there are some buyers of immigration services that buy all or most of their global needs from full line providers like Emigra, would those buyers continue to do so in the face of price increases by such providers – or would they instead shift their purchases to the broad array of providers of particular kinds of services or of services in particular countries and areas?

Emigra has offered no proof that defendants could charge significantly more than a competitive price for any or all of its immigrations services without losing too many sales to other service providers to make its price unprofitable.  For that matter, it has offered no evidence that Emigra itself charges more for immigration services than providers who do not offer one-stop shopping.  Indeed, as discussed in more detail below, Emigra has produced no evidence whatsoever regarding pricing.  Nor has Emigra made any showing regarding the cost of switching services from a single-source to individual providers or any other measure typically used to define a market under Guidelines.[96]  Hence, while some customers might prefer a single source provider, Emigra has failed to adduce proof that such customers would not surrender that preference rather than pay a significantly higher price.  The existence of one-stop shopping, and a group of customers with a preference or even demand for it, is insufficient to define a relevant market.

---

[96]
See MERGER GUIDELINES at § 1.1.  The Guidelines use the following factors: (1) evidence that buyers have shifted or have considered shifting purchases between products in response to relative changes in price or other competitive variables;(2) evidence that sellers base business decisions on the prospect of buyer substitution between products in response to relative changes in price or other competitive variables; (3) the influence of downstream competition faced by buyers in their output markets; and (4) the timing and costs of switching products.

B.      *The* Brown Shoe *Criteria*

Hard data concerning cross-elasticity is not the only means of proving a relevant market.  In *Brown Shoe Co. v. United States,*[97] the Supreme Court famously observed that, within the broad market determined by interchangeability of use and cross-elasticity of demand:

> "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.  [citation omitted]  The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[98]

As a preliminary matter, it is relevant to note that the Supreme Court's use of the submarket terminology does not make its criteria irrelevant here.  In the years since *Brown Shoe*, the Department of Justice, the Federal Trade Commission, and many courts have come to recognize that the distinction between markets and submarkets is confusing and unhelpful because it obscures the real inquiry.[99]  Indeed, the Second Circuit has observed that "[t]he term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market."[100]  Hence, the *Brown Shoe*

---

[97]

370 U.S. 294.

[98]

*Id.* at 325.

[99]

*See, e.g., Allen-Myland v. IBM Corp.*, 33 F.3d 194, 208 n. 16 (3rd Cir. 1994), *cert denied*, 513 U.S. 1066 (1994); *FTC v. Staples*, 970 F. Supp. 1066, 1080 n. 11 (D.D.C. 1997).

[100]

*Geneva Pharmaceuticals Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 496 (2d Cir. 2004). *See also, e.g., United States Anchor Mfg. Co. v. Rule Indus.,* 7 F.3d 986, 995 (11th Cir. 1993) ("As the Supreme Court's language [in *Brown Shoe*] itself suggests, defining a 'submarket' is the equivalent of defining a relevant product market for antitrust purposes."), *cert. denied*, 512 U.S. 1221 (1994); *AD/SAT v. Assoc. Press,* 920 F. Supp. 1287, 1296 n.6 (S.D.N.Y. 1996) ("The required analysis does not change whether a particular product

37

factors are pertinent to the definition of relevant markets in antitrust cases, regardless of whether they are termed markets or submarkets.  The Court therefore turns to the evidence pertaining to these considerations.

### 1.   Industry or Public Recognition

"[E]vidence of 'industry or public recognition of [a proposed market or] submarket as a separate economic unit'" is important in determining its relevance for antitrust purposes 'because we assume that economic actors usually have accurate perceptions of economic realities.'"[101]  In *Brown Shoe*, for example, the Supreme Court upheld the lower court's finding that men's, women's, and children's shoes were separate submarkets based in part on the public's clear recognition of these categories as individual submarkets.[102]

Emigra has adduced no evidence suggesting industry or public recognition of a distinct market consisting of large multinational corporations that insist upon or prefer providers offering one-stop shopping for immigration services.  The only arrow in its quiver is a press release

market is deemed a market or a submarket."), *aff'd,* 181 F.3d 216 (2d Cir. 1999).

[101]   *FTC v. Whole Foods Market., Inc.*, 548 F.3d 1028, 1045 (D.C. Cir. 2008) (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986)).

[102]   *Brown Shoe*, 370 U.S. at 326.

*Whole Foods Market, Inc.* is instructive.  There, the D.C. Circuit focused on the "enormous amount" of evidence adduced by the Federal Trade Commission ("FTC") showing industry or public recognition of the natural and organic markets as a distinct economic entity.  The evidence included "dozens of record studies" – including some prepared by Whole Foods and Wild Oats, the companies proposing to merge – that distinguished between "conventional" grocery stores and "natural food" or "organic" stores.  The Court relied also on clear statements from the parties to the proposed merger indicating that "both believed that their companies occupied a market separate from the conventional grocery store industry."  *Id.* a 1045.

38

statement by Fragomen founder Austin Fragomen, Jr., in which Mr. Fragomen, in announcing the Fragomen Organization's acquisition of another immigration practice, said that the organization could provide "comprehensive world-wide immigration services to large clients with complex needs who benefit from the delivery of consolidated global immigration services across multiple regions."[103] The Fragomen statement suggests that the Fragomen Organization seeks to sell its services on the basis, perhaps among others, that its global capabilities offer a benefit to certain large clients, a proposition that some prospective clients may find convincing.  But it does not support the notion that there is industry or public recognition of a distinct market for a broad line of immigration services provided by single firms to large corporations.  It thus falls considerably short of raising a genuine issue of material fact with respect to this *Brown Shoe* criterion.

2.      *Special Characteristics and Uses*

Under *Brown Shoe* and its progeny, the special characteristics and uses of a product or service can serve as another indicium of the existence of a relevant market.  Indeed, the district court in *FTC v. Staples* credited the FTC's evidence of special characteristics of office superstores that distinguish them from other purveyors of office supplies, including the superstores' significant differences in appearance, physical size, format, the variety of products they offered, and the type of customers they targeted and served.[104]  The proof, which included the court's own visits to several superstores and other office supply sellers, led the court to conclude, "You certainly know an office

---

[103]

Flyer Decl. ¶ 8 n.6.

[104]

*Staples*, 970 F. Supp. at 1078.

superstore when you see one."[105]

Emigra's main evidence on this point is Mr. DuPuis's declaration regarding what Emigra calls its "Global Case Management," which includes "document gathering assistance, document conditioning, consular processing, and internet status monitoring."[106] According to Mr. DePuis, Emigra's "intention is to provide a complete immigration services solution . . . with end-to-end case management, home country support, and host country services."[107] The shortcoming of this evidence, however, is that it does no more than restate as a proposed market Emigra's own business plan without addressing the question whether that business plan reflects competitive realities in the marketplace. This is an important distinction.

By way of illustration, consider the automobile industry of years gone by. General Motors sold five different car lines, Ford three and Chrysler two, all attempting in varying degrees to offer brands that would appeal to different groups of consumers at different but overlapping price points. But to define the market, for antitrust purposes, as consisting only of multi-brand automobile manufacturers would have ignored the reality that single brand suppliers – think Toyota, Honda, Nissan, Volvo and others – could and did provide very meaningful competition. Similarly, Emigra's attempt to define the market by reference only to a description of the activities in which it and the Fragomen Organization engage ignores the pivotal question – whether the activities of providers who offer narrower ranges of services offer meaningful competition to the full line providers.

---

[105]

      *Id.* at 1079, (citing to *Bon-Ton Stores, Inc. v. May Department Stores*, `881 F. Supp. 860, 870 (W.D. N.Y. 1994) ("Customers know a department store when they see it.").

[106]

      DePuis Decl. ¶ 21.

[107]

      *Id.*

Emigra attempts to deal with this problem by asserting that "local and regional providers cannot meet the service needs of major international customers due to their limitations of range and reach and capacity."[108]  But there is no admissible evidence to support that contention.  To be sure, Mr. DePuis states his *belief* "that small departments of large global firms can [not] compete effectively for such work, as they have not developed global networks or combinations of local expertise necessary to provide geographically diverse services."[109]  He maintains also that smaller providers of immigration services, including those identified by defendants as existing within accounting firms, relocation firms, and law firms, cannot compete in the single source market because they lack "global reach in the provision of single-source immigration services."[110]  And he would conclude, therefore, that the potential competitors identified by Fragomen "simply are not competition for single-source work provided by Fragomen and Emigra."[111]  But these statements of belief and conclusory statements are not supported by admissible evidence.

### 3.    *Distinct Customers*

Emigra asserts that its "prime customers" – in other words, some unspecified subset of its entire customer base –  "have needs for placement throughout the world, in sufficient volume that internal management or even monitoring is impractical for the customer" and that "such

---

[108]

    *Id.* ¶ 36.

[109]

    *Id.* at ¶ 37.

[110]

    *Id.* at ¶ 38.

[111]

    *Id.* at ¶ 398.

customers want a single-source option, which currently is provided primarily, if not solely, by Emigra and Fragomen."[112]   This statement thus has three elements – claims that (1) *some* of Emigra's customers have needs "throughout the world," and (2) those customers (a) have such needs in sufficient volume that internal management and monitoring, presumably of multiple outside providers, is impractical, and (b) therefore "want a single-source option."  As each of these elements is essential to Emigra's argument, it is important to look at each.

Mr. DuPuis, giving him the benefit of the doubt to which a non-movant is entitled, presumably is in a position to know that some of his customers have global needs for the simple reason that Emigra fills at least some of them, so the Court assumes the accuracy of that statement. But the assertion that it is impractical for those customers to satisfy their needs either internally, or by hiring, managing and monitoring multiple outside providers, is an *ipse dixit*, unsupported by any competent evidence.  And the claim that such customers – that is to say, some undefined portion of Emigra's business – "want a single-source provider" – is a matter as to which Mr. DuPuis lacks personal knowledge and thus is not competent to testify.  Conspicuously absent, it bears noting, is even a single affidavit from a single Emigra customer supporting this assertion.

### 4.   Distinct Prices

Emigra likewise has provided no evidence whatsoever regarding prices for immigration services generally or in its alleged Service Submarket in particular.  There is, then, no basis for concluding that there is any price differential between the single-source providers and those

---

[112]       DePuis Decl. ¶ 35.

who offer narrower lines of services.  This cuts against Emigra's position.[113]

>    5.    *Sensitivity to Price Changes*

Courts consistently find sensitivity to price changes to be a critical factor in evaluating an alleged market.[114]  In *FTC v. Staples,* for example, the FTC successfully established a narrow submarket for office superstores (as opposed to sellers of office supplies generally) based largely on a "compelling showing that a small but significant increase in Staples' prices will not cause a significant number of consumers to turn to non-superstore alternatives for purchasing their consumable office supplies."[115]  In other words, the pricing evidence led the court to conclude that "office superstore prices are affected primarily by other office superstores and not by non-superstore competitors."[116]

Emigra has provided no evidence regarding sensitivity to price changes in its alleged Services Submarket.  Indeed, Emigra's position resembles that of the plaintiff in *Thurman Industries, Inc. v. Pay 'N Pak Stores Inc.*[117]  The plaintiff there alleged a narrow cluster market of home center stores that offered one-stop shopping for home improvement tools in which only it and a handful of

---

[113]

>    *See, e.g., Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir. 1979) ("[o]ne of the most important indicia suggested in Brown Shoe is whether drive-thru photo processing is offered at prices distinct from other methods of photo processing"), *cert. denied*, 445 U.S. 917 (1980).

[114]

>    *See, e.g.*, *Staples*, 970 F. Supp. at 1078.

[115]

>    *Id.* at 1078.

[116]

>    *Id.* at 1077.

[117]

>    875 F.2d 1369 (9th Cir. 1989).

other stores competed.  It asserted that "the convenience of one-stop shopping and the presence of trained sales staffs at home centers appeal to consumers on a different level than the products individually."[118]   In upholding the district court's grant of summary judgment dismissing the complaint, the Ninth Circuit rejected the plaintiff's narrow market definition, focusing on the lack of evidence of price differentials between the "home center stores" that offered one-stop-shopping and other retailers that offered narrower ranges of  the same products.[119]   The court held that the factors identified by Thurman – that home centers are perceived as distinguishable from other stores by their variety of products and trained sales staff, and that customers engaged in home repairs/remodeling patronize home centers because of this distinction –

> "are wholly inadequate to allow a finding that specialty stores selling house paint are unable through price reductions or other marketing strategies to lure significant numbers of do-it-yourself builders into buying paint at a specialty store even if they purchase all their other supplies at a home center."[120]

Emigra suffers from a similar lack of evidence.


### 6.   *Specialized Vendors*

Emigra's central claim in this case is that itself and Fragomen are specialized vendors offering one-stop shopping for global immigration services to large corporations that seek such one-stop shopping.  The fact that such vendors exist lends some support to its position.  As will appear, however, it is not controlling.

---

118
       *Id*. at 1377.

119
       *Id*. at 1376.

120
       *Id*.

### C.       Conclusion - Market Definition

As noted above, in a case that requires proof of a relevant market, it is not enough to survive even a Rule 12(b)(6) motion to dismiss to make bald assertions as to its existence or definition.  Such a complaint must "define its proposed relevant market with a reference to the rule of reasonable interchangeability and cross-elasticity of demand, or allege[] a proposed relevant market that . . . encompass[es] all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor.'"[121]  Where a defendant puts the existence of a plaintiff's alleged market at issue on a motion for summary judgment, the plaintiff must come forward with admissible evidence that, construed in the plaintiff's favor, raises a genuine issue of material fact on the market definition issue or suffer an adverse judgment.  Indeed, our Circuit and other courts have approved summary judgment dismissing antitrust cases for failure to come forward with sufficient evidence to define and raise a genuine issue of fact material to the definition of a relevant market.[122]  Emigra has not satisfied that requirement by any applicable standard.

---

[121]

 *Chapman,* 546 F.3d at 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc.,* 124 F.3d at 436).

[122]

 *E.g., PepsiCo, Inc.,* 315 F.3d at 107 (summary judgment affirmed where there was "no discrete class of customers that has such a strong preference for [product] that it would not consider substitutes if other factors (especially price) changed"); *Golan v. Pingel Enter., Inc.,* 310 F.3d 1360, 1369 (Fed. Cir. 2002) (antitrust plaintiff "failed to provide sufficient evidence to establish a relevant market . . . only conclusory allegations); *Levine v. Cent. Florida Med. Affiliates,* 72 F.3d 1538, 1551-53 (11th Cir. 1996) (plaintiff's "narrow definition of the relevant product market does not satisfy his burden of presenting prima facie evidence of the relevant market"), *cert. denied* 519 U.S. 820 (1996); *Rebel Oil Co. v. Atl. Richfield Col,* 51 F.3d 1421, 1435 (9th Cir. 1995) (summary judgment appropriate if plaintiff's "evidence cannot sustain a jury verdict on the issue of market definition") *cert. denied*, 525 U.S. 1017 (1998); *Disenos Artisticos E Industriales, S.A. v. Work,* 714 F. Supp. 46, 48-49 (E.D.N.Y. 1989) (summary judgment granted where market definition was "unsupported by any probative or credible evidence"); *Jules Jurgensen/Rhapsody, Inc. v. Rolex Watch U.S.A., Inc.,* Civ. A. No. 85-5605, 1987 WL 9276, at *2 (E.D. Pa. Apr. 9,

Emigra has not defined with any specificity what particular services it contends make up its proposed Service Submarket.  Nor has it has offered any admissible evidence to support the view that full line sellers of whatever bundle of services it has in mind would be unconstrained in raising prices by competition from partial line or single product sellers.

Nor has Emigra raised a genuine issue of fact even under the more generous *Brown Shoe* criteria.  There is no admissible evidence of (1) industry or public recognition of a distinct market for providers of one-stop shopping for immigration services sought by large multinational corporations, (2) distinct pricing, or (3) sensitivity to price changes.  There is no evidence that the end result of the efforts of both providers of one-stop shopping and providers of more limited ranges of services is different in any way – a work or residence permit or entry visa procured by either necessarily is identical, affording the holder no greater or lesser privileges.  The most that can be said for Emigra's evidentiary showing is that there is some evidence that (1) both Emigra and the Fragomen Organization seek to offer a broad array of immigration services to big companies and that some big companies patronize them.  This perhaps gives rise to inferences that Emigra and the Fragomen Organization in a sense are specialized vendors and that there may be distinct customers, although the latter inference is questionable and in any case weak because there is no evidence that even the companies that patronize Emigra or defendants do so to the exclusion of other, narrower-gauged vendors.

In the last analysis, "the *Brown Shoe* indicia are not to be used in a 'talismanic fashion' whereby their presence or absence are regarded as mechanically dispositive of the issue"

1987)*; see also Belfiore v. New York Times Co.,* 826 F.2d 177, 180 (2d Cir. 1987), *cert. denied,* 484 U.S. 1067 (1988) (summary judgment affirmed and plaintiffs' narrowly defined market rejected on grounds that the definition was "implausible" and "an awkward attempt to conform their theory to the facts they allege").

of market definition.[123]  Rather, the object is to use them in a pragmatic fashion with a keen eye on

economic reality.[124]  So the ultimate question here is whether the mere existence of two full line

sellers of immigration services to large multinational corporations would permit a rational jury to

find that Emigra's Service Submarket is a relevant market, consistent with economic reality, for

antitrust purposes in the absence of any evidence of industry or public recognition of such a market,

of distinct pricing, of sensitivity to price changes, or of any of the other indicia of a relevant market.

To state the question is to answer it in the negative.  Emigra has offered insufficient evidence to

create a genuine issue of material fact as to the definition or existence of the proposed Service

Submarket.  The monopolization and attempted monopolization claims with respect to it therefore

must be dismissed.


*IV.     Monopolization and Attempted Monopolization – Monopoly Power*

            In view of the dismissal of the monopolization and attempted monopolization claims

as to the Service Submarket, it is unnecessary to consider whether Emigra has offered sufficient

evidence as to the existence or dangerous probability of monopoly power in that area of business.

As defendants have not challenged the existence of a Service Market, consisting of "immigration

services provided to corporations who are employers of U.S. citizens and/or foreign nationals,"

however, the Court must determine whether Emigra has raised a genuine issue of material fact as to

whether the Fragomen Organization has monopoly power, or a dangerous probability of acquiring

---

[123]

        *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979) (quoting *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Co.*, 518 F.2d 913, 932 (9th Cir. 1975)), *cert. denied* 447 U.S. 924 (1980).

[124]

        *Id.*

monopoly power, in that alleged market.

Monopoly power, also referred to as market power, is the power to control prices or exclude competition.[125]  It may be proven directly by evidence of control of prices or the exclusion of competition or, as is more common, may be inferred from one firm's large percentage share of the relevant market.[126]

Emigra has offered no evidence of control of prices or the exclusion of competition. The fact that the Fragomen Organization hired Mr. Freel from Emigra and through him allegedly gained access to Emigra commercially sensitive information falls far short of raising a genuine issue of fact as to the exclusion of competition both because (a) Emigra has not been excluded, and (b) a contrary conclusion would turn many disputes over the hiring by one competitor of an employee of another, the stuff of everyday commercial tort claims, into monopolization or attempted monopolization cases.  Nor do Emigra's allegations regarding Shimoda fill the gap, either standing alone or in combination with the Freel hiring.  Emigra has not even alleged, let alone provided evidence, of anything that the Fragomen Organization did in relation to Shimoda that disadvantaged Emigra.  And it has offered no admissible evidence that it lacks an abundance of alternatives in Japan to using Shimoda.

Emigra fares no better with respect to market share.  It has offered no evidence of the total sales of "immigration services provided [by all providers] to corporations who are employers of U.S. citizens and/or foreign nationals" or any basis for concluding that the share of those services

---

[125]

*E. I. Du Pont de Nemours & Co.*, 351 U.S. at 396.

[126]

*Tops Markets*, 142 F.3d at 92.

48

provided by the Fragomen Organization approaches the levels necessary to permit an inference of monopoly power or a dangerous probability thereof.  Indeed, it has not even tried.  Mr. Depuis' declaration focuses almost exclusively on attempting to create a material issue of fact regarding the alleged single source Submarket.[127]  The broader Service Market is barely mentioned.

Emigra's silence on the issue of monopoly power in the broader Service Market is particularly striking in the face of the Fragomen Organization's identification of a host of competitors and potential competitors in the provision of immigration services to large companies, including accounting firms, relocation service firms, immigration consulting firms, and in-house legal and human resource departments of large corporations.[128]  Although defendants discussed these other providers mainly in response to Emigra's alleged single source Service Submarket, the existence of these competitors and potential competitors certainly is relevant to question of Fragomen market power – or lack thereof –  in the overall Service Market for immigration services, which is not confined to single source providers.  And while Emigra challenges whether these firms can compete within the alleged single-source Service Submarket, it says nothing about their ability to compete in the broader market for immigration services.[129]

Emigra has failed also to confront Fragomen's assertions regarding the lack of significant entry barriers in the Service Market.[130]  Market power can persist only when entry

---

[127]

*See, e.g.*, Depuis Decl. ¶¶ 20-22, 35-41.

[128]

Buffenstein Decl. ¶¶ 22-29, 33-38, 39-41, 42-44, 45-48.

[129]

Pl. 56.1 St. ¶ 34.

[130]

*See* Kosiski Decl. ¶¶ 23-24; Buffenstein Decl. ¶¶ 30-31, 62; Kaplan Decl. ¶¶ 22-25.

49

barriers – market circumstances, governments, or the defendants – block rivals' entry or expansion.[131]  And the lack of significant entry barriers can defeat a monopolization claim, even in the fact of a defendant's high market share.[132]  Emigra's only arguments regarding entry barriers focus on alleged barriers to the Service Submarket – not to the broader Service Market.[133]

Emigra has offered no admissible evidence that the defendants enjoy power over prices, have excluded of competitors, or have the market share necessary to give rise to an inference of market power, actual or dangerously probable, in the alleged Service Market.  Even if it had done so, the abundant, unrebutted evidence of lack of barriers to entry and additional potential competition would require the conclusion that it had failed to raise a genuine issue of material fact as to this indispensable element of a monopolization or attempted monopolization claim.  Accordingly, the monopolization and attempted monopolization claims relating to the alleged Service Market will be dismissed unless Emigra's Rule 56(f) application is sufficient to warrant discovery prior to a final disposition of these claims.

V.      *The Conspiracy to Monopolize Claim*

Emigra alleges in conclusory terms that Mr. Freel and the Fragomen Organization

---

[131]

IIB AREEDA & HOVENKAMP ¶ 501 at 110.

[132]

*See, e.g.*, *Tops Markets.*, 142 F.3d at 99 (rejecting a claim of market power despite a market share of over 70 percent; "[w]e cannot be blinded by market share figures and ignore marketplace realities, such as the relative ease of competitive entry").

[133]

*See, e.g.*, Pl. 56.1 St. ¶¶ 32, 33.

50

conspired to monopolize the Service Market and Service Submarket.[134]  It goes on to claim that Mr.

Freel, while still employed by Emigra, negotiated for a new job with the Fragomen Organization and,

in the course of those negotiations, disclosed Emigra trade secrets and confidential information.[128]

This disclosure during the pre-employment stage is specifically said to have been in furtherance of

the alleged conspiracy to monopolize.[129]

Defendants seek summary judgment on this claim on the ground that Mr. Freel, under

*Copperweld,* was incapable as a matter of law of conspiring with his employer, the Fragomen

Organization.  To the extent the complaint purports to allege that the alleged conspiracy hatched

during the pre-employment negotiations continued once Mr. Freel became a Fragomen employee,

they are unmistakably correct for the reasons stated above.  But the complaint is not so limited, as

it implicitly contends that the conspiracy to monopolize began before Mr. Freel was hired by the

Fragomen Organization and that the pre-employment trade secret disclosures were acts in furtherance

of the conspiracy.  *Copperweld* does not dispose of that aspect of the conspiracy claim.  But that does

not mean that even this narrow aspect of Emigra's claim survives summary judgment.

The alleged conspiracy is one to monopolize the Service Market and Submarket.  The

Court already has held that the record does not raise a genuine issue of material fact as to (1) the

existence of the alleged Service Submarket, or (2) the existence, or dangerous probability of, market

power in the alleged Service Market.

---

[134]

Am Cpt ¶ 117.

[128]

*Id.* ¶¶ 49, *see* ¶¶ 113-23.

[129]

*Id.* ¶ 49.

51

A claim of conspiracy to monopolize requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize.[130]  And while rigorous proof of a relevant market and the likelihood of monopolization is not required in this Circuit on a conspiracy to monopolize claim, the relevant market and the likelihood of its monopolization may have a significant bearing on whether the requisite specific intent to monopolize is present.

Given the record before this Court, no reasonable jury could find that Mr. Freel's alleged disclosure of Emigra's confidential information during his pre-employment negotiations with the Fragomen Organization, assuming that occurred, was undertaken with the requisite specific intent to monopolize.  There quite plainly is no admissible evidence supporting the existence of the alleged Service Submarket, so the very notion of a conspiracy to monopolize it is an oxymoron – one cannot monopolize something that does not exist.  Likewise, the fact that there is no admissible evidence to suggest that the Fragomen Organization enjoys, or has any realistic hope of gaining, monopoly power in the far broader Service Market is fatal to the conspiracy to monopolize that alleged market for a similar reason.  It makes little sense to say that the Fragomen Organization pried Emigra's confidential information out of Mr. Freel before hiring him with the specific intent to monopolize the Service Market – as opposed to doing so, if it did, for the simple purpose of competing more effectively, if perhaps tortiously.

*VI.     The Rule 56(f) Application*

---

130

*Volvo North America Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 58-59 (2d Cir. 1988).

This brings us to Emigra's Rule 56(f) contentions.

As noted above, Rule 56(f) is the safety valve that, when satisfied, prevents the entry of summary judgment against a party where there is good reason to believe that evidence sufficient to defeat the motion for summary judgment exists, but the non-moving party legitimately needs discovery to get that evidence.  But Rule 56(f) requires far more than simply a claim that the non-moving party has not had or wants more discovery.  Our Circuit has made clear what is necessary to open the door in such circumstances:

> "Rule 56(f) provides:
>
> "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition [to a motion for summary judgment], the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.'
>
> "Thus, as we often have said, a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts. *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995) (quoting *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989)); *accord, Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985)."[131]

Thus, the Court must determine whether Emigra's declarations satisfy each of these criteria with respect to two questions:  (1) the existence and relevance of the alleged Service Submarket, and (2)

---

[131] *Concourse Rehab. & Nursing Ctr., Inc.,*249 F.3d at146 n.3 (quoting *Gurary,* 190 F.3d at 43-44 (2d Cir. 1999) (internal quotation marks omitted)).  *Accord, Boomer v. Goord,* 283 Fed. Appx. 855, 857 (2d Cir. 2008); *Haran v. Dow Jones, Inc.,* 216 F.3d 1072 (table), 2000 WL 777982, at *3 (2d Cir. 2000); *Feingold v. Hankin,* 91 Fed. Appx. 176, 178 (2d Cir. 2004).

whether the Fragomen Organization enjoys, or is dangerously likely to procure, market power in the Service Market.  Moreover, it is quite important to understand at the outset exactly why Emigra claims it needs discovery to resist this motion, apart from its incorrect assertion that summary judgment never is appropriate before at least some discovery.

Emigra relies on the declarations of Dr. Flyer and Mr. DuPuis.  The premise of Dr. Flyer's declaration is that it is defendants' burden to prove that Emigra's allegations.[132]  He claims that it is impossible to tell whether they have done so without discovery.[133]  This premise is the basis also of Mr. DuPuis's argument in support of discovery.[134]  And it is quite explicit in Emigra's memorandum in opposition to the motion for summary judgment, which asserts that "[d]efendants' papers are insufficient to permit adequate economic analysis of their contentions, much less to justify dismissal of Emigra's claims as a matter of law."[135]

As discussed above, this premise, which underlies Emigra's opposition to defendants' motion and its Rule 56(f) arguments, is incorrect.  Defendants were not obliged to come forward with any evidence on those matters.  As these were matters as to which plaintiff would have the burden of proof at trial, they were entitled to seek summary judgment merely by contending that plaintiff cannot prove its allegations.  By doing so, with or without supporting evidence, they shifted the

---

[132]

Flyer Decl. ¶¶ 4, 7, 10.

[133]

*E.g., id.* ¶¶ 10-24, especially paragraph 24, which concludes that "[t]he evidence put forth by Fragomen is insufficient to fully evaluate and much less to dismiss the allegations made by Emigra").

[134]

DuPuis Decl. ¶¶ 6-8 and *passim.*

[135]

Pl. Mem. 2.

54

burden to Emigra to come forward with admissible evidence in support of *Emigra's* allegations. In consequence, it does not matter whether discovery might yield a basis for questioning defendants' factual assertions concerning the definition of the relevant market(s) or the existence of market power. What matters is whether Emigra has satisfied Rule 56(f) with respect to its ability to support *its own allegations* with admissible evidence, not with respect to challenging defendants' contentions. With that in mind, the Court proceeds to whether there is anything in plaintiff's papers that satisfies Rule 56(f) and therefore warrants discovery before a definitive ruling on defendants' motion.

### A.    Section 1 Claims

The bases for the proposed dismissal of the Section 1 claims are that (1) *Copperweld* requires the rejection of the intra-enterprise conspiracy claim as a matter of law and (2) Emigra has offered no admissible evidence of any anticompetitive arrangement between FGIS and Shimoda, much less an arrangement that violates the rule of reason. Emigra has offered no reason to question defendants' assertions as to their corporate interrelationships and thus no basis for discovery as to whether *Copperweld* applies to require dismissal of the conspiracy claim.[136] And while it makes a *pro forma* assertion that it cannot admit defendants' averments with respect to the alleged arrangement with Shimoda absent discovery,[137] the contention is unpersuasive.

Emigra has an office and offers services in Japan. It formerly used Shimoda to assist it in providing those services. It therefore has knowledge of the Japanese marketplace, knowledge of which in any case is not peculiar to the defendants. There is no reason to suppose that it is unable

---

[136]    *See* supra note 65.

[137]    Pl. 56.1 St. ¶¶ 57-60.

55

to procure evidence concerning the availability in Japan of providers other than Shimoda or, indeed, that it made any effort to do so.  Nor has it demonstrated that discovery would be likely to demonstrate that there are not sufficient alternatives.

Accordingly, there is nothing in Emigra's papers that warrants discovery prior to dismissal of its Section 1 claims.

B.      The Service Submarket – Market Definition

On the present state of the record, Emigra has failed to raise a genuine issue of material fact as to the definition and existence of its alleged Service Submarket because it has failed to offer admissible evidence that (a) the customers of single-source providers buyers would not shift their business to others offering narrower lines in the face of price increases by such providers, or (b) a consideration of the *Brown Shoe* factors could justify a conclusion that the Service Submarket is a relevant market for antitrust purposes.

Most of the discovery proposed in Emigra's declarations would be directed at obtaining confidential Fragomen information such as customer lists, vendor relationships, revenues per customer, internal strategic documents, bid documents, and pricing.[138] None addresses the first of these questions.

Some of the proposed discovery might yield information relevant to some of the *Brown Shoe* criteria.  For example, it contends, quite reasonably, that defendants' internal strategic documents might identify the firms that defendants regard as their main competitors.[139] This in fact

---

[138]

*E.g.,* DuPuis Decl. ¶ 9; Flyer Decl. ¶ 11, 14, 18.

[139]

*Id.* ¶ 14.

56

would be pertinent to the existence, or lack thereof, of industry recognition of single-source providers as a market distinct from other providers.[140]   Similarly, internal Fragomen Organization documents might reveal information showing "that Fragoment's competitors for pertinent work are primarily single-source providers"[141] and that its major customers are large corporations that buy coordinated and geographically diverse services.[142]   Such evidence could support an argument that Emigra and the Fragomen Organization are, as plaintiff claims, specialized vendors of immigration services, which would be a consideration relevant under *Brown Shoe*.   Whether these and any other examples of discovery from defendants might yield evidence relevant to one or more of the *Brown Shoe* criteria, however, is not the only consideration in determining whether Emigra has satisfied Rule 56(f).

As an initial matter, one seeking Rule 56(f) discovery must demonstrate a reasonable expectation that the discovery sought would raise a genuine issue of material fact, in this case as to the existence of the Service Submarket alleged by Emigra.   Evidence that defendants regard single-source providers as their primary competition, for example, would not carry the day in the absence of proof that single-source providers have the ability to raise prices without losing sufficient business to others to make price increases unprofitable.   But the Court does not rely on this concern alone, as there is a more compelling basis for rejecting Emigra's position.

Emigra claims to be one of only two competitors in its alleged Service Submarket.

---

[140]

Indeed, the D.C. Circuit in *Whole Foods* cited emails from Whole Foods and Wild Oats officials as significant proof of industry recognition of a distinct organic food submarket. *Whole Foods Market, Inc.* 548 F.3d at 1045.

[141]

Flyer Decl. ¶¶ 11, 16-17.

[142]

*See id.* at 18.

It therefore necessarily knows with whom it competes, whether it is able to price materially higher than providers who offer only a narrower line of services, whether it and others in the industry recognize single-source providers as a distinct market, its own profit margins, the nature of its own customer base, the details of its own vendor relationships, the details of bidding on requests for proposals, and the like. In other words, it knows whatever is public information about those who buy and sell in this line of endeavor, and it knows about its own operations, everything that it seeks to learn about defendants' operations.[143] Every bit of that information, whether public or internal to Emigra, is just as relevant to determining whether the Service Submarket indeed is a relevant market for antitrust purposes as the same information that is in defendants' hands. Thus, by way of example, if it would be important to know from defendants' internal documents that the Fragomen Organization regards Emigra as its only or principal competitor, it would be equally important to know that Emigra's internal documents, created *ante litem modem,* show that Emigra regarded the Fragomen Organization is its only or principal competitor. Likewise, if it would be relevant to know that a high proportion of defendants' revenues come from large corporations who regularly use defendants in many countries rather than using many local providers, it would be equally relevant to know that this is true of Emigra's customers. Yet the singular fact about this motion is that Emigra has come forward with *none* of the information concerning its own operations that might be expected either to support or to undercut its allegations concerning the relevant market.

        This failure is telling. As the Court of Appeals has said, among the requirements of Rule 56(f) is a showing by affidavit not only that the information one seeks would be pertinent, but also of "what effort affiant has made to obtain [it], and . . . why the affiant was unsuccessful in those

---

[143]     *See* DuPuis Decl. ¶ 11.

efforts."[144]  Here, Emigra has offered no explanation for why its failure to come forward with the relevant information so obviously residing in its own files.  This not only casts doubt on its *bona fides* in seeking this information from defendants and suggests an inference (which, given that this is a motion for summary judgment, this Court does not draw) that Emigra's files would not help its position, but demonstrates that it has failed to satisfy the Rule 56(f) requirements because it has not shown a sufficient effort to offer the evidence that it does have.  Similarly, it has not claimed that it has sought any information whatever from buyers of immigration services – all of whom are in a position to say whether they regard single-source providers as a distinct market, whether those that use single-source providers would shift to other providers in the face of price increases by single-source providers, and to provide a host of other relevant data – let alone indicated that efforts to obtain information from buyers had been unsuccessful.

In short, what Emigra seeks to do here is akin to engaging in a game of stud poker in which it would require its adversary disclose its hole card before Emigra places its bet.  The problem with that gambit is the rules.  The rules – *Celotex* and its progeny – say that a motion for summary judgment places the burden of coming forward on the non-moving party on those issues as to which it would have the burden of proof at trial.  Emigra, for whatever reason, has elected to withhold the evidence in its possession concerning whether its alleged Service Submarket is a relevant market for antitrust purposes.  Having done so, it cannot insist on its competitor revealing its competitively sensitive information.  That would put Emigra in a "heads-I-win, tails-you-lose."  Rule 56(f) does not countenance such gamesmanship.

---

[144]       *See supra* note 131 and accompanying text.

C.      *The Service Market – Monopoly Power*

On the present state of the record, defendants appear to be entitled to summary judgment dismissing the monopolization and attempted monopolization claims on the ground that there is no evidence that they have, or are likely to attain, market or monopoly power.  The remaining question is whether Emigra has satisfied the requirements of Rule 56(f) in respect of proposed discovery addressed to that question.

Nothing in Emigra's proposed discovery is directed at obtaining evidence likely to raise a genuine issue of material fact as to whether defendants have the power to control prices or exclude competition.  That leaves the matter of market share.

Market share typically is the proportion of the total dollar sales in a particular market accounted for by one competitor.[145]  In other words, it is a fraction of which the numerator would be the sales of the competitor in question and the denominator would be the total of all sales by all competitors.

A very small aspect of the discovery proposed by Emigra might, and probably would, elicit the numerator of this fraction – defendants' revenues from the sale of immigration services.[146]  But the numerator alone would be meaningless without the denominator, and Emigra has not proposed any discovery of other industry participants, providers or customers, that would be

---

[145]

On occasion, it is determined by other measures such as production capacity, none of which is pertinent here.  *See generally* HERBERT HOVENKAMP, ECONOMICS AND FEDERAL ANTITRUST LAW § 6.10, at 182-83. (1985).

[146]

Emigra seeks a list of customers with total revenue by customer by year.  Flyer Decl. ¶ 18. This might prove to be the numerator of the market share fraction.  The qualification inherent in the use of the word "might," however, reflects the fact that revenues by customer by year could include payment for services that do not fall within the proposed Service Market.

60

necessary to establish the denominator – total sales in the Service Market.  Thus, the proposed discovery can not reasonably be expected to yield evidence sufficient to create a material issue of fact even as to defendants' market share.  But there is a more basic problem.

Defendants have placed in issue Emigra's ability to prove that its market share in the alleged Service Market – which includes all sales of immigration services provided to all corporations who are employers of U.S. citizens and/or foreign nationals – is sufficient to give rise to an inference of actual or dangerously probable market power, i.e., a share certainly no lower than 20 percent and probably no lower than 30 percent.[147]  Emigra thus has the burden of showing, for Rule 56(f) purposes, among other things, that there is a reasonable expectation that its proposed discovery would show that defendants' share of the alleged Service Market – that is, its share of all revenues from provision of immigration services to corporations who are employers of U.S. citizens and/or foreign nationals *by all providers, all over the world* – exceeds 20 percent.  Emigra has not even attempted to do so, even for the United States.  It therefore has failed to show a reasonable expectation that the proposed discovery would raise a genuine issue of material fact as to the existence of a market share that might, if all other considerations favored Emigra, give rise to an inference of market or monopoly power.

*VII.    The Pendent State Law Claims*

---

[147]

Judge Learned Hand famously said in *United States v. Alum. Co. of Am.,* 148 F.2d 416, 424 (2d Cir. 1945) (sitting as a court of last resort pursuant to 15 U.S.C. § 29, which at the time authorized the designation of a court of appeal as the final stop in certain antitrust actions), that market share of 90 percent "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not."  Our Circuit subsequently held that a market share of 20 percent, standing alone, is presumptively inadequate to permit a finding of dangerous probability of success and that even a share of 30 percent might be insufficient. *H.L. Hayden Co. of N.Y. v. Siemens Med. Systs., Inc.,* 879 F.2d 1005, 1018 (2d Cir. 1989).

61

Where a district court has dismissed before trial all claims over which it has original jurisdiction, the district court ordinarily should decline to exercise its supplemental jurisdiction and therefore dismiss pendent state claims without prejudice.[148]   All that remains of this case are Emigra's state law claims arising from the defendant's hiring of Ryan Freel. As there is no independent basis of federal jurisdiction over those claims, the proper place for their adjudication is in state court.  Accordingly, those claims will be dismissed without prejudice.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment dismissing the complaint [Docket Item 19] is granted.  The federal claims are dismissed on the merits and with prejudice.  The state law claims are dismissed for lack of subject matter jurisdiction

.

SO ORDERED.

Dated:        March 31, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[148]

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).